1   JOHNSON BOTTINI, LLP
    FRANK J. JOHNSON (174882)
2   frankj@johnsonbottini.com
    FRANCIS A. BOTTINI, JR. (175783)
3   frankb@johnsonbottini.com
    DEREK J. WILSON (250309)
4   derekw@johnsonbottini.com
    655 W. Broadway, Suite 1400
5   San Diego, CA 92101
    Telephone: (619) 230-0063
6   Facsimile: (619) 233-5535

7   Attorneys for Plaintiff

8

9                   UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11  MARY E. BARBOUR, AS TRUSTEE OF        ) Case No.
    THE MARY E. BARBOUR FAMILY            )
12  TRUST ONE, Derivatively On Behalf of  ) (Derivative Action)
    BROCADE COMMUNICATIONS                )
13  SYSTEMS, INC.,                        )
                                          ) VERIFIED SHAREHOLDER
14                      Plaintiff,        ) DERIVATIVE COMPLAINT FOR
                                          ) VIOLATIONS OF AND CONSPIRACY
15       vs.                              ) TO VIOLATE THE RACKETEER
                                          ) INFLUENCED AND CORRUPT
16  GREGORY L. REYES, DAVID L. HOUSE,     ) ORGANIZATIONS ACT; BREACHES
    MICHAEL KLAYKO, RICHARD               ) OF AND CONSPIRACY TO BREACH
17  DERANLEAU, KUMAR MALAVALLI,           ) FIDUCIARY DUTY; FRAUD; UNJUST
    ANTONIO CANOVA, MICHAEL J. BYRD,      ) ENRICHMENT; VIOLATIONS OF
18  STEPHANIE JENSEN, NEIL DEMPSEY,       ) CALIFORNIA CORPORATIONS CODE
    SANJAY VASWANI, L. WILLIAM            ) SECTIONS 25402 AND 25403; WASTE
19  KRAUSE, ROBERT R. WALKER, GLENN       ) OF CORPORATE ASSETS;
    C. JONES, MICHAEL J. ROSE, SETH D.    ) DECLARATORY RELIEF; BREACH OF
20  NEIMAN, NICHOLAS G. MOORE,            ) CONTRACT; PROFESSIONAL
    CHRISTOPHER B. PAISLEY, WILLIAM K.    ) NEGLIGENCE; AND LEGAL AND
21  O'BRIEN, LARRY SONSINI, MARK          ) ACCOUNTING MALPRACTICE
    LESLIE, TYLER WALL, RENATO A.         )
22  DIPENTIMA, JOHN W. GERDELMAN,         )
    KPMG, LLP, WILSON SONSINI             )
23  GOODRICH & ROSATI, P.C. AND DOES      )
    1-25, inclusive,                      )
24                                        )
                                          )
25                      Defendants,       )
                                          )
26       -and-                            )
                                          )
27  BROCADE COMMUNICATIONS                )
    SYSTEMS, INC., a Delaware corporation,)
28                                        )
                                          )
                        Nominal Defendant.) DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## INTRODUCTION

1.     This is a shareholder derivative action brought by a shareholder of Brocade Communications Systems, Inc. ("Brocade" or the "Company"), on behalf of the Company, against certain of its current and former officers, directors and outside lawyers and accountants.[1]

2.     This action arises out of the pervasive misappropriation of Brocade assets through the backdating of stock options -- facilitated by the direct and indirect manipulation of stock option grant dates, improper documentation and accounting, and false and misleading publicly-filed financial reports and the resulting damages to Brocade.  Specifically, certain of Brocade's executives and directors, aided and abetted by the Company's outside lawyers and accounting firm, oversaw a six-year scheme designed to pay undeserved and hidden equity-based compensation to certain employees, avoid accounting charges and taxation associated with such compensation, and lie to shareholders about their misconduct.  Two of those executives, defendants Gregory Reyes ("Reyes"), Brocade's former Chief Executive Officer ("CEO") and Chairman, and Stephanie Jensen ("Jensen"), Brocade's former Vice President of Human Resources, have been convicted following jury trials on multiple felony counts of violations of federal securities laws for their participation in the subterfuge. Reyes now will spend 21 months in a federal penitentiary and must pay a $15 million fine.  Jensen was sentenced to four months in prison and fined $1.25 million.

---

[1] Plaintiff bases her allegations herein upon information and belief, except those allegations concerning herself, which are based upon her personal knowledge.  Plaintiff's information and belief is derived from her counsel's investigation, which included counsel's review and analysis of the following:  (1) Brocade's filings with the United States Securities and Exchange Commission ("SEC"); (2) press releases, conference call transcripts, public statements, analyst reports, news articles and other publications by or pertaining to Brocade and the defendants named herein; and (3) pleadings, papers and any documents filed with and publicly available from the court's hearing on the criminal, SEC enforcement and civil matters described herein.  All allegations herein are based on such publicly-available sources of information.  Many of the additional facts supporting plaintiff's allegations herein are within the sole knowledge of defendants, or remain within their custody, control or possession.  Plaintiff believes that a reasonable opportunity for discovery will yield additional substantial evidentiary support for the allegations herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     3.    The defendants' participation in the illegal manipulation of Brocade's stock options,

2 which violated state and federal law as well as the Company's own shareholder-approved stock

3 option plans, has caused Brocade to incur massive damage.  This derivative action thus seeks to hold

4 those responsible for the Company's losses accountable for their actions, and alleges causes of action

5 against the individually-named defendants for: (a) violations of the federal Racketeer Influenced and

6 Corrupt Organizations Act ("RICO"); (b) multiple breaches of fiduciary duties owed to Brocade; (c)

7 engaging in a conspiracy to breach those duties; (d) fraud; (e) unjust enrichment; (f) violations of

8 state law prohibitions on insider selling codified in California Corporations Code sections 25402 and

9 25403; (g) corporate waste; (h) legal and accounting malpractice; and (i) a declaratory judgment that

10 certain defendants are not entitled to indemnification from Brocade.  This complaint concerns

11 misconduct that occurred from October 1999 to the present (the "Relevant Period").

<strong>NATURE AND SUMMARY OF THE ACTION</strong>

13     4.    Brocade was founded in 1995.  According to its website, Brocade "provides the

14 industry's leading platforms, solutions, and services for intelligently connecting, managing, and

15 optimizing IT resources in shared storage environments."  Brocade became a public company in

16 May 1999, which coincided with the "tech boom," a period during which companies specializing in

17 computer technology experienced rapid and substantial growth in revenues, profitability, and in the

18 size of operations.  Not wanting to be left behind, Brocade embarked upon a rapid expansion of its

19 operations, fueled in part by the illegal stock option backdating scheme detailed herein.  Between

20 October 1999 and October 2002, the Company hired over 1,150 employees, which increased the size

21 of its workforce more than six-fold.

22     5.    During the tech boom, Brocade faced fierce competition with other growing tech

23 companies over skilled workers – and stock options were the carrots that tech companies such as

24 Brocade used to attract new personnel.  A stock option allows the recipient of the option to purchase

25 company stock at a specified price – referred to as the "exercise price" – for a specified period of

26 time.  When the option recipient exercises the option, he or she purchases the stock from the

27 company at the exercise price, regardless of the stock's price at the time the option is exercised.  If

28 the exercise price is backdated to a price that is lower than the market price on the true grant date,

1  the option holder pays less for the share and the company receives less when the stock option is

2  exercised. As a result, the option holder enjoys a greater profit, while the company receives less

3  money.

4      6.      Defendant Reyes sought to get a leg up on Brocade's hiring competition by offering

5  backdated stock options to prospective employees. Reyes, who owned approximately 4,796,440

6  shares in the Company at the end of 1999, would personally benefit from any price appreciation in

7  Brocade's stock as a result of the growing workforce. The practice of "backdating," in which an

8  option grant date is directly or indirectly manipulated to reflect an earlier date when the stock price

9  was lower, guarantees that an employee receives an instant paper profit for his/her options.

10  Backdating is not technically illegal if: (i) the practice is clearly communicated to shareholders; (ii) it

11  does not violate a company's plans that define and authorize stock option grants; (iii) it is properly

12  accounted for and disclosed in the company's financial statements; and (iv) it is accurately reported

13  for tax purposes. Defendants, however, intentionally failed to follow any of these requirements.

14  Reyes' personal view of backdating, as expressed to a former human resources employee, was that

15  "*it's not illegal if you don't get caught.*"

16      7.      Defendant Reyes granted backdated stock options "as a committee of one" with

17  respect to the grant of stock options to non-executive employees. Reyes succumbed to pressure to

18  "resign" as CEO in January 2005. As the sole member of this "Compensation Committee," Reyes

19  even held "ad hoc" Board "meetings" with himself to approve his backdated options grants.

20  Wielding practically unchecked authority, Reyes granted many thousands of options to employees.

21  Brocade was eventually forced to recognize $375 million of expenses directly related to the illegally

22  backdated stock options. Reyes also falsified corporate records at Brocade and other documents in

23  an effort to cover up his misfeasance. Further, Brocade's auditors – first, Arthur Andersen, LLP

24  ("Arthur Andersen"), and later, defendant KPMG, LLP ("KPMG") – ignored evidence of the

25  backdated stock options when performing their audits.

26      8.      Reyes and Brocade's Compensation Committee also granted millions of backdated

27  stock options to Brocade executives and directors. For example, on April 17, 2001, this committee

28  (then comprised of defendants Neil Dempsey ("Dempsey") and Mark Leslie ("Leslie")) supposedly

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  met with Reyes to approve 8,461,967 stock options to eight Brocade executives, including Reyes

2  himself. This meeting, however, did not appear on Dempsey's and Leslie's personal calendars – and

3  Reyes was at the Boston Marathon on that day. The option grants were dated April 18, 2001, which

4  just happened to coincide with Brocade's lowest stock price for the month of April. These facts lead

5  to an inference as obvious as it is reasonable: these defendants intentionally fabricated the meeting

6  date and falsified the grant date of the options.

7       9.     From 1999 through 2005, defendant Reyes, assisted by defendant Jensen, other

8  Brocade executives and the Compensation Committee, continued to illegally falsify employment

9  records, meeting minutes and option grants to conceal the manipulation of the stock option grants

10 awarded to themselves, directors, executives and employees. Specifically, these defendants directed

11 personnel in Brocade's human resources department to pull the Company's historical stock prices off

12 the internet and used those prices to determine the date and price for a potential stock option grant

13 that would land at or near the stock's lowest pricing point during a particular period. The price of

14 Brocade shares on the reported option grant date, therefore, was lower than the share price on the

15 actual day options were issued, thus providing Brocade employees, prospective employees and

16 certain of the defendants with more favorably-priced, "in-the-money" options.

17      10.    The backdating scheme did not end there, however. Reyes, Jensen and Byrd, with the

18 blessing of the Board and Wilson Sonsini Goodrich & Rosati P.C. ("WSGR"), Brocade's outside

19 legal counsel, also concocted a so-called "part-time" program by which Reyes and many Brocade

20 executives could falsify a particular employee's hire date. Ostensibly, the purpose of the program

21 was to allow new hires to work for a few weeks on a part-time basis to transition into their Brocade

22 jobs. The real purpose of the part-time program, however, was to allow new hires to benefit from

23 having their stock options priced with the benefit of hindsight to maximize their personal profits.

24 Defendants Reyes, Jensen and Brocade human resources personnel would routinely fabricate the

25 start date of the individuals who were not yet Brocade employees to take advantage of a low pricing

26 point that appeared on Brocade's Yahoo! Finance stock price printout.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

11.     KPMG took over as Brocade's auditors on or about June 2002, and became aware of the part-time program shortly thereafter. The part-time program continued unabated until the end of 2002.

12.     Despite his knowledge of the illegal conduct of Reyes, Jensen and the Board, and the dramatically negative accounting implications for Brocade, defendant Antonio Canova ("Canova"), the Company's Chief Financial Officer ("CFO") between mid-2001 and mid-December 2005, refused to blow the whistle on the defendants' actions. Instead, he became a willing, active participant in the improper backdating scheme. Canova instructed Brocade's finance department personnel to ensure that the dates used for option grants in the fabricated Compensation Committee minutes were consistent with the Company's financial records. Defendants Reyes and Canova then made and certified publicly-filed financial statements that misrepresented Brocade's earnings, compensation expense and employee stock option practices. When Brocade's stock option scandal was publicly disclosed (at least in part) in 2004, Canova was revealed to be one of the primary wrongdoers who attempted to eliminate his own liability and that of the Board for the illegal conduct. For example, when the internal investigation of backdating at Brocade first arose in 2004, Canova feebly insisted to investigators that Brocade's stock option accounting treatment had been correct and that there was no need for restatement. Canova also engaged in obstructionist tactics and lied during two Audit Committee investigations. When Canova's scheming failed and Brocade was forced to restate its financial results to make additional disclosures concerning the illegal stock option backdating, Canova was eventually forced to resign in December 2005.

13.     Defendant Michael J. Byrd ("Byrd"), Canova's predecessor as CFO, also was a major participant in the backdating activity. Initially hired as CFO in 1999, he was later promoted to Chief Operating Officer ("COO") and President, positions he held until he left Brocade in 2003. Byrd himself was a principal architect of the part-time program at Brocade. Together with Jensen, Byrd also selected dates for the backdated stock options. As a result, in-the-money options were granted to such executives without being properly accounted for in Brocade's publicly-filed financial statements. Through his knowledge of Reyes' improper backdating activity – and his own participation in the scheme – Byrd was an essential participant and co-conspirator in the illegal

1   conduct, which led to Brocade filing financial statements in which the Company materially

2   understated its compensation expenses and falsely represented that it had incurred no costs for stock

3   option grants.

4       14.    As a result of these defendants' backdating practices, thousands of employees and

5   certain of the defendants received favorably valued -- and falsely dated -- stock option grants. For

6   example, during FY:04, Reyes made thirty-two option grants. Of those grants, nineteen grants went

7   to over 1,000 employees (representing options to purchase a total of approximately 16 million

8   shares), that were priced at the weekly low closing price for Brocade's stock -- and for an additional

9   three grants, within just $0.03 of the weekly low.

10      15.    Throughout the Relevant Period during which Reyes and others were harming

11  Brocade, the Board consciously disregarded the looming mountain of falsified and internally

12  inconsistent paperwork; KPMG disregarded the backdated stock option entries found not only on its

13  own workpapers, but also on those it had received from Arthur Andersen; and WSGR dispensed

14  grossly improper legal advice, including advice concerning the part-time program. As a result, these

15  illicit stock option backdating practices went undisclosed for almost seven years. And the scheme

16  would have remained undisclosed if it had not been for Dan Cudgma ("Cudgma"), a Brocade

17  employee who blew the whistle on the illegal stock option backdating at the Company.

18      16.    After Cudgma filed a complaint detailing the backdating at Brocade, the Audit

19  Committee initiated an investigation and retained WSGR to purportedly conduct a preliminary

20  investigation -- wholly ignoring the fact that WSGR had been Brocade's long-time outside general

21  counsel during the backdating activity at the Company and that its founding partner -- Larry Sonsini

22  ("Sonsini") -- was a board member during the wrongdoing. The Audit Committee later retained

23  Morrison & Foerster LLP ("Morrison") in connection with the investigation. Morrison attorneys

24  eventually interviewed defendants Jensen and Reyes. During his interviews, however, Reyes

25  repeatedly lied about his involvement in the backdating scheme.

26      17.    According to a February 13, 2006 article in Business Week, at some point in or about

27  November 2004, Reyes and others initiated a process to seek to sell Brocade to Cisco Systems, Inc.

28  ("Cisco"). *See* Peter Burrows, *Brocade Stung by Stock Options*, BUSINESS WEEK, Feb. 13, 2006. A

1  successful sale of the Company potentially could have expunged defendants of their liability to

2  Brocade for the stock option manipulations then under investigation by the Audit Committee. This

3  article noted that Reyes "was in the final stages of selling Brocade to Cisco Systems Inc. for $9 per

4  share," when talks between the two companies broke down after the Board disclosed the ongoing

5  investigation into the stock option backdating at Brocade. The article stated that "Cisco got cold feet

6  after finding the accounting irregularities on its own but confirm that Reyes' departure two months

7  later further diminished its interest."

8      18.    On January 24, 2005, the Company publicly announced the completion of the Audit

9  Committee's internal review. As a result of this investigation, the Audit Committee concluded there

10  was an "insufficient basis to rely on the Company's process and related documentation to support

11  recorded measurement dates used to account for certain stock options granted prior to August 2003."

12      19.    On January 31, 2005, Brocade filed a restatement of its fiscal 2002 and 2003 financial

13  statements to correct understated equity-based compensation expense of $303 million associated

14  with the manipulated stock options. This restatement was rushed and deficient, however. On

15  November 14, 2005, Brocade was forced to file a second restatement of its fiscal 1999 through 2004

16  financial statements to correct an additional $72 million in equity-based compensation expenses.

17  Even after these two restatements, the Board refused to take affirmative action against the

18  wrongdoers. In fact, the Board has done the opposite. During May 2006, the Board approved a

19  tender offer whereby the recipients of backdated options were allowed to exchange their options for

20  a cash payment. This tender offer cost Brocade approximately $3.5 to $4.5 million.

21      20.    The backdating of stock options at Brocade has resulted in substantial private civil

22  litigation, as well as criminal actions against Reyes and Jensen and civil enforcement actions

23  initiated by the SEC.

24          a.    *Criminal actions against Reyes and Jensen.* On July 20, 2006, the United

25  States Attorney for the Northern District of California filed criminal charges against Reyes and

26  Jensen. *See United States of America v. Reyes*, No. 3:06-cr-00556-CRB-1 & 2 (N.D. Cal. Jul. 20,

27  2006). After a full trial, and in the first U.S. felony criminal conviction by a jury arising out of the

28  backdating of stock options, Reyes was convicted on August 7, 2007 of one count of conspiracy, one

- 7 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   count of securities fraud, three counts of filing false documents with the SEC, one count of falsifying

2   Brocade's books and records, and four counts of lying to an accountant. Following the conviction,

3   the U.S. Attorney stated that "the evidence at trial proved that [Reyes] intentionally falsified

4   Brocade's corporate records over a four-year period to avoid recognizing compensation expenses for

5   in-the-money stock option grants that materially misstated Brocade's publicly filed income

6   statements." Facing incarceration of up to twenty years, Reyes was sentenced to twenty-one months

7   in prison and ordered to pay a $15 million fine. Jensen fared no better. She was convicted following

8   a jury trial on December 5, 2007 of two criminal counts — conspiracy to falsify books, records and

9   accounts in violation of 18 U.S.C. §371; and falsifying books, records and accounts in violation of

10  15 U.S.C. §§78m(b)(2)(A), 78M(b)(5), and 78ff, 17 C.F.R. §240.13b2-1, all arising out of her role in

11  the illegal employee compensation scheme that took place at Brocade. Jensen was sentenced to four

12  months in prison and ordered to pay a $1.25 million fine.

13          b.      *Enforcement actions filed by the SEC against Reyes, Jensen, Canova and*

14  *Byrd.* On July 20, 2006, the SEC filed civil charges against defendants Reyes, Jensen and Canova.

15  The SEC alleged that these three defendants concealed millions of dollars in expenses in order to

16  benefit themselves, certain employees, officers and directors by falsifying various records relating to

17  employee stock option grants. *See Securities and Exchange Comm'n v. Reyes*, No. 06-4435-CRB

18  (N.D. Cal. Jul. 20, 2006) (the "SEC Action"). Last summer, the SEC filed a new enforcement action

19  against Byrd arising out of his role in the backdating activity at Brocade. The complaint against

20  Byrd was subsequently consolidated into the SEC Action. *See Securities and Exchange Comm'n v.*

21  *Byrd*, No. 3:07-cv-04223-CRB (N.D. Cal. Aug. 17, 2007).

22          c.      *SEC enforcement action filed against Brocade.* Since at least mid-2006,

23  Brocade had been in negotiations with the SEC to resolve a contemplated enforcement action against

24  the Company. In May 2007, the SEC filed an enforcement action against Brocade. *See Securities*

25  *and Exchange Comm'n v. Brocade Comm'ns Sys., Inc.*, No. 3:07-cv-02821-CRB (N.D. Cal. May 31,

26  2007). On August 27, 2007, a final judgment was entered against Brocade based on a settlement

27

28

1  between the Company and the SEC. In addition to a variety of permanent injunctive relief, Brocade

2  was ordered to pay a civil penalty of $7 million within ten days after entry of judgment.[2]

3         d.    *Shareholder class actions against Brocade and the individual defendants.*

4  Shortly after the Company announced that it would need to file a second restatement of its financial

5  results for a portion of the Relevant Period to reflect additional stock-based compensation expense

6  that had been hidden from the public, a series of now-consolidated class actions were commenced

7  against Brocade and Reyes, Canova, Sonsini, Seth D. Neiman ("Neiman") and Dempsey. *See In re*

8  *Brocade Securities Litig.*, Consolidated Case No. 3:05-cv-02042-CRB (N.D. Cal. May 19, 2005)

9  (the "Federal Securities Class Action").[3]  The Court has denied motions to dismiss filed by all

10  defendants.  This action is still pending and has caused Brocade to expend millions of dollars to

11  defend the case.

12         e.    *State and federal court shareholder derivative actions.*  In May 2005, a

13  Brocade shareholder filed the first of three related state court derivative actions arising out of the

14  restatement and stock option backdating activity.  All three actions are now consolidated in the

15  Superior Court of California, County of Santa Clara.  *See In re Brocade Comm'ns Sys., Inc.*

16  *Derivative Litig.*, Lead Case No. 1-05-cv-041683 (the "State Derivative Action").  About a week

17  after the first such action was filed, a Brocade shareholder brought the first of four derivative actions

18  filed in the U.S. District Court for the Northern District of California. All of such actions were later

19  consolidated.  *See In re Brocade Comm'ns Sys., Inc. Derivative Litig.*, Lead Case No. 3:05-cv-

20

21

22  [2] The judgment permanently enjoins Brocade from violating the following: (1) Section 17(a) of the
    Securities Act, 15 U.S.C. §77q(a); (2) Section 10(b) of the Securities and Exchange Act of 1934 (the
23  "Exchange Act"), 15 U.S.C. § 8j(b) and Rule 10b-5 thereunder (17 C.F.R. §240.10b-5); (3) Section
    13(a) of the Exchange Act, 15 U.S.C. § 18m(a) and Rules 12b-20, 13a-1, 13a-11, 13a-13 thereunder
24  (17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13); and (4) Sections 13(b)(2)(A) and
    13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B).
25

26  [3] On October 23, 2007, a new class action arising out of the backdating activity at Brocade was
    filed.  *See Huang v. Reyes et al.*, Santa Clara Superior Court case no. 1:07-cv-097163.  On
    November 26, 2007, Brocade removed the action to the U.S. District Court for the Northern District
27  of California.  *See Huang v. Reyes et al.*, case no. 3:07-cv-05950-CRB.  On March 6, 2008, the
    Court denied a motion to dismiss and remanded this action to state court, where it is currently
28  pending.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  02233-CRB (the "Federal Derivative Action"). The derivative actions in both venues are still

2  pending.

3      21.    Despite the pendency of the above-described actions, during June 2006, the Board –

4  counseled by WSGR and Brocade's in-house general counsel, defendant Tyler Wall ("Wall") –

5  directed Brocade to enter into a highly premature and improper settlement of the derivative claims

6  alleged in the Federal Derivative Action and State Derivative Action. According to the Amended

7  Stipulation of Settlement that sets forth the terms of the Proposed Settlement, plaintiffs in the

8  Federal Derivative Action agreed to release all defendants (except Reyes) in the Federal Derivative

9  Action for *all derivative claims* alleged prior to January 2006 in exchange for some illusory

10  corporate therapeutics and $525,000 in attorney's fees (the "Proposed Settlement").[4] Under the terms

11  of the Proposed Settlement, Brocade would have received absolutely no compensation at all for the

12  hundreds of millions of dollars in damages it has suffered and continues to incur. Moreover, the

13  Proposed Settlement would have released all derivative claims relating to defendants' backdating of

14  stock options without providing for any monetary recovery to Brocade.

15      22.    As a result of the defendants' improprieties, the Company has suffered massive

16  damages, has expended millions of dollars, and will continue to do so as a result of the devastating

17  consequences of the illicit backdating activity. These damages include the exhaustion of Brocade's

18  applicable insurance coverage; costs of over $73 million paid to outside counsel, accounting firms

19  and consultants to prepare the restatements, respond to the governmental investigations and

20  enforcement actions, and advance legal fees incurred by the wrongdoers – Brocade's officers and

21  directors; $7 million in fines in connection with the governmental investigations; and enforcement

22  actions; and approximately $3.5 to $4.5 million paid in the tender offer. Additionally, Brocade faces

23  millions of dollars in potential legal liability from the Federal Securities Class Action and its market

24  capitalization has been damaged by over $9.1 billion. Moreover, Brocade has advanced at least

25

26

27

28  [4] The Amended Stipulation of Settlement is set forth at Docket No. 107 in the Federal Derivative
    Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  $46,709,323 in legal fees and expenses to Reyes and $7,140,253 in legal fees and expenses to Jensen

2  for their legal defenses.

3      23.    Certain of the defendants have fared much better than Brocade by selling over *$1.5*

4  *billion* worth of their Brocade stock while in possession of material, non-public information about

5  the stock option backdating and false financial statements.

6                             **JURISDICTION AND VENUE**

7      24.    This Court has jurisdiction in this case arising under Article III of the United States

8  Constitution and 28 U.S.C. §1331 because of claims arising under RICO, 18 U.S.C. §§1962(c) and

9  1964. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other

10  claims that are so related to claims in the action within such original jurisdiction that they form part

11  of the same case or controversy under Article III of the United States Constitution.

12      25.    This Court has jurisdiction over each defendant named herein because each defendant

13  is either a corporation that conducts business in and maintains operations in this District, or is an

14  individual who has sufficient minimum contacts with this District so as to render the exercise of

15  jurisdiction by the District courts permissible under traditional notions of fair play and substantial

16  justice.

17      26.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Brocade

18  maintains its principal place of business in the District; (ii) one or more of the defendants either

19  resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions

20  and wrongs complained of herein, including the defendants' primary participation in the wrongful

21  acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to

22  Brocade occurred in this District; and (iv) defendants have received substantial compensation in this

23  District by doing business here and engaging in numerous activities that had an effect in this District.

24                             **THE PARTIES**

25      27.    At the time of the transaction complained of herein, the Mary E. Barbour Family

26  Trust One was an owner and holder of Brocade common stock. Plaintiff Mary E. Barbour brings

27  this action solely in her capacity as trustee of said trust. Plaintiff continues to hold Brocade common

28  stock.

28.    Nominal defendant Brocade is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 1745 Technology Drive, San Jose, California. Brocade was founded in 1995 and designs, develops, markets, sells and supports data storage networking products and services. During the beginning portion of the Relevant Period, Brocade was a California corporation.

29.    Defendant Reyes was Brocade's CEO from July 1998 to January 2005. Reyes was also Brocade's President from July 1998 to May 2001; Brocade's Chairman of the Board from May 2001 to January 2005; a Brocade director from July 1998 to April 2005; and an advisor to Brocade from January 2005 to July 2005. As alleged herein, Reyes was a chief architect and engineer of the stock option backdating at Brocade, and was recognized as such on August 7, 2007, when a jury convicted him on multiple felony charges stemming from his misconduct. Reyes also received at least 10,532,133 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Reyes backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Reyes sold 10,183,063 of his personally-held shares for $580,227,132.41 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid defendant Reyes the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2005 | $112,273 | - | | $262,560 |
| 2004 | $506,667 | $344,824 | 1,600,000 | $4,350 |
| 2003 | $500,000 | - | 1,703,214 | $4,141 |
| 2002 | $500,000 | - | - | $2,385 |
| 2001 | $500,000 | $74,250 | 10,032,133 | $2,175 |
| 2000 | $360,000 | $1,615,800 | 1,040,000 | $2,105 |
| 1999 | $200,000 | $150,000 | - | $576 |
| 1998 | $60,606 | | 12,285,296 | $480 |

30.    Defendant David L. House ("House") is Brocade's Chairman of the Board and has been since December 2005, and is a Brocade director and has been since 2004. House was Brocade's Executive Chairman of the Board from January 2005 to December 2005. He also is a member of Brocade's Compensation Committee and has been since January 2006. House also sat on

- 12 -

1  the Compensation Committee from November 2004 to January 2005. Because of House's positions,

2  he knew or should have known that Brocade executives were improperly backdating stock option

3  grants to maximize their personal profits, via access to internal corporate documents, conversations

4  and connections with other corporate officers and employees, attendance at management and Board

5  meetings and committees thereof and via reports and other information provided to him in

6  connection therewith.

7      31.    Defendant Michael Klayko ("Klayko") is Brocade's CEO and a Brocade director, and

8  has been since January 2005. Klayko was Brocade's Vice President, Worldwide Sales from May

9  2004 to January 2005; Vice President, Worldwide Marketing and Support from April 2003 to May

10  2004; and Vice President, OEM Sales from January 2003 to April 2003. Because of Klayko's posi-

11  tions, he knew or should have known that Brocade executives were improperly backdating stock

12  option grants to maximize their personal profits, via access to internal corporate documents, conver-

13  sations and connections with other corporate officers and employees, attendance at management

14  meetings and Board meetings and committees thereof and via reports and other information provided

15  to him in connection therewith. Klayko sold 408,000 of his personally-held shares for $2,061,440 in

16  proceeds while in possession of material, non-public information concerning the illegally-

17  undisclosed backdating stock option grant practices. Brocade paid defendant Klayko the following

18  compensation:

19
| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $605,000 | - | $1,042,457 | - | $1,125,975 | 1,299,314 | $18,333 |
| 2006 | $540,000 | $1,743,050 | $779,999 | 166,667 | - | - | $22,403 |
| 2005 | $481,364 | $341,951 | - | 1,600,000 | - | - | $3,587 |
| 2004 | $283,333 | $195,230 | - | 575,000 | - | - | $4,664 |
| 2003 | $175,000 | $42,464 | - | 713,781 | - | - | $3,324 |

23      32.    Defendant Richard Deranleau ("Deranleau") is Brocade's Chief Financial Officer

24  ("CFO") and has been since May 2006. Deranleau also is a Brocade Vice President and has been

25  since November 2005. Deranleau was Brocade's interim CFO from December 2005 to May 2006,

26  and Brocade's Controller and Treasurer from May 2003 to December 2005. Because of Deranleau's

27  positions, he knew or should have known that Brocade executives were improperly backdating stock

28  option grants to maximize their personal profits, via access to internal corporate documents,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  conversations and connections with other corporate officers and employees, attendance at

2  management meetings and committees thereof and via reports and other information provided to him

3  in connection therewith.  Deranleau sold 2,784 of his personally-held shares for $17,807.60 in

4  proceeds while in possession of material, non-public information concerning the illegally-

5  undisclosed backdating stock option grant practices.  Brocade paid defendant Deranleau the

6  following compensation:

7
8

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $327,803 | - | $415,152 | - | $595,843 | 336,820 | $41,735 |
| 2006 | $265,035 | $473,096 | $337,500 | 56,250 | - | - | $46,921 |
| 2005 | $206,766 | $81,845 | - | 80,000 | - | - | $2,154 |
| 2004 | $187,968 | $73,415 | - | 5,750 | - | - | $2,087 |

9
10

11  33.    Defendant Kumar Malavalli ("Malavalli") was Brocade's Vice President, Technology

12  from October 1995 until at least September 2000.  Malavalli was a founder of Brocade and was

13  involved with the establishment of the "committee of one."  Because of Malavalli's position, he knew

14  or should have known that Brocade executives were improperly backdating stock option grants to

15  maximize their personal profits, via access to internal corporate documents, conversations and

16  connections with other corporate officers and employees, attendance at management meetings and

17  committees thereof and via reports and other information provided to him in connection therewith.

18  Malavalli received at least 106,000 options that were dated at or very close to the lowest stock price

19  for the month during which options were granted.  Accordingly, on information and belief, plaintiff

20  alleges that Malavalli backdated these stock options and received illegal compensation from Brocade

21  that was not disclosed to the Company's shareholders.  Malavalli sold 693,950 of his personally-held

22  shares for $131,473,111 in proceeds while in possession of material, non-public information

23  concerning the illegally-undisclosed backdating stock option grant practices.  Brocade paid

24  defendant Malavalli the following compensation:

25
26

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 1999 | $167,160 | $21,071 | 134,000 | $475 |
| 1998 | $162,840 | $13,027 | - | $1,188 |

27

28

34.    Defendant Canova was Brocade's CFO from May 2001 to December 2005; Vice President, Administration from November 2004 to December 2005; and Vice President, Finance from May 2001 to November 2004. Canova remained an employee of Brocade until January 2006. Because of Canova's position as CFO he knew that Brocade executives were improperly backdating stock option grants to maximize their personal profits. For example, during April 2001, Canova received an e-mail from defendant Jensen that revealed that Brocade was regularly granting stock options at the lowest stock price between meetings when options were granted. Canova also knew from e-mail that Brocade's part-time program was a vehicle for granting backdated options to newly-hired employees. Despite this knowledge, Canova took no action to expose the backdating at Brocade. In fact, Canova actively participated in the backdating. Canova received at least 556,506 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Canova backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Canova is currently facing civil charges from the SEC regarding his participation in the backdating scheme at Brocade. Canova sold 4,903 of his personally-held shares for $31,526.29 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid defendant Canova the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2005 | $331,250 | $154,258 | 175,000 | $2,235 |
| 2004 | $252,050 | $151,750 | 375,000 | $3,863 |
| 2003 | $238,525 | $55,826 | 695,149 | $3,593 |
| 2002 | $235,000 | $36,954 | - | $2,004 |
| 2001 | $202,790 | $15,477 | 916,506 | $1,897 |

35.    Defendant Byrd was Brocade's President and COO from May 2001 to January 2003. Byrd was also Brocade's Vice President, Finance, and CFO from April 1999 to May 2001. As Canova's predecessor, he knew that Brocade executives were improperly backdating stock option grants to maximize their personal profits and actively participated in the backdating scheme. On several occasions, Byrd – together with defendant Jensen – selected low stock price dates for

- 15 -

1  backdated options. Byrd also knew that the part-time program was a vehicle for granting backdated

2  options to Brocade new hires and approved one such backdated grant for new hire Richard Geruson.

3  Byrd received at least 1,848,768 options that were dated at or very close to the lowest stock price for

4  the month during which options were granted. Accordingly, on information and belief, plaintiff

5  alleges that Byrd was involved in the backdating of these stock options and received illegal

6  compensation from Brocade that was not disclosed to the Company's shareholders. Byrd sold

7  653,380 of his personally-held shares for $73,068,872 in proceeds while in possession of material,

8  non-public information concerning the illegally-undisclosed backdating stock option grant practices.

9  Byrd is currently facing civil charges from the SEC in regards to his participation in the backdating

10  scheme at Brocade. Brocade paid defendant Byrd the following compensation:

11

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2002 | $325,000 | - | - | $720 |
| 2001 | $304,205 | $31,955 | 1,806,268 | $560 |
| 2000 | $250,000 | $413,900 | 85,000 | $420 |
| 1999 | $100,000 | - | 2,640,000 | $576 |

15      36.     Defendant Jensen was Brocade's Vice President of Human Resources from October

16  1999 to February 2004. Jensen was also a Brocade consultant from February 2004 to August 2004.

17  Jensen knew that Brocade executives were improperly backdating stock option grants to maximize

18  their personal profits because she was one of the principal actors in the backdating scheme. Among

19  other things, Jensen selected the dates for backdated grants and concealed those grants by falsifying

20  employment records, meeting minutes and option grant documents. Jensen also knew about, and

21  actively directed, Brocade's part-time program, which was a vehicle for backdating grants to newly-

22  hired personnel. Jensen was convicted of multiple felony counts for violations of the federal

23  securities laws and currently faces civil charges from the SEC.

24      37.     Defendant Dempsey was a Brocade director from 1995 to April 2007. Dempsey was

25  a member of Brocade's Compensation Committee from at least 2000 to April 2007, and was

26  Chairman of Brocade's Compensation Committee from 2005 to April 2007. Dempsey was a

27  member of the Audit Committee from at least 2000 to 2004. Because Dempsey was a member of the

28  Compensation Committee throughout the backdating, he knew that Brocade executives were

- 16 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  improperly backdating stock option grants to maximize their personal profits. As a Compensation

2  Committee member, he approved those backdated grants. For example, on April 17, 2001, Dempsey

3  and defendant Leslie supposedly met with Reyes to approve 8,461,967 shares underlying option

4  grants to eight Brocade executives, including Reyes himself. This meeting, however, did not appear

5  on Dempsey's and Leslie's personal calendars -- and Reyes was at the Boston Marathon on that day.

6  Dempsey sold 136,824 of his personally-held shares for $15,205,898.50 in proceeds while in

7  possession of material, non-public information concerning the illegally-undisclosed backdating stock

8  option grant practices.

9      38.    Defendant Sanjay Vaswani ("Vaswani") is a Brocade director and has been since

10  April 2004. Vaswani is also Chairman of Brocade's Compensation Committee and has been since

11  2007, and a member of Brocade's Compensation Committee and has been since 2004. Because of

12  Vaswani's positions, he knew or should have known that Brocade executives were improperly

13  backdating stock option grants to maximize their personal profits, via access to internal corporate

14  documents, conversations and connections with other corporate officers and employees, attendance

15  at Board meetings and committees thereof and via reports and other information provided to him in

16  connection therewith.

17      39.    Defendant L. William Krause ("Krause") is a Brocade director and has been since

18  2004. Krause is also a member of Brocade's Compensation Committee and has been since 2004.

19  Krause was a member of Brocade's Audit Committee from 2005 to April 2006. Because of Krause's

20  positions, he knew or should have known that Brocade executives were improperly backdating stock

21  option grants to maximize their personal profits, via access to internal corporate documents,

22  conversations and connections with other corporate officers and employees, attendance at Board

23  meetings and committees thereof and via reports and other information provided to him in

24  connection therewith.

25      40.    Defendant Robert R. Walker ("Walker") is a Brocade director and has been since

26  April 2005. Walker is also Chairman of Brocade's Audit Committee and has been since April 2006,

27  and a member of Brocade's Audit Committee and has been since April 2005. Walker had actual

28  knowledge that Brocade executives were improperly backdating stock option grants to maximize

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | their personal profits, since he was advised of the Audit Committee investigation results.

2 | Nonetheless, he wrongfully approved the settlement of the Federal Derivative Action.

3 |     41.    Defendant Glenn C. Jones ("Jones") is a Brocade director and has been since April

4 | 2006. Jones is also a member of Brocade's Audit Committee and has been since April 2006. Jones

5 | had actual knowledge that the Brocade executives were improperly backdating stock option grants to

6 | maximize their personal profits, since he was advised of the audit committee investigation results.

7 | Nonetheless, he wrongfully approved the settlement of the Federal Derivative Action.

8 |     42.    Defendant Michael J. Rose ("Rose") is a Brocade director and has been since April

9 | 2006. Rose is also a member of the Audit Committee and has been since April 2006. Rose had

10 | actual knowledge that the Brocade executives were improperly backdating stock option grants to

11 | maximize their personal profits, since he was advised of the audit committee investigation results.

12 | since he was advised of the audit committee investigation results. Nonetheless, he wrongfully

13 | approved the settlement of the Federal Derivative Action.

14 |     43.    Defendant Seth D. Neiman ("Neiman") was Brocade's Chairman of the Board from

15 | August 1995 to May 2001. Neiman was also Brocade's CEO from August 1995 to June 1996 and a

16 | Brocade director from 1995 to April 2006. Neiman was a member of Brocade's Compensation

17 | Committee from 2002 to 2004, and a member of Brocade's Audit Committee from at least 2000 to

18 | 2001. Because Neiman was a member of the Compensation Committee throughout the backdating,

19 | he knew that Brocade executives were improperly backdating stock option grants to maximize their

20 | personal profits. As a Compensation Committee member, he approved those backdated grants.

21 | Neiman sold 1,100,445 of his personally-held shares for $250,579,947.73 in proceeds while in

22 | possession of material, non-public information concerning the illegally-undisclosed backdating stock

23 | option grant practices.

24 |     44.    Defendant Nicholas G. Moore ("Moore") was a Brocade director from April 2003 to

25 | November 2005. Moore was also a member of Brocade's Audit Committee from 2003 to November

26 | 2005. Because of Moore's positions, he knew or should have known that Brocade executives were

27 | improperly backdating stock option grants to maximize their personal profits, via access to internal

28 | corporate documents, conversations and connections with other corporate officers and employees,

1  attendance at Board meetings and committees thereof and via reports and other information provided

2  to him in connection therewith.

3       45.    Defendant Christopher B. Paisley ("Paisley") was a Brocade director from August

4  2002 to April 2006. Paisley was also Chairman of the Audit Committee from August 2002 to April

5  2006. Because of Paisley's positions, as well as his extensive, expert knowledge of applicable

6  accounting standards, he knew or should have known that Brocade executives were improperly

7  backdating stock option grants to maximize their personal profits, via access to internal corporate

8  documents, conversations and connections with other corporate officers and employees, attendance

9  at Board meetings and committees thereof and via reports and other information provided to him in

10  connection therewith.

11       46.    Defendant William K. O'Brien ("O'Brien") was a Brocade director from July 2004 to

12  January 2005. O'Brien was a member of Brocade's Audit Committee from October 2004 to February

13  2005 and a member of the Compensation Committee from November 2004 to December 2004.

14  Because of O'Brien's positions, he knew or should have known that Brocade executives were

15  improperly backdating stock option grants to maximize their personal profits, via access to internal

16  corporate documents, conversations and connections with other corporate officers and employees,

17  attendance at Board meetings and committees thereof and via reports and other information provided

18  to him in connection therewith.

19       47.    Defendant Sonsini was a director of Brocade from January 1999 to March 2005.

20  Sonsini was also a member of Brocade's Audit Committee from 2001 to 2003. Further, Sonsini's

21  law firm, WSGR, acted as principal legal counsel to Brocade. Additionally, Sonsini was considered

22  to be the law expert on the Board. Defendant Sonsini held 144,232 shares of Brocade stock as of

23  February 28, 2005. Because of Sonsini's positions on the Board as well as the role that he and his

24  law firm played as Brocade's long-time general outside legal counsel, he knew or should have known

25  that Brocade executives were improperly backdating stock option grants to maximize their personal

26  profits, via access to internal corporate documents, conversations and connections with other

27  corporate officers and employees, attendance at Board meetings and committees thereof and via

28  reports and other information provided to him in connection therewith. Sonsini sold 12,500 of his

1  personally-held shares for $1,738,562.50 in proceeds while in possession of material, non-public

2  information concerning the illegally-undisclosed backdating stock option grant practices.

3          48.    Defendant Leslie was a Brocade director from January 1999 to May 2002. Leslie was

4  a member of Brocade's Audit Committee in 2002 and a member of the Compensation Committee

5  from 2000 to 2001. Because Leslie was a member of the Compensation Committee throughout the

6  backdating, he knew that Brocade executives were improperly backdating stock option grants to

7  maximize their personal profits. As a Compensation Committee member, he approved those

8  backdated grants. Leslie sold 432,612 of his personally-held shares for $32,284,184.58 in proceeds

9  while in possession of material, non-public information concerning the illegally-undisclosed

10 backdating stock option grant practices.

11         49.    Defendant Wall is Brocade's Vice President and General Counsel and has been since

12 June 2005. Wall is also Brocade's Chief Compliance Officer and Corporate Secretary and has been

13 since July 2005. On information and belief, Wall negligently supplied erroneous and ill-advised

14 legal advice to Brocade for the Company to enter into the Proposed Settlement and to seek

15 preliminary and final approval of such Proposed Settlement from the Court, despite the fact that the

16 Proposed Settlement did not and does not represent a fair, reasonable or adequate resolution of the

17 claims asserted in the Federal Derivative Action or State Derivative Action. Defendant Wall

18 currently holds approximately 123,372 Brocade shares.

19         50.    Defendant Renato A. DiPentima ("DiPentima") is a Brocade director and has been

20 since January 2007. DiPentima was appointed to the Board in connection with Brocade's acquisition

21 of McDATA Corporation.

22         51.    Defendant John W. Gerdelman ("Gerdelman") is a Brocade director and has been

23 since January 2007. Gerdelman is also a member of Brocade's Compensation Committee and has

24 been since February 2007. Gerdelman was appointed to the Board in connection with Brocade's

25 acquisition of McDATA Corporation.

26         52.    Defendant KPMG was engaged by Brocade to provide independent auditing and/or

27 consulting services to Brocade, including the preparation, examination and/or review of Brocade's

28 annual and interim financial statements for the period of time from 2002 to the present, which

1  financial statements were disseminated to Brocade shareholders and filed with the SEC. KPMG was

2  engaged to perform and performed these services so that Brocade's financial statements would be

3  presented to, and reviewed and relied upon by Brocade shareholders, governmental agencies, the

4  investing public and members of the financial community. As a result of the services it rendered to

5  Brocade, KPMG's representatives were frequently present at Brocade's corporate headquarters and

6  financial offices from 2002 to the present, and had virtually limitless access to Brocade's confidential

7  corporate financial and business information, including information concerning Brocade's executive

8  compensation and stock option practices along with Brocade's true financial condition which KPMG

9  was aware of and/or negligently disregarded. KPMG personnel also received and reviewed audit

10  work papers created by or at the direction of Arthur Andersen, which had been engaged by Brocade

11  to perform independent auditing and/or consulting services to the Company prior to the retention of

12  KPMG. Said work papers directly disclosed the existence of backdated stock options at Brocade.

13  KPMG actively participated in the presentation, review and issuance of Brocade's false financial

14  statements. KPMG issued unqualified audit reports on Brocade's financial statements for the period

15  from 2002 to the present. KPMG also reviewed the Company's interim financial statements.

16  Despite the fact that KPMG performed grossly negligent or reckless audits for Brocade, and

17  recklessly or intentionally ignored evidence of the backdating of stock options, the Brocade directors

18  have failed to fire KPMG.

19      53.    Defendant WSGR is engaged by Brocade as the Company's outside counsel. In that

20  capacity, WSGR provided legal advice with respect to the granting, documenting, accounting and

21  reporting of stock options issued by Brocade including the implementation of a so-called part-time

22  employment program designed and implemented from its inception to facilitate the backdating of

23  stock option grants for new hires and to surreptitiously falsify Brocade's overall treatment of the

24  accounting for stock option grants. On information and belief, WSGR also counseled that Brocade

25  attempt to sell itself to Cisco in order to expunge defendants' liability for the stock options

26  manipulation. When that transaction fell apart, WSGR counseled that Brocade enter into the

27  Proposed Settlement, which would provide for illusory corporate governance reforms and no

28  monetary compensation for the Company in exchange for a broad release for the vast majority of

1  defendants herein. WSGR also acted as counsel of record for Brocade in the Federal Derivative

2  Action, the State Derivative Action, and the securities fraud class action. By May 2007, however, in

3  direct response to a motion to disqualify WSRG filed by plaintiffs in the State Derivative Action,

4  WSGR withdrew as Brocade's counsel in the State Derivative Action. In September 2007, after a

5  hearing on plaintiffs' motion to disqualify WSGR in the State Derivative Action. WSGR also was

6  forced to withdraw from representing the indivdual defendants in the case. WSGR, however,

7  remains as Brocade's general outside counsel for other matters.

8      54.    The defendants identified in ¶¶29-31, 37-48, 50-51 may be referred to herein as the

9  "Director Defendants." The defendants identified in ¶¶29, 31-36, 43, 49 may be referred to herein as

10  the "Officer Defendants." The defendants identified in ¶¶29, 33-35, 37 may be referred to herein as

11  the "Options Defendants." The defendants identified in ¶¶29, 31-35, 37, 43, 47-48 may be referred

12  to herein as the "Insider Selling Defendants." The defendants identified in ¶¶29-31, 34-45, 47-52

13  may be referred to herein as the "RICO Defendants." Collectively, the Director Defendants and the

14  Officer Defendants may be referred to herein as the "Individual Defendants."

15                **NON-PARTIES WHO RECEIVED BACKDATED STOCK OPTIONS**

16      55.    Jack Cuthbert ("Cuthbert") was Brocade's Vice President, OEM Sales from August

17  2002 until at least May 2004. Cuthbert was Brocade's Vice President, Worldwide Sales from

18  November 2001 to August 2002; Vice President, Worldwide Sales, Marketing and Support, from

19  November 2000 to November 2001; and Vice President, Worldwide Marketing from April 2000 to

20  November 2000. Because of Cuthbert's positions, he knew or should have known that Brocade

21  executives were improperly backdating stock option grants to maximize their personal profits, via

22  access to internal corporate documents, conversations and connections with other corporate officers

23  and employees, attendance at management meetings and committees thereof and via reports and

24  other information provided to him in connection therewith. Cuthbert received at least 1,525,043

25  options that were dated at or very close to the lowest stock price for the month during which options

26  were granted. Accordingly, on information and belief, plaintiff alleges that Cuthbert received illegal

27  compensation from Brocade that was not disclosed to the Company's shareholders. Brocade paid

28  Cuthbert the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2003 | $270,000 | $61,974 | 1,167,593 | $2,549 |
| 2002 | $270,000 | $55,080 | - | $882 |
| 2001 | $270,000 | $20,269 | 1,289,211 | $808 |
| 2000 | $120,000 | $278,750 | 543,328 | $427,460 |
| 1999 | $114,000 | $20,000 | 560,000 | $102,448 |
| 1998 | $95,000 | $12,500 | 440,000 | $19,850 |

56. David A. Smith ("D. Smith") was Brocade's Vice President, Service, Support and SAN Integration from January 2000 to at least February 2002. Because of D. Smith's position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. D. Smith received at least 291,636 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that D. Smith received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Brocade paid D. Smith the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $250,000 | $26,125 | 291,636 | $250,675 |
| 2000 | $145,538 | $154,640 | 800,000 | $182,670 |

57. Paul R. Bonderson, Jr. ("Bonderson") was Brocade's Chief Technology Officer from April 2003 until at least June 2004. Bonderson was also Brocade's Chief Engineer from April 2003 until at least January 2004; Vice President, Engineering from January 2003 to April 2003; Vice President Strategic Development from November 2001 to January 2003; and Vice President, Engineering from August 1995 to November 2001. Bonderson is a co-founder of Brocade. Because of Bonderson's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  him in connection therewith. Bonderson received at least 752,446 options that were dated at or very

2  close to the lowest stock price for the month during which options were granted. Accordingly, on

3  information and belief, plaintiff alleges that Bonderson received illegal compensation from Brocade

4  that was not disclosed to the Company's shareholders. Bonderson sold 2,018,320 of his personally-

5  held shares for $271,440,260 in proceeds while in possession of material, non-public information

6  concerning the illegally-undisclosed backdating stock option grant practices.  Brocade paid

7  Bonderson the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $270,000 | $27,844 | 486,446 | $2,235 |
| 2000 | $220,000 | $396,567 | 532,000 | $1,870 |
| 1999 | $165,000 | $9,901 | 268,000 | $475 |
| 1998 | $165,000 | $12,375 | - | $504 |

58.    Victor M. Rinkle ("Rinkle") was Brocade's Vice President, Operations, from January

1998 until at least March 2004.  Because of Rinkle's position, he knew or should have known that

Brocade executives were improperly backdating stock option grants to maximize their personal

profits, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management meetings and committees thereof and

via reports and other information provided to him in connection therewith. Rinkle received at least

346,536 options that were dated at or very close to the lowest stock price for the month during which

options were granted. Accordingly, on information and belief, plaintiff alleges that Rinkle received

illegal compensation from Brocade that was not disclosed to the Company's shareholders.  Rinkle

sold 462,600 of his personally-held shares for $72,974,793 in proceeds while in possession of

material, non-public information concerning the illegally-undisclosed backdating stock option grant

practices.  Brocade paid defendant Rinkle the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 1999 | $171,875 | $20,188 | 160,000 | $504 |
| 1998 | $115,340 | $39,375 | 800,000 | $990 |

59.    Charles W. Smith ("C. Smith") was Brocade's Vice President, OEM Sales from

November 2000 until at least August 2002. C. Smith was also Brocade's Vice President, Worldwide

- 24 -

1   Sales from February 1997 until at least August 2002. Because of C. Smith's positions, he knew or

2   should have known that Brocade executives were improperly backdating stock option grants to

3   maximize their personal profits, via access to internal corporate documents, conversations and

4   connections with other corporate officers and employees, attendance at management meetings and

5   committees thereof and via reports and other information provided to him in connection therewith.

6   C. Smith received at least 294,194 options that were dated at or very close to the lowest stock price

7   for the month during which options were granted. Accordingly, on information and belief, plaintiff

8   alleges that C. Smith received illegal compensation from Brocade that was not disclosed to the

9   Company's shareholders. C. Smith sold 343,900 of his personally-held shares for $59,051,185 in

10  proceeds while in possession of material, non-public information concerning the illegally-

11  undisclosed backdating stock option grant practices. Brocade paid C. Smith the following

12  compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2000 | $160,000 | $358,250 | 288,328 | $642,123 |
| 1999 | $120,000 | $62,250 | 280,000 | $272,782 |
| 1998 | $118,500 | - | 280,000 | $87,306 |

17      60.    Peter J. Tarrant ("Tarrant") was Brocade's Vice President, Marketing and Business

18  Development from December 1997 until about February 2001, and Vice President, Strategic

19  Marketing in February 2001. Because of Tarrant's positions, he knew or should have known that

20  Brocade executives were improperly backdating stock option grants to maximize their personal

21  profits, via access to internal corporate documents, conversations and connections with other

22  corporate officers and employees, attendance at management meetings and committees thereof and

23  via reports and other information provided to him in connection therewith. Tarrant received at least

24  166,664 options that were dated at or very close to the lowest stock price for the month during which

25  options were granted. Accordingly, on information and belief, plaintiff alleges that Tarrant received

26  illegal compensation from Brocade that was not disclosed to the Company's shareholders. Tarrant

27  sold 265,000 of his personally-held shares for $45,026,665 in proceeds while in possession of

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid Tarrant the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $270,000 | $27,844 | 486,446 | $2,235 |
| 2000 | $220,000 | $396,567 | 532,000 | $1,870 |
| 1999 | $165,000 | $9,901 | 268,000 | $475 |
| 1998 | $165,000 | $12,375 | - | $504 |

## SUBSTANTIVE ALLEGATIONS

### Brocade's Stock-Based Compensation Policies

61.     Pursuant to various shareholder-approved stock option plans ("Plans"), during the Relevant Period Brocade granted options for shares of the Company's common stock to its employees, directors and consultants. During February 1998, the Board adopted the 1998 Equity Incentive Plan ("1998 Plan"), which provided for the granting of stock options to employees, officers, directors and independent contractors. The 1998 Plan was succeeded by the 1999 Stock Plan (the "1999 Plan"), which provided for the granting of stock options to Brocade officers and employees. Also during 1999, the Company's Board approved the 1999 Nonstatutory Stock Option Plan (the "Nonstatutory Plan"), which authorizes Brocade to grant the Company's common stock to non-employee directors. Additionally, since 1999, Brocade's officers and/or directors consistently represented in the Company's filings with the SEC that employee stock options were granted with an exercise price that was "equal to the fair market value of our Common Stock as determined by reference to the closing price reported on the NASDAQ National Market on the date of the grant."

62.     Tax rules and accounting standards in effect from the time Brocade became a public company in 1999, through 2004, turned on whether an option was "at-the-money" -- that is, with a strike price at or above the market's closing price for the stock on the day the option was granted – because such a strike price makes the option incentive compensation, and thus a deductible expense for tax purposes. Under applicable law and accounting standards, "at-the-money" option grants did not have to be counted as an expense by United States public companies when figuring out their taxable earnings. However, as detailed with more particularity herein, defendants Reyes, Jensen and

1    Canova routinely recorded grant dates that were retroactively manipulated to when the market price

2    was lower than it was when they were actually awarded, meaning the options certain Brocade

3    executives received were actually "in-the-money" – and would not have qualified as tax deductions.

4    Accordingly, if it turns out that the exercise price of an option has been changed, a previously-issued

5    option may be disallowed altogether, and previously-recognized tax benefits from employee stock

6    option exercises recognized by the Company may have to be either be adjusted or eliminated. As

7    these tax benefits represented a significant source of cash flow for Brocade since 1999, which was

8    unsatisfactorily accounted for in Brocade's recent restatement, the resulting impact on the Company's

9    taxable income may be devastating.

10          63.     While the Generally Accepted Accounting Principles ("GAAP") does not restrict a

11    company's ability to grant "in-the-money" options, it does require that companies expense the excess

12    of the market price of the stock at the date of grant over the exercise price of the option. One of the

13    primary reasons options were issued "at-the-money" in the past was to avoid having to record stock

14    option expense. Indeed, defendants Reyes, Jensen and Canova were motivated to avoid Company

15    policies prohibiting the issuance of certain "in-the-money" options by the desire to provide

16    themselves, other executives, directors and Brocade employees with more lucrative compensation

17    and avoid recognition of compensation expense under accounting conventions, standards and rules in

18    effect at the time. They further wanted to avoid the millions of dollars of compensation expenses.

19    **Stock Options Awarded by Reyes Under Brocade's 1998 Plan, 1999 Plan, the Nonstatutory Plan and Later Plans Were Void**

20

21          64.     Defendant Reyes issued many stock options to employees and non-Section 16 officers

22    at Brocade. But Reyes was never a member of Brocade's Compensation Committee. Until February

23    21, 2001, Reyes was only authorized to act as a "Committee of One" to issue stock options under the

24    1998 Plan. Thus, until February 21, 2001, all stock options issued by Reyes under the 1999 Plan or

25    any later plans were void. Moreover, with respect to the 1998 Plan, Reyes only had authority to

26    issue options subsequent to an Initial Public Offering ("IPO") of the Company's stock. Nonetheless,

27    he issued hundreds of thousands of stock options under the 1998 Plan prior to the Company's IPO.

28    Thus, all such options were void.

          65.     The stock option plans described herein required stock options to be awarded by the

1   "Administrator," which was defined as the full Board or a committee of the Board. *See, e.g.*,

2   Nonstatutory Plan, §§2(a), 4. If the Administrator acted as such a committee, the committee could

3   only act pursuant to "the specific duties delegated by the Board to such Committee." *Id.* at §4(b).

4       66.    On February 26, 1998, while Brocade was still a California corporation, the Board,

5   including defendants Neiman and Dempsey, adopted the 1998 Plan. At this Board meeting, the

6   directors, including Neiman and Dempsey, also passed a resolution delegating to the Company's

7   CEO the authority to make stock option awards under the 1998 Plan to employees other than Section

8   16 officers. This authorization, however, only took effect upon the IPO of the Company's stock,

9   which subsequently happened in May 1999. This resolution constituted a breach of the fiduciary

10  duties owed by Neiman and Dempsey to Brocade because it delegated too much authority to the

11  CEO and constituted an abdication of the duties owed by Neiman and Dempsey to Brocade as

12  directors and as members of the Compensation Committee.

13      67.    Thus, when Reyes became Brocade's CEO in January 1999, he was not authorized,

14  acting alone, to issue any stock options because the Company had not yet conducted an IPO of its

15  stock. Moreover, once the IPO occurred, Reyes was only authorized to issue stock options under the

16  1998 Plan and not under any other plan. The Board did not pass an authorization similar to the

17  February 26, 1998 resolution which gave Reyes authority to issue stock options under the 1999 Plan

18  or any subsequent plan. The Board never did so until February 21, 2001. Thus, all stock options

19  issued by Reyes under the 1999 Plan or the Nonstatuory Plan at any time from 1999 to February 21,

20  2001 were and are completely void.

21      68.    Moreover, Brocade's Compensation Committee had actual knowledge that Reyes was

22  not authorized to issue stock options under the 1999 Plan, Nonstatuory Plan or later plans. As noted

23  above, defendants Neiman and Dempsey were present at the February 26, 1998 Board meeting and

24  voted to authorize the CEO to issue options under the 1998 Plan. Thus, they knew that Reyes, who

25  was not a member of the Compensation Committee, could only issue options pursuant to a valid

26  resolution of the full Board. The rest of the directors also knew this because the Plans very clearly

27  stated that options may only be issued by the full Board or one of its committees acting pursuant to a

28  valid delegation of authority. Thus, all members of the Board acted with knowledge or gross

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 recklessness in allowing Reyes to issue options under the 1999 Plan and later plans with no authority

2 to issue such options.

3      69.    Even Reyes' authority to issue stock options under the 1998 Plan was suspect. At the

4 time the Board passed the resolution delegating this authority to Reyes, Brocade was a California

5 corporation. California law does not authorize a board of directors to delegate authority to a

6 "committee of one." Thus, even the Board's delegation to Reyes to issue options under the 1998

7 Plan was improper, unfounded and a breach of the Board's fiduciary duties.

8      70.    In addition, the stock options issued by Reyes under the 1998 Plan that were

9 backdated, as alleged herein, were also void due to the fact that they were issued in a manner clearly

10 contrary to the explicit contractual provisions of the 1998 Plan, which required all options issued

11 under the Plan to be issued at a strike price no less than the fair market value of Brocade's stock on

12 the grant date.

13 **Reyes Takes Over as CEO and Immediately Begins to Exceed the Authority Granted to**
**Him to Issue Stock Options**

14

15      71.    By January 1999, Reyes had been appointed CEO of Brocade.

16      72.    On January 29, 1999, defendant Sonsini became a member of the Board as well as

Brocade's Secretary. Defendants Reyes, Neiman, and Dempsey, as the only directors present at a

17 January 29, 1999 Board meeting, immediately granted Sonsini 124,000 stock options.

18      73.    As noted above, the February 26, 1998 resolution passed by the Board only allowed

19 Reyes to act as a "committee of one" with respect to stock options authorized under the 1998 Plan

20 and granted after Brocade's IPO.

21      74.    As of February 1999, Brocade was still a privately-held California corporation.

22 Nevertheless, Reyes immediately began to issue stock options as a "committee of one." For

23 example, on February 19, 1999, Reyes signed a resolution issuing 20,000 stock options to Kent

24 Bernat under the 1998 Plan. Defendants Neiman and Dempsey knew that this stock award was void

25 because they had passed a resolution less than one year earlier that only had granted Reyes' limited

26 authority to grant options after the IPO. Defendant Sonsini also knew Reyes' conduct was improper

27 because he was a corporate law expert and was the Company's Secretary. Defendant Leslie was also

28 a member of Brocade's Board at this time and was aware of the unauthorized nature of Reyes'

1 | conduct. Nonetheless, Neiman, Dempsey, Leslie and Sonsini condoned Reyes' stock option grants.

2 |      75.    On February 22, 1999, Reyes issued 2,500 stock options to Kari Fields. On February

3 | 26, 1999, Reyes issued over 160,000 stock options to various individuals. Between March 1, 1999

4 | and March 10, 1999, Reyes issued another 83,000 unauthorized and void stock options. At a Board

5 | meeting on March 17, 1999, defendants Dempsey, Neiman, Leslie and Sonsini "ratified and

6 | approved" those stock options. However, this supposed ratification and approval was ineffectual.

7 | As indicated above, Brocade's stock option plans required the stock options to be awarded by the

8 | Administrator, which had to be the full Board or a committee of the Board acting pursuant to a valid

9 | delegation of authority. The stock options issued by Reyes were void because they were not

10 | awarded by the full Board or a valid committee. Void acts cannot be ratified or approved. Thus,

11 | Reyes' conduct in improperly acting as the Administrator during January, February, and March 1999

12 | (prior to the IPO) caused the options awarded by Reyes to be void and thus incapable of ratification

13 | by the Board.

14 |      76.    At the March 17, 1999 Board meeting, defendants Neiman, Dempsey, Leslie, Reyes

15 | and Sonsini authorized the Company to begin the process of preparing for an IPO. They also passed

16 | a resolution combining Brocade's 1995 Equity Incentive Plan, the 1998 Plan and the 1998 Executive

17 | Equity Incentive Plan into the 1999 Plan, effective upon closing of the IPO. However, the Board did

18 | not pass a resolution authorizing Reyes to act as a "committee of one" with respect to options issued

19 | under the 1999 Plan. At the meeting, defendant Leslie was also elected as a member of the

20 | Compensation Committee.

21 |      77.    As indicated above, the 1999 Plan only authorized stock options to be issued by the

22 | Administrator.

23 |      78.    On April 1, 1999, Reyes granted 151,000 options, again without proper authority.

24 | Reyes issued another 19,000 options on April 28, 1999, and another 40,000 on April 30, 1999.

25 |      79.    Defendant Byrd was named CFO, Vice President of Finance, and Assistant Secretary,

26 | on May 3, 1999.

27 |      80.    Reyes issued another 50,000 options on May 5, 1999. On May 19, 1999, Reyes

28 | issued another 173,500 stock options.

- 30 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       81.    On May 24, 1999, Brocade conducted the IPO of its stock at $19 per share.

2       82.    On June 24, 1999, the Board met and voted, among other things, to "ratify and

3  approve" the stock options awarded by Reyes on April 28, April 30, May 5, May 7, and May 19,

4  1999. As noted above, however, Reyes' issuance of these options was void. Thus, the Board could

5  not approve or ratify a void act.

6       83.    By August 4, 1999, Brocade's stock price had increased to $98 per share. On that

7  day, and acting alone, Reyes issued 245,000 stock options.

8       84.    Reyes continued to issue stock options as a "committee of one" throughout 1999 and

9  up to and including February 21, 2001. During that time, Reyes issued hundreds of thousands of

10  stock options. During this entire time, the Board never passed a resolution authorizing Reyes to

11  issue stock options under the 1999 Plan. Indeed, to the contrary, in October 1999 the Board updated

12  the charter of the Compensation Committee to state, among other things, that it was the job of the

13  Compensation Committee, not Reyes, to act as the Administrator under the 1999 Plan (*i.e.* to issue

14  stock options). Nonetheless, the members of the Compensation Committee and the rest of the Board

15  continued to allow Reyes to issue options as a "committee of one."

16       85.    On February 21, 2001, defendants Reyes, Dempsey, Leslie, Neiman and Sonsini, who

17  comprised all of the members of Board at the time, purported to issue a resolution pursuant to a

18  "Unanimous Written Consent" ("UWC"). A UWC is a procedure pursuant to which the Board

19  makes a decision without an actual meeting -- the Board simply disseminates a piece of paper and

20  each director signs the paper. Under the February 21, 2001 UWC, defendants Reyes, Dempsey,

21  Leslie, Neiman and Sonsini authorized Reyes for the first time to grant nonstatutory stock options to

22  non-executive officer employees at Brocade under Brocade's 1999 Plan. The UWC authorized

23  Reyes to issue such options to the indicated employees "in his sole discretion." This UWC

24  represented a blatant breach of fiduciary duty by Reyes, Dempsey, Leslie, Neiman and Sonsini since

25  Reyes had already been issuing options "in his sole discretion" under the 1999 Plan for two years. In

26  addition, actions by "Unanimous Written Consent," whether or not technically permitted, do not

27  constitute good corporate governance with respect to important issues such as authority to grant

28  stock options. Such critical decisions should only be made at in-person Board meetings where an

1    opportunity exists for full discussion of the advantages and disadvantages of the decision. Such

2    decisions should also only be made after consultation with the company's counsel. As members of

3    the Compensation Committee, moreover, Neiman, Dempsey and Leslie had been explicitly vested

4    with the responsibility to issue stock options under the 1999 Plan by the full Board in October 1999.

5    The delegation of sole discretion to Reyes constituted an abdication of the fiduciary duties owed by

6    Neiman, Dempsey and Leslie as members of the Compensation Committee.

7         86.    Even after the February 21, 2001 resolution, the options issued by Reyes under the

8    1999 Plan that were backdated, as alleged herein, were void because they did not comply with the

9    explicit contractual requirements of the 1999 Plan that all stock options must be issued at a strike

10   price no less than the fair market value of Brocade's stock on the grant date.

11   **Reyes, Jensen, Canova and Byrd Violated Brocade's Stock-Based Compensation Policies**

12        87.    Dating back to at least 1999, defendants Reyes and Jensen initiated an illicit course of

13   conduct by which they manipulated stock option grant dates so as to illegally maximize stock profits

14   for themselves and Brocade insiders. Specifically, Reyes and Jensen directly or indirectly changed

15   the grant dates on an untold number of stock options to reflect lower exercise prices than the price on

16   the actual grant date in order to unjustifiably benefit Reyes, certain of the Officer and Director

17   Defendants and many Brocade employees. Not only did their actions violate Brocade's stated stock

18   option granting practices, they also ran afoul of applicable accounting rules in effect until 2004,

19   because they willfully and intentionally *did not* record the required compensation expense and make

20   the necessary disclosures to render the financial statements not misleading.

21        88.    Despite their knowledge of the illegitimacy of Reyes and Jensen's practices,

22   defendant Byrd and later defendant Canova, who replaced Byrd as CFO during mid-2001 (Byrd was

23   promoted to COO at the time) refused to blow the whistle on their illicit actions. Rather, Byrd and

24   Canova became willing, active participants in the illicit backdating of options. Byrd and Canova

25   instructed finance department personnel to ensure that the dates used for option grants in the

26   fabricated Compensation Committee minutes were consistent with the Company's financial records.

27   Defendants Reyes, Byrd and Canova then made material misrepresentations about the Company's

28   earnings, compensation expense and employee stock option practices. As a result of these

1    defendants' manipulative backdating option practices, numerous employees and certain of the

2    defendants received favorably valued – albeit illicit – stock option grants.

3           89.      Though this backdating scheme was designed and implemented by Reyes, Jensen,

4    Byrd and Canova, the Director Defendants, in turn, acquiesced in this scheme by implicitly

5    approving these grants to the Options Defendants, among others, even though those options were

6    improperly backdated. In fact, the Director Defendants did nothing to prevent Reyes' improper

7    actions as a "committee of one." Further, the Insider Selling Defendants benefited by disposing of

8    16,718,281 shares which were traded based on material, nonpublic information, collecting

9    approximately $1.5 billion in illegitimate proceeds.

10          90.      Defendant Reyes, as CEO and Chairman, caused the Company to make knowingly

11    false representations to Brocade's shareholders and the investing public in its annual and quarterly

12    filings concerning the Company's stock option practices. In embarking upon this scheme to conceal

13    the true nature of Brocade's stock option granting practices and make it appear as if Brocade was in

14    compliance with applicable tax, GAAP and SEC rules, as detailed more particularly herein, Reyes

15    and certain other Brocade executives falsified records and documents in support of their backdated

16    option grants.

17          91.      In furtherance of their scheme, Reyes, Jensen, Byrd and Canova put in place a system

18    for falsifying other documentation to conceal the manipulation of grant dates and thus avoid

19    detection of their backdating scheme. Specifically, these defendants: (i) fabricated Compensation

20    Committee minutes and similar documents so that it appeared that Reyes, as the sole Compensation

21    Committee member, granted stock options at the market value of Brocade's stock on dates when the

22    value of the Company's stock was relatively low; (ii) fabricated personnel records for certain

23    employees so that they could benefit from stock option grants that were purportedly made and priced

24    when the market value of Brocade's stock was relatively low; (iii) fabricated employment offer

25    letters and other records for certain employees, all of which depicted false employment dates so that

26    they could benefit from stock option grants that were purportedly made and priced when the market

27    value of Brocade's stock was relatively low; and (iv) caused false entries to be made into the

28    Company's financial books and records, which were then reflected in Brocade's financial statements

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    that were publicly filed with the SEC. By engaging in these illicit activities in an attempt to conceal

2    their backdating practices, Reyes, Jensen, Byrd and Canova violated Brocade's stock option plans.

3    **The Particulars of the Pervasive Stock Option Manipulation Scheme at Brocade**

4        92.    Beginning in January 1999, as alleged above, the Board gave defendant Reyes

5    sweeping powers over Brocade's stock option granting process. In particular, the Board granted

6    Reyes the authority to act as a "compensation committee of one" with respect to stock option grants

7    under the 1998 Plan with respect to options granted after the IPO. Although Reyes was only granted

8    explicit authority to grant options to employees, in practice, Reyes granted options to executives as

9    well. Certain of Reyes' executive stock option grants were later allegedly ratified by defendants

10   Dempsey and Neiman, who were members of Brocade's Compensation Committee at times during

11   1999 through 2001.

12       93.    The Compensation Committee and the Board then consciously disregarded Reyes'

13   abuse of those powers and conspired with him to conceal those abuses. These powers were

14   continually granted to him until Reyes' "resignation" in January 2005. In essence, Reyes was given

15   authority to dole out stock options "as a committee of one." Under the virtually unchecked authority

16   delegated to him, Reyes granted options to employees that were improperly backdated, and also

17   falsified records and other documents, including compensation committee minutes, in an effort to

18   cover up his misfeasance and avoid detection by the Company's shareholders and auditors.

19       94.    Reyes carried out this scheme by enlisting Brocade's human resources department to

20   (i) provide historical stock data; and (ii) fabricate employment offer letters, personnel records,

21   compensation and Board committee minutes and other financial books and records. Reyes primarily

22   worked with defendants Jensen and Byrd to compile the stock data and fabricate the documents.

23       95.    At Jensen's request, Steven Beyer ("Beyer"), Brocade's Senior Compensation and

24   Benefits Manager from October 2001 to August 2002, would pull historical stock prices from the

25   Yahoo! Finance webpage for at least the preceding 45 days (or longer). Beyer would then circle or

26   highlight two or three of the lowest closing prices. At other times, Jensen and Byrd would highlight

27   or circle the historical low stock prices that appeared on the stock price printouts.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

96.     Beyer's next step was to pull a list of new hire employees. He typically received that list from Margaret Lee ("Lee"), Brocade's staffing infrastructure manager. Lee was responsible for Brocade's hiring process, including the extension of employment offer letters and the processing of signed offer letters. Lee was also involved in Brocade's stock option granting process as to new hires. Lee reported to Theresa Uchida ("Uchida"), Brocade's recruiting director. For a short time, Lee reported to defendant Jensen before Uchida was hired.

97.     Beyer then took the new hire list and formatted it into a template to show the employee's name, their start dates, the number of options they would receive and a signature line. Beyer selected the employee start dates based upon instructions from defendants Jensen and Reyes. These start dates corresponded with the low closing price dates that Beyer circled on the historical price lists.

98.     In calculated hindsight, Reyes would then backdate the grant documentation to one of the dates highlighted on the Yahoo! Finance printout to make it appear that the options had been granted on that earlier date. Defendant Jensen would then prepare fictitious Compensation Committee minutes to match the grants that defendant Reyes had deceitfully chosen. Because Reyes and Jensen supplied documentation that falsely represented that the options were granted on an earlier date and that the exercise price for the grants was the earlier market value, both knew that the grants should be recorded as compensation expense in its financial statements.

99.     Beyer also had a role in dating the fictitious Compensation Committee minutes that reflected an authorization of the option grants. Defendant Jensen would provide a date for Beyer to write onto the minutes. This date would correspond to one of the dates that Beyer had highlighted on the Yahoo! Finance printout. The minutes were never signed at the time that Beyer handed them to Jensen, but were typically returned to him within a day with the requisite signature. Defendants Dempsey and Neiman, who were members of the Compensation Committee during 1999 through 2001, consciously disregarded the fact that the Compensation Committee meeting minutes were never dated as of the date that meeting actually occurred.

100.     At certain times, Lee was responsible for fabricating the Compensation Committee minutes. Jensen would provide Lee with a print out of Brocade's closing stock price during the last

1    thirty days with specific dates highlighted that corresponded to historical low stock prices. These

2    prices may not have been the lowest stock price, but they were generally priced close to the lowest.

3    Jensen would then tell Lee to prepare the Compensation Committee minutes for those dates. Jensen

4    also instructed Lee to prepare the minutes with a short time frame because Reyes needed to sign the

5    minutes.

6        101.    After the fabricated compensation minutes were prepared, Lee, under defendants

7    Reyes' and Jensen's direction, would shred the highlighted historical stock price printouts.

8        102.    Beyer or Lee would then forward the fabricated Compensation Committee minutes to

9    Elizabeth Moore ("E. Moore"), who worked in Brocade's stock administration organization. E.

10   Moore was responsible for collecting signed documents and inputting the data into the stock

11   administration system. There was always a sense of urgency in getting the signed minutes and other

12   option grant documentation to E. Moore because the new employees wanted to be advised as to the

13   actual pricing of their options and what their "paper value" was. Brocade employees who received

14   options knew that the options were manipulated because they did not receive their documentation

15   until well after they started working at Brocade.

16       103.    When prospective employees sent in their signed employment offer letters too late to

17   be included in a favorable option grant, Lee, under Jensen's direction, would cut and paste particular

18   employees onto a previous set of signed Compensation Committee minutes. Lee would get the

19   earlier set of signed minutes from Moore. The revised Compensation Committee minutes were not

20   re-signed. Lee did this on at least six occasions.

21       104.    Lee was responsible for communicating with prospective employees regarding when

22   stock options were going to be priced. Defendant Jensen instructed Lee on how to respond. In

23   particular, Jensen told Lee to tell prospective employees that the options were priced when the

24   Compensation Committee meets and that the committee would try to meet at opportune times to get

25   the most out of advantageous stock prices.

26       105.    By June 2003, the fraudulent backdating practice, including the manipulation of the

27   timing and granting of stock option grants facilitated by doctored paperwork from Brocade's human

28   resources department, had become so routine that an employee of that department prepared a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 memorandum describing the practice. The memorandum titled "New Hire Stock Processing"

2 explicitly directed human resources employees to recommend a pricing date by printing out

3 historical closing prices for Brocade's stock and identify the closing price that is the lowest since the

4 last pricing date. In particular, the memo stated: "Discern which date is the lowest since the last

5 pricing date and create a New Hire Pricing Report." This memorandum was shared by lower level

6 human resources employees who helped implement the process, which continued into 2004.

7     106.   Jensen directed Beyer and Lee to not use e-mail or voice mail to discuss the stock

8 option pricing process. In fact, Jensen told Beyer and Lee to limit all communications concerning

9 the stock option granting process to face-to-face communications. On one occasion, Lee forgot

10 about this directive and left Jensen a voice mail concerning the option granting process. Lee was

11 met with a stern reprimand from Jensen after she discovered the voice mail.

12     107.   At another point, Beyer expressed his concern regarding the legality of Brocade's

13 stock option pricing process to defendant Jensen. Defendant Jensen responded that she was not

14 concerned with the legality of the process. Rather, she was concerned with completing the process

15 as directed by defendant Reyes.

16                              **The "Part-Time" Program**

17     108.   From early 2002 to at least the end of 2002, under Reyes' direction and with the

18 blessing of the Board, WSGR and Sonsini, Brocade used a so-called "part-time" program for new

19 hires. Defendant Byrd was credited with being the architect of the part-time program. Ostensibly,

20 the purpose of the program was to allow new hires to work for a few weeks on a part-time basis to

21 become indoctrinated into the Brocade culture. New hires who participated in the program were

22 required to work only four hours to ten hours per week.

23     109.   The real purpose of the part-time program, however, was to allow a new hire to

24 benefit from having his or her stock options priced at low points to maximize their personal paper

25 profit. Defendants Reyes, Jensen and Brocade human resources personnel would routinely fabricate

26 the start date of the part-time period to take advantage of a low pricing point that appeared on

27 Brocade's human resources' Yahoo! Finance stock price printout.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110.    Under the part-time program, prospective employees who elected to participate were required to work only four to ten hours per week, and were offered cash and stock compensation during the program, including stock options.  In exchange for such compensation, prospective employees were supposed to transition into working at Brocade by, for example, researching Brocade's products, markets and business strategy.  The actual activities were supposed to be set by the prospective employee's managers.  In some cases, however, no activities were established.  Moreover, prospective employees were allowed to continue working with their former employers during their supposed participation in the part-time program.

111.    The part-time program continued until the end of 2002, which was approximately seven months after which KPMG became Brocade's auditors.

112.    Beyer was one of the new hires whose hire date was backdated to take advantage of a historical low in Brocade's stock price.  Dean Traut was another.

**Reyes Used the Part-Time Program as a Recruiting Perk to Attract Employees**

113.    Brocade became a public company in May 1999, which coincided with the "tech boom," a period during which companies specializing in computer technology experienced rapid and substantial growth in revenues, profitability and in the size of operations.  Due to its specialization in areas of computer technologies, the Company benefited from a blistering rate of growth with a onetime market capitalization of $24 billion.  As a result of this accelerated ascension in revenue and in the size of operations, between October 1999 and October 2002, Brocade hired over 1,150 employees, increasing the size of its workforce by more than six-fold.

114.    During the tech boom, lean and fast-growing tech companies facilitated a frenetic hiring environment marked by increasingly fierce competition over skilled workers.  Stock options were the fastest-growing segment of executive pay in 2000.  A survey reported in the CPA Journal (May 2001, p. 15) showed that average total compensation for chief executive officers of publicly-traded companies in the United States increased 16% in 2000 to $10.89 million, with an average stock option value of $6.45 million, representing 60% of total remuneration.  This environment fostered a culture of cheating by greedy corporate executives who felt they could disregard the rules.  Brocade was run by one such executive, defendant Reyes, who implemented a pervasive scheme to

- 38 -

1   use deliberately backdated option grants as a recruiting tool. As a result, Brocade violated GAAP,
2   securities laws and tax laws as detailed more particularly herein. In addition, under the influence of
3   Reyes, the Director Defendants allowed the practice of improperly backdating options to flourish,
4   which caused the outright violation of Brocade's own rules for granting options.

5       115.    Specifically, to recruit and retain certain employees, defendant Reyes, assisted by
6   Jensen and Byrd, and later by Canova, made liberal use of employee stock options as a form of
7   compensation. The stock options gave employees the right to buy Brocade's stock at a set price,
8   called the exercise price or "strike" price. The positive paper value of the options to these employees
9   was instant to the extent the market price of Brocade's stock exceeded the strike price of the options
10  on the actual grant date.

11      116.    With the part-time program in place, Reyes had unfettered control over the particular
12  strike price that he could offer potential employees. For example, particularly valuable prospective
13  employees could be offered stock options that became even more valuable via the manipulation of
14  that employee's part-time start date.

15                          **The Roles Played By WSGR and Sonsini**

16      117.    WSGR has acted as Brocade's general outside legal counsel since 1999. During that
17  time, WSGR provided legal advice to the Board on a number of compensation issues, including the
18  part-time program and defendant Reyes' "committee of one" role with respect to stock option grants.
19  In his capacity as a Brocade director, defendant Sonsini signed the February 21, 2001 resolution that
20  belatedly gave Reyes "sole discretion" to issue stock options to non-executive employees under the
21  1999 Plan. Sonsini, who was chairman of WSGR and a director from 1999 to March 2005, was
22  considered by other directors to be the "law expert" on the Board. In that capacity, Sonsini also
23  provided legal advice on issues related to stock-based compensation.

24                          **KPMG's Role in the Backdating Scheme**

25      118.    KPMG began auditing Brocade on or about June 2002, when it took over for Arthur
26  Andersen, the Company's previous auditors. After assuming its duties as Brocade's auditors, KPMG
27  audit personnel assigned to work on Brocade's account received and reviewed Arthur Andersen's
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    work papers, which contained indications of the backdating of stock options, and which accorded

2    inappropriate accounting treatment for the part-time program.

3        119.    During mid to late 2002, KPMG's New York office reviewed Brocade's accounting

4    treatment for its part-time program. After examination, the office rejected the accounting treatment

5    as inappropriate because there was insufficient documentation to establish that employees who

6    purportedly held a "part-time" status actually were working. Nevertheless, the part-time program

7    continued unabated for several months under KPMG's watch.

8        120.    At all relevant times, KPMG was a necessary and active participant in the Individual

9    Defendants' improper accounting and financial reporting. In an effort to preserve its relationship

10    with Brocade, pursuant to which it received millions in dollars in fees, KPMG knowingly or

11    recklessly disregarded the Individual Defendants' improper accounting and financial reporting

12    practices, ignored repeated grants of stock options at monthly, quarterly and annual lows and

13    actively assisted the Individual Defendants in concealing its wrongdoing from the market by, *inter*

14    *alia*, improperly issuing unqualified audit opinions certifying that Brocade had complied with

15    GAAP. For the relevant years 2000 through 2005, Brocade paid KPMG the following fees:

16

| Fiscal Year | Fees Paid to KPMG |
|---|---|
| 2005 | $2,424,000 |
| 2004 | $733,000 |
| 2003 | $1,012,000 |
| 2002 | $328,010 |
| Total | $4,497,010 |

21        121.    During their yearly audits and quarterly reviews of Brocade's books, records and

22    financial statements, members of KPMG's engagement team had virtually limitless access to

23    information concerning Brocade's true financial condition. KPMG had unfettered access to Arthur

24    Andersen's work papers, Brocade documents and employees, and had conversations with Company

25    management and employees about the Individual Defendants' financial reporting and accounting

26    practices. As part of its audit process, KPMG reviewed Board and Compensation Committee

27    minutes and resolutions that authorized stock option grants. KPMG also reviewed share data reports

28    that included information concerning option grants, exercises and cancellations. KPMG even

1  reviewed the time lag between the effective date of a stock option grant and the date upon which the
2  option grant was entered into Brocade's computer system.

3       122.   KPMG knew or recklessly disregarded that the Individual Defendants were, contrary
4  to GAAP, backdating stock options at Brocade without appropriately documenting, accounting for or
5  reporting such activity under applicable law and accounting standards. Indeed, KPMG's audit work
6  papers reflected that the auditors knew that Brocade stock options were backdated. For example, a
7  KPMG work paper titled "Summary of All Stock Option Plans FY 2002 Rollforward/
8  Reconcilliation" contained an entry that stated, "Option grants entered in FY2002 but effective FY
9  2001 ... (182,251) ...." This entry shows that KPMG auditors knew that options that were entered in
10 fiscal 2002 were given an effective date during fiscal 2001.

11      123.   Further, KPMG knew that Brocade options were being manipulated from a review of
12 Arthur Andersen's work papers. Those work papers revealed that Brocade had a policy of awarding
13 stock options to new hires priced as of the date they signed or accepted their offer letters. One such
14 work paper generated during the course of the fiscal 2001 audit contained an entry that stated:
15 "Option grants entered after 2000 FYE with grant dates prior to 2000 FYE (12,000). For reporting
16 purposes these should be considered additional FY2001 grants ...."

17     **Documented Instances of Options Manipulation as to Brocade New Hires**

18      124.   New hire Andy Taylor ("Taylor") interviewed with Brocade on September 6 and 26,
19 2001. Following the interviews, Taylor received two offer letters that were both dated as of October
20 1, 2001. One offer letter indicated a part-time start date of October 1, 2001 and a full-time start date
21 of November 5, 2001, while the other letter only indicated the November 5, 2001 full-time start date.
22 On February 27, 2002, Beyer sent an e-mail to defendant Jensen in which he wrote: "I believe the
23 concensus [sic] was for us to go back and correct the grant date to his supposed [part-time] hire
24 date."

25      125.   New hire Richard Geruson ("Geruson") received an employment offer letter dated
26 October 30, 2001 that provided for a part-time start date of October 30, 2001. Beyer was involved in
27 Geruson's hiring process. In particular, Beyer was responsible for changing Geruson's placement on
28 multiple stock option lists to get him the lowest stock price possible for his stock options. Beyer did

1  this under instructions from defendants Jensen and Reyes. Under those instructions, Beyer set

2  Geruson's part-time start date on October 30, 2001. Moreover, Brocade human resources personnel

3  changed Geruson's offer letter at least three times to take advantage of low strike prices.

4      126.    On February 11, 2002, defendant Byrd e-mailed Uchida his approval of the October

5  30, 2001 start date. Robert D. Bossi ("Bossi") also reviewed the options granted to Geruson that

6  were priced as of October 30, 2001. Ron Epstein, one of Brocade's in-house counsel, also reviewed

7  Geruson's offer letter and hire date.

8      127.    On January 11, 2002, Beyer sent an e-mail titled "stock update" to Heidi Rado,

9  Eduardo Salas and Norma Olmos, who worked in Brocade human resources. In the e-mail, Beyer

10  wrote "OK guys we need to urgently wrap up any outstanding stock issues for Q1. Steph and I

11  HAVE to present Greg with finalized recommendations by this coming Monday . . . ." The e-mail

12  indicated that as of January 11, Brocade had not granted options to employees who started during the

13  Company's fiscal first quarter 2002 (November 2001 through January 2002). This means that option

14  grants to new hires, who purportedly started working for Brocade during the quarter, were later

15  manipulated by Reyes and Jensen.

16      128.    A later e-mail from Beyer to Colleen Divine and Lee indicates that no grants to new

17  employees who started during the quarter were made as of January 25, 2002. The e-mail stated:

18  "Margie/Colleen as an fyi, the coming stock approval is for new hires through 10/30 only. We

19  wanted to hold off on those past that date for the next Board meeting." "Board meeting" was a

20  reference to Reyes' willingness to sign off on the backdated option grants.

21      129.    On January 28, 2002, Bossi sent an e-mail to Beyer and Jensen that stated "just a

22  reminder - we need the Q1 new hire stock grant list as soon as possible so we can input the share

23  data to support the upcoming q1 review by [Arthur Anderson]." In other words, Bossi was telling

24  Beyer to get on the ball to get the new hire grant list falsified, signed and dated in time for the

25  auditor's review.

26      130.    Later on January 28, 2002, Beyer sent an e-mail to Jensen that suggested that "we

27  catch up with the new hire options via two separate grants; NH 10/31-11/28 $28.82 NH 11/29-

28  01/22 $31.76 I do not believe we'll see lower prices than these going forward." This means that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Beyer was proposing that new hires who started between October 31 and November 28, 2001 would

2  receive grants priced at $28.32; and that new hires who started between November 29, 2001 and

3  January 22, 2002 would receive grants priced at $31.76 – regardless of their actual start date. Beyer

4  determined the $28.32 and $31.76 stock prices by printing out the closing price of Brocade's stock

5  from the Yahoo! Finance page and circling the lowest prices.

6      131.   In response to the e-mail, Reyes and Jensen began planning their next round of

7  falsified documentation. The e-mail also stated that "per Bob, any stock that wish to give with a pre

8  01/26 price will need to be submitted to Bob by the end of this week." "Bob" refers to Robert Bossi.

9      132.   During February 2002, Reyes interviewed Cudgma, who was later employed at

10  Brocade sometime during April 2002 and who ultimately blew the whistle on the backdating

11  scheme. As part of his original retention packet, Cudgma was told he would receive an options

12  grant. That options grant was manipulated several times in the following months, under the direction

13  of Reyes and Jensen, to take advantage of lower stock prices.

14      133.   Brocade's first quarter of fiscal year 2002 ended on January 26, 2002. On February

15  6, 2002, Beyer sent an e-mail to the human resources department with copies to defendants Jensen

16  and Bossi that stated: "as of yesterday afternoon we have final signature approval for all Q1 QSAP

17  stock as well as new hire stock through Jan 22." Thus, Brocade did not issue or price any first

18  quarter 2002 stock options until well after the end of the quarter – and with the use of hindsight and

19  backdating.

20      134.   During March 2002, Uchida approached Lee and told her to change the hire dates for

21  Cudgma and Geruson. In particular, Uchida told Lee to change the hire dates from the

22  October/November 2001 time frame to the February 2002 time frame to take advantage of better

23  strike prices. Lee then fabricated the relevant documents and delivered them to Uchida. Lee also

24  "cleaned up" other documents including non-disclosure agreements and other documents that

25  Cudgma and Geruson had signed.

26      135.   On or about March 2003, Brocade retained iQuantic to provide advice regarding stock

27  option expensing and other issues. On May 22, 2003, iQuantic made a presentation to the Board

28  about expensing stock options. Reyes was particularly concerned about iQuantic's presentation

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 because if Brocade had to properly expense stock options, his ability to entice new employees with
2 backdated stock options would be severely constrained.

3    136.    On May 27, 2003, June Weaver ("Weaver"), Brocade's former communications
4 human resources administrator, met with defendant Paisley. According to Weaver, she and Paisley
5 discussed "the 'Greg [Reyes] approved' stock guidelines."

6    137.    On June 23, 2004, Weaver e-mailed Patricia Kada (Brocade's compensation analyst)
7 and Grace Ward (Brocade's compensation and benefits manager) stating: "please put the Monday
8 price for Spirng/Mars [sic] and new hires and have Greg [Reyes] sign today." This e-mail reflected
9 the fact that stock options for new hires being awarded on June 23, 2004 were being priced as of
10 June 21.

11    138.    During Reyes' criminal trial, Weaver testified that she had discussed the legality of
12 Brocade's option grant process with defendant Reyes during the time that he was backdating stock
13 options. Weaver testified that Reyes brazenly told her that "*It's not illegal if you don't get caught.*"
14 Weaver also testified that she remembered Reyes making that statement to her "very well." But
15 Reyes' shameless attitude eventually caught up to him.

16    **Illustrations of the Backdated New Hire and Other Employee Grants**

17    139.    On at least nine occasions between January 2, 2001 and July 2, 2002, Reyes, with
18 Jensen's assistance, backdated grant dates to provide new hires and other employees with "in-the-
19 money" options while evading the requirements of applicable law and accounting standards to
20 properly and timely document, account for and report the compensation expense incurred by
21 Brocade related to those grants. As indicated by the charts below, those grants were backdated as of
22 the following dates: January 2, 2001, April 17, 2001, July 23, 2001, October 1, 2001, October 30,
23 2001, November 28, 2001, January 22, 2002, February 28, 2002 and July 2, 2002.

24    140.    In fact, as illustrated in the below charts, between 3Q:00 and 4Q:02, Reyes granted
25 stock options to employees at the quarterly low stock price in eight of the ten quarters and with
26 exercise prices near the quarterly low stock price in the other two quarters.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





(1) Antonio Canova received 377,750 shares. Defendant Canova disclosed this grant on a Form 3 filed May 16, 2001.
(2) David A. Smith received 207,810 shares; Jack Cuthbert received 541,760 shares. Defendants and non-parties disclosed these grants on a Form 4 filed June 8, 2001.
(3) Paul R. Henderson received 260,450 shares; Michael J. Byrd received 1,139,050 shares; Gregory Reyes received 3,970,080 shares; Victor Rinkle received 172,540 shares and Charles W. Smith received 110,030 shares. Defendants and non-parties disclosed these grants on a Form 5 filed December 11, 2001.
(4) Larry Sonsini received 60,000 shares; Seth Neiman received 80,000 shares; Mark Leslie received 60,000 shares; Neil Dempsey received 60,000 shares. Defendants disclosed these grants on a form 5 filed February 7, 2002.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

(1) Paul R. Bonderson received 5,996 shares; Michael J. Byrd received 257,218 shares; Antonio Canova received 178,756 shares; Gregory Reyes received 1,262,113 shares; Victor Rinkle received 3,996 shares; David A. Smith received 3,826 shares.  Defendants and non-parties disclosed these grants on a Form 5 filed December 11, 2001.
(2) Jack Cuthbert received 205,451 shares.  Cuthbert disclosed this grant on a Form 4 filed December 7, 2001.
(3) Seth Neiman received 75,000 shares.  Defendant Neiman disclosed this grant on a Form 5 filed February 7, 2002.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





141.    Year after year, defendant Reyes' transgressions continued unabated as his sweeping authority remained unchecked by the Board.  On at least six occasions between August 15, 2003 and October 20, 2004, Reyes backdated options grants to provide employees with "in-the-money" options while evading the requirement that Brocade properly document, account for and report the compensation expense related to those grants.  Those grants were backdated as of the following dates: August 15, 2003, October 20, 2003, January 22, 2004, February 26, 2004, March 22, 2004 and June 21, 2004.

142.    Indeed, as depicted in the following charts, during Brocade's FY:04, Reyes made thirty-two option grants.  Of those grants, nineteen grants were to over 1,000 employees (granting options to purchase a total of approximately 16 million shares), that were priced at the weekly low closing price for Brocade's stock and for an additional three grants, within just $0.03 of the weekly low.



(1) On August 15, 2003 Paul Bonderson received 200,000 shares; Jack Cuthbert received 250,000 shares; Michael Klayko received 250,000 shares; Defendants and non-parties disclosed these grants on a Form 4 filed August 19, 2003.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Canova Perpetuated the Backdating Scheme by Consciously Refusing to Expose It**

143.    Defendant Canova joined Brocade in late 2000 after working previously as a CPA. Canova, with his relevant financial expertise, was wholly familiar with the cardinal principle that "in-the-money" stock options must be recorded as a compensation expense. In complete disregard of this tenet, however, Canova facilitated the backdating subterfuge by turning a blind eye when presented with evidence that suggested the existence of an improper option backdating scheme and neglected to discuss the matter with the Company's external auditors despite having ample opportunity to do so. Indeed, Canova ultimately participated in Reyes and Jensen's illegal activities.

144.    Beginning in April 2001, after Canova was promoted to the position of CFO, he learned of multiple facts calling into question the integrity of Brocade's financial statements based on the Company's option grants. Canova thus received first-hand knowledge of the backdating scheme in place at Brocade through his elevated role in the Company. Specifically, in April 2001, Canova received an e-mail from Jensen in which a Brocade manager had stated that the Company's option price was "usually the lowest closing price" experienced between meetings when options were granted. In a comment darkly alluding to a cover-up, Canova instructed that Jensen should caution the manager "not to make statements about the board granting shares at the lowest price."

145.    Shortly thereafter, during a discussion between Canova and Brocade's controller, the controller expressed concerns about the delay between purported option grant dates and the dates when the finance department employees received documentation of the grants. Although the delay was a result of, and suggested the existence of, the options backdating scheme, Canova did nothing to investigate other than speaking with Reyes.

146.    In early 2002, Canova was presented with further evidence of the stock option back-dating scheme. In particular, the options of two Company executives, Geruson and Cudgma, were backdated and supported by falsified offer letters with earlier than actual start dates, as alleged above. Then, in October 2002, Canova again received an e-mail describing the process for granting options to Geruson as "forging paperwork and offer letters so he could get better priced options." Indeed, it is impossible for a person of Canova's financial acumen to even argue that he was unaware that the Company was the victim of an options backdating scheme. Specifically, Canova

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   consciously or recklessly ignored evidence of falsified records and documentation, unscrupulous

2   options pricing conventions, and the absence of effective controls and coordination between the

3   finance and human resource departments, as well as between those departments and the Board. He

4   neither investigated nor reviewed the impact of these improprieties and manipulations on Brocade's

5   financial statements and also failed to alert the Audit Committee or external auditors to their

6   existence. As a result, Brocade failed to timely record any compensation expense related to the

7   backdated options grants.

8       147.    Instead, after learning of these facts, Canova facilitated the backdating scheme by

9   directing finance department employees to ensure that the dates used for option grants in the

10  fabricated Compensation Committee minutes were consistent with the falsified employee records

11  reflecting their purported hiring dates. When inconsistencies were found between these documents,

12  Canova directed finance department employees to alter the documents so that they were consistent.

13  This way, the Company's external auditors would not be able to discover the true nature of Brocade's

14  options granting practices.

15      148.    In light of all these facts and in conjunction with Canova's willful ignorance of the

16  existence of numerous improprieties and manipulations, it is clear that Canova knew the

17  documentation of options grants used to prepare the Company's financial statements were not

18  reliable.

19  **Defendants Reyes, Jensen, Byrd and Canova Caused Brocade to Report Materially**
    **Inaccurate Financial Information.**

20

21      149.    Defendants Reyes, Jensen, Byrd and Canova knew about the accounting rules and

22  reporting requirements applicable to Brocade stock option grants, and thus knew their falsifications

23  of official option grant date documents and corresponding fabrications of Compensation Committee

24  minutes violated these rules. Specifically, these defendants were aware of the requirement that "in-

25  the-money" option grants be recorded as a compensation expense through instruction, advisement

26  and participation in conversations regarding the rules with persons at the Company, with Brocade's

27  outside auditors and with various consultants, including, without limitation, WSGR and Sonsini. In

28  particular, Reyes spoke frequently, within the Company, with persons outside Brocade, and publicly,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    about the rules requiring public companies to record, properly document, account for and report an

2    expense for "in-the-money" options grants.

3    **Reyes Engaged in Self-Dealing to the Detriment of the Company and Shareholders**

4    150.    Defendant Reyes was motivated, in part, to conceal the backdating scheme from

5    shareholders, external auditors and the SEC due to the fact that he and other Company officers

6    derived substantial personal benefits from the wrongdoings.  Specifically, Reyes knew that he and

7    other officers of the Company received options backdated as of the same dates as the backdated

8    employee options.  Thus, Reyes abused his position as Chairman of the Board and CEO of the

9    Company in recommending that the Director Defendants compensate officers, including himself,

10   through options grants.[5]

11   151.    In a June 2003 resolution, the Director Defendants accepted a recommendation that

12   Reyes, in his position as CEO, be granted a total of 1.1 million options divided into two grants

13   during two fiscal quarters.  Relying only on the resolution, Reyes included himself in two options

14   grants that were otherwise made to employees of Brocade.  Although nothing in the Board's

15   resolution specified the dates of the grants to Reyes or the strike prices, Reyes granted himself

16   600,000 options as of August 15, 2003 and 500,000 options as of December 10, 2003.  Only after the

17   grants were made and recorded in Brocade's books and records did the Board approve the grants.

18   152.    Also, on at least two other occasions, Reyes received large options grants that were

19   dated as of the same dates on which he had granted other employees backdated options.  Those

20   grants to Reyes were backdated to April 17, 2001 and October 1, 2001.  Further, defendant Klayko

21   was granted over 575,000 backdated options between May 21, 2004 and December 10, 2004.

22

23

24

25   _____

26   [5]  Ownership of company stock by executives and insiders is usually considered a positive
     development because it shows a belief in the company's prospects.  However, not all ownership
     positions are created equal.  An executive's insider purchases on the open market show a far more
27   real commitment than *gratis* stock options.  Although at-the-money stock option grants are supposed
     to align the interests of management and shareholders, the granting of backdated stock options
28   present insiders with a hidden mechanism to enrich themselves at the expense of shareholders.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Brocade's Board Is Culpable for Allowing the Scheme to Continue**

1

2    153.    One of the most troubling aspects of the illicit option backdating scheme is that the

3    Director Defendants blindly relinquished total responsibility for setting option grant dates to Reyes

4    and other executives and knowingly failed to correct their illicit scheme.  In effect, options

5    backdating opens the door to executive self-dealing, which is exactly what happened here.  The

6    Director Defendants never disclosed what role, if any, Brocade executives like Reyes played in the

7    Company's stock option grant decision-making process.  In sum, the Director Defendants, as

8    Brocade's guardians, utterly failed to implement effective internal controls that would have ensured

9    that Company executives would have followed the shareholder-approved Plans with proper and

10    transparent policies and procedures.

11    154.    Not only did the Director Defendants improperly delegate sweeping authority to

12    Reyes in the granting of stock options to employees and executives, they implicitly acquiesced in the

13    improper arrangements described herein by wholly failing to take any reasonable steps or actions to

14    assure themselves that the Company's compensation policies were being properly followed.

15    Specifically, the Director Defendants failed to establish an effective system of internal controls,

16    which directly and proximately led to the years of illicit backdating activity at the Company.  For

17    example, the Director Defendants did not compile the required paperwork, utterly failed to

18    implement internal controls to prevent or timely detect problems associated with falsified paperwork,

19    and allowed inaccurate and incomplete minutes of Board meetings to be fabricated while at the same

20    time knowing such deceptive records were being used to document when directors supposedly had

21    approved grants.  Further, when presented with the opportunity to actually investigate the Company's

22    compensation practices, the Director Defendants chose to conduct a sham restatement instead.

23    Finally, these defendants attempted to extinguish their own liability, as well as the liability faced by

24    many others, by voting to approve the Proposed Settlement, which was and remains patently unfair,

25    inadequate and unreasonable.

26    155.    The Director Defendants' misfeasance calls into question the unscrupulous corporate

27    culture at Brocade, the lack of integrity of the Company's executives and its directors, the Director

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Defendants' non-existent oversight, and accentuates Brocade's deficient internal controls over its

2  compensation practices in general.

### SEVERAL OF THE INDIVIDUAL DEFENDANTS RECEIVED MANIPULATED STOCK OPTION GRANTS

156.    In addition to the untold numbers of Brocade employees and new hires who benefited

from the illicit backdating scheme hatched by Reyes, Jensen, Byrd and Canova, several of the

Individual Defendants also received backdated option grants.  As the charts below demonstrate,

numerous options were suspiciously granted at or near the lowest price of the month in which the

options were granted

### FY:99 Option Grants

157.    During FY:99, defendants Reyes, Byrd, Malavalli and non-parties C. Smith, Cuthbert

Bonderson, Tarrant, and Rinkle received options at the lowest price of the month in which the

options were granted.  Specifically, options granted on November 20, 1999 were recorded at $128.50

per share – the lowest stock price for the month of November.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**FY:00 Option Grants**

158.    During FY:00, defendants Reyes and Byrd, together with non-parties C. Smith, Cuthbert, D. Smith, Rinkle and Bonderson, received options at or near the lowest price of the month in which the options were granted.  Specifically, options granted on February 1, 2000 were recorded at $76.88 per share – the lowest stock price for the month of February.  Similarly, options on November 30, 2000 were recorded at $76.88 per share – the lowest stock price for the month of November.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



November 2000 Stock Option Grants

On November 30, 2000, defendants and non-parties purportedly granted the following options at an exercise price of $76.88 per share - the lowest share price for the months of September 22, 2000 through December 15, 2000 - to the following Brocade insiders:

Paul R. Bonderson, Jr.(5) 220,000    Gregory Reyes (1) 4,500,000
Michael J. Byrd (4) 410,000    Victor Rinkle (6) 80,000
Jack Cuthbert (3) 542,500    Charles W. Smith (1) 80,000
David A. Smith (2) 60,000

(1) On December 11, 2001, defendant Reyes and C. Smith disclosed this grant on a Form 5.
(2) On December 12, 2001, D. Smith disclosed this grant on a Form 5.
(3) On December 13, 2001, Cuthbert disclosed this grant on a Form 5.
(4) On December 14, 2001, Byrd disclosed this grant on a Form 5.
(5) On December 15, 2001, Bonderson disclosed this grant on a Form 5.
(6) On December 18, 2001, Rinkle disclosed this grant on a Form 5.

**FY:01 Option Grants**

159.    During FY:01, defendants Reyes, Byrd and Canova, together with non-parties C. Smith, Cuthbert, D. Smith, Bonderson and Rinkle, received at least 8,461,967 options at the lowest price of the month in which the options were granted. Specifically, options granted on April 18, 2001 were recorded at $20.70 per share – the lowest stock price for the month of April. Similarly options granted on October 2, 2001 were recorded at $12.90 per share – the lowest stock price for the month of October.

160.    In connection with the April 18, 2001 grant, Reyes and Dempsey executed a unanimous written consent form that approved stock options to purchase 260,450 shares to Bonderson. The consent form was dated April 17, 2001.

161.    A set of Compensation Committee minutes were also purportedly dated on April 17, 2001. These minutes reflect option grants to defendants Reyes, Byrd and Canova, together with non-parties C. Smith, Cuthbert, D. Smith, Bonderson and Rinkle. According to the minutes, defendants Dempsey, Leslie and Reyes attended the April 17, 2001 meeting. This meeting, however, did not appear in the personal calendars for defendants Dempsey and Leslie. Moreover, Reyes was in Boston, Massachusetts for the Boston Marathon on that day. This leads to the strong

- 57 -

inference, of course, that a meeting of the Compensation Committee never occurred on April 17, 2001 and that the minutes were fabricated.

162.    As the following chart illustrates, the shares reflected in the April 17, 2001 unanimous consent form and Compensation Committee minutes were purportedly granted on April 18, 2001 at the lowest share price for April 6, 2001 through July 2, 2001. On information and belief, the dates on the April 17, 2001 Compensation Committee minutes and the unanimous consent form were falsified.



April 2001 Stock Option Grants

On April 18, 2001, defendants and non-parties purportedly granted the following options at an exercise price of $20.70 per share – the lowest share price for the period beginning April 6, 2001 through July 2, 2001 – to the following Brocade Insiders:

| Paul R. Bonderson, Jr. (1) | 260,450 | Gregory Reyes (1) | 3,970,020 |
| Michael J. Byrd (1) | 1,139,050 | Victor Rinkle (1) | 172,540 |
| Jack Cuthbert | 641,760 | Charles W. Smith (1) | 110,030 |
| David A. Smith | 207,910 | Antonio Canova | 377,760 |

On May 16, 2001 defendant Canova disclosed this grant on a Form 3.

On June 8, 2001 defendants D. Smith and Cuthbert disclosed these grants on a Form 4. Form 4 was filed late

(1) On December 11, 2001 defendants and non-parties disclosed these grants on a Form 5.

163.    As the following chart illustrates, shares purportedly granted on October 2, 2001 were priced at the lowest share price for the period of May 21, 2001 through December 11, 2001. On information and belief, this option grant was manipulated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



On October 2, 2001, defendants purportedly granted the following options at an exercise price of $12.90 per share – the lowest share price for the period beginning May 21, 2001 through December 11, 2001 – to the following Brocade insiders:

Paul R. Bonderson, Jr.   5,996       Gregory Reyes     1,262,113
Michael J. Byrd     257,218       Victor Rinkle          3,996
Jack Cuthbert       205,451       Anctonio Canova   178,756
David A. Smith       3,826

On December 11, 2001 defendants Bonderson, Byrd, Canova, Reyes, Rinkle and D. Smith disclosed these grants on a Form 5.

On December 7, 2001 defendant Cuthbert disclosed this grant on a Form 4. Form 4 was filed late according to SEC filing regulations.

164.    The following table provides an estimate as to the illegal paper profit that the defendants and non-parties identified in the prior charts gained as a result of their stock option manipulations:

| Defendants and non-parties | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Grant Date | Estimated Price on Actual Date Option was Granted | | Estimated Paper Profit | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Bonderson | 12/10/1999 | 266,000 | $128.50 | $151.50 | $160.00 | $6,118,000.00 | $8,379,000.00 |
| | 12/11/2001 | 260,450 | $20.70 | $31.34 | $53.26 | $2,771,188.00 | $8,480,252.00 |
| | 12/11/2001 | 5,996 | $12.90 | $13.43 | $38.80 | $3,177.88 | $155,296.40 |
| | 12/15/2001 | 220,000 | $76.88 | $167.94 | $225.13 | $20,033,200.00 | $32,615,000.00 |
| Byrd | 12/10/1999 | 42,500 | $128.50 | $151.50 | $160.00 | $977,500.00 | $1,338,750.00 |
| | 12/11/2001 | 1,139,050 | $20.70 | $31.34 | $53.26 | $12,119,492.00 | $37,087,468.00 |
| | 12/11/2001 | 257,218 | $12.90 | $13.43 | $38.80 | $136,325.54 | $6,661,946.20 |
| | 12/14/2001 | 410,000 | $76.88 | $167.94 | $225.13 | $37,334,600.00 | $60,782,500.00 |
| Canova | 5/16/2001 | 377,750 | $20.70 | $31.34 | $53.26 | $4,019,260.00 | $12,299,540.00 |
| | 12/11/2001 | 178,756 | $12.90 | $13.43 | $38.80 | $94,740.68 | $4,629,780.40 |
| Cuthbert | 8/8/2000 | 35,832 | $128.50 | $151.50 | $160.00 | $824,136.00 | $1,128,708.00 |
| | 8/8/2000 | 200,000 | $81.00 | $89.32 | $213.69 | $1,663,000.00 | $26,538,000.00 |
| | 6/8/2001 | 541,760 | $20.70 | $31.34 | $53.26 | $5,764,326.40 | $17,639,705.60 |
| | 12/7/2001 | 205,451 | $12.90 | $13.43 | $38.80 | $108,889.03 | $5,321,180.90 |
| | 12/13/2001 | 542,000 | $76.88 | $167.94 | $225.13 | $49,354,520.00 | $80,351,500.00 |
| Malavalli | 12/10/1999 | 106,000 | $128.50 | $151.50 | $160.00 | $2,438,000.00 | $3,339,000.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Reyes | 12/10/1999 | 500,000 | $128.50 | $151.50 | $160.00 | $11,500,000.00 | $15,750,000.00 |
| | 12/11/2001 | 4,800,000 | $76.88 | $167.94 | $225.13 | $437,088,000.00 | $711,600,000.00 |
| | 12/11/2001 | 3,970,020 | $20.70 | $31.34 | $53.26 | $42,241,012.80 | $129,263,851.20 |
| | 12/11/2001 | 1,262,113 | $12.90 | $13.43 | $38.80 | $668,919.89 | $32,688,726.70 |
| Rinkle | 12/10/1999 | 90,000 | $128.50 | $151.50 | $160.00 | $2,070,000.00 | $2,835,000.00 |
| | 12/11/2001 | 172,540 | $20.70 | $31.34 | $53.26 | $1,835,825.60 | $5,617,902.40 |
| | 12/11/2001 | 3,996 | $12.90 | $13.43 | $38.80 | $2,117.88 | $103,496.40 |
| | 12/16/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Smith, C. | 12/10/1999 | 104,164 | $128.50 | $151.50 | $160.00 | $2,395,772.00 | $3,281,166.00 |
| | 12/11/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| | 12/11/2001 | 110,030 | $20.70 | $31.34 | $53.26 | $1,170,719.20 | $3,582,576.80 |
| Smith, D. | 6/8/2001 | 207,810 | $20.70 | $31.34 | $53.26 | $2,211,098.40 | $6,766,293.60 |
| | 12/11/2001 | 3,826 | $12.90 | $13.43 | $38.80 | $2,027.78 | $99,093.40 |
| | 12/12/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Tarrant | 12/10/1999 | 166,664 | $128.50 | $151.50 | $160.00 | $3,833,272.00 | $5,249,916.00 |
| TOTAL ESTIMATED PAPER PROFITS | | | | | | | |

## THE TRUTH BEGINS TO EMERGE

165.     Despite attempts by defendants Reyes, Jensen, Byrd and Canova to conceal their illicit backdating practices, the impact of their actions on the Company began to be incrementally disclosed in January 2005. For example, on January 24, 2005, the Company announced that, as a result of an internal review conducted by Brocade's Audit Committee, the Company expected to record additional stock-based compensation charges from FY:99 through 3Q:03. The press release further stated that "[f]or years prior to 2002, the Company will reduce previously reported net income by approximately $304 million (consisting of a reduction to net income in years 1999 and 2000 of $15 million and $1,019 million, respectively, and an increase to net income in 2001 of $730 million) relating solely to stock based compensation and associated income tax adjustments." Finally, it was disclosed that the Company would calculate the additional historical stock-based compensation charges using the variable method of accounting under Accounting Principles Board Opinion No. 25 ("APB 25").

166.     On that same day, the Company announced that Reyes would no longer serve as Brocade's Chairman and CEO. Reyes, however, was not truly departing from the Company. Instead, he was allowed to remain a director of Brocade and as an advisor to the Board and the new

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   CEO, defendant Klayko.[6]

2       167.    On January 31, 2005, Brocade filed a restatement of its fiscal 2002 and 2003 financial

3   statements. The Form 10-K containing the restatement was signed by defendants Klayko, Reyes,

4   Canova, Neiman, House, Krause, Dempsey, Sonsini, Moore, Paisley and Vaswani.

5       168.    According to the Company's Form 10-Q filed with the SEC on March 9, 2005,

6   Brocade incurred internal review costs of $3.7 million, primarily related to professional service fees.

7   Furthermore, Brocade estimated the Company will make adjustments pertaining to stock option

8   grants totaling $304 million in years 1999 and 2000 only. Estimates for adjustments to the

9   Company's cost of stock based compensation for FY:04, FY:03, FY:02 and FY:01 may exceed $52.6

10  million.

11      169.    Notwithstanding the fact that Brocade was forced to restate two years of financial

12  results as a result of the Director Defendants' acquiescence to misfeasance by Reyes, Jensen, Byrd

13  and Canova, on February 18, 2005, the Director Defendants announced they had unanimously

14  approved an *increase* in their own compensation as directors. Under this increase, in addition to

15  annual fees for sitting on the Board and each respective meeting thereof, each non-employee

16  receives $1,500 for each committee meeting the director attends in person and $1,000 for each

17  committee meeting in which the director participates telephonically. Moreover, the chairman of

18  each committee receives an additional cash payment of $5,000, and the non-employee lead director

19  will receive an annual cash payment of $15,000. The Director Defendants made this increase

20  retroactive to apply to all meetings conducted during FY:05, including meetings that had occurred

21  prior to the date of approval.

22      170.    Then, on May 16, 2005, Brocade announced that it would need to file a second

23  restatement of its fiscal year 2002 through 2004 financial results. On that same day, Brocade issued

24  a press release titled "Brocade Restates Financial Statements to Reflect Additional Stock-Based

25  _____

26  [6] The 2005 Proxy, filed with the SEC on February 28, 2005, announced that under the terms of the
    employment agreement between Brocade and Reyes, the Company would pay Reyes $520,000 per
27  year for two years to serve as a consultant to the Company. Reyes also remained eligible for
    incentive compensation of $390,000 per year plus reimbursement for expenses "incurred by Reyes in
28  the operation and use of his private plane and properties when used for Brocade business."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 Compensation Expense; Company Affirms That None of the Adjustments Impact Historical

2 Revenues, Cash Positions, or Non-Stock Option Related Operating Expenses." The press release

3 provided as follows:

> Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that none of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.

> Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

> After discovering the additional information regarding *non-compliance of its guidelines*, the Company commenced a review of certain other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods for up to three months from the start of the LOA. The expected charges relate principally to options that continued to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. *Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.*

> Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

> The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
| --- | --- | --- |
| 2001 | $12.0 - $26.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.08 - $0.09 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

*The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices.* Brocade has no further information regarding the timing or scope of the investigation.

"It is not unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. "We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

171.    On June 8, 2005, the Company announced the delayed filing of its 2Q:05 Form 10-Q.

172.    On June 9, 2005, the SEC raised the level of its investigation from an informal inquiry to a formal order of investigation, which indicated that the agency was taking a much more serious view of the defendants' misconduct.

173.    On June 13, 2005, the Company issued a press release entitled "Brocade Receives NASDAQ Notification Related to Late Filing of Form 10-Q for Second Quarter of Fiscal 2005." The press release stated in part:

Brocade Communications Systems, Inc. today announced that on June 10, 2005, it received a notice from the Nasdaq Stock Market stating that the Company is not in compliance with Nasdaq's Marketplace Rule 4310(c)(14) because the Company has not timely filed its Report on Form 10-Q for the fiscal quarter ended April 30, 2005. As a result of the filing delay, an "E" will be added to Brocade's ticker symbol and Brocade will begin trading under the symbol "BRCDE" effective at the opening of business on June 14, 2005. The presence of an "E" does not constitute a trading halt or delisting.

174.    On June 30, 2005, the Company filed a Form 8-K with the SEC, which stated in part:

In a Form 8-K filed with the SEC on June 8, 2005, Brocade Communications Systems, Inc. (the "Company") announced that it was delaying the filing of its Form 10-Q for its second fiscal quarter ended April 30, 2005. In that same filing, the Company stated that its Audit Committee has been performing an independent review of the Company's stock option accounting regarding leaves of absence and transition and advisory roles from 2001 through 2004. The Company is working diligently to complete and file its amended Form 10-K for the fiscal year ended October 29, 2004, along with the restatement of its financial statements for prior fiscal years. However, until the Audit Committee review is completed, the Company is unable to complete and file its Form 10-Q for the second fiscal quarter ended April 30, 2005 and the amended 2004 Form 10-K.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*On June 24, 2005, the Company received a letter from the Trustee for the holder of the Company's 2% Convertible Subordinated Notes stating that the Company failed to provide to the Trustee its Form 10-Q for the second fiscal quarter ended April 30, 2005.* The letter further stated that if the Company does not file its Form 10-Q for the second fiscal quarter ended April 30, 2005 with the Trustee within 60 days of June 24, 2005, the date of the letter, *an Event of Default, as defined under the Indenture governing the Notes, will have occurred. If an Event of Default were to occur, the Trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding could attempt to declare all unpaid principal and premium, if any, and accrued interest on the Notes then outstanding to be immediately due and payable. Approximately $279 million in unpaid principal was outstanding under the Notes as of June 29, 2005.* The Company's total cash and investments as of April, 30, 2005, the end of the Company's second fiscal quarter, was approximately $746 million.

175.    In a Form 8-K filed with the SEC on July 27, 2005, Brocade announced the termination of the "agreement and employment arrangement between the Company and [defendant] Reyes." Additional information concerning the termination of Reyes' employment was not released.

176.    On August 23, 2005, Brocade filed a Form 8-K with the SEC that stated in part:

*On August 23, 2005, Brocade Communications Systems, Inc. (the "Company") made an irrevocable call for redemption of all of the Company's outstanding 2% Convertible Subordinated Notes Due 2007 (the "Notes") as of August 22, 2006 (the "Redemption Date") in accordance with the terms of the Indenture dated as of December 21, 2001 between the Company and U.S. Bank National Association* (as successor trustee to State Street Bank and Trust of California N.A.), as Trustee (the "Indenture"). *In connection with the call for redemption of the Notes, the Company deposited with the Trustee $276.1 million in interest-bearing U.S. Treasury securities* (the "Funds"), which will cover all interest scheduled to become due and owing on the Notes prior to the Redemption Date (which will continue to be paid from the Funds to the noteholders when due and payable) and all accrued interest, principal and call premium owing on the Notes on the Redemption Date, thereby fulfilling the Company's obligations to the noteholders. The Funds will remain on the Company's balance sheet as restricted securities until the Redemption Date. The Company's call for redemption of the Notes and deposit of the requisite principal, interest and call premium amount with the Trustee for the benefit of the noteholders discharged the Indenture effective as of August 23, 2005, subject only to the rights of the noteholders to receive payments of interest, principal and call premium from the Funds deposited with the Trustee and certain related rights. A call premium of 0.4% of the face value of the Notes will be due because the Notes will be redeemed prior to their due date of January 1, 2007.

*The Company expects to record a loss on investments of approximately $4.7 million in the quarter ending October 29, 2005* with respect to the disposition of certain short-term and long-term investments that was necessary to deposit the Funds with the Trustee.

In the event that the Company had not exercised the call for redemption of the Notes, the Company expected to be declared in default under the Notes due to the Company's inability to file its Form 10-Q for the quarter ended April 30, 2005 on or before August 23, 2005. *In such an event, $279.7 million in principal and accrued interest would have become immediately due and payable under the Notes.* The Notes would have otherwise been due in January 1, 2007.

- 64 -

The Company's total cash and investments as of July 30, 2005, the end of the Company's third fiscal quarter, was $733.8 million. As noted above, *the Funds deposited with the Trustee on August 23, 2005 will remain on the Company's balance sheet as restricted securities until the Redemption Date.*

177.    On September 9, 2005, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC for its 3Q:05 Form 10-Q. Brocade still had yet to file its 2Q:05 Form 10-Q.

178.    On November 14, 2005, the Company filed its second restatement of its fiscal 2002 through first fiscal quarter 2005 financial results. A Form 8-K filed by Brocade on that date stated in pertinent part:

As previously disclosed on Form 8-K filed with the Securities and Exchange Commission on May 16, 2005, Brocade Communications Systems, Inc. (the "Company") determined that *the Company's financial statements for the fiscal years ended October 30, 2004, October 25, 2003, and October 26, 2002, and the interim periods contained therein, should no longer be relied upon because of errors in such financial statements.* The Company has restated those financial statements, which appear in the Company's Annual Report on Form 10-K/A for the fiscal year ended October 30, 2004 (the "Form 10-K/A"). As a result of such restatements, on November 10, 2005, the Company, on management's recommendation and in consultation with the Company's Audit Committee and KPMG, LLP, the Company's independent registered public accounting firm, concluded that *the financial statements for the first fiscal quarter of 2005 ended January 29, 2005, should no longer be relied upon because of an error in such financial statements.*

Specifically, the Company concluded that the Company's balance sheet for the first quarter of fiscal 2005 ended January 29, 2005 needs to be restated to reflect the cumulative effect of the restatements previously announced on additional paid-in capital and retained earnings. The restatement of the financial statements for the quarter ended January 29, 2005 relates exclusively to reclassifications within shareholders equity related to the cumulative effect of the foregoing restatements.

179.    Although the Director Defendants failed and refused to adequately investigate the cause of Brocade's restatements, on November 14, 2005, they caused or allowed the Company to list a number of changes it had made to its stock option program's internal controls in response to certain of the material weaknesses present in Brocade's internal controls. In this second restatement, the Company added approximately *$71 million* in stock-based compensation expenses. The amended FY:04 Form 10-K stated in pertinent part:

*Changes from December 2002 through October 30, 2004*

1.    Improvements in Disclosure Controls and Internal Control over Financial Reporting:

- 65 -

- We improved the documentation of our significant accounting policies, which are reviewed with our Audit Committee.

- Improvements have been made to the Audit Committee charter and committee functions. The Audit Committee charter was expanded to include in its scope the responsibility to review and approve all new or changes to, significant accounting policies and positions. In addition, we expanded both the number of Audit Committee meetings from four to eight standing meetings, and the duration of those meetings. This allows a more in-depth review of complex accounting issues.

- We formed a Disclosure Committee composed of representatives from our accounting, legal and investor relations departments, and our financial management, the minutes of which are reviewed with the Audit Committee.

2.    *Improvements in stock option granting process and related Internal Controls:*

- We implemented cross functional teams composed of members of our legal, accounting and human resources departments to develop improvements in the stock option granting process.

- We formalized guidelines relating to the size and vesting schedule of stock option grants for all new employees and on-going employee grants.

- We improved the documentation of the actions of the Compensation Committee and grant subcommittee regarding stock option granting.

- We made personnel changes in areas associated with the stock option granting process to increase the levels of experience of the personnel involved.

- We increased the frequency of stock option grants, moving to grants on a two to three week routine cycle, and significantly reduced the processing time between grant dates and the delivery of option paperwork to employees.

***Changes Subsequent to October 30, 2004***

Subsequent to October 30, 2004, we have taken a number of steps to strengthen our disclosure controls and procedures and internal control over financial reporting. These remedial measures include personnel and procedural changes to improve the stock option granting and employee change in status processes. Specifically, we have implemented the following additional internal control improvements:

- Increased the Compensation Committee of the Board of Directors to three independent members.

- The Compensation Committee refined and limited delegation of authority to a subcommittee to grant stock options.

- Documented into a formal written policy our stock option granting process.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Created a pre-determined schedule for employee stock option grants, including enhancements with respect to the grant routine cycle.

- Adopted a policy not to grant executive officers options when trading is restricted for executives under the Company's Insider Trading Policy.

- Improved the documentation and revised the approval process for initial, or changes to, policies associated with change in employee status, including leaves of absence and in transition and advisory roles.

- Established cross-functional teams comprised of members of our accounting, information technology and human resource departments to develop improvements in the employee change of status systems and processes.

- Performed additional training for personnel in areas associated with the stock option granting and employee change in status processes to increase competency levels of the personnel involved.

We also completed further testing of the policies and procedures and related controls that we recently implemented as discussed above.

180.    On November 16, 2005, the Company issued a press release announcing its preliminary 4Q:05 financial results. In it, Brocade stated that its GAAP earnings per share was expected to include charges of approximately: (i) *$4.9 million related to the internal review and SEC investigation*; and (ii) $0.7 million for stock-based compensation.

181.    On November 22, 2005, the Company issued a press release announcing the resignation of defendant Moore from the Company's Board. Brocade disclosed no reasons for his departure.

182.    On December 6, 2005, the *Silicon Valley/San Jose Business Journal* published an article entitled "*Probe Costs Drag Down Brocade Earnings.*" The article stated in pertinent part:

Earnings reported Tuesday by Brocade Communications Systems Inc. fell sharply on the costs of an internal probe related to a Securities and Exchange Commission inquiry.

San Jose-based Brocade's posted net income of $1.1 million, or 0 cents per share, compared to $20.3 million, or 8 cents a share, a year ago.

*This year's fourth quarter results included $5 million in inquiry expenses and a $5.2 million pretax loss on investments. The Securities and Exchange Commission and Justice Department are investigating Brocade's treatment of stock options expensing.*

Without the special charges, Brocade would have earned $19 million, or 7 cents a share, in the quarter, 2 cents better than a survey of analysts predicted.

Revenue fell 6 percent from a year ago to $145.5 million.

- 67 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    183.    On December 21, 2005, the Company announced defendant Canova's resignation as

2    CFO.  Brocade disclosed no explanation for his departure.

3    184.    On January 13, 2006, the Company filed a Form NT 10-K, indicating that it would

4    not be able to timely file its FY:05 Form 10-K.

5    185.    On January 23, 2006, the Company filed a Form 8-K with the SEC that announced

6    that Brocade and its Board, along with defendants House, Krause, Moore, O'Brien, Paisley, Sonsini,

7    Neiman, Dempsey and Vaswani, had entered into a tolling agreement with Reyes (the "Tolling

8    Agreement").  Under the terms of this agreement, all periods of limitation (statutory or otherwise)

9    affecting any claims or causes of action that defendant Reyes may have against Brocade and its

10   directors or any of them, or which Brocade and the above-mentioned defendants may have against

11   Reyes, shall be tolled from January 1, 2006 until the earlier of (1) January 1, 2008, or (2) forty-five

12   days from the date of service upon the attorneys for the parties hereto of a written notice terminating

13   this agreement.  This announcement centered on defendant Reyes' plan to file a lawsuit against the

14   directors on January 24, 2006.  Apparently, the Board was able to persuade Reyes to delay the filing

15   of his suit by extending the statute of limitations on a potential wrongful termination charge.

16   186.    On February 13, 2006, *Business Week* published an article entitled "Brocade: Stung

17   By Stock Options," which discussed the supposed disputes between members of the Board.

18   Significantly, Reyes is reported to have said that Sonsini urged the Board to make Reyes a

19   "committee of one" to dole out options as he wished in 1999. The article stated, in pertinent part:

> After Greg Reyes suddenly resigned as chief executive of Brocade Communications
> Inc. a year ago, the reputation of the swashbuckling onetime billionaire immediately
> went from gold to mud. The reason: His ouster came just weeks after Brocade
> announced options accounting irregularities that required a restatement of earnings.
> But now, more than his image is on the line. Three sources tell BusinessWeek that the
> Securities & Exchange Commission is likely to bring civil charges against him in the
> coming weeks. The Justice Dept. is also investigating a criminal case. "I'm scared,"
> says Reyes.
>
> He should be. *Twice in the last year, Brocade admitted that it incorrectly
> accounted for options it granted new hires. The probe comes when the government is
> investigating many former tech high-fliers for similar practices. Predicts one tech
> lawyer, "Someone is going to get the opportunity to be the Martha Stewart of options
> pricing, and Brocade is a leading candidate."*
>
> But Reyes, who loves to hunt big game, plans to fight back. And he plans to do
> it in a way that could put a spotlight on Brocade's board -- including Silicon Valley
> super-lawyer Larry W. Sonsini, who left the board soon after Reyes' departure. The 43-

- 68 -

year-old Reyes insists he did nothing to enrich himself and says the mistakes were primarily paperwork errors by a former human resources executive. *Even if he had approved the practices, he says, it would have been within his authority, given the sweeping powers the board gave him in 1999.* Now, he argues, seven current and former directors are scapegoating him to minimize their own liability. "What better way to do that than to throw me under the bus," he says. Neither Brocade, Sonsini, the SEC, or the Justice Dept. would comment for this story.

Reyes was planning to file a civil suit against the directors on Jan. 24, before Brocade persuaded him to hold off by extending the statute of limitations on a potential wrongful termination charge. And he's also mulling a shareholder suit, alleging that the investigation by the board's audit committee did far more to hurt investors than the alleged accounting miscues. In particular, he says he was in the final stages of selling Brocade to Cisco Systems Inc. (CSCO ) for $9 a share in November, 2004. Brocade makes data storage gear and was one of the hottest stocks of the Net bubble, with a onetime market cap of $24 billion. But talks with Cisco stalled after the board disclosed the investigation. Other inside sources say that Cisco got cold feet after finding the accounting irregularities on its own but confirm that Reyes' departure two months later further diminished its interest. Cisco declined to comment.

Much of Reyes' ire is saved for Sonsini, a power broker who has advised everyone from Steve Jobs to Google (GOOG ) during a storied 40-year-career. *Reyes says Sonsini urged the board to make Reyes a "committee of one" to dole out options as he wished in 1999.* The next he heard from the board, he claims, was after a disgruntled former employee threatened to file a whistleblower suit in 2004 alleging improprieties related to options.

*After an investigation, Reyes says Sonsini persuaded him to resign because the evidence pointing to him was "overwhelming and conclusive." Only after Reyes had seen the evidence and, unimpressed, tried to rescind his resignation did Sonsini reveal that Brocade's outside auditor had refused to certify Brocade's financials with Reyes as CEO, says Reyes. His argument: that members of the board overstated his role in order to deflect the auditor's attention from themselves.*

With possible SEC charges looming, Reyes is pressing his demands. He told Brocade he would drop talk of lawsuits if it publicly exonerates him, puts him back on the board, and pays him a rich consulting package it rescinded last summer. But if the government's case is as strong as some insiders close to Brocade hint it is, this big-game hunter may be feeling less like the pursuer and more like prey.

187.   On February 8, 2006, the Company filed a Form 8-K with the SEC, which announced that Brocade's Nominating and Corporate Governance Committee approved a one-time payment of $100,000 to defendant House in recognition of his role as Chairman during the previous year. The filing also announced that defendants Paisley and Neiman notified the Company that they would not be standing for re-election to the Board at the Company's 2006 Annual Meeting of Stockholders.

188.   On February 17, 2006, *Business Week* published an article entitled "The Plot Thickens at Brocade," which highlighted the personnel-related disclosures made on February 8, 2006. The article stated in pertinent part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Turns out that, according to a Feb. 8 government filing, two of Brocade's board members will not stand for reelection at the company's annual meeting on April 17.

One of those directors is *Seth Neiman*, a managing partner at Crosspoint Venture Partners. *He's considered a father of the company, given that he provided initial funding and management aid even before there was a business plan.* My sources suggest his departure is no big surprise, as Nieman has talked about wanting to step off the board for the last few years.

More interesting is the departure of former 3Com Corp. chief financial officer *Chris Paisley. As head of the board's audit committee, he's had a central role in the saga of the past year.* He launched the sweeping internal investigation into the company's books that began in late 2004, after a disgruntled former sales manager threatened to bring a whistleblower suit to the SEC alleging options accounting naughtiness, if the company didn't renege on a threat to foreclose on his house to get repayment of a loan granted to him when he was hired. The investigation led to massive restatements, a public acknowledgement of accounting problems and possibly "improprieties", and the ouster of Reyes, a larger-than-life personality in this niche of the networking market who was seen as the driving force behind the company.

* * *

While on the topic of Brocade, there's one more recent item of note, also announced in that 8-K filing from Feb. 8. *The company announced it was paying boardmember Dave House, a former executive at Intel and Nortel, a one-time $100,000 bonus for his work over the past year. That's interesting because, according to multiple sources, House was originally picked to replace Reyes.* Only after many top executives protested that House lacked sufficient knowledge of the close-knit storage networking business did the board decide to give the job to company executive Mike Klayko, who was running sales at the time.

Brocade, House and Klayko all declined to comment, citing the SEC investigation.

189.    On May 12, 2006, Brocade filed a Form 8-K with the SEC that announced in pertinent part:

On May 12, 2006, Brocade Communications Systems, Inc. filed a Schedule TO ("Tender Offer") with the Securities and Exchange Commission. *The Tender Offer was filed to address recent changes to tax laws that could have serious, unfavorable personal tax consequences for some of Brocade's employees who received certain stock options that were or may have been granted at a discount from fair market value at the time of grant.* Specifically, under Section 409A of the Internal Revenue Code, certain options granted at a discount may trigger certain adverse tax consequences, including income tax at vesting, an additional 20% tax and interest charges, in addition to standard federal, state and other applicable taxes.

190.    On June 5, 2006, MercuryNews.com released an article entitled "Company's Recruiting Perks Under Fire in Suit," which elaborated on certain disreputable hiring practices by Brocade since at least 1999. The article stated in pertinent part:

It was boom time in Silicon Valley and Greg Reyes wouldn't take no for an answer.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The CEO of Brocade Communications wanted David Smith, a senior executive at a Houston software firm, to join the hot, newly public company. So he dangled a big relocation bonus and 200,000 options to buy Brocade's stock at $149.06 a share.

*Reyes set the price in a Jan. 6, 2000, offer letter -- well before Smith started working at Brocade in April. With Brocade's stock surging, that gave Smith a big head start to millions of dollars in potential profits.*

*Smith, a shareholder lawsuit claims, was among a number of employees who benefited from Brocade's "pervasive scheme" to manipulate option grants.*

*The suit provides a glimpse at how one company allegedly used deliberately timed option grants as a recruiting tool during the dot-com boom.* Brocade is one of more than two dozen companies nationwide where options practices -- including backdating of grants to take advantage of lower stock prices -- are now being investigated by federal regulators or the companies themselves.

Reyes couldn't be reached for comment and his attorney didn't return calls or e-mails. A spokeswoman for Brocade wouldn't comment on pending litigation. Smith, who was later fired by Brocade and now lives in Florida, declined to comment.

Smith eventually netted $7.4 million from his sale of Brocade shares in 2000 and 2001, the San Jose-based data storage networking company said in court documents.

\* \* \*

The 112-page shareholder lawsuit, initially filed in May 2005 and consolidated as a class action in April, cites Smith's situation as *one of several examples of how Brocade allegedly violated its own rules for granting options, hid the actual costs from shareholders and regulators, and defrauded investors.*

Much of the activity occurred during the dot-com boom, when Silicon Valley companies were competing fiercely for skilled workers.

"You had a hiring frenzy and stocks going through the roof. Mix in some desperate hiring managers and lax controls around option grants, and it's not surprising that some of the sloppiness evolved into abuse. This is where it all ends up," said Tim Sparks, president of Compensia, a compensation consultant in San Jose. His firm was hired in May to advise Brocade's current board.

*The lawsuit in San Francisco federal district court claims Brocade recruited employees by giving them offer letters with early, often false, start dates for employment -- so they could get the lowest possible price on options. Some came in to fill out paperwork just to get an early start date and were put on leaves of absence from Brocade while they finished their employment at another company, the suit says.*

*The suit alleges that Reyes had the authority to ``dole out'' options ``as a committee of one'' and that he also at times held ``ad hoc'' board meetings with other executives to approve option grants.*

- 71 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Reyes stepped down as CEO in January 2005, a few weeks after the company's first announcement that it would restate financials. But he stayed on as a consultant until June 2005.

Brocade disclosed May 16, 2005, that the Justice Department and the Securities and Exchange Commission were investigating its option-granting practices.

Leslie Davis, a spokeswoman for Brocade, said the company will address some of the litigation issues in its next quarterly SEC filing. Brocade is in "active" settlement talks with the SEC and has set aside $7 million for a potential settlement, she added.

Spokesmen for the SEC and the Justice Department declined to comment on Brocade.

Attorneys at Wilson Sonsini Goodrich & Rosati, who represent Brocade and its board, did not return calls seeking comment.

Making changes

Brocade recently has moved to improve its controls and accounting practices. The company, which went public in 1999, has restated every year of its financials through 2004.

*One of its most telling restatements was for fiscal 2000, ended Oct. 31, 2000. Brocade said that it actually lost $951.2 million or $4.59 a share, instead of earning $68 million, or 65 cents a share. The $1 billion difference, the company said, was related to its stock-based compensation and associated income tax adjustments.*

Brocade also said in SEC filings in 2005 that restatements were necessary because it had incorrectly accounted for option grants to new hires, part-time employees, employees on leaves of absence or in transitory roles with the company, from 1999 to 2004.

*The shareholder suit against Brocade was based on information from nine former employees, several of whom were recruiters or worked in human resources handling offer letters and other paperwork.* The Arkansas Public Employee Retirement System, claiming a loss of $1.9 million, is the lead plaintiff in the shareholder suit.

Smith's Jan. 6, 2000, letter offered him a job as a vice president, with a base salary of $240,000 a year and 200,000 options, with the grant date being his first day of employment. "Therefore, with your start date of Jan. 6, 2000, your stock will be priced at $149.063 per share," wrote Reyes, in the letter, which was an exhibit in a separate lawsuit by Brocade against Smith.

In that suit, Smith stated that he started working full time at Brocade in April 2000 -- significantly later than the supposed January start date.

*Another former Brocade employee who allegedly had a confrontation with Reyes was named in the shareholder suit as the whistle-blower in the federal investigations of Brocade. Daniel Cudgma was hired as a vice president in sales, the suit says. A former employee in the recruiting department quoted in the suit*

recalled "a rush to get approvals and the t's crossed and i's dotted so Cudgma could take advantage of a lower strike price.

    After a disagreement with Reyes, the suit contends, Cudgma "threatened to expose the whole backdating thing" and was fired.

        Cudgma, who is now a vice president of sales of Gryphon Networks outside of Boston, did not return calls.

191.    The Individual Defendants have thus far refused to admit that they caused and/or allowed Brocade to engage in improper backdating of stock options. Instead, their acquiescence to the backdating scheme by defendants Reyes, Jensen, Byrd and Canova continue as they attempted to fortify any losses they themselves might incur. For example, in a Form 8-K filed with the SEC on May 12, 2006, the Individual Defendants acknowledged that the tender offer was intended to alleviate "serious, unfavorable personal tax consequences for some of Brocade's employees who received certain stock options that were or may have been granted at a discount from fair market value at the time of grant."

192.    On June 12, 2006, Brocade filed a Form 8-K with the SEC in which the Company detailed agreements, totaling over $683,000, entered into with certain of the Individual Defendants, among others, pursuant to the Tender Offer announced on May 12, 2006. The Form 8-K stated in pertinent part:

Effective June 12, 2006, Brocade Communications Systems, Inc. (the "Company") completed its previously disclosed Tender Offer (see Form 8-K filed May 12, 2006). As previously announced, the Tender Offer was filed to address recent changes to tax laws that could have adverse personal tax consequences for some of Brocade's employees who received stock options that were or may have been granted at a discount from fair market value at the time of grant. Four of the Company's executive officers elected to participate in the Tender Offer and, as a result, have entered into definitive agreements with the Company in connection with the Tender Offer, effective as of June 12, 2006. Each of the agreements with the executive officers who participated in the Tender Offer is detailed below and was entered into on the same terms and conditions as were available to all participants in the Tender Offer:

• *Michael Klayko*, Chief Executive Officer, elected to amend a portion of his nonqualified stock option grant dated August 15, 2003 to increase the exercise price per share from $5.53 to $5.64. In consideration for the amendment to his option, Mr. Klayko will receive a cash payment of *$18,333.37* promptly following January 1, 2007.

• *Richard Deranleau*, Chief Financial Officer, Vice President and Treasurer, elected (i) to amend a portion of his nonqualified stock option grant dated December 10, 2003 to increase the exercise price per share from $5.52 to $5.78 and to receive a cash payment promptly following January 1, 2007 of *$1,040.00* in consideration for the amendment to such option, (ii) to

- 73 -

1    amend a portion of his nonqualified stock option grant dated June 9, 2004 to
     increase the exercise price per share from $5.68 to $5.71 and to receive a
2    cash payment promptly following January 1, 2007 of *$367.50* in
     consideration for the amendment to such option, and (iii) to cancel a portion
3    of his nonqualified stock option grant dated July 28, 2003 in consideration
     for a cash payment to be made promptly following January 1, 2007 of
4    *$40,327.53.*

5    193.    Thus, rather than pursuing action against the recipients of the benefits of the

6    Company's fiscal woes, the defendants on the Board at the time of the Tender Offer remained more

7    concerned with preventing any financial loss to themselves or their colleagues.

8                                **THE PROPOSED SETTLEMENT**

9    194.    Not only did the Board, KPMG, Sonsini and WSGR fail to uncover and/or stop the

10   improper option backdating and refuse to completely scrutinize the causes of the Company's four-

11   year restatement, which was rendered inaccurate by the lack of any meaningful investigation, the

12   Board has further caused Brocade to enter into the Proposed Settlement. According to the Amended

13   Stipulation of Settlement, the Federal Derivative Plaintiffs have agreed to release all defendants,

14   except defendant Reyes, in the Federal Derivative Action for *all derivative claims* alleged prior to

15   January 2006 in exchange for some illusory corporate therapeutics and $525,000 in attorney's fees.

16   Under the terms of the Proposed Settlement, Brocade will receive no compensation at all for the

17   damages it incurred, the extent of which is still unfolding and being revealed.   Moreover, the

18   Proposed Settlement will release all claims relating to defendants' backdating of stock options that

19   are now the subject of civil and criminal charges against several of defendants herein without any

20   monetary recovery for Brocade. The unfair, unreasonable and inadequate Proposed Settlement is the

21   latest act in defendants' continuing conspiracy to cover up their rampant backdating and escape

22   liability.   In effect, they hope that his settlement will be their "get out of jail free card."

23   195.    Defendant Wall played an active role in the events leading up to the Proposed

24   Settlement. For example, during a September 21, 2007 hearing in the State Derivative Action, the

25   Court asked counsel for Brocade the following question:  "Was [Wall] involved in the negotiation

26   for the settlement that is currently pending in federal court?" Brocade's counsel responded that "he

27   was." On information and belief, plaintiff alleges that WSGR played a similarly active role in the

28   negotiation of the Proposed Settlement.

                                        - 74 -

196.    On August 18, 2006, United States District Court Judge Charles Breyer refused to approve the Proposed Settlement stating that attorneys on both sides had not "presented [him] with anything other than the lawyers saying we think this is a good idea." On October 6, 2006, the parties in the Federal Derivative Action provided Judge Breyer with supplemental briefing on the supposed adequacy of the Proposed Settlement. To date, the Court has yet to grant final approval to the Proposed Settlement.

197.    It is no surprise that the Court has refused to approve the Proposed Settlement to date. As it currently stands, apart from the uncertain and wafer-thin proposed corporate therapeutics, Brocade would receive no compensation for the monumental damages that it has incurred and continues to suffer, the extent of which is still being revealed. Moreover, the Proposed Settlement would release all claims relating to defendants' conspiracy and backdating of stock options that are now the subject of civil and criminal charges -- without providing any monetary recovery for Brocade. Likewise, the Proposed Settlement contemplates the release of Brocade's valuable claims against KPMG and WSGR for no consideration whatsoever.

## CIVIL AND CRIMINAL CHARGES ARE BROUGHT AGAINST BROCADE AND DEFENDANTS REYES, JENSEN, CANOVA AND BYRD

198.    On July 20, 2006, the SEC announced that it had filed civil charges against defendants Reyes, Jensen and Canova [7] A criminal case was simultaneously brought by the United States Attorney for the Northern District of California against Reyes and Jensen.[8] An article by *The Wall Street Journal*, entitled "Brocade Ex-CEO, 2 Others Charged In Options Probe" released on July 21, 2006, explained the charges in both actions. It stated, in pertinent part, as follows:

> *Federal authorities issued civil and criminal securities-fraud charges against a former Silicon Valley chief executive and two other executives in a stock-options backdating scheme, signaling they will take a hard line in the widening scandal.*
>
> Prosecutors accused 43-year-old Gregory Reyes, the CEO of Brocade Communications Systems Inc. until January 2005, of backdating options he doled out as a "committee of one" to hundreds of employees, boosting the potential value of the

---

[7] *See supra,* ¶20a.

[8] *See supra,* ¶20b.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

-options and concealing millions of dollars of compensation expenses from shareholders.

*Officials underscored how seriously they view options manipulation by charging not just Mr. Reyes -- who isn't directly accused of backdating his own grants, and who made no profit from them -- but also a former chief financial officer and former vice president for human resources at the firm.*

They also indicated that many more executives could face charges related to manipulating options. Securities and Exchange Commission Chairman Christopher Cox said the agency is investigating more than 80 companies.

*"The full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating," he said at a San Francisco news conference.* He said additional cases likely would be brought in the "coming weeks and months."

The crux of the case brought yesterday is that Mr. Reyes altered the dates of option grants to new employees to increase their value and give Brocade, a San Jose, Calif., maker of switching devices for data-storage networks, an edge in the cutthroat scramble for talent during Silicon Valley's boom days. In doing so, prosecutors said, he violated accounting rules by not recording the proper expenses for the options.

*Under a criminal complaint from the U.S. attorney for the Northern District of California, Mr. Reyes faces a single count of securities fraud, which carries a maximum penalty of 20 years in prison. Also facing a criminal-fraud charge is Stephanie Jensen, 48, Brocade's human-resources director from October 1999 through February 2004. She is accused of helping Mr. Reyes with the scheme.*

Both also face civil charges from the SEC of securities fraud and filing false documents. *Antonio Canova, 44, who served as the company's finance chief from May 2001 until he left in December, also was charged in the civil* case but not in the criminal action.

\* \* \*

*The SEC's Mr. Cox warned that backdating "deceives investors and the market as a whole about the financial health of companies that cheat in this way." He added, "It is poisonous to an efficient marketplace."*

\* \* \*

The charges against Ms. Jensen and Mr. Canova suggested that federal officials won't hesitate to pursue those further down the corporate ladder who allegedly participated in an options-timing fraud.

John Coffee, a law professor at Columbia Law School, said human-resources officials could find themselves in the hot seat as prosecutors attempt to persuade them to cooperate in investigations of senior executives. "This is going to send a shiver through the spines of much of corporate America," he said.

*The SEC also showed it won't take a kind view of executives who knew about backdating but signed off on financial statements. The agency said that's what Mr. Canova did, despite hearing misgivings from some employees about the*

*practice. The SEC also alleged that he "helped facilitate" the fraud by directing others to ensure that option dates matched hiring dates in employee records.*

199. . On August 17, 2007, the SEC filed a new enforcement action against defendant Byrd arising out of his alleged role in the backdating activity at Brocade, which subsequently was consolidated into the SEC action against Reyes, Jensen and Canova. Among other things, the SEC's complaint against Byrd accuses him of allowing Brocade "to represent to shareholders that the Company did not incur expenses to employees, including executives." According to the complaint, Byrd violated the antifraud, books and records and other provisions of the federal securities laws. The SEC is seeking civil monetary penalties and disgorgement of Byrd's ill-gotten gains.

200. Thus, even as the architects of Brocade's fiscal woes began to confront the criminal and civil enforcement consequences of their misconduct, the remaining Individual Defendants, who participated in, facilitated knowingly or recklessly acquiesced to the scheme, have denied any role in the backdating scandal that now embroils Brocade. Instead, on July 20, 2006, the Individual Defendants caused or allowed the Company to issue a press release, entitled "Brocade Statement Regarding Stock Option Matters," in which they proclaimed that "[n]o executive officers involved in the historical stock option granting practices remain employed with Brocade."

201. The July 20, 2006 press release further disclosed that the Company had reserved $7 million for a proposed settlement with the SEC. This disclosure was a harbinger of the damages that would be paid by Brocade about a year later to settle the enforcement action eventually filed by the SEC in May 2007 against the Company itself that arose out of the illicit backdating activity described herein.[9] On August 27, 2007, a final judgment against Brocade was entered based on an agreement between the Company and the SEC. In addition to a variety of permanent injunctive relief set forth in the judgment, Brocade was ordered to pay a civil penalty of $7 million within ten days after entry of judgment.

202. In the first U.S. felony criminal conviction by a jury arising out of the backdating of stock options, Reyes was found guilty in the U.S. District Court for the Northern District of

_____

[9] *See supra* ¶¶197,199

1  California on August 7, 2007 of one count of conspiracy, one count of securities fraud, three counts

2  of filing false documents with the SEC, one count of falsifying Brocade's books and records and four

3  counts of lying to an accountant. Following a jury trial, Jensen also was convicted in the same Court

4  on December 5, 2007 on two criminal counts – conspiracy to falsify books, records and accounts in

5  violation of 18 U.S.C. §371; and falsifying books, records and accounts in violation of 15 U.S.C.

6  §§78m(b)(2)(A), 78m(b)(5), and 78ff, 17 C.F.R. §240.13b2-1, all arising out of her role in the illegal

7  employee compensation scheme that took place at Brocade

8                    **IMPROPER FINANCIAL REPORTING**

9         203.    The Individual Defendants and defendant KPMG, by their fiduciary duties of care,

10  good faith and loyalty, owed to Brocade a duty to ensure that the Company's financial reporting

11  fairly presented, in all material respects, the operations and financial condition of the Company. In

12  order to adequately carry out these duties, it was and remains necessary for the Individual

13  Defendants to have known and understood, and know and understand, the material, non-public

14  information to be either disclosed or omitted from the Company's public statements. This material,

15  non-public information included the presence of material weaknesses in Brocade's internal controls.

16  Further, defendants Neiman, Dempsey, Moore, Leslie, Krause, Sonsini, Paisley and O'Brien, as

17  members of the Audit Committee at various times since at least 1999, had a special duty to know and

18  understand this material information as set out in the Audit Committee's charter which provides that

19  it is responsible for, among other things, oversight of: (i) the quality and integrity of the Company's

20  accounting and financial reporting processes and the audits of its financial statements; (ii) the

21  performance of the Company's systems of internal controls, disclosure controls and internal audit

22  functions; and (iii) the Company's procedures for legal and regulatory compliance, risk assessment

23  and business conduct standards. Defendants Byrd, Canova, Klayko, Deranleau, Jensen, Reyes and

24  House, along with non-parties Cuthbert, D. Smith and Bonderson and, as officers of Brocade, had

25  ample opportunity to discuss this material information with their fellow officers at management

26  meetings and via internal corporate documents and reports. Moreover, defendants House, Klayko,

27  Reyes, Neiman, Dempsey, Walker, Moore, Vaswani, Leslie, Krause, Jones, Rose, Sonsini, Paisley

28  and O'Brien, as directors of Brocade, had ample opportunity to discuss this material information with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   management and fellow directors at any of the approximately thirty-four Board meetings that

2   occurred between 1999 and 2004. Defendant Paisley had a heightened duty stemming from his

3   financial expertise. Defendant Paisley is a professor of Accounting and Finance at Santa Clara

4   University and has been since January 2001. Despite these duties, the Individual Defendants and

5   KPMG negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions,

6   the following improper statements to be disseminated by Brocade to the investing public and the

7   Company's shareholders since at least 1999.

8                           **The FY:99 Form 10-Q and Form 10-K**

9         204.    On September 15, 1999, the Individual Defendants caused or allowed Brocade to file

10  Form 10-Q for the 3Q:99. On January 31, 2000, the Individual Defendants caused or allowed the

11  Company to file its FY:99 Form 10-K with the SEC. The FY:99 Form 10-K was subsequently

12  amended. Accordingly, on February 28, 2000, the Individual Defendants caused or allowed the

13  Company to file its FY:99 Form 10-K/A with the SEC. The FY:99 Form 10-Qs and 10-K were

14  simultaneously distributed to shareholders and the public. The FY:99 Form 10-Qs and 10-K

15  included Brocade's FY:99 financial statements which were improperly presented in violation of

16  GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's

17  compensation expense was understated and its net earnings were overstated.

18                          **The FY:00 Form 10-Qs and Form 10-K**

19        205.    On March 13, 2000, June 13, 2000 and September 12, 2000, the Individual

20  Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:00, 2Q:00 and 3Q:00,

21  respectively. On January 26, 2001, the Individual Defendants caused or allowed the Company to file

22  its FY:00 Form 10-K with the SEC. The FY:00 Form 10-Qs and 10-K were simultaneously

23  distributed to shareholders and the public. The FY:00 Form 10-Qs and 10-K included Brocade's

24  FY:00 financial statements which were improperly presented in violation of GAAP, due to improper

25  accounting for the backdated stock options. As a result, Brocade's compensation expense was

26  understated and its net earnings were overstated.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The FY:01 Form 10-Qs and Form 10-K**

206.    On March 13, 2001, June 12, 2001 and September 11, 2001, the Individual Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:01, 2Q:01 and 3Q:01, respectively. On January 24, 2002, the Individual Defendants caused or allowed the Company to file its FY:01 Form 10-K with the SEC. The FY:01 Form 10-Qs and 10-K were simultaneously distributed to shareholders and the public. The FY:01 Form 10-Qs and 10-K included Brocade's FY:01 financial statements which were improperly presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's compensation expense was understated and its net earnings were overstated.

**The FY:02 Form 10-Qs and Form 10-K**

207.    On March 12, 2002, May 30, 2002 and August 27, 2002, the Individual Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:02, 2Q:02 and 3Q:02, respectively. On January 22, 2003, the Individual Defendants caused or allowed the Company to file its FY:02 Form 10-K with the SEC. The FY:02 Form 10-Qs and 10-K were simultaneously distributed to shareholders and the public. The FY:02 Form 10-Qs and 10-K included Brocade's FY:02 financial statements which were improperly presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's compensation expense was understated and its net earnings were overstated.

| Defendants | Reported Grant Date | Adjusted Number of Securities Underlying Options | Adjusted Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | Estimated Paper Profit | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Jensen, Stephanie | 10/4/1999 | 640,000 | $25.85 | $26.00 - | $36.13 | $96,000.00 - | $6,576,000.00 |
| Tarrant, Peter | 10/4/1999 | 400,000 | $25.85 | $26.00 - | $36.13 | $60,000.00 - | $4,110,000.00 |
| Bonderson, Paul | 11/19/1999 | 532,000 | $32.13 | $32.81 - | $40.00 | $363,090.00 - | $4,186,840.00 |
| Byrd, Michael | 11/19/1999 | 85,000 | $32.13 | $32.81 - | $40.00 | $58,012.50 - | $668,950.00 |
| Cuthbert, Jack | 11/19/1999 | 143,328 | $32.13 | $32.81 - | $40.00 | $97,821.36 - | $1,127,991.36 |
| Malavalli, Kumar | 11/19/1999 | 212,000 | $32.13 | $32.81 - | $40.00 | $144,690.00 - | $1,668,440.00 |
| Reyes, Gregory | 11/19/1999 | 1,040,000 | $32.13 | $32.81 - | $40.00 | $709,800.00 - | $8,184,800.00 |
| Rinkle, Victor | 11/19/1999 | 180,000 | $32.13 | $32.81 - | $40.00 | $122,850.00 - | $1,416,600.00 |
| Smith, Charles | 11/19/1999 | 288,328 | $32.13 | $32.81 - | $40.00 | $196,783.86 - | $2,269,141.36 |
| Tarrant, Peter | 11/19/1999 | 120,000 | $32.13 | $32.81 - | $40.00 | $81,900.00 - | $944,400.00 |
| Smith, David | 1/6/2000 | 800,000 | $37.27 | $39.93 - | $44.66 | $2,127,760.00 - | $5,908,960.00 |
| Cuthbert, Jack | 1/31/2000 | 400,000 | $40.50 | $42.48 - | $70.77 | $793,760.00 - | $12,106,240.00 |
| Dempsey, Neal | 1/31/2000 | 10,000 | $40.50 | $42.48 - | $70.77 | $19,844.00 - | $302,656.00 |

- 80 -

| Name | Date | Shares | | | | | | | |
|------|------|--------|------|------|---|--------|--------------|---|----------------|
| Neiman, Seth | 1/31/2000 | 10,000 | $40.50 | $42.48 | - | $70.77 | $19,844.00 | - | $302,656.00 |
| Bonderson, Paul | 11/29/2000 | 220,000 | $76.88 | $80.91 | - | $112.56 | $885,786.00 | - | $7,850,150.00 |
| Byrd, Michael | 11/29/2000 | 410,000 | $76.88 | $80.91 | - | $112.56 | $1,650,783.00 | - | $14,629,825.00 |
| Cuthbert, Jack | 11/29/2000 | 542,000 | $76.88 | $80.91 | - | $112.56 | $2,182,254.60 | - | $19,339,915.00 |
| Jensen, Stephanie | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | - | $2,854,600.00 |
| Malavalli, Kumar | 11/29/2000 | 50,000 | $76.88 | $80.91 | - | $112.56 | $201,315.00 | - | $1,784,125.00 |
| Reyes, Gregory | 11/29/2000 | 4,800,000 | $76.88 | $80.91 | - | $112.56 | $19,326,240.00 | - | $171,276,000.00 |
| Rinkle, Victor | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | - | $2,854,600.00 |
| Smith, Charles | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | - | $2,854,600.00 |
| Smith, David | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | - | $2,854,600.00 |
| Canova, Antonio | 12/21/2000 | 360,000 | $68.44 | $75.50 | - | $105.00 | $2,541,600.00 | - | $13,161,600.00 |
| Bonderson, Paul | 4/17/2001 | 260,450 | $20.70 | $24.83 | - | $49.94 | $1,075,658.50 | - | $7,615,558.00 |
| Byrd, Michael | 4/17/2001 | 1,139,050 | $20.70 | $24.83 | - | $49.94 | $4,704,276.50 | - | $33,305,822.00 |
| Canova, Tony | 4/17/2001 | 377,750 | $20.70 | $24.83 | - | $49.94 | $1,560,107.50 | - | $11,045,410.00 |
| Cuthbert, Jack | 4/17/2001 | 541,760 | $20.70 | $24.83 | - | $49.94 | $2,237,468.80 | - | $15,841,062.40 |
| Dempsey, Neal | 4/17/2001 | 80,000 | $20.70 | $24.83 | - | $49.94 | $330,400.00 | - | $2,339,200.00 |
| Jensen, Stephanie | 4/17/2001 | 176,460 | $20.70 | $24.83 | - | $49.94 | $728,779.80 | - | $5,159,690.40 |
| Leslie, Mark | 4/17/2001 | 60,000 | $20.70 | $24.83 | - | $49.94 | $247,800.00 | - | $1,754,400.00 |
| Malavalli, Kumar | 4/17/2001 | 73,910 | $20.70 | $24.83 | - | $49.94 | $305,248.30 | - | $2,161,128.40 |
| Neiman, Seth | 4/17/2001 | 80,000 | $20.70 | $24.83 | - | $49.94 | $330,400.00 | - | $2,339,200.00 |
| Reyes, Gregory | 4/17/2001 | 3,970,020 | $20.70 | $24.83 | - | $49.94 | $16,396,182.60 | - | $116,083,384.80 |
| Rinkle, Victor | 4/17/2001 | 172,540 | $20.70 | $24.83 | - | $49.94 | $712,590.20 | - | $5,045,069.60 |
| Smith, Charles | 4/17/2001 | 110,030 | $20.70 | $24.83 | - | $49.94 | $454,423.90 | - | $3,217,277.20 |
| Smith, David | 4/17/2001 | 207,810 | $20.70 | $24.83 | - | $49.94 | $858,255.30 | - | $6,076,364.40 |
| Sonsini, Larry | 4/17/2001 | 60,000 | $20.70 | $24.83 | - | $49.94 | $247,800.00 | - | $1,754,400.00 |
| Tarrant, Peter | 4/17/2001 | 48,480 | $20.70 | $24.83 | - | $49.94 | $200,222.40 | - | $1,417,555.20 |
| Bonderson, Paul | 10/1/2001 | 5,996 | $12.90 | $13.43 | - | $27.10 | $3,177.88 | - | $85,143.20 |
| Byrd, Michael | 10/1/2001 | 257,218 | $12.90 | $13.43 | - | $27.10 | $136,325.54 | - | $3,652,495.80 |
| Canova, Antonio | 10/1/2001 | 178,756 | $12.90 | $13.43 | - | $27.10 | $94,740.68 | - | $2,538,335.20 |
| Cuthbert, Jack | 10/1/2001 | 205,451 | $12.90 | $13.43 | - | $27.10 | $108,889.03 | - | $2,917,404.20 |
| Dempsey, Neal | 10/1/2001 | 75,000 | $12.90 | $13.43 | - | $27.10 | $39,750.00 | - | $1,085,000.00 |
| Jensen, Stephanie | 10/1/2001 | 83,411 | $12.90 | $13.43 | - | $27.10 | $44,207.83 | - | $1,184,436.20 |
| Malavalli, Kumar | 10/1/2001 | 1,292 | $12.90 | $13.43 | - | $27.10 | $684.76 | - | $18,346.40 |
| Neiman, Seth | 10/1/2001 | 75,000 | $12.90 | $13.43 | - | $27.10 | $39,750.00 | - | $1,065,000.00 |
| Reyes, Gregory | 10/1/2001 | 1,262,113 | $12.90 | $13.43 | - | $27.10 | $668,919.89 | - | $17,922,004.60 |
| Rinkle, Victor | 10/1/2001 | 3,996 | $12.90 | $13.43 | - | $27.10 | $2,117.88 | - | $56,743.20 |
| Smith, David | 10/1/2001 | 3,826 | $12.90 | $13.43 | - | $27.10 | $2,027.78 | - | $54,329.20 |
| Klayko, Michael | 1/27/2003 | 463,781 | $4.55 | $4.56 | - | $4.80 | $4,637.81 | - | $115,945.25 |
| Bonderson, Paul | 8/15/2003* | 200,000 | $5.53 | $5.64 | - | $5.64 | $22,000.00 | - | $22,000.00 |
| Canova, Antonio | 8/15/2003* | 150,000 | $5.53 | $5.64 | - | $5.64 | $16,500.00 | - | $16,500.00 |
| Cuthbert, Jack | 8/15/2003* | 300,000 | $5.53 | $5.64 | - | $5.64 | $33,000.00 | - | $33,000.00 |
| Jensen, Stephanie | 8/15/2003* | 100,000 | $5.53 | $5.64 | - | $5.64 | $11,000.00 | - | $11,000.00 |
| Klayko, Michael | 8/15/2003* | 250,000 | $5.53 | $5.64 | - | $5.64 | $27,500.00 | - | $27,500.00 |
| Reyes, Gregory | 8/15/2003* | 600,000 | $5.53 | $5.64 | - | $5.64 | $66,000.00 | - | $66,000.00 |
| Total | | 22,496,756 | | | | | $64,679,393.20 | | $535,240,395.17 |

- 81 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**The FY:03 Form 10-Qs and Form 10-K**

2  208. On March 7, 2003, June 9, 2003 and September 8, 2003, the Individual Defendants

3 caused or allowed Brocade to file Form 10-Qs for the 1Q:03, 2Q:03 and 3Q:03, respectively. On

4 January 20, 2004, the Individual Defendants caused or allowed the Company to file its FY:03 Form

5 10-K with the SEC. The FY:03 Form 10-Qs and 10-K were simultaneously distributed to

6 shareholders and the public. The FY:03 Form 10-Qs and 10-K included Brocade's FY:03 financial

7 statements which were improperly presented in violation of GAAP, due to improper accounting for

8 the backdated stock options. As a result, Brocade's compensation expense was understated and its

9 net earnings were overstated.

10

**The FY:04 Form 10-Qs and Form 10-K**

11  209. On March 8, 2004, June 14, 2004 and September 13, 2004, the Individual Defendants

12 caused or allowed Brocade to file Form 10-Qs for the 1Q:04, 2Q:04 and 3Q:04, respectively. On

13 January 31, 2005, the Individual Defendants caused or allowed the Company to file its FY:04 Form

14 10-K with the SEC. The FY:04 Form 10-Qs and 10-K were simultaneously distributed to

15 shareholders and the public. The FY:04 Form 10-Qs and 10-K included Brocade's FY:04 financial

16 statements which were improperly presented in violation of GAAP, due to improper accounting for

17 the backdated stock options. As a result, Brocade's compensation expense was understated and its

18 net earnings were overstated.

19

**The FY:05 Form 10-Qs and Form 10-K**

20  210. On March 9, 2005, June 10, 2005 and September 9, 2005, the Individual Defendants

21 caused or allowed Brocade to file Form 10-Q for the 1Q:05, and NT 10-K's for 2Q:05 and 3Q:05,

22 respectively. On January 19, 2006, the Individual Defendants caused or allowed the Company to file

23 its FY:05 Form 10-K with the SEC. On November 14, 2005, the Individual Defendants caused or

24 allowed Brocade to file Form 10-Qs for the 2Q-05 and 3Q:05, Form 10-Q/A for the 1Q:05 and Form

25 10-K/A for the FY:04. The FY:05 Form 10-Qs, 10-Q/A and 10-K along with the FY:04 Form 10-

26 K/A were simultaneously distributed to shareholders and the public. The FY:05 Form 10-Qs and 10-

27 K included Brocade's FY:05 financial statements which were improperly presented in violation of

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  GAAP, due to improper accounting for the backdated stock options.  As a result, Brocade's

2  compensation expense was understated and its net earnings were overstated.

3      211.  The improper FY:98 to FY:05 Form 10-Ks and 10-Qs described above were

4  reviewed, prepared and/or endorsed by the Individual Defendants.  The following chart details the

5  defendants who signed and certified the Company's filings under the Sarbanes-Oxley Act of 2002

6  ("SOX"):

| Date | Filing | Person(s) Who Signed and Certified | Notes |
|------|--------|-----------------------------------|-------|
| 9/15/1999 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 1/31/2000 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | |
| 1/31/2000 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | **Period:** October 31, 1999 |
| 2/28/2000 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | **Period:** October 31, 1999 |
| 3/13/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 6/13/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 9/12/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 1/26/2001 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | |
| 3/13/2001 | 10-Q | Michael J. Byrd (Vice President, and Chief Financial Officer) | |
| 6/12/2001 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) | |
| 9/11/2001 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) | |
| 1/24/2002 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Mark Leslie (Director); Seth D. Neiman (Director); Larry W. Sonsini (Director) | |
| 3/12/2002 | 10-Q | Antonio Canova (Vice President, and Chief Financial Officer) | |
| 5/30/2002 | 10-Q | Antonio Canova (Vice President, and Chief Financial Officer) | |
| 8/27/2002 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1/22/2003 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Larry W. Sonsini (Director) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 3/7/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 6/9/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 9/8/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 1/20/2004 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Larry W. Sonsini (Director); Nicholas G. Moore (Director) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 3/8/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 6/14/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 9/13/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 1/31/2005 | 10-K | Michael Klayko (Chief Executive Officer); Antonio Canova (Vice President, Administration, and Chief Financial Officer); David L. House (Executive Chairman); L. William Krause (Lead Director); Neal Dempsey (Director); Nicholas G. Moore (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Gregory L. Reyes (Director); Sanjay Vaswani (Director); Larry W. Sonsini (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 3/9/2005 | 10-Q | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 11/14/2005 | 10-Q | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 11/14/2005 | 10-Q/A | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | **Period:** January 29, 2005 |
| 11/14/2005 | 10-K/A | Michael Klayko (Chief Executive Officer); Antonio Canova (Vice President, Administration, and Chief Financial Officer); David L. House (Executive Chairman); L. William Krause (Lead Director); Neal Dempsey (Director); Nicholas G. Moore (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Sanjay Vaswani (Director); Robert Walker (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | **Period:** October 30, 2004 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1 2 3 4 | 1/19/2006 | 10-K | Michael Klayko (Chief Executive Officer); Richard Deranleau (Vice President, Accounting, and Interim Chief Financial Officer); David L. House (Chairman of the Board); L. William Krause (Lead Director); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Sanjay Vaswani (Director); Robert Walker (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| 5 | 3/8/2006 | 10-Q | Richard Deranleau (Vice President, Interim Chief Financial Officer, and Treasurer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| 6 | 6/7/2006 | 10-Q | Richard Deranleau (Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| 7 | 9/6/2006 | 10-Q | Richard Deranleau (Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |

212.    The SOX certifications signed in conjunction with the filing of Brocade's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Brocade's FY:05 Form 10-K that was signed by defendants Klayko and Deranleau:

I, [Michael Klayko/Richard Deranleau], certify that:

1.  I have reviewed this Annual Report on Form 10-K for the fiscal year ended October 29, 2005 of Brocade Communications Systems, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

213.   Pursuant to the Audit Committee's charter, defendants Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause, as members of the Audit Committee since at least 1999, were each responsible to oversee the integrity of Brocade's financial information oversight, which included reviewing and discussing with management and the independent auditor the Company's quarterly and annual financial statements, the critical accounting policies and practices used by the Company and earnings press releases, guidance and other information provided to analysts and rating agencies. Specifically, the Audit Committee was required to review in advance and approve all filings with the SEC containing, or incorporating by reference, Brocade's financial information including the Quarterly Reports on Form 10-Q, the Annual Report on Form 10-K, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in such filings. Thus, by reason of such duties, Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause knew of or recklessly disregarded the false and misleading statements contained in the Company's Forms 10-K filed for FY:00, FY:01, FY:02, FY:03 and FY:04 Further, in the Audit Committee's report contained in the Company's Proxy Statements for FY:00, FY:01, FY:02, FY:03

and FY:04, each of which were filed with the SEC, Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause affirmed that they had fulfilled these duties in relation to each of the Forms 10-K:

> The following is the report of the Audit Committee of the Board of Directors. The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended 2000 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

> Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

## INSIDER SELLING

214.    As a result of the Individual Defendants' actions, Brocade's market capitalization has been damaged by over $9.1 billion. At the same time that these defendants were causing Brocade to suffer such devastation, the Insider Selling Defendants fared much better, as depicted in the table below, by selling approximately $1.5 billion dollars of their personally-held stock.

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BONDERSON | 8/23/1999 | 20,000 | $164.22 | $3,284,400.00 |
| | 8/24/1999 | 20,000 | $168.67 | $3,373,400.00 |
| | 8/25/1999 | 27,000 | $181.35 | $4,896,450.00 |
| | 8/26/1999 | 20,000 | $179.38 | $3,587,600.00 |
| | 9/22/1999 | 7,750 | $226.33 | $1,754,057.50 |
| | 9/23/1999 | 12,250 | $225.13 | $2,757,842.50 |
| | 9/27/1999 | 10,000 | $210.27 | $2,102,700.00 |
| | 9/28/1999 | 10,000 | $213.15 | $2,131,500.00 |
| | 9/30/1999 | 10,000 | $211.71 | $2,117,100.00 |
| | 12/8/1999 | 39,000 | $144.50 | $5,635,500.00 |
| | 12/10/1999 | 21,000 | $140.00 | $2,940,000.00 |
| | 12/10/1999 | 10,000 | $141.00 | $1,410,000.00 |
| | 12/10/1999 | 10,000 | $141.38 | $1,413,800.00 |
| | 12/17/1999 | 60,000 | $140.33 | $8,419,800.00 |
| | 2/22/2000 | 500 | $264.56 | $132,280.00 |
| | 2/22/2000 | 50,000 | $266.06 | $13,303,000.00 |
| | 2/22/2000 | 500 | $276.31 | $138,155.00 |
| | 2/23/2000 | 10,000 | $267.90 | $2,679,000.00 |
| | 2/24/2000 | 40,000 | $267.05 | $10,682,000.00 |
| | 2/24/2000 | 21,500 | $268.37 | $5,769,955.00 |
| | 2/25/2000 | 18,500 | $269.16 | $4,979,460.00 |
| | 3/7/2000 | 18,500 | $336.03 | $6,216,555.00 |

| | | | | |
|---|---|---|---|---|
| | | 3/9/2000 | 31,500 | $325.33 | $10,247,895.00 |
| | | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | | 5/30/2000 | 50,000 | $110.03 | $5,501,500.00 |
| | | 6/1/2000 | 40,000 | $120.47 | $4,818,800.00 |
| | | 6/2/2000 | 10,000 | $126.50 | $1,265,000.00 |
| | | 6/2/2000 | 50,000 | $133.18 | $6,659,000.00 |
| | | 6/15/2000 | 78,500 | $141.79 | $11,130,515.00 |
| | | 6/16/2000 | 7,500 | $145.00 | $1,087,500.00 |
| | | 6/16/2000 | 21,500 | $146.63 | $3,152,545.00 |
| | | 6/19/2000 | 42,500 | $145.00 | $6,162,500.00 |
| | | 8/18/2000 | 25,000 | $209.00 | $5,225,000.00 |
| | | 8/21/2000 | 10,000 | $212.23 | $2,122,300.00 |
| | | 8/22/2000 | 40,000 | $213.53 | $8,541,200.00 |
| | | 8/23/2000 | 15,000 | $214.00 | $3,210,000.00 |
| | | 8/24/2000 | 50,000 | $220.12 | $11,006,000.00 |
| | | 8/24/2000 | 10,000 | $223.50 | $2,235,000.00 |
| | | 8/30/2000 | 60,000 | $218.16 | $13,089,600.00 |
| | | 8/31/2000 | 20,000 | $227.41 | $4,548,200.00 |
| | | 9/1/2000 | 10,000 | $229.00 | $2,290,000.00 |
| | | 9/14/2000 | 15,000 | $219.50 | $3,292,500.00 |
| | | 9/20/2000 | 15,000 | $220.38 | $3,305,700.00 |
| | | 9/20/2000 | 15,000 | $223.38 | $3,350,700.00 |
| | | 9/20/2000 | 15,000 | $230.19 | $3,452,850.00 |
| | | 12/1/2000 | 40,000 | $86.78 | $3,471,200.00 |
| | | 12/4/2000 | 80,000 | $85.19 | $6,815,200.00 |
| | | 12/5/2000 | 80,000 | $85.96 | $6,876,800.00 |
| | | 12/6/2000 | 100,000 | $92.25 | $9,225,000.00 |
| | | 12/8/2000 | 100,000 | $108.79 | $10,879,000.00 |
| | | 1/4/2001 | 25,000 | $89.38 | $2,234,500.00 |
| | | 1/5/2001 | 75,000 | $79.65 | $5,973,750.00 |
| | | 5/17/2001 | 25,000 | $47.49 | $1,187,250.00 |
| | | 5/18/2001 | 25,000 | $46.56 | $1,164,000.00 |
| | | 5/21/2001 | 220,000 | $49.96 | $10,991,200.00 |
| | | 5/21/2001 | 18,000 | $49.96 | $899,280.00 |
| | | 5/21/2001 | 12,000 | $49.96 | $599,520.00 |
| | | 12/5/2001 | 50,000 | $36.08 | $1,804,000.00 |
| | | 12/7/2001 | 50,000 | $38.15 | $1,907,500.00 |
| | | 12/11/2001 | 50,000 | $39.00 | $1,950,000.00 |
| | | | 2,018,320 | | $271,440,260.00 |
| | | | | | |
| | BYRD | 9/22/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 12/23/1999 | 33,500 | $157.19 | $5,265,865.00 |
| | | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |

- 88 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |
| | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |
| | 4/6/2000 | 37,500 | $141.20 | $5,295,000.00 |
| | 4/7/2000 | 65,000 | $145.68 | $9,469,200.00 |
| | 6/16/2000 | 60,000 | $141.76 | $8,505,600.00 |
| | 7/3/2000 | 6,500 | $180.50 | $1,173,250.00 |
| | 7/5/2000 | 10,000 | $180.31 | $1,803,100.00 |
| | 7/6/2000 | 5,000 | $173.16 | $865,800.00 |
| | 7/6/2000 | 4,000 | $173.44 | $693,760.00 |
| | 7/6/2000 | 5,500 | $174.06 | $957,330.00 |
| | 8/24/2000 | 27,000 | $218.49 | $5,899,230.00 |
| | 9/5/2000 | 28,000 | $229.18 | $6,417,040.00 |
| | 10/3/2000 | 17,000 | $224.86 | $3,822,620.00 |
| | 10/4/2000 | 10,000 | $220.19 | $2,201,900.00 |
| | 12/11/2001 | 300,000 | $38.58 | $11,574,000.00 |
| | 7/5/2002 | 880 | $16.70 | $14,696.00 |
| | | 653,380 | | $73,068,872.00 |
| | | | | |
| CANOVA | 6/2/2003 | 4,903 | $6.43 | $31,526.29 |
| | | 4,903 | | $31,526.29 |
| | | | | |
| DEMPSEY | 12/1/1999 | 6,846 | $141.68 | $969,954.29 |
| | 12/3/1999 | 2,500 | $141.63 | $354,075.00 |
| | 1/5/2000 | 5,000 | $150.38 | $751,900.00 |
| | 1/5/2000 | 5,000 | $155.00 | $775,000.00 |
| | 1/5/2000 | 5,000 | $158.88 | $794,400.00 |
| | 1/5/2000 | 5,000 | $168.25 | $841,250.00 |
| | 3/23/2000 | 2,500 | $174.44 | $436,100.00 |
| | 3/24/2000 | 5,000 | $175.00 | $875,000.00 |
| | 3/30/2000 | 2,500 | $174.38 | $435,950.00 |
| | 3/31/2000 | 5,000 | $175.53 | $877,650.00 |
| | 5/24/2000 | 39,000 | $97.14 | $3,788,460.00 |
| | 8/22/2000 | 4,000 | $215.00 | $860,000.00 |
| | 8/23/2000 | 4,000 | $215.25 | $861,000.00 |
| | 12/11/2000 | 10,000 | $114.10 | $1,141,000.00 |
| | 1/4/2001 | 8,000 | $90.28 | $722,240.00 |
| | 12/12/2001 | 9,648 | $39.26 | $378,780.48 |
| | 12/12/2001 | 5,656 | $39.26 | $222,054.56 |
| | 9/23/2002 | 4,875 | $10.12 | $49,335.00 |
| | 9/24/2002 | 7,299 | $9.83 | $71,749.17 |
| | | 136,824 | | $15,205,898.50 |
| | | | | |
| DERANLEAU | 3/23/2006 | 1,000 | $6.39 | $6,390.00 |
| | 3/23/2006 | 1,784 | $6.40 | $11,417.60 |
| | | 2,784 | | $17,807.60 |
| | | | | |
| KLAYKO | 10/8/2004 | 8,000 | $6.18 | $49,440.00 |
| | 2/23/2006 | 300,000 | $5.03 | $1,509,000.00 |
| | 2/23/2006 | 100,000 | $5.03 | $503,000.00 |
| | | 408,000 | | $2,061,440.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| LESLIE | 8/23/1999 | 12,186 | $161.25 | $1,964,992.50 |
| | 2/23/2000 | 17,500 | $267.22 | $4,676,350.00 |
| | 2/24/2000 | 9,164 | $268.23 | $2,458,059.72 |
| | 2/24/2000 | 23,336 | $269.09 | $6,279,484.24 |
| | 8/25/2000 | 14,268 | $216.42 | $3,087,880.56 |
| | 8/25/2000 | 2,666 | $216.42 | $576,975.72 |
| | 12/12/2000 | 28,000 | $114.20 | $3,197,600.00 |
| | 12/12/2000 | 6,000 | $114.20 | $685,200.00 |
| | 12/3/2001 | 144,168 | $31.02 | $4,472,091.36 |
| | 12/3/2001 | 35,324 | $31.02 | $1,095,750.48 |
| | 4/4/2002 | 120,000 | $27.07 | $3,248,400.00 |
| | 4/4/2002 | 20,000 | $27.07 | $541,400.00 |
| | | 432,612 | | $32,284,184.58 |
| | | | | |
| MALAVALLI | 8/23/1999 | 68,950 | $164.22 | $11,322,969.00 |
| | 9/22/1999 | 4,650 | $226.33 | $1,052,434.50 |
| | 9/23/1999 | 7,350 | $222.13 | $1,632,655.50 |
| | 9/27/1999 | 6,000 | $210.27 | $1,261,620.00 |
| | 9/28/1999 | 6,000 | $213.15 | $1,278,900.00 |
| | 9/30/1999 | 6,000 | $211.71 | $1,270,260.00 |
| | 12/8/1999 | 20,000 | $143.69 | $2,873,800.00 |
| | 12/16/1999 | 20,000 | $130.31 | $2,606,200.00 |
| | 12/21/1999 | 20,000 | $147.19 | $2,943,800.00 |
| | 1/6/2000 | 10,000 | $159.00 | $1,590,000.00 |
| | 1/7/2000 | 10,000 | $152.02 | $1,520,200.00 |
| | 2/22/2000 | 10,000 | $266.06 | $2,660,600.00 |
| | 2/22/2000 | 15,000 | $266.96 | $4,004,400.00 |
| | 2/23/2000 | 8,000 | $267.90 | $2,143,200.00 |
| | 2/24/2000 | 25,000 | $268.37 | $6,709,250.00 |
| | 2/25/2000 | 25,000 | $269.16 | $6,729,000.00 |
| | 2/25/2000 | 17,000 | $274.00 | $4,658,000.00 |
| | 3/9/2000 | 50,000 | $325.33 | $16,266,500.00 |
| | 5/25/2000 | 30,000 | $105.90 | $3,177,000.00 |
| | 5/25/2000 | 15,000 | $110.40 | $1,656,000.00 |
| | 5/30/2000 | 15,000 | $110.03 | $1,650,450.00 |
| | 5/31/2000 | 40,000 | $115.69 | $4,627,600.00 |
| | 6/1/2000 | 22,500 | $120.47 | $2,710,575.00 |
| | 6/2/2000 | 7,500 | $126.50 | $948,750.00 |
| | 6/2/2000 | 40,000 | $132.84 | $5,313,600.00 |
| | 6/7/2000 | 20,000 | $147.94 | $2,958,800.00 |
| | 6/19/2000 | 25,000 | $145.00 | $3,625,000.00 |
| | 6/19/2000 | 25,000 | $148.31 | $3,707,750.00 |
| | 7/7/2000 | 10,000 | $178.00 | $1,780,000.00 |
| | 9/1/2000 | 20,000 | $230.00 | $4,600,000.00 |
| | 9/5/2000 | 6,700 | $230.00 | $1,541,000.00 |
| | 9/14/2000 | 20,000 | $218.07 | $4,361,400.00 |
| | 9/20/2000 | 13,300 | $230.09 | $3,060,197.00 |
| | 9/21/2000 | 20,000 | $234.17 | $4,683,400.00 |
| | 9/22/2000 | 25,000 | $244.66 | $6,116,500.00 |
| | 9/28/2000 | 10,000 | $243.13 | $2,431,300.00 |
| | | 693,950 | | $131,473,111.00 |

- 90 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| NEIMAN | 9/22/1999 | 10,100 | $223.07 | $2,253,007.00 |
| | 9/22/1999 | 23,325 | $226.33 | $5,279,147.25 |
| | 9/23/1999 | 6,775 | $225.13 | $1,525,255.75 |
| | 9/23/1999 | 3,900 | $226.33 | $882,687.00 |
| | 9/24/1999 | 16,100 | $216.45 | $3,484,845.00 |
| | 10/6/1999 | 728 | $209.19 | $152,290.32 |
| | 12/3/1999 | 15,296 | $142.00 | $2,172,032.00 |
| | 12/3/1999 | 412 | $142.00 | $58,504.00 |
| | 12/3/1999 | 20,000 | $142.14 | $2,842,800.00 |
| | 12/6/1999 | 13,000 | $142.50 | $1,852,500.00 |
| | 12/6/1999 | 10,000 | $143.38 | $1,433,800.00 |
| | 12/7/1999 | 40,000 | $138.47 | $5,538,800.00 |
| | 12/8/1999 | 7,000 | $142.50 | $997,500.00 |
| | 12/8/1999 | 12,500 | $145.20 | $1,815,000.00 |
| | 12/10/1999 | 2,500 | $142.00 | $355,000.00 |
| | 12/17/1999 | 17,500 | $142.15 | $2,487,625.00 |
| | 12/20/1999 | 18,800 | $142.19 | $2,673,172.00 |
| | 12/21/1999 | 7,500 | $144.93 | $1,086,975.00 |
| | 12/22/1999 | 50,000 | $152.77 | $7,638,500.00 |
| | 12/27/1999 | 6,000 | $157.50 | $945,000.00 |
| | 12/28/1999 | 50,000 | $155.28 | $7,764,000.00 |
| | 12/29/1999 | 50,000 | $162.59 | $8,129,500.00 |
| | 1/3/2000 | 50,000 | $169.85 | $8,492,500.00 |
| | 2/22/2000 | 50,000 | $265.94 | $13,297,000.00 |
| | 2/23/2000 | 50,000 | $268.32 | $13,416,000.00 |
| | 2/28/2000 | 31,150 | $283.18 | $8,821,057.00 |
| | 3/1/2000 | 90,842 | $295.79 | $26,870,155.18 |
| | 3/2/2000 | 3,000 | $315.00 | $945,000.00 |
| | 3/3/2000 | 97,000 | $315.45 | $30,598,650.00 |
| | 3/6/2000 | 80,000 | $322.66 | $25,812,800.00 |
| | 3/7/2000 | 20,000 | $336.47 | $6,729,400.00 |
| | 3/7/2000 | 20,000 | $338.00 | $6,760,000.00 |
| | 3/7/2000 | 20,000 | $340.33 | $6,806,600.00 |
| | 3/10/2000 | 10,000 | $340.00 | $3,400,000.00 |
| | 3/10/2000 | 10,000 | $345.00 | $3,450,000.00 |
| | 3/20/2000 | 21,000 | $167.52 | $3,517,920.00 |
| | 3/22/2000 | 19,000 | $168.27 | $3,197,130.00 |
| | 6/20/2000 | 13,508 | $159.19 | $2,150,338.52 |
| | 6/20/2000 | 13,509 | $160.19 | $2,164,006.71 |
| | 8/21/2000 | 96,500 | $211.10 | $20,371,150.00 |
| | 8/22/2000 | 3,500 | $211.00 | $738,500.00 |
| | 12/1/2000 | 20,000 | $83.69 | $1,673,800.00 |
| | | 1,100,445 | | $250,579,947.73 |
| | | | | |
| REYES | 9/22/1999 | 9,300 | $226.33 | $2,104,869.00 |
| | 9/23/1999 | 14,700 | $225.13 | $3,309,411.00 |
| | 9/27/1999 | 15,000 | $210.27 | $3,154,050.00 |
| | 9/28/1999 | 16,000 | $213.15 | $3,410,400.00 |
| | 9/28/1999 | 23,500 | $216.32 | $5,083,520.00 |
| | 9/30/1999 | 16,500 | $211.71 | $3,493,215.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1 | | 10/1/1999 | 13,200 | $208.02 | $2,745,864.00 |
| | | 10/4/1999 | 20,000 | $206.31 | $4,126,200.00 |
| 2 | | 10/5/1999 | 10,000 | $207.53 | $2,075,300.00 |
| | | 10/6/1999 | 16,800 | $209.85 | $3,525,480.00 |
| 3 | | 12/15/1999 | 50,000 | $123.56 | $6,178,000.00 |
| | | 12/15/1999 | 25,000 | $124.44 | $3,111,000.00 |
| 4 | | 12/16/1999 | 60,500 | $128.88 | $7,797,240.00 |
| | | 12/17/1999 | 50,000 | $139.11 | $6,955,500.00 |
| 5 | | 12/17/1999 | 11,500 | $141.00 | $1,621,500.00 |
| | | 12/20/1999 | 15,000 | $145.00 | $2,175,000.00 |
| 6 | | 12/21/1999 | 100,000 | $151.80 | $15,180,000.00 |
| 7 | | 2/22/2000 | 17,500 | $267.00 | $4,672,500.00 |
| | | 2/23/2000 | 12,500 | $267.90 | $3,348,750.00 |
| 8 | | 2/24/2000 | 30,000 | $268.37 | $8,051,100.00 |
| | | 2/25/2000 | 40,000 | $269.16 | $10,766,400.00 |
| 9 | | 2/25/2000 | 50,000 | $270.83 | $13,541,500.00 |
| 10 | | 2/25/2000 | 25,000 | $274.00 | $6,850,000.00 |
| | | 2/28/2000 | 25,000 | $275.30 | $6,882,500.00 |
| 11 | | 2/28/2000 | 100,000 | $283.71 | $28,371,000.00 |
| | | 3/7/2000 | 96,000 | $337.54 | $32,403,840.00 |
| 12 | | 3/8/2000 | 5,000 | $332.44 | $1,662,200.00 |
| 13 | | 3/9/2000 | 49,000 | $325.33 | $15,941,170.00 |
| | | 3/10/2000 | 5,500 | $342.91 | $1,886,005.00 |
| 14 | | 3/13/2000 | 10,000 | $335.95 | $3,359,500.00 |
| | | 3/14/2000 | 6,000 | $338.59 | $2,031,540.00 |
| 15 | | 3/17/2000 | 57,000 | $153.07 | $8,724,990.00 |
| | | 5/19/2000 | 100,000 | $100.02 | $10,002,000.00 |
| 16 | | 5/23/2000 | 100,000 | $110.54 | $11,054,000.00 |
| | | 5/31/2000 | 25,000 | $120.20 | $3,005,000.00 |
| 17 | | 6/2/2000 | 25,000 | $133.18 | $3,329,500.00 |
| | | 6/2/2000 | 75,000 | $133.30 | $9,997,500.00 |
| 18 | | 6/8/2000 | 25,000 | $151.79 | $3,794,750.00 |
| | | 6/9/2000 | 5,000 | $155.00 | $775,000.00 |
| 19 | | 6/14/2000 | 50,000 | $142.19 | $7,109,500.00 |
| 20 | | 6/15/2000 | 100,000 | $140.24 | $14,024,000.00 |
| | | 6/16/2000 | 50,000 | $143.25 | $7,162,500.00 |
| 21 | | 6/26/2000 | 22,145 | $157.19 | $3,480,972.55 |
| | | 8/21/2000 | 32,500 | $212.50 | $6,906,250.00 |
| 22 | | 8/22/2000 | 67,500 | $212.01 | $14,310,675.00 |
| | | 8/22/2000 | 50,000 | $213.61 | $10,680,500.00 |
| 23 | | 8/23/2000 | 50,000 | $214.54 | $10,727,000.00 |
| | | 8/24/2000 | 40,000 | $219.53 | $8,781,200.00 |
| 24 | | 8/24/2000 | 10,000 | $223.50 | $2,235,000.00 |
| 25 | | 8/30/2000 | 5,942 | $219.63 | $1,305,041.46 |
| | | 9/18/2000 | 127,000 | $214.26 | $27,211,020.00 |
| 26 | | 9/18/2000 | 973 | $214.26 | $208,474.98 |
| | | 12/5/2000 | 150,000 | $87.97 | $13,195,500.00 |
| 27 | | 12/5/2000 | 100,000 | $94.63 | $9,463,000.00 |
| | | 12/6/2000 | 50,000 | $97.44 | $4,872,000.00 |
| 28 | | 12/7/2000 | 100,000 | $98.41 | $9,841,000.00 |
| | | 12/8/2000 | 420 | $106.62 | $44,780.40 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1 | | 12/8/2000 | 72,886 | $106.62 | $7,771,105.32 |
| | | 12/11/2000 | 39,000 | $113.51 | $4,426,890.00 |
| 2 | | 12/27/2000 | 100,000 | $88.09 | $8,809,000.00 |
| | | 12/28/2000 | 100,000 | $93.35 | $9,335,000.00 |
| 3 | | 12/28/2000 | 20,944 | $96.42 | $2,019,420.48 |
| | | 12/29/2000 | 35,000 | $97.88 | $3,425,800.00 |
| 4 | | 5/17/2001 | 250,000 | $46.47 | $11,617,500.00 |
| | | 5/17/2001 | 50,000 | $47.00 | $2,350,000.00 |
| 5 | | 6/7/2001 | 300,000 | $46.35 | $13,905,000.00 |
| | | 12/4/2001 | 250,000 | $33.10 | $8,275,000.00 |
| 6 | | 12/5/2001 | 250,000 | $36.18 | $9,045,000.00 |
| 7 | | 12/10/2001 | 500,000 | $37.52 | $18,760,000.00 |
| | | 12/11/2001 | 630,000 | $39.10 | $24,633,000.00 |
| 8 | | 1/4/2002 | 85,600 | $37.44 | $3,204,864.00 |
| | | 1/4/2002 | 85,600 | $37.99 | $3,251,944.00 |
| 9 | | 3/31/2004 | 100,000 | $6.64 | $664,000.00 |
| 10 | | 2/22/2005 | 449 | $6.30 | $2,828.70 |
| | | 2/22/2005 | 124,985 | $6.32 | $789,905.20 |
| 11 | | 2/22/2005 | 173,495 | $6.33 | $1,098,223.35 |
| | | 2/22/2005 | 221,710 | $6.34 | $1,405,641.40 |
| 12 | | 2/22/2005 | 183,152 | $6.35 | $1,163,015.20 |
| | | 2/22/2005 | 69,875 | $6.36 | $444,405.00 |
| 13 | | 2/22/2005 | 31,239 | $6.37 | $198,992.43 |
| | | 2/22/2005 | 136,712 | $6.38 | $872,222.56 |
| 14 | | 2/22/2005 | 109,300 | $6.39 | $698,427.00 |
| 15 | | 2/22/2005 | 13,900 | $6.40 | $88,960.00 |
| | | 2/22/2005 | 4,000 | $6.41 | $25,640.00 |
| 16 | | 2/22/2005 | 40,700 | $6.42 | $261,294.00 |
| | | 2/22/2005 | 1,500 | $6.43 | $9,645.00 |
| 17 | | 2/22/2005 | 15,000 | $6.45 | $96,750.00 |
| | | 2/22/2005 | 3,900 | $6.46 | $25,194.00 |
| 18 | | 2/22/2005 | 833 | $6.47 | $5,389.51 |
| | | 2/22/2005 | 5,000 | $6.49 | $32,450.00 |
| 19 | | 2/22/2005 | 48,600 | $6.50 | $315,900.00 |
| 20 | | 2/22/2005 | 31,150 | $6.51 | $202,786.50 |
| | | 2/22/2005 | 1,500 | $6.52 | $9,780.00 |
| 21 | | 2/23/2005 | 809 | $6.07 | $4,910.63 |
| | | 2/23/2005 | 365,221 | $6.08 | $2,220,543.68 |
| 22 | | 2/23/2005 | 179,331 | $6.10 | $1,093,919.10 |
| | | 2/23/2005 | 134,970 | $6.11 | $824,666.70 |
| 23 | | 2/23/2005 | 82,800 | $6.12 | $506,736.00 |
| | | 2/23/2005 | 7,369 | $6.13 | $45,171.97 |
| 24 | | 2/23/2005 | 5,893 | $6.15 | $36,241.95 |
| | | 2/23/2005 | 14,700 | $6.16 | $90,552.00 |
| 25 | | 2/23/2005 | 12,600 | $6.17 | $77,742.00 |
| | | 2/23/2005 | 31,907 | $6.18 | $197,185.26 |
| 26 | | 2/23/2005 | 20,000 | $6.19 | $123,800.00 |
| 27 | | 2/23/2005 | 25,600 | $6.20 | $158,720.00 |
| | | 2/23/2005 | 39,800 | $6.21 | $247,158.00 |
| 28 | | 2/23/2005 | 55,000 | $6.22 | $342,100.00 |
| | | 2/23/2005 | 14,000 | $6.23 | $87,220.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1 | | 2/23/2005 | 9,893 | $6.24 | $61,732.32 |
| | | 2/23/2005 | 5,600 | $6.25 | $35,000.00 |
| 2 | | 2/23/2005 | 16,100 | $6.29 | $101,269.00 |
| | | 2/23/2005 | 54,700 | $6.30 | $344,610.00 |
| 3 | | 2/23/2005 | 18,700 | $6.31 | $117,997.00 |
| | | 2/23/2005 | 42,000 | $6.32 | $265,440.00 |
| 4 | | 2/23/2005 | 5,000 | $6.33 | $31,650.00 |
| | | 2/23/2005 | 10,315 | $6.34 | $65,397.10 |
| 5 | | 2/23/2005 | 900 | $6.35 | $5,715.00 |
| 6 | | 2/23/2005 | 11,434 | $6.37 | $72,834.58 |
| | | 2/23/2005 | 6,358 | $6.38 | $40,564.04 |
| 7 | | 2/24/2005 | 900,000 | $6.10 | $5,490,000.00 |
| | | 2/24/2005 | 12,466 | $6.10 | $76,042.60 |
| 8 | | 2/24/2005 | 373,747 | $6.11 | $2,283,594.17 |
| | | 2/24/2005 | 464,788 | $6.12 | $2,844,502.56 |
| 9 | | 2/24/2005 | 175,777 | $6.13 | $1,077,513.01 |
| 10 | | 2/24/2005 | 67,445 | $6.14 | $414,112.30 |
| | | 2/24/2005 | 127,698 | $6.15 | $785,342.70 |
| 11 | | 2/24/2005 | 165,453 | $6.16 | $1,019,190.48 |
| | | 2/24/2005 | 62,000 | $6.17 | $382,540.00 |
| 12 | | 2/24/2005 | 138,479 | $6.18 | $855,800.22 |
| | | 2/24/2005 | 50,400 | $6.19 | $311,976.00 |
| 13 | | 2/25/2005 | 30,800 | $6.20 | $190,960.00 |
| 14 | | | 10,183,063 | | $580,227,132.41 |
| 15 | RINKLE | 8/23/1999 | 24,000 | $164.22 | $3,941,280.00 |
| | | 9/23/1999 | 4,000 | $225.13 | $900,520.00 |
| 16 | | 9/27/1999 | 4,000 | $210.27 | $841,080.00 |
| | | 9/28/1999 | 2,500 | $213.15 | $532,875.00 |
| 17 | | 9/30/1999 | 1,500 | $211.71 | $317,565.00 |
| | | 12/27/1999 | 10,650 | $158.00 | $1,682,700.00 |
| 18 | | 12/28/1999 | 24,000 | $158.00 | $3,792,000.00 |
| | | 3/1/2000 | 12,500 | $299.75 | $3,746,875.00 |
| 19 | | 3/2/2000 | 12,500 | $303.05 | $3,788,125.00 |
| 20 | | 3/6/2000 | 2,000 | $325.00 | $650,000.00 |
| | | 3/7/2000 | 8,000 | $340.33 | $2,722,640.00 |
| 21 | | 3/23/2000 | 20,000 | $174.20 | $3,484,000.00 |
| | | 6/16/2000 | 50,000 | $142.00 | $7,100,000.00 |
| 22 | | 6/19/2000 | 30,000 | $150.17 | $4,505,100.00 |
| | | 7/6/2000 | 3,250 | $173.05 | $562,412.50 |
| 23 | | 7/6/2000 | 3,250 | $173.05 | $562,412.50 |
| | | 7/6/2000 | 3,500 | $173.05 | $605,675.00 |
| 24 | | 7/7/2000 | 1,725 | $178.00 | $307,050.00 |
| | | 7/7/2000 | 1,625 | $178.00 | $289,250.00 |
| 25 | | 7/7/2000 | 1,625 | $178.00 | $289,250.00 |
| 26 | | 7/7/2000 | 1,725 | $180.00 | $310,500.00 |
| | | 7/7/2000 | 1,625 | $180.00 | $292,500.00 |
| 27 | | 7/7/2000 | 1,625 | $180.00 | $292,500.00 |
| | | 9/22/2000 | 20,000 | $245.94 | $4,918,800.00 |
| 28 | | 9/25/2000 | 16,300 | $257.47 | $4,196,761.00 |
| | | 9/25/2000 | 5,000 | $258.50 | $1,292,500.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | 9/25/2000 | 5,000 | $258.50 | $1,292,500.00 |
| | | 9/26/2000 | 6,000 | $240.06 | $1,440,360.00 |
| | | 9/26/2000 | 6,000 | $240.06 | $1,440,360.00 |
| | | 9/26/2000 | 700 | $240.06 | $168,042.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 4,200 | $240.40 | $1,009,680.00 |
| | | 12/11/2000 | 58,000 | $115.02 | $6,671,160.00 |
| | | 1/4/2001 | 10,000 | $91.00 | $910,000.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 9,800 | $79.65 | $780,570.00 |
| | | 1/5/2001 | 4,600 | $79.65 | $366,390.00 |
| | | 5/23/2001 | 10,000 | $50.00 | $500,000.00 |
| | | 5/24/2001 | 10,000 | $49.50 | $495,000.00 |
| | | | 462,600 | | $72,974,793.00 |
| SMITH, C. | | 8/23/1999 | 10,000 | $164.22 | $1,642,200.00 |
| | | 8/25/1999 | 7,100 | $181.35 | $1,287,585.00 |
| | | 8/25/1999 | 900 | $181.35 | $163,215.00 |
| | | 8/30/1999 | 100 | $180.00 | $18,000.00 |
| | | 8/31/1999 | 800 | $185.00 | $148,000.00 |
| | | 9/22/1999 | 1,550 | $226.33 | $350,811.50 |
| | | 9/23/1999 | 450 | $225.13 | $101,308.50 |
| | | 10/6/1999 | 7,000 | $225.94 | $1,581,580.00 |
| | | 10/7/1999 | 1,000 | $225.81 | $225,810.00 |
| | | 12/21/1999 | 10,000 | $149.75 | $1,497,500.00 |
| | | 12/21/1999 | 10,000 | $155.00 | $1,550,000.00 |
| | | 1/3/2000 | 5,000 | $177.76 | $888,800.00 |
| | | 3/1/2000 | 5,000 | $299.00 | $1,495,000.00 |
| | | 3/10/2000 | 10,000 | $349.75 | $3,497,500.00 |
| | | 3/20/2000 | 15,000 | $171.44 | $2,571,600.00 |
| | | 3/22/2000 | 25,000 | $170.13 | $4,253,250.00 |
| | | 3/30/2000 | 12,500 | $174.50 | $2,181,250.00 |
| | | 3/31/2000 | 7,500 | $174.50 | $1,308,750.00 |
| | | 3/31/2000 | 20,000 | $174.88 | $3,497,600.00 |
| | | 6/2/2000 | 20,000 | $126.50 | $2,530,000.00 |
| | | 6/2/2000 | 10,000 | $130.94 | $1,309,400.00 |
| | | 6/6/2000 | 10,000 | $140.25 | $1,402,500.00 |
| | | 6/8/2000 | 10,000 | $155.44 | $1,554,400.00 |
| | | 6/19/2000 | 5,000 | $155.00 | $775,000.00 |
| | | 6/20/2000 | 5,000 | $160.00 | $800,000.00 |
| | | 6/21/2000 | 5,000 | $165.00 | $825,000.00 |
| | | 6/28/2000 | 10,000 | $169.00 | $1,690,000.00 |
| | | 8/22/2000 | 10,000 | $212.00 | $2,120,000.00 |
| | | 8/22/2000 | 10,000 | $215.00 | $2,150,000.00 |
| | | 8/24/2000 | 10,000 | $220.10 | $2,201,000.00 |
| | | 8/31/2000 | 10,000 | $225.00 | $2,250,000.00 |
| | | 9/1/2000 | 5,000 | $230.00 | $1,150,000.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

|  |  |  |  |  |
|---|---|---|---|---|
|  | 9/5/2000 | 2,500 | $230.00 | $575,000.00 |
|  | 9/20/2000 | 10,000 | $229.25 | $2,292,500.00 |
|  | 9/20/2000 | 2,500 | $230.09 | $575,225.00 |
|  | 9/22/2000 | 10,000 | $250.04 | $2,500,400.00 |
|  | 1/4/2001 | 10,000 | $90.50 | $905,000.00 |
|  | 1/5/2001 | 40,000 | $79.65 | $3,186,000.00 |
|  |  | 343,900 |  | $59,051,185.00 |
|  |  |  |  |  |
| SONSINI | 12/9/1999 | 12,500 | $139.09 | $1,738,562.50 |
|  |  | 12,500 |  | $1,738,562.50 |
|  |  |  |  |  |
| TARRANT | 8/23/1999 | 10,000 | $164.22 | $1,642,200.00 |
|  | 8/25/1999 | 4,500 | $181.35 | $816,075.00 |
|  | 8/26/1999 | 5,500 | $179.38 | $986,590.00 |
|  | 12/7/1999 | 20,000 | $140.06 | $2,801,200.00 |
|  | 2/24/2000 | 20,000 | $265.19 | $5,303,800.00 |
|  | 2/24/2000 | 15,000 | $265.94 | $3,989,100.00 |
|  | 2/24/2000 | 5,000 | $268.37 | $1,341,850.00 |
|  | 2/25/2000 | 10,000 | $269.16 | $2,691,600.00 |
|  | 5/24/2000 | 40,000 | $92.08 | $3,683,200.00 |
|  | 5/24/2000 | 40,000 | $100.01 | $4,000,400.00 |
|  | 6/19/2000 | 40,000 | $142.18 | $5,687,200.00 |
|  | 8/21/2000 | 25,000 | $210.80 | $5,270,000.00 |
|  | 8/31/2000 | 25,000 | $225.00 | $5,625,000.00 |
|  | 9/26/2000 | 5,000 | $237.69 | $1,188,450.00 |
|  |  | 265,000 |  | $45,026,665.00 |
|  |  |  |  |  |
| TOTAL |  | 16,718,281 |  | $1,535,181,385.61 |

215.    Reyes' sales on February 22, 2005 were particularly suspicious. The Form 8-K filed by Brocade with the SEC on that day announced, among other things, that Reyes would not stand for re-election on the Board, and indicates that the form was "accepted" by the SEC at "2005-02-22 06:05:17." On February 22, Reyes sold 1,217,000 shares for $7,474,49.85 in proceeds. These sales also came before Brocade's first restatement, which was filed on May 16, 2005.

## THE IMPROPER STOCK REPURCHASE

216.    During August 2004, the Board authorized a stock repurchase program providing for the repurchase of up to $100 million worth of the Company's stock. Under this program, the Board authorized the repurchase of over 1.1 million shares at prices that were artificially inflated. These repurchases occurred between January 2005 and May 2005. During this time, Brocade's stock was artificially inflated because the Company did not disclose that the stock option compensation expenses being restated as announced on January 24, 2005 were the result of options backdating

1  until May 16, 2005. During that time, Brocade's stock value declined from $7.46 per share to $4.01
2  per share.

3      217.    Brocade repurchased the 1.1 million shares at an average price of approximately
4  $6.12 per share, which is substantially higher than Brocade's stock value of $4.01 per share after the
5  full disclosure of stock options backdating at the Company. The repurchase price is comparable to
6  the $6.19 per share that defendant Reyes averaged in selling his own Brocade stock holdings during
7  the same time period. On information and belief, in authorizing the stock repurchases, the Board
8  members failed to properly discuss and consider that the Company's stock was artificially inflated
9  due to concealed stock option backdating.

10                                                        **DAMAGES TO BROCADE**

11      218.    Brocade fared much worse than the Insider Selling Defendants and the Options
12  Defendants. The Company has spent and will need to further expend significant sums of money,
13  including, without limitation, the following:

14            (a)    costs incurred and to be incurred to carry out internal investigations, including
15  legal fees paid to outside counsel, accounting firms and consultants. Currently, these costs amount
16  to more than $73 million and continue to rapidly increase;

17            (b)    costs incurred and to be incurred from potential and actual fines in connection
18  with governmental investigations and enforcement actions, which total at least $7 million to date;

19            (c)    costs incurred and to be incurred from the indemnification of defendants or
20  third parties pursuant to indemnity agreements or as otherwise may be required by law;

21            (d)    costs incurred for legal fees and associated expenses incurred and to be
22  incurred by Brocade in connection with the defense of the Company against the enforcement action
23  filed by the SEC and class actions filed by shareholders that arise out of the stock option backdating
24  misconduct alleged herein;

25            (e)    costs incurred and to be incurred arising out of damages that have been or may
26  be paid by the Company in connection with the resolution of class actions filed by shareholders that
27  arise out of the stock option backdating misconduct alleged herein, whether by settlement,
28  arbitration, judgment or otherwise;

1    (f)  costs incurred and to be incurred from increased D&O insurance premiums as

2 a result of the illegally manipulated stock option grants;

3    (g)  enormous tax liabilities from improper deductions taken on backdated option

4 grants, and the costs associated with the Tender Offer alleged herein;

5    (h)  costs incurred and to be incurred from directing manpower to restate

6 Brocade's prior financial results to correct for the improperly dated stock option grants;

7    (i)  costs incurred from the millions that Brocade has advanced to the defendants

8 to pay for their legal defense, including at least $46,709,323 in legal fees and expenses to Reyes and

9 $7,140,253 in legal fees and expenses to Jensen;

10    (j)  costs incurred and to be incurred from directing manpower to correct

11 Brocade's defective internal controls; and

12    (k)  Costs incurred from canceling improperly backdated options in exchange for a

13 cash payment of approximately $3.5 - $4.5 million.

14  219.  Brocade also suffers from the untoward effects of the illegal backdating practices on

15 its own corporate reputation, which are difficult to quantify. For example, in reaction to the

16 backdating disclosures, the Corporate Library – the leading independent source for United States

17 corporate governance information and analysis – had downgraded Brocade's overall corporate

18 governance rating to a "D." A rating of "D" placed Brocade in a high risk category due to the

19 epidemic of illicit stock option granting practices at the Company.

20          **PLAINTIFF'S DERIVATIVE ALLEGATIONS**

21  220.  Plaintiff brings this action derivatively in the right and for the benefit of Brocade to

22 redress injuries suffered, and to be suffered, by the Company as a direct result of the violations by

23 the Individual Defendants of federal securities laws, multiple breaches of fiduciary duties owed to

24 Brocade, the conspiracy to breach those duties and violations of California state law prohibitions on

25 insider selling codified in California Corporations Code sections 25402 and 25403. Brocade is

26 named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer

27 jurisdiction on this Court that it would not otherwise have.

28

1    221.    Plaintiff will adequately and fairly represent the interests of Brocade in enforcing and

2    prosecuting its rights.

3    222.    Plaintiff is the trustee of "The Mary E. Barbour Family Trust One," which was and is

4    an owner of the stock of Brocade during the time of the transaction complained of, and it remains a

5    shareholder of the Company.

6                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

7    223.    By reason of their positions as officers, directors and/or fiduciaries of Brocade and

8    because of their ability to control the business and corporate affairs of Brocade, the Individual

9    Defendants owed Brocade and its shareholders fiduciary obligations of trust, loyalty, good faith and

10   due care, and were and are required to use their utmost ability to control and manage Brocade in a

11   fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in

12   furtherance of the best interests of Brocade and its shareholders so as to benefit all shareholders

13   equally and not in furtherance of their personal interest or benefit.

14   224.    Each director and officer of the Company owes to Brocade and its shareholders the

15   fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

16   Company and in the use and preservation of its property and assets, and the highest obligations of

17   fair dealing.  In addition, as officers and/or directors of a publicly-held company, the Individual

18   Defendants had a duty to timely disseminate accurate and truthful information with regard to the

19   compensation paid to its executives and employees.  These disclosures necessarily include the value

20   of stock options granted to the Company's executives.

21   225.    The Individual Defendants, because of their positions of control and authority as

22   directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise control

23   over the wrongful acts complained of herein, as the Company's disclosures of its financial results

24   including expenses related to stock option grants.  Because of their advisory, executive, managerial

25   and directorial positions with Brocade, each of the Individual Defendants had access to adverse, non-

26   public material information about the financial condition and improper representations of Brocade.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

226.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brocade, and was at all times acting within the course and scope of such agency.

227.    To discharge their duties, the officers and directors of Brocade were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Brocade were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to Brocade's internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that Brocade was properly handling its tax liabilities;

(f)    ensure that Brocade's internal controls were sufficient to prevent backdating or other manipulations of stock options granted to Brocade executives; and

(g)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

228.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

1    the exercise of due care and diligence in the management and administration of the affairs of the

2    Company, as well as in the use and preservation of its property and assets. The conduct of the

3    Individual Defendants complained of herein involves a knowing and culpable violation of their

4    obligations as directors and officers of Brocade, the absence of good faith on their part, and a

5    reckless disregard for their duties to the Company and its shareholders that the Individual

6    Defendants were aware or should have been aware posed a risk of serious injury to the Company.

7    The conduct of the Individual Defendants, who were also officers and/or directors of the Company,

8    has been ratified by the remaining Individual Defendants who collectively comprise all of the Board.

9        229.    Because of their positions of control and authority as directors and/or officers of

10   Brocade, each of the defendants was able to and did, directly and indirectly, control the wrongful

11   acts complained of herein. As to the Director Defendants, these acts included: (i) agreement to

12   and/or acquiescence in defendants' option backdating scheme; and (ii) refusal to demand the

13   resignations or seek to recover from the defendants for their misconduct. Because of their positions

14   with Brocade, each defendant was aware of these wrongful acts, had access to adverse, non-public

15   information and was required to disclose these facts promptly and accurately to Brocade's

16   shareholders and the financial markets but failed to do so.

17       230.    In each of Brocade's publicly-filed Proxy Statements for 1999-2005, the Individual

18   Defendants repeated that the stock option grants made during that period carried an exercise price

19   that was *not less than* the fair market value of Brocade's stock *on the date granted*, as calculated by

20   the public trading price of the stock at the market's close on that date. However, such defendants

21   concealed until January 2005 that the stock option grants were repeatedly and consciously backdated

22   to ensure that the strike price associated with the option grants was at or near the lowest trading price

23   for that fiscal period. Plaintiff thus seeks to have: (i) an accounting of all undisclosed backdated

24   stock option grants made to defendants; (ii) all the unexercised options granted to defendants

25   between at least 1999 and 2005 cancelled; and (iii) the financial gains obtained via the exercise of

26   any backdated stock options returned to the Company.

27       231.    Additionally, the Individual Defendants never disclosed the fact that the Board's

28   Compensation Committee actually delegated Reyes the authority to approve the granting and

- 101 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  recording of substantially *all* compensation-related activity based upon the Company's liberal use of

2  stock options to attract and retain employees. Further, the Individual Defendants never disclosed the

3  Compensation Committee's approval of 1.1 million grants to Reyes and the fact that they had

4  delegated to Reyes the unfettered authority to approve and record the grant date and exercise price.

5      232.    The actions have also irreparably harmed Brocade's corporate image and goodwill.

6  For at least the foreseeable future, Brocade will suffer from what is know as the "liar's discount," a

7  term applied to the stocks of companies who have been implicated in illegal behavior and have

8  misled the investing public, such that Brocade's ability to raise equity capital or dept on favorable

9  terms in the future is now impaired.

10             DUTIES OF DEFENDANT KPMG

11     233.    Defendant KPMG owed a duty to Brocade to perform its auditing procedures in

12  accordance with professional auditing standards. Although a diligent application of standard

13  Generally Accepted Auditing Standards ("GAAS") procedures by KPMG auditors assigned to

14  Brocade should have caused KPMG to identify and act to stop the fraudulent accounting activity

15  alleged herein, KPMG also knew or should have known that Brocade exhibited specific

16  characteristics recognized by GAAS of an audit client at higher than normal risk of committing

17  fraud. These auditing standards were adopted to force heightened awareness by auditors of the

18  possibilities for fraud and, when risk was found to be high, to require more extensive audit planning

19  and procedures in those areas suggesting high risk. These standards applied to the audits of each of

20  Brocade's fraudulent financial statements filed with the SEC for FY:02 through FY:04.[10]

21

22

23

24  [10] In 1996, the Auditing Standards Board issued SAS No. 82, Consideration of Fraud in a Financial
    Statement Audit, which should have been applied to the fraudulent financial statements filed with the
    SEC for FY:00 audited by Arthur Andersen. In response to questions and criticisms of the auditing

25  and accounting profession's lack of adequate addressing of the subject of fraud, the AICPA replaced
    SAS No. 82 with SAS 99 to give expanded guidance to auditors for detecting fraud. Per the AICPA,

26  the standard was part of an effort to "restore investor confidence in U.S. capital markets and re-
    establish audited financial statements as a clear picture window into Corporate America." SAS 99

27  became effective for audits of financial statements for periods beginning on or after December 15,
    2002. Thus, KPMG's audits should have complied with SAS 99, which established the standards

28  and provided guidance to auditors in fulfilling their responsibility to detect fraud.

234.     GAAS requires, among other things, that an auditor plan and perform the audit with a healthy attitude of professional skepticism. This requires an auditor to conduct an objective analysis of persuasive evidence to make a reasonable judgment whether a public company's financial statements are accurate. When a client can be characterized as a high risk for fraud – as Brocade should have been – then even greater care is required in planning and conducting the audit, and heightened scrutiny is to be applied to management's selection and application of significant accounting practices. This is especially true in areas related to executive compensation to ensure they are not being used to misstate financial results.

235.     GAAS also requires an auditor to assess whether an accounting system is effective. Among other things, an effective accounting system records transactions on a timely basis in sufficient detail to permit proper classification and quantification for financial reporting purposes. As part of this process, the auditor must assess the effectiveness of the client's internal control system for preventing or detecting a material misstatement in the financial reports. Cardinal characteristics of adequate internal controls include, among other things, properly designed procedures to record stock compensation transactions accurately and segregation of duties so that it is difficult to perpetuate and conceal accounting errors and fraud.

236.     Thus, KPMG was obligated to perform professional audits and act with reasonable care and competence in the performance of its auditing and consulting services, which required KPMG to ensure that Brocade was properly addressing material matters relating to the granting, documenting, accounting and reporting for stock option grants. Furthermore, KPMG was required to exercise professional skepticism, a standard that required its personnel to probe and question Brocade management, and to recognize the need to diligently and carefully corroborate management representations and explanations concerning potentially material matters. KPMG either knowingly or recklessly failed to address risks associated with the fact that Brocade improperly granted, documented, accounted for and reported stock option grants, and as a result, materially misstated its financial statements. KPMG also knowingly or recklessly failed to consider the fact that Brocade had multiple material weaknesses in internal controls related to the granting, documenting, accounting for and reporting of stock options. KPMG was obligated under professional auditing

1   standards to acquire sufficient information to assess the nature and magnitude of these risks. KPMG

2   had a duty to consider the following indicators of risk related to Brocade's option granting practices:

3           (a)     As recognized in public filings, the Company's success depended upon its

4   ability to attract and retain qualified personnel along with "excessive interests in management in

5   maintaining or increasing the entity's stock price or earnings trends through the use of unusually

6   aggressive accounting practices." AU §316.67.

7           (b)     Brocade's executives and key employees compensation scheme was heavily

8   dependent upon stock option grants. Like other technology companies in Silicon Valley, Brocade

9   faced significant competition to hire and retain qualified personnel. Brocade's management believed

10  that the Company's success depended in part on its ability to hire and retain qualified personnel.

11  Brocade thus made liberal use of employee stock options as a form of compensation.

12          (c)     Brocade's historical stock option grants had "highly variable grant dates,"

13  which coincided with a pattern of jumps in share value following stock option grants.

14          (d)     Brocade's historical stock price experience high levels of stock price volatility

15  and Brocade's levels of option grants are high in relation to shares outstanding.

16          (e)     The extent of or lack of involvement of Brocade's Compensation Committee

17  in matters involving the accounting, timing and granting of stock options and the fact that between

18  fiscal years 2000 through 2004, the Compensation Committee only met a total of nine times.

19          (f)     As Brocade's former CEO and Chairman, Reyes was highly influential and

20  able to recommend that the Board act to compensate officers, including himself, through option

21  grants.

22          (g)     Authority to grant stock options was delegated to Brocade's management. In

23  fact, defendant Reyes as CEO, acted as a one-man compensation committee and he personally

24  benefited from the option backdating scheme. Reyes was therefore in a unique position to override

25  any existing controls related to the accounting, timing, and granting of stock options.

26          (h)     By June 2003, the fraudulent backdating practices alleged herein had become

27  so routine and endemic at Brocade that an employee from the Human Resources department

28  prepared a memorandum describing the practices. The memorandum explicitly directs Human

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Resources employees to recommend a pricing date by printing out historical closing prices for

2  Brocade's stock and identifying the closing price that is the lowest since the last pricing date.

3          (i)     In June 2003, a committee of the Board approved a recommendation that

4  Reyes be granted 1.1 million options, but failed to stipulate the terms of the award (*i.e.* specified date

5  of grants or strike prices) and allowed Reyes himself to determine the terms of the award. This

6  committee did not approve the grants until after Reyes made the grants and they were recorded in

7  Brocade's books and records.

8      237.    KPMG is being sued in its capacity as an auditor for failure to consider obvious risk

9  factors indicating the existence of fraud, failure to exercise professional care and skepticism, failure

10  to obtain sufficient competent evidential matter, and over-reliance on management representations.

11      238.    GAAS requires that auditors exercise due professional care in performing an audit or

12  review and in preparing the audit report. AU §230.01. Due professional care requires that the

13  auditor exercise professional skepticism in performing audit and review procedures and gathering

14  and analyzing audit evidence. AU §230.07-.08. "In exercising professional skepticism, the auditor

15  should not be satisfied with less than persuasive evidence because of a belief that management is

16  honest." AU §230.09. Exercise of professional skepticism requires auditors to demonstrate a

17  questioning mind and to critically assess audit evidence. AU §316.27.

18      239.    GAAS also requires that auditors obtain sufficient competent evidential matter

19  through inspection, observation, inquiries and confirmations to afford a reasonable basis for an audit

20  opinion. AU §326.01. Evidence obtained from independent sources outside the company provides

21  greater assurance of reliability than that secured solely within the company. AU §326.21a. Auditors

22  *may not* substitute management's representations for the application of auditing procedures

23  necessary to afford a reasonable basis for an audit opinion. AU §333.02.

24      240.    In auditing and reviewing Brocade's financial statements, KPMG auditors acted

25  unreasonably in failing to exercise due professional care and skepticism, failing to obtain sufficient

26  competent evidential matter, and substituting management's representations with competent

27  evidential matter.

28

241.    Among other things, KPMG's liability arises from the fact its personnel failed to appropriately consider and modify the nature, timing and extent of procedures performed based upon fraud risk factors and internal control deficiencies, including management's ability to override internal controls. KPMG reasonably should have known that Brocade's accounting and reporting of compensation expense was not in conformity with GAAP. KPMG also reasonably should have know that certain disclosures in Brocade's publicly-filed financial information was inconsistent with actual practices employed by Brocade and that these did not comply with GAAP disclosure requirements.

242.    KPMG, however, concurred with Brocade's accounting, did not object to Brocade's disclosures, and issued audit reports stating that KPMG had conducted its audits in accordance with GAAS and concluded that Brocade's financial statements fairly presented its financial results in conformity with GAAP.

243.    In reaching these conclusions, KPMG unreasonably relied on uncorroborated representations by Brocade management and/or unreasonably determined that the stock compensation expense was immaterial to Brocade's financial statements. As a result, KPMG did not comply with GAAS by unreasonably failing to exercise due professional care and skepticism and to obtain sufficient competent evidential matter.    Instead, KPMG substituted management representations for competent evidence and failed to take appropriate action to correct Brocade's inconsistent and deficient public disclosures while issuing inaccurate audit reports. Therefore, KPMG deliberately acquiesced in or ratified the dishonest acts of, and receipt of improperly backdated or otherwise manipulated stock options by Brocade insiders.

### THE BROCADE BOARD

244.    The Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to Brocade a duty to ensure that the Company's financial reporting fairly presented the operations and financial condition of Brocade in all material aspects. In order to adequately carry out these duties, it was and is necessary for the Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Brocade's internal controls were non-

1  existent or materially inadequate and that Reyes, Jensen, Byrd and Canova were improperly

2  backdating option grants to themselves, other employees and directors.

3      245.    The Director Defendants knew this material information through the Board meetings

4  that occurred since 1999, as well as at meetings of committees of the Board.

5      246.    Despite these duties, the Director Defendants negligently, recklessly and/or

6  intentionally caused or allowed, by their actions or inactions, the improper stock option grants

7  discussed herein to be issued and approved since at least 1999.

8      247.    Instead of properly disclosing the improper stock option backdating practices, the

9  Director Defendants caused or allowed these practices to continue unabated and undisclosed until

10  June 2006.

11      248.    The standing committees of the Brocade Board responsible for compensation and

12  oversight are and have been the Compensation Committee and the Audit Committee.

13                     **The Compensation Committee**

14      249.    The Compensation Committee consists of defendants Dempsey, Krause, House and

15  Vaswani with Dempsey serving for over seven years; defendants Krause, House and Vaswani have

16  each served for at least three years. Since 1999, defendants Leslie, Neiman, O'Brien and Krause also

17  served on the Compensation Committee at various times.

18      250.    Pursuant to the Compensation Committee Charter, the Committee is charged as

19  follows:

20      The Compensation Committee shall, for each of the Company's executive officers,
review and approve such executive officer's (i) annual base salary level; (ii) annual

21  incentive compensation; (iii) long-term incentive compensation; (iv) employment,
severance and change-in-control agreements, if any; and (v) any other compensation,

22  ongoing perquisites or special benefit items. In so reviewing and approving
executive compensation, the Compensation Committee shall:

23

24          • identify corporate goals and objectives relevant to executive
compensation (including efforts by the Company to retain such

25            executives and the cost to the Company of each executive's
compensation or of all executive compensation as a whole);

26          • evaluate each executive's performance in light of such goals and
objectives and set each executive's compensation based on such

27            evaluation and such other factors as the Compensation Committee
deems appropriate and in the best interests of the Company; and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- determine any long-term incentive component of each executive's compensation based on awards given to such executive in past years, the Company's performance, stockholder return and the value of similar incentive awards relative to such targets at comparable companies and such other factors as the Compensation Committee deems appropriate and in the best interests of the Company.

The Compensation Committee shall report the results of such review and any action it takes with respect to the compensation of the Company's executive officers to the Board.

Except for grants and awards to executive officers of the Company, the Compensation Committee may delegate to one or more officers of the Company its authority to make grants and awards under the Company's incentive compensation or other equity-based plans *as the Compensation Committee deems appropriate and in accordance with the terms of such plans.*

### Disclosure

The Compensation Committee shall prepare the report on executive compensation that is required by SEC rules to be included in the Company's annual proxy statement.

### Reporting to the Board

The Compensation Committee shall make regular reports to the Board. These reports shall include a review of any recommendations or issues that arise with respect to Company compensation and benefits policies, executive compensation and any other matters that the Compensation Committee deems appropriate or is requested to be included by the Board.

251.    Accordingly, as members of the Compensation Committee, defendants Dempsey, Krause, House, Vaswani and Leslie bore direct responsibility to the issuance of option grants under the Company's Plans.  In particular, the Compensation Committee: (i) discharges the Board's responsibilities relating to compensation of Brocade's executive officers, including evaluation of the CEO; (ii) produces an annual report on executive compensation for inclusion in Brocade's proxy statements; and (iii) exercises overall responsibility for approving and evaluating executive officer compensation plans.  Though the Compensation Committee may, according to its charter, delegate its authority, the committee remained under a duty to ensure that the delegee, Reyes, acted in accordance with the Plans.

252.    Therefore, the members of Brocade's Compensation Committee are responsible for administering the issuance of option grants under the Company's 1999 Stock Option Plan. Accordingly, defendants Dempsey, Krause, House, Vaswani and Leslie were responsible to review the stock option grants to Brocade executives and evaluate the appropriateness of the actions relative

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   to any authority delegated to Reyes. But, since at least 1999, such defendants impermissibly

2   delegated their authority to Reyes. Moreover, on June 2003, the Compensation Committee approved

3   a recommendation to award defendant Reyes 1.1 million options but failed to provide the terms of

4   the award. Instead, the Compensation Committee delegated to Reyes himself the authority to choose

5   the terms (*i.e.* grant date and exercise price), thus creating an obvious opportunity for him to

6   fraudulently manipulate the award to enrich himself. Thus, these Director Defendants did not fulfill

7   their duties, therefore causing and allowing the Company's executives to obtain unreasonable and

8   unreported compensation via the backdating of stock option grants.

9       253.    The members of the Compensation Committee knew or should have known that: (i)

10  compensation practices were critical to the Company's success; (ii) executive and employee

11  compensation schemes were heavily dependant upon stock option grants; (iii) Brocade's historical

12  stock option grants had highly variable grant dates that coincided with patterns of jumps in share

13  values following stock option grants; and (iv) the delegation of authority to Reyes to approve

14  substantially all stock options granted to key employees utterly lacked any adequate internal controls

15  (*i.e.* segregation of duties), which provided Reyes with the opportunity to commit and conceal

16  unabated and consequent damages fraud on a unmitigated massive scale. Reyes, Jensen, Byrd and

17  Canova were unduly compensating Brocade's employees, officers and directors and thereby

18  permitted or condoned the unlawful practices described herein. Accordingly, through the improper

19  abdication of their duties and responsibilities as members of the Compensation Committee, the

20  misconduct of these defendants was a direct and proximate cause of the unlawful practices alleged

21  herein.

22                              **The Audit Committee**

23      254.    The Audit Committee consists of defendants Walker, Jones and Rose. Since 1999,

24  defendants Neiman, Dempsey, Leslie, Sonsini, Paisley, Moore, Krause and O'Brien each served at

25  various times on the Audit Committee.

26      255.    Pursuant to its Charter, the Audit Committee is charged as follows:

27

28

**Financial Statements, Disclosure and Other Risk Management and Compliance Matters**

- Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

- Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

- Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

- Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release;

- Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and audit committee members, member qualifications and activities;

- Reviewing on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

- Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

- Reviewing the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;

- As appropriate, obtaining advice and assistance from outside legal, accounting or other advisors (without seeking Board of Directors approval);

- Reviewing, approving and monitoring the Company's code of ethics for its senior financial officers;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

- Reviewing the Company's financial and accounting reporting compliance relating to its employee benefit plans; and

- Reviewing and approving in advance any proposed related party transactions.

**Reporting to the Board**

- At least quarterly, reporting to the Board. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to be included by the Board;

- At least annually, reviewing and assessing the adequacy of this charter and recommend any proposed changes to the Board for approval; and

- At least annually, evaluating its own performance and report to the Board on such evaluation.

256.    During FY:04, the Audit Committee submitted a report incorporating the fabricated financial results for inclusion in Brocade's FY:05 Proxy Statement that provided, in relevant part:

The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended October 30, 2004 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

257.    Accordingly, as members of the Audit Committee at some point since at least 1999, defendants Walker, Jones, Rose, Neiman, Dempsey, Leslie, Sonsini, Paisley, Moore, Krause and O'Brien had a special duty to know and understand this material information regarding the stock option grants as set out in the Audit Committee's charter, which provides in relevant part that the Audit Committee is responsible for: (i) assisting the Board in fulfilling its responsibilities for general

- 111 -

1  oversight of the integrity of Brocade's financial statements; (ii) Brocade's compliance with legal and

2  regulatory requirements; (iii) the independent auditors' qualifications and independence; (iv) the

3  performance of Brocade's internal audit function and independent auditors; and (v) risk assessment

4  and risk management. Under the Audit Committee Charter, the Audit Committee assists the Board

5  in the oversight and monitoring of the Company's financial controls, including any improvement or

6  changes to be made in such internal controls.

7       258.    The members of the Audit Committee knew, recklessly disregarded or should have

8  known that Brocade's financial statements were inaccurate and certain stock option grants were

9  improper, because they failed to consider the risks of material misstatement related to matters

10  involving the granting, documenting, accounting and reporting of stock options, and thereby

11  permitted or condoned the unlawful practices described herein. Also, the Audit Committee failed to

12  consider the materially weak internal controls designed to ensure stock option practice complied

13  with GAAP and SEC rules. Accordingly, defendants Walker, Jones, Rose, Neiman, Dempsey,

14  Leslie, Sonsini, Paisley, Moore, Krause and O'Brien, through their improper execution of their duties

15  and responsibilities as members of the Brocade Audit Committee, knew of, or recklessly disregarded

16  or should have known the unlawful practices at Brocade described herein.

17  **DEMAND FUTILITY ALLEGATIONS AGAINST THE BOARD AT THE TIME THE STATE AND FEDERAL DERIVATIVE ACTIONS WERE INITIATED**

18

19       259.    At the time the original complaints were filed in the State Derivative Action and

20  Federal Derivative Action, the Board consisted of the following nine individuals: defendants House,

21  Klayko, Moore, Neiman, Paisley, Dempsey, Krause, Vaswani and Walker. No pre-suit demand was

22  made on that Board of Brocade to institute this action because such a demand would have been a

23  futile, wasteful and useless act.

24       260.    The Board retains and exercises the ultimate responsibility for approving compen-

25  sation awarded to Brocade's executive officers. This responsibility encompasses the awards of stock

26  options that were backdated by Reyes, Jensen, Byrd and Canova. Therefore, the defendants who sat

27  on the Board at the time the original complaints were filed in the State Derivative Action and Federal

28  Derivative Action face a substantial likelihood of personal liability for failing to fulfill their fiduciary

1   duties to Brocade in acquiescing to Reyes, Jensen, Byrd and Canova's improper scheme, by
2   implicitly approving the option grants as dated, as well as for their utter failure to implement
3   effective internal controls. Such defendants reasonably could and should have properly informed
4   themselves of the circumstances surrounding the options granted to Brocade's executives before
5   approving them. Indeed, these options were routinely approved by the Board when they were dated
6   at or near the Company's lowest closing price for the respective month in which the options were
7   granted, establishing that these decisions were not informed. Accordingly, there was and is reason to
8   doubt that defendants House, Klayko, Moore, Neiman, Paisley, Dempsey, Krause, Vaswani and
9   Walker were and are disinterested because they face a sufficient likelihood of liability for their
10  breaches of fiduciary duty to Brocade. The Board's decision to approve the options also was not the
11  product of valid business judgment. Thus, demand was futile as to defendants House, Klayko,
12  Moore, Neiman, Paisley, Dempsey, Krause, Vaswani and Walker.

13      261.    The Compensation Committee of the Board is specifically responsible under its
14  charter for granting stock options or other equity awards to Brocade executives. This responsibility,
15  although held by the Board, is delegated to the Compensation Committee. But as alleged herein, the
16  Compensation Committee impermissibly delegated its responsibility to Reyes in total contravention
17  of its charter, which states, in pertinent part, as follows:

18          ***Purpose***

19          The purpose of the Compensation Committee of the Board of Directors (the
            "Board") of Brocade Communications Systems, Inc. (the "Company") shall be to
20          discharge the Board's responsibilities relating to compensation of the Company's
            executive officers. ***The Compensation Committee has overall responsibility for (i)***
21          ***overseeing the Company's compensation and benefits policies generally; (ii)***
            ***overseeing, evaluating and approving executive officer compensation plans,***
22          ***policies and programs;*** and (iii) preparing the report on executive compensation that
            is required by Securities and Exchange Commission rules to be included in the
23          Company's annual proxy statement.

24          ***Reporting to the Board***

25          The Compensation Committee shall make regular reports to the Board. These
            reports shall include a review of any recommendations or issues that arise with
26          respect to Company compensation and benefits policies, executive compensation and
            any other matters that the Compensation Committee deems appropriate or is
27          requested to be included by the Board.

28

1  From at least 2000 to April 2007, Dempsey was a member of the Compensation Committee, and was

2  its Chairman from 2005 to April 2007. He also sat on the Audit Committee from at least 2000 to

3  2004. Krause has been a member of the Compensation Committee since 2004, and sat on the Audit

4  Committee from 2005 to April 2006. House has been a member of the Compensation Committee

5  since January 2006, and also sat on this committee from November 2004 to January 2005. Vaswani

6  has sat on the Compensation Committee since 2004, and has been its Chairman since 2007. As

7  members of the Compensation Committee, these defendants were responsible to review and grant

8  stock options granted to Brocade executives during their respective tenures on the committee. These

9  defendants did not fulfill this duty because they did not act to inform themselves of the

10  circumstances surrounding these option grants, thereby causing or allowing the Company's

11  executives to obtain unreasonable and unreported compensation via the backdating of stock option

12  grants. In fact, Krause, House, Dempsey and Vaswani completely abdicated their duties to Reyes.

13  Between fiscal years 2000-2004, the Compensation Committee held only nine meetings, and did not

14  even meet in fiscal year 2000 – all of which indicates that the Company suffered from having a

15  Compensation Committee that met only sporadically and devoted patently inadequate time and effort

16  to its work. Accordingly, there was and is a reasonable doubt that Dempsey, Krause, House and

17  Vaswani were disinterested because they face a sufficient likelihood of liability for their breaches of

18  fiduciary duty to Brocade. The Compensation Committee's decision to approve the options also was

19  not the product of valid business judgment. Thus, demand was futile as to defendants Dempsey,

20  Krause, House and Vaswani.

21      262.    The Audit Committee of the Board is responsible under its charter for reviewing the

22  Company's financial and accounting reporting compliance relating to its employee benefit plans.

23  Since at least 1999, the Audit Committee was comprised, at various times, of defendants Dempsey,

24  Paisley, Moore, and Krause. Dempsey sat on this committee from at least 2000 to 2004. Paisley

25  was member of this committee, and its Chairman, from August 2002 to April 2006. Moore sat on

26  this committee from 2003 to November 2005, and finally, Krause was a member of this committee

27  from 2005 to April 2006. As members of the Audit Committee, these defendants were responsible

28  for ensuring that Brocade's internal controls were adequate and that the Company's quarterly and

1  annual financial statements were accurate. Brocade's internal controls, however, were deficient as

2  evidenced by the ability of Reyes, Jensen, Byrd and Canova to perpetrate the improper backdating of

3  stock option grants for almost seven years. As a result of the improper option backdating, the

4  Company's financials were rendered inaccurate because those financials did not account for the true

5  amount of compensation being granted to Brocade's executives and employees. Accordingly, there

6  was and is a reasonable doubt that Paisley, Moore, Krause and Dempsey were disinterested because

7  they face a sufficient likelihood of liability for their breaches of fiduciary duty to Brocade. Thus,

8  demand was futile as to defendants House, Neiman, Paisley, Dempsey, Krause and Vaswani,

9  directors who abdicated their fiduciary duties to Reyes' compensation committee of one.

10     263.    On or about September 1999, the Board abdicated its duties with respect to the

11  granting of stock options to defendant Reyes under the 1998 Plan, who effectively became a

12  committee of one. Reyes maintained that authority throughout the period in which certain insiders,

13  including Reyes, oversaw the stock option manipulation. The decision to grant Reyes this

14  unchecked authority and to allow him to maintain that authority was not the product of valid

15  business judgment. This is because the Board consciously disregarded the fabricated Compensation

16  Committee minutes and other documents that Reyes, Jensen and others used to carry out their

17  scheme. Accordingly, demand was futile as to defendants Dempsey, Neiman, Vaswani and Krause.

18     264.    All of the members of the Board at the time the original complaints were filed in the

19  State Derivative Action and Federal Derivative Action authorized and/or permitted the false state-

20  ments disseminated directly to the public or made directly to securities analysts and which were

21  made available and distributed to shareholders, authorized and/or permitted the issuance of various

22  of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged

23  herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by

24  them.

25     265.    As a result of their access to and review of internal corporate documents,

26  conversations and connections with other corporate officers, employees and directors, and

27  attendance at management and Board meetings, each of the members of the Board at the time the

28  original complaints were filed in the State Derivative Action and Federal Derivative Action knew the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  adverse, non-public information regarding the improper accounting and its detrimental impact on the

2  Company's reported earnings. While in possession of this material adverse, non-public, information

3  regarding the Company, the following defendants participated in the illegal insider selling:

4          (a)    Klayko sold 408,000 shares of Brocade stock for proceeds of $2,061,440

5  while in possession of material non-public information; and

6          (b)    Dempsey sold 136,824 shares of Brocade stock for proceeds of $15,205,898

7  while in possession of material non-public information.

8  Because these defendants received an illicit personal financial benefit from the challenged insider

9  trading transactions, these defendants were and are interested. They also face a sufficiently

10  substantial threat of liability for their illegal insider selling. Since these directors breached their

11  fiduciary duties and were and are interested, any demand upon them would have been futile.

12      266.    The principal professional occupation of defendant Klayko was his employment with

13  Brocade, pursuant to which he received and continues to receive substantial monetary compensations

14  and other benefits. Specifically, Klayko was paid the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $605,000 | - | $1,042,457 | - | $1,125,975 | 1,299,314 | $18,333 |
| 2006 | $540,000 | $1,743,050 | $779,999 | 166,667 | - | - | $22,403 |
| 2005 | $481,364 | $341,951 | - | 1,600,000 | - | - | $3,587 |
| 2004 | $283,333 | $195,230 | - | 575,000 | - | - | $4,664 |
| 2003 | $175,000 | $42,464 | - | 713,781 | - | - | $3,324 |

20  Accordingly, at the time the original complaints in the State Derivative Action and Federal

21  Derivative Action were filed, Klayko lacked independence from Dempsey, Krause, House and

22  Vaswani – defendants who were not disinterested and/or independent and who exerted dispositive

23  influence over defendant Klayko's compensation. The Compensation Committee has the authority to

24  review and approve Klayko's base salary, bonus and equity compensation. Therefore, this lack of

25  independence rendered defendant Klayko incapable of impartially considering a demand to

26  commence and vigorously prosecute this action.

27      267.    Defendant Moore, by his specialized financial expertise and position as a member of

28  the Audit Committee, was in a unique position to understand the business of Brocade, as well as its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   finances, markets and present and future business prospects.  Specifically, Moore holds a B.S. in

2   Accounting.  He was Global Chairman, CEO - U.S. of the PricewaterhouseCoopers LLP ("PwC")

3   accounting firm from July 1998 until June 2001.  Prior to that, he was Chairman and CEO of the

4   Coopers & Lybrand LLP accounting firm from October 1994 until June 1998.  His qualifications led

5   to Moore's appointment to the Audit Committee – a position that he held from 2003 to November

6   2005.  Thus, because of his unique education, skills and experience, as well as his position as a

7   member of the Audit Committee, Moore had a heightened duty to ensure the accuracy and fairness

8   of Brocade's financials.  Nevertheless, Moore faces a sufficient likelihood of liability because he

9   breached his duties by causing or allowing the improper financial statements described herein, and

10  by utterly failing to cause the Audit Committee to create, implement and maintain a system of

11  internal controls that would have timely detected and/or prevented the stock option backdating

12  misconduct alleged herein.  As a result, any demand upon him would have been futile.

13          268.    Defendant Paisley, by his specialized financial expertise and position as Chairman of

14  the Audit Committee, was perfectly positioned to understand the business of Brocade, as well as its

15  finances, markets and present and future business prospects.  Specifically, Paisley has a B.A. in

16  Economics and an M.B.A.  He has been the Dean's Executive Professor of Accounting and Finance

17  in the Leavy School of Business at Santa Clara University since January 2001.  From September

18  1985 until May 2000, Paisley was the Senior Vice President of Finance and Chief Financial Officer

19  of 3Com Corporation.  These qualifications led to Paisley's ascension as a director to become the

20  Chairman of the Audit Committee – a position that he held from August 2002 to April 2006.  Thus,

21  because of his unique education, skills and experience, as well as his position as Chairman of the

22  Audit Committee, Paisley had a heightened duty to ensure the accuracy and fairness of Brocade's

23  financials.  Nevertheless, Paisely faces a sufficient likelihood of liability because he breached his

24  duties by causing or allowing the improper financial statements described herein, and by utterly

25  failing to cause the Audit Committee to create, implement and maintain a system of internal controls

26  that would have timely detected and/or prevented the stock option backdating misconduct alleged

27  herein.  As a result, any demand upon Paisley would have been futile.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    269.    The entire Brocade Board participated in the wrongs complained of herein. Brocade's

2    directors were and are not disinterested or independent due to the following: defendants House,

3    Klayko, Moore, Neiman, Paisley, Dempsey, Krause, Vaswani and Walker served on the Brocade

4    Board during the period in which Company executives were improperly backdating their stock

5    option grants.    Pursuant to their specific duties as Board members, each was charged with the

6    management of the Company and to conduct its business affairs.    Each of the above-referenced

7    defendants breached the fiduciary duties that they owed to Brocade and its shareholders in that they

8    failed to prevent and correct the improper stock option backdating practices and utterly failed to

9    implement a system of internal controls that would have prevented or timely detected the backdating

10   activity alleged herein. Thus, the Brocade Board cannot exercise independent objective judgment in

11   deciding whether to bring this action and vigorously prosecute it because such directors were and are

12   interested: it is their actions that have subjected Brocade to damages in the form of substantial costs

13   that the Company has expended and continues to face, as more particularly alleged herein.

14   270.    A number of the members of the Board as it was constituted at the time that the

15   original complaints were filed in the State Derivative Action and Federal Derivative Action, because

16   of their inter-related business, professional and personal relationships, have developed debilitating

17   conflicts of interest that prevented them from taking the necessary and proper action on behalf of the

18   Company as requested herein. In addition to the conflicts that exist as a result of their participation

19   in the option backdating, improper accounting and insider selling, as detailed herein, the majority of

20   the Board, as it was constituted at the time the original complaints were filed in the State Derivative

21   Action and Federal Derivative Action, including the defendants listed below, are subject to the

22   following prejudicial entanglements:

23           (i)    **Moore and O'Brien Are Long-Time Business Associates:**

24           Defendant O'Brien was a Global Managing Partner of PwC.  Defendant
     Moore was Global Chairman, CEO-US of PwC from July 1998 to June 2001.
25   Because of their long-standing and entangling business and professional
     relationships, defendant Moore will not take the action requested by plaintiff herein
26   against defendant O'Brien or the remainder of the Individual Defendants.

27           (ii)    **Klayko and Walker Are Long-Time Business Associates:**

28           Defendant Klayko held various positions at Hewlett-Packard Company prior
     to 1995. Walker held various positions at Hewlett-Packard Company for 24 years

- 118 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

until he resigned in 1999. Because of their long-standing and entangling business and professional relationships, neither Klayko nor Walker will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(iii)    **Paisley and Krause Are Long-Term Business Associates:**

Defendant Paisley was the Senior Vice President of Finance and CFO of 3Com Corp. from 1985 to 2000. Krause served as President and CEO of 3Com Corp. from 1981 to 1990, and as its Chairman from 1987 to 1993. Because of their long-standing and entangling business and professional relationships, neither Paisley nor Krause will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(iv)    **Dempsey, Moore and Neiman Interceded in Reyes' Criminal Trial, Arguing for Leniency:**

Prior to Reyes' sentencing, defendants Dempsey, Moore and Neiman (as well as defendant O'Brien) wrote letters to the Court in support of Reyes that were severely antagonistic to the best interests of Brocade:[11]

• On September 25, 2007, Dempsey wrote a letter to the Court noting that he personally knew members of Reyes' immediate family, and that Dempsey found Reyes "to be ethical and a man of exceptional character." Dempsey argued against a jail sentence for Reyes.

• On September 20, 2007, Moore wrote to the Court and urged it to show "leniency" in sentencing Reyes. In arguing for leniency, Moore essentially offered a well-crafted "everybody was doing it" sort of argument that had to be "fully understood and weighed very heavily in assessing the punishment."

• In an undated letter, Neiman noted that he had gotten to know members of Reyes' immediate family and had "spent time with them as a family." Neiman asserted that he "never saw or heard of Greg doing anything to harm the company, its customers, its employees, or its shareholders." Neiman argued against the "prolonged separation" between Reyes and his family that a prison sentence would entail.

271.    The acts complained of constitute violations of the fiduciary duties owed by Brocade's officers and directors and these acts are incapable of ratification.

272.    Brocade has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Board (as it was constituted at the time the original complaints were filed in the State Derivative Action and Federal Derivative Action) have not filed any lawsuits against themselves or others who were responsible for that

---

[11] These letters are collected at Docket No. 688-6 in *United States of America v. Reyes*, No. 3:06-cr-00556-CRB-1 (N.D. Cal. Jul. 20, 2006).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  wrongful conduct to attempt to recover for Brocade any part of the damages Brocade suffered and

2  will suffer thereby.

**DEMAND FUTILITY ALLEGATIONS AGAINST**
**BROCADE'S CURRENT BOARD**

273.    Brocade's current Board consists of the following nine individuals:  defendants House, Jones, Klayko, Krause, Rose, Vaswani, Walker, DiPentima and Gerdelman.  Plaintiff did not make any demand on the Board to institute this action because such a demand would have been a futile, wasteful and useless act.

274.    During February 2008, the Board formed a special litigation committee ("SLC") to investigate the claims asserted on behalf of Brocade in the State Derivative Action and Federal Derivative Action.  The SLC consists of defendants DiPentima and Gerdelman.  The formation of the SLC is an admission that the remaining members of the Board lack the independence and disinterestedness needed to objectively and in good faith consider a demand that the Company bring the instant action.  Thus, demand is futile as to defendants House, Jones, Klayko, Krause, Rose, Vaswani and Walker.

275.    Demand is futile as to defendants DiPentima and Gerdelman, and they are unfit to serve as members of the SLC, because each of them is interested in the subject matter of this litigation as a result of their breaches of fiduciary duty to Brocade.  In particular, these two defendants breached fiduciary duties owed to Brocade by supporting WSGR as Brocade's outside counsel with respect to the litigation despite WSGR's blatant, disabling and non-waivable conflicts of interest.  In fact, as members of the Board prior to their appointment to the SLC, DiPentima and Gerdelman supported the filing of various legal memoranda in opposition to motions to disqualify WSGR and force Brocade to retain independent counsel.  Moreover, before their appointment to the SLC, DiPentima and Gerdelman – like their fellow directors – supported the Proposed Settlement, which threatens to wipe out Brocade's derivative claims that are worth potentially hundreds of millions of dollars.  Indeed, along with other members of the Board, DiPentima and Gerdelman supported various filings by WSGR in federal court intended to move the Proposed Settlement toward a successful final approval by that court.  DiPentima and Gerdelman's support of legal

- 120 -

1   strategies that favor the Individual Defendants' interests at the expense of Brocade's interests is a

2   breach of fiduciary duty owed to Brocade. Accordingly, DiPentima and Gerdelman are interested

3   and demand is futile as to these two defendants.

4        276.    As alleged herein, the Board is ultimately responsible for approving the compensation

5   awarded to Brocade's executive officers. Such compensation encompasses the stock options that

6   were illicitly backdated by defendants Reyes, Jensen, Byrd and Canova. Five members of the Board

7   were involved in the egregious wrongdoing and remain liable for breaching their fiduciary duties in

8   connection with Brocade's wrongful compensation practices. Specifically, defendants House,

9   Klayko, Krause, Vaswani and Walker face sufficiently substantial liability for failing to fulfill their

10  fiduciary duties to Brocade in acquiescing to Reyes, Jensen, Canova and Byrd's improper scheme

11  and thereby causing and/or allowing the approval of the challenged option grants as dated.

12  Therefore, these defendants failed to exercise proper due care in carrying out their duties and

13  responsibilities as officers and directors of Brocade by consciously permitting the backdating

14  scheme to remain in place or by being recklessly ignorant in failing to inform themselves of the

15  illegal circumstances surrounding the options granted to Brocade's directors, executives and other

16  employees before approving them – including their utter failure to establish a system of internal

17  controls and oversight mechanisms that could and would have prevented or timely detected the illicit

18  backdating activity alleged herein. As a result of the misfeasance and complete abdication of their

19  fiduciary duties by these defendants, improperly-backdated options were routinely granted by Reyes

20  and peremptorily approved by the Board when they were dated at or near the Company's lowest

21  closing price for the respective month in which the options were granted, establishing that these

22  defendants failed to establish any effective internal controls and procedures. Moreover, these defen-

23  dants allowed the backdating scheme to continue unabated for almost seven years – a patently

24  unreasonable period of time – which revealed additional materially-deficient internal controls in

25  connection with the Company's financial reporting and accounting processes. Accordingly, reason-

26  able doubt exists that defendants House, Klayko, Krause, Vaswani and Walker are able to evaluate

27  demand in a sufficiently disinterested and independent manner. Further, the acts complained of

28  herein resulted in Brocade's material non-compliance with applicable legal, financial and ethical

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  regulations that has caused the Company to sustain substantial harm.  In this regard, decisions made

2  by these defendants to invariably approve the options were not the product of valid business

3  judgment.  For all the foregoing reasons, demand was futile as to defendants House, Klayko, Krause,

4  Vaswani and Walker.

5        277.    Seven members of the Board participated in approving the Proposed Settlement,

6  which purports to globally extinguish all derivative claims against virtually all possible defendants in

7  all actions arising out of or otherwise related to the improprieties that have been complained of

8  extensively herein.  The Proposed Settlement is patently unfair to the Company and its shareholders

9  because Brocade has suffered and will continue to suffer harm from defendants' actions.  Under the

10  terms of the Proposed Settlement, the Board may implement some corporate therapeutics, but to the

11  extent the Board decides to do so, it also may later discard any such reforms in the purported

12  exercise of its business judgment – which proved to be routinely and fatally flawed with regard to

13  the Board's other breaches of fiduciary duty alleged herein.  Further, the Proposed Settlement, if

14  approved, would provide for absolutely no monetary relief for the Company.  Such a result is plainly

15  contradictory to Brocade's best interests, as the Company has suffered losses that reach well into the

16  hundreds of millions, if not billions, of dollars that relate to the backdating caused by the egregious

17  misconduct of the Individual Defendants.  These losses, while massive, are still indeterminate, as the

18  SEC Action and Federal Securities Class Action remain unresolved.  In stark contrast, defendants

19  House, Klayko, Krause, Vaswani and Walker would escape liability if the Proposed Settlement is

20  approved, as they would receive a broad release of all claims related to their wrongdoings.  As a

21  result, these defendants will be allowed to walk away unscathed from the tumult and havoc wrought

22  by their own misconduct whereas Brocade and its shareholders cannot escape from the effects,

23  which will continue to persist well into the future.  This demonstration of unjust enrichment or unfair

24  exchange taken in spite of the Company's immeasurable losses could not have been the decision of a

25  board of directors exercising valid business judgment.  Motivated by their desire to entrench

26  themselves on the Board and extinguish liability for themselves, their legal counsel and auditors, the

27  Board approved a settlement that did not represent a fair, reasonable or adequate resolution of the

28  derivative claims asserted in either the Federal Derivative Action or State Derivative Action, and so

1  has foregone adherence to their duty to act in furtherance of the Company's best interests. By

2  displacing Brocade's significant interest in a fair recovery with their unique, personal and economic

3  interests, the entire Board has also breached their fiduciary duties. Accordingly, reasonable doubt

4  exists as to the ability of the entire Board to evaluate demand in a sufficiently disinterested and

5  independent manner. For all the foregoing reasons, demand was futile as to defendants House,

6  Jones, Klayko, Krause, Rose, Vaswani, Walker, DiPentima and Gerdelman.

7      278.    Demand is futile as to defendants House, Jones, Klayko, Krause, Rose, Vaswani,

8  Walker, DiPentima and Gerdelman for the further reason that based on information and belief,

9  plaintiff alleges that Tolling Agreement expired as of January 1, 2008, and that these defendants

10 failed to make reasonable and timely efforts to secure its renewal. In particular, on September 11,

11 2006, WSGR, acting as counsel for Brocade and defendants House, Krause, Moore, O'Brien,

12 Paisley, Sonsini, Neiman, Dempsey and Vaswani, wrote a letter to counsel for Reyes giving notice

13 that House, Krause, Moore, O'Brien, Paisley, Sonsini, Neiman, Dempsey and Vaswani were

14 terminating the Tolling Agreement "solely as to themselves." This letter further stated that "while all

15 periods of limitation (statutory or otherwise) will begin to run again forty-five (45) days from the

16 date of service of this notice upon you as to any claims or causes of action which Reyes may have

17 against the Directors or which any of them may have against Reyes, the statute of limitations

18 remains tolled on any claim which Reyes may have against Brocade or which Brocade may have

19 against Reyes." The fact that these defendants took such action was not publicly disclosed until well

20 over a year later, when the letter was attached as Exhibit 10.80 to Brocade's Form 10-K for FY:07

21 filed on December 21, 2007. The Tolling Agreement expired on its own terms a little over a week

22 later on January 1, 2008, and plaintiff is unaware of any public disclosures made by Brocade or other

23 information that would indicate this agreement was renewed or renegotiated with Reyes. Thus, by

24 failing to take reasonable and necessary steps to secure the renewal of the Tolling Agreement,

25 defendants House, Jones, Klayko, Krause, Rose, Vaswani, Walker, DiPentima and Gerdelman

26 materially undermined Brocade's ability to file new claims in a new action against Reyes, who now

27 may be able to defend such claims based on applicable periods of limitation or repose – all of which

28 would have been tolled with a renewed Tolling Agreement. Such grossly negligent inaction or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ineffective action by defendants House, Jones, Klayko, Krause, Rose, Vaswani, Walker, DiPentima

2  and Gerdelman further evinces a languid and careless attitude with respect to the protection of

3  Brocade's ability to seek redress for the damages the Company has suffered as a result of the stock

4  option backdating scheme quarterbacked by Reyes, and thus, demand is futile as to these defendants.

5       279.    The Compensation Committee of the Board is specifically responsible under its

6  charter for granting stock options or other equity awards to Brocade executives. This responsibility,

7  although held by the Board, is delegated to the Compensation Committee. This committee,

8  however, impermissibly delegated its responsibility to Reyes in total contravention of its charter.

9  The charter for the Compensation Committee states, in pertinent part, as follows:

> **Purpose**
>
> The purpose of the Compensation Committee of the Board of Directors (the "Board") of Brocade Communications Systems, Inc. (the "Company") shall be to discharge the Board's responsibilities relating to compensation of the Company's executive officers. ***The Compensation Committee has overall responsibility for (i) overseeing the Company's compensation and benefits policies generally; (ii) overseeing, evaluating and approving executive officer compensation plans, policies and programs;*** and (iii) preparing the report on executive compensation that is required by Securities and Exchange Commission rules to be included in the Company's annual proxy statement.
>
> **Reporting to the Board**
>
> The Compensation Committee shall make regular reports to the Board. These reports shall include a review of any recommendations or issues that arise with respect to Company compensation and benefits policies, executive compensation and any other matters that the Compensation Committee deems appropriate or is requested to be included by the Board.

20  During the Relevant Period, the members of the current Board who sat on the Compensation

21  Committee were defendants Krause, House and Vaswani, as alleged herein. As members of this

22  committee, these defendants were responsible to review and grant stock options granted to Brocade

23  executives during their respective tenures on the committee, and to ensure such grants were made,

24  documented, accounted for and reported in accordance with the shareholder-approved Plans and

25  applicable laws and accounting guidelines. These defendants did not fulfill this duty because they

26  did not act to inform themselves of the illegal circumstances surrounding these option grants, and

27  utterly failed to establish and maintain a system of adequate internal controls and oversight

28  procedures that could and would have timely detected or prevented the stock option backdating

- 124 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    alleged herein. Such failures by these defendants directly and proximately caused or allowed the

2    Company's executives to obtain unreasonable and unreported windfall compensation via the

3    backdating of stock option grants. Accordingly, there is a reasonable doubt that defendants Krause,

4    House and Vaswani are disinterested because they face a sufficient likelihood of liability for their

5    breaches of fiduciary duty to Brocade. The Compensation Committee's decision to approve stock

6    options that were backdated also was not the product of valid business judgment. Thus, demand was

7    futile as to defendants Krause, House and Vaswani.

8        280.    The Audit Committee of the Board is responsible under its charter for reviewing

9    Brocade's financial and accounting reporting compliance relating to its employee benefit plans.

10   During the Relevant Period, defendant Krause was a member of the Audit Committee. As a member

11   of this committee, Krause was responsible for ensuring that Brocade established and implemented a

12   system of internal controls and oversight procedures in connection with financial reporting and

13   accounting that were adequate, and that the Company's quarterly and annual financial statements

14   were not presented in a manner that was materially false or misleading. Brocade's system of internal

15   controls, however, was non-existent, as evidenced by the unfettered ability of Reyes, Jensen, Byrd

16   and Canova to perpetrate the improper backdating of stock option grants for almost seven years.

17   Indeed, with the criminal convictions of Reyes and Jensen, the utter lack of adequate internal

18   controls relative to the granting, documentation, accounting and reporting of stock options at

19   Brocade is beyond question. As a result of the improper stock option backdating, the Company's

20   financials were rendered inaccurate because they did not account for the true amount of

21   compensation being granted to Brocade's executives and employees. Accordingly, there is a reason-

22   able doubt that defendant Krause is disinterested because they face a sufficient likelihood of liability

23   for their breaches of fiduciary duty to Brocade. Thus, demand was futile as to defendant Krause.

24       281.    As a result of their access to and review of internal corporate documents,

25   conversations and connections with other corporate officers, employees and directors, and

26   attendance at management and Board meetings, each of the members of the current Board knew the

27   adverse, non-public information regarding the improper accounting and its detrimental impact on the

28   Company's reported earnings. Specifically, while in possession of this material adverse, non-public,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  information regarding the Company, defendant Klayko sold 400,000 shares of Brocade stock for

2  proceeds of $2,010,560 while in possession of material non-public information. Because Klayko

3  received an illicit personal financial benefit from the challenged insider trading transactions, he is

4  interested. Also, Klayko faces a sufficiently substantial threat of liability for his illegal insider

5  selling. Since Klayco has breached his fiduciary duties and is interested, any demand upon him was

6  futile.

7  282. The principal professional occupation of defendant Klayko was his employment with

8  Brocade, pursuant to which he received and continues to receive substantial monetary compensations

9  and other benefits. Specifically, defendant Klayko was paid the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $605,000 | - | $1,042,457 | - | $1,125,975 | 1,299,314 | $18,333 |
| 2006 | $540,000 | $1,743,050 | $779,999 | 166,667 | - | - | $22,403 |
| 2005 | $481,364 | $341,951 | - | 1,600,000 | - | - | $3,587 |
| 2004 | $283,333 | $195,230 | - | 575,000 | - | - | $4,664 |
| 2003 | $175,000 | $42,464 | - | 713,781 | - | - | $3,324 |

15  Accordingly, Klayko lacked independence from defendants House, Krause, Vaswani – defendants

16  who are not disinterested and/or independent and who exert dispositive influence over Klayko's

17  compensation. The Compensation Committee has the authority to review and approve Klayko's base

18  salary, bonus and equity compensation. Therefore, this lack of independence rendered defendant

19  Klayko incapable of impartially considering a demand to commence and vigorously prosecute this

20  action.

21  283. In order to bring this suit, all of the directors of Brocade would be forced to sue

22  themselves and persons with whom they have extensive business and personal entanglements, which

23  they will not do, thereby excusing demand. Namely, a number of the current members of the Board,

24  because of their inter-related business, professional and personal relationships, have developed

25  debilitating conflicts of interest that prevent the Board members of the Company from taking the

26  necessary and proper action on behalf of the Company as requested herein. In addition to the

27  conflicts that exist as a result of their participation in the option backdating, improper accounting and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

insider selling, as detailed herein supra, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

    (a)    ***Klayko and Walker Are Long-Time Business Associates:***

    Defendant Klayko held various positions at Hewlett-Packard Company prior to 1995. Defendant Walker held various positions at Hewlett-Packard Company for 24 years until he resigned in 1999. Because of their long-standing and entangling business and professional relationships, neither defendant Klayko nor defendant Walker would take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

    284.    Each of the members of the Board who were directors during the time the false public financial statements alleged herein were published authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

    285.    A majority of the current Board participated in the wrongs complained of herein. Defendants House, Klayko, Krause, Vaswani and Walker are not disinterested or independent because they served on the Board during the period in which Company executives were improperly backdating their stock option grants. Pursuant to their specific duties as directors, each was charged with the proper and diligent management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Brocade and its shareholders in that they failed to prevent and correct the improper stock option backdating practices, and completely failed to establish and maintain a system of adequate internal controls and oversight mechanisms to timely prevent, detect and correct the hidden and improper activity related to the backdating of stock options. Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because defendants House, Klayko, Krause, Vaswani and Walker are interested personally in the outcome as it is their misconduct that has subjected Brocade to damages as alleged herein.

    286.    The acts complained of constitute violations of the fiduciary duties owed by Brocade's officers and directors and these acts are incapable of ratification.

- 127 -

287. Brocade has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby.

## COUNT I

### Against the RICO Defendants for Violation of RICO, 18 U.S.C. § 1962(c), Through Conspiracy, Mail and Wire Fraud, Securities Fraud, and Manipulation of Stock Options

288. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

289. Pursuant to 18 U.S.C. §1964(c), plaintiff, derivatively on behalf of Brocade, has and may assert a private right of action against the RICO Defendants for their pattern of racketeering activity in violation of RICO.

290. During the Relevant Period, the RICO Defendants devised and engaged in a scheme whereby they formed a separate enterprise and/or association-in-fact enterprise for the common purpose of illegally manipulating the granting of stock options at Brocade and to attempt to cover up such misconduct by filing false financial statements with the SEC to the direct, obvious, and inescapable injury to the business and property of Brocade.

291. In violation of 18 U.S.C. §1962(c), the RICO Defendants conducted or participated in the affairs of the enterprise identified herein.

292. Plaintiff and Brocade are each "persons" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

293. The RICO Defendants are "persons" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

### Defendants' RICO Enterprise

294. The RICO "enterprise" within the meaning of 18 U.S.C. §1961(4) is an association-in-fact consisting of defendants Reyes, Jensen, Canova, Byrd, Neiman, Dempsey, Leslie, Paisley, House, Klayko, Moore, Krause, Vaswani, Walker, Jones, Rose, DiPentima, Gerdelman, Wall, KPMG and Sonsini (the "RICO Enterprise"or "RICO Defendants").

295. The RICO Enterprise was an ongoing and continuing organization consisting of

- 128 -

1  individuals who associated together for the common or shared purpose of manipulating awards of

2  stock options at Brocade, attempting to cover up the illegal stock option grants, and seeking to

3  eliminate the liability of the RICO Defendants and others for the illegal activity. Over a more than

4  eight-year timeframe during the Relevant Period, the RICO Defendants conspired and acted to

5  illegally manipulate the granting of stock options at Brocade, cover up the illegal granting of stock

6  options at the Company, and attempt to eliminate the liability of the RICO Defendants and others for

7  the illegal activity.  As a result of this illegal enterprise, stock options were manipulated, and

8  materially false financial statements were filed, for the fiscal years 1999 to 2004.  Further, the RICO

9  Defendants were enriched and Brocade was damaged in that it received less money than it should

10  have when recipients of the options exercised the options.  From 1999 to the present, the RICO

11  Defendants took steps to conceal the illegal activity and to attempt to release culpable defendants

12  from liability for the illegal conduct, all to the detriment of Brocade.

13      296.    At all relevant times, the association of individuals and entities that form the RICO

14  Enterprise was also associated for the lawful purpose of working for Brocade, serving on the Board

15  or serving as Brocade's outside auditor.

16      297.    The RICO Defendants constructed and implemented a common system of granting

17  Brocade stock options with exercise prices less than the fair market value of Brocade's stock on the

18  grant date.  This common system involved a scheme whereby stock options were "backdated" by

19  issuing the options days or weeks after the supposed grant date, and then pricing the options at a low

20  point in the past instead of pricing the options on the date the options were actually awarded.  The

21  RICO Defendants are distinct individuals, entities or, in the case of KPMG, a partnership.

22      298.    The RICO Enterprise affected interstate commerce. It was a further part of said

23  scheme and artifice, and in furtherance thereof, that the RICO Defendants would and did communi-

24  cate with each other and with their co-conspirators and others, in person, through mail service

25  provided by the U.S. Postal Service, by telephone and other interstate and foreign wire facilities.

26      299.    For the purpose of executing and attempting to execute the scheme and artifice

27  described herein, the RICO Defendants and their co-conspirators would and did knowingly place and

28  cause to be placed in any post office or authorized depository for mail matters and things to be sent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  and delivered by the United States Postal Service; took and received therefrom such matters and

2  things; and knowingly caused to be delivered by mail according to the direction thereon, and at the

3  place at which it is directed to be delivered by the person to whom it is addressed, any such matters

4  and things, in violation of 18 U.S.C. §1341, including, but not limited to, the instances set forth in

5  the predicate racketeering acts described below.

6      300.    For purposes of executing and attempting to execute that scheme and artifice, the

7  RICO Defendants and their co-conspirators would and did knowingly transmit and cause to be

8  transmitted in interstate and foreign commerce by means of wire, radio and television

9  communication writings, signs, signals, pictures and sounds (collectively "Transmissions") in

10 violation of 18 U.S.C. §1343, including, but not limited to, the transmissions set forth in the

11 predicate racketeering acts described below.

12              **Conduct of the Affairs of the RICO Enterprise**

13     301.    The RICO Defendants conducted or participated in the conduct of the RICO

14 Enterprise in violation of 18 U.S.C. §1962(c). Such conduct and participation was carried out in at

15 least the following ways:

16          (a)    Through a conspiracy to commit securities and mail fraud in violation of 18

17 U.S.C. §371. Reyes was convicted of this offense on August 7, 2007. Jensen was convicted of this

18 offense on December 5, 2007;

19          (b)    Through knowingly and willingly, directly and indirectly, falsifying and

20 causing to be falsified books, records and accounts of Brocade as to a material matter, in violation of

21 15 U.S.C. §§78m(b)(2)(A), 78m(b)(5) and 78ff(a). Reyes was convicted of this offense on August 7,

22 2007. Jensen was convicted of this offense on December 5, 2007;

23          (c)    Through securities fraud, in violation of 15 U.S.C. §§78j(b) and 78ff; 17

24 C.F.R. §240.10b-5, 18 U.S.C. §2;

25          (d)    Through filing false SEC filings, in violation of 15 U.S.C. §§78j(b) and 78ff;

26 17 C.F.R. §240.10b-5, 18 U.S.C. §2; and

27          (e)    Through violation of 18 U.S.C. §§1341 (mail fraud) and 18 U.S.C. §1343

28 (wire fraud).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    **The RICO Defendants' Pattern of Racketeering Activity and the Predicate Acts**

2        302.    Throughout the Relevant Period, the RICO Defendants knowingly, willfully and

3    unlawfully conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise

4    through a pattern of racketeering activity, including multiple predicate acts chargeable under 18

5    U.S.C. §371, 15 U.S.C. §§78j(b) and 78ff; 17 C.F.R. §240.10b-5, 18 U.S.C. §2, and 15 U.S.C.

6    §§78m(b)(2)(A), 78m(b)(5) and 78ff(a), in violation of 18 U.S.C. §1962(c).

7        303.    From at least as early as 1999, and continuing until the time of filing of this

8    complaint, the RICO Defendants and others known and unknown did knowingly and intentionally

9    devise and intend to devise a scheme and artifice to defraud, and obtain money and property from,

10   members of the public and Brocade by means of materially false and fraudulent pretenses,

11   representations and promises, and omissions of material facts, knowing that the pretenses,

12   representations and promises, were false when made.

13       304.    The RICO Defendants' activities in furtherance of the RICO Enterprise were ongoing

14   and continuous over at least eight or more years.   These violations constitute a "pattern of

15   racketeering activity" within the meaning of 18 U.S.C. §1962(c).

16       305.    The predicate acts in furtherance of the RICO Enterprise included, but were not

17   limited to, the following:

18           (a)    *Predicate Act No. 1*: Reyes and Jensen backdated Brocade Compensation

19   Committee minutes so that the minutes falsely reported that a meeting occurred on October 30, 2001

20   and that stock options were granted on that day and priced at the market value of Brocade's stock on

21   that day;

22           (b)    *Predicate Act No. 2*: Reyes and Jensen backdated Brocade Compensation

23   Committee minutes so that the minutes falsely reported that a meeting occurred on November 28,

24   2001 and that stock options were granted on that day and priced at the market value of Brocade's

25   stock on that day;

26           (c)    *Predicate Act No. 3*: Reyes and Jensen backdated Brocade Compensation

27   Committee minutes so that the minutes falsely reported that a meeting occurred on January 22, 2002

28

1  and that stock options were granted on that day and priced at the market value of Brocade's stock on

2  that day;

3        (d)    ***Predicate Act No. 4***:  Reyes and Jensen backdated Brocade Compensation

4  Committee minutes so that the minutes falsely reported that a meeting occurred on February 28,

5  2002 and that stock options were granted on that day and priced at the market value of Brocade's

6  stock on that day;

7        (e)    ***Common Facts for Predicate Act Nos. 1-4***:  For all of the backdated Compen-

8  sation Committee minutes, Reyes, Jensen and others conspired to commit the substantive crimes

9  noted above.  One witness testified that he understood Jensen and Reyes operated together in

10  determining the appropriate retroactive price for option grants.[12] Another witness testified that under

11  Jensen's supervision, three possible retroactive grant dates would be selected.  Jensen would then

12  take the potential dates to Reyes and return with signed, falsified Compensation Committee meeting

13  minutes.  Jensen oversaw and directed Stephen Beyer, Colleen Devine, and Margie Lee in gathering

14  the historical price information for Brocade stock, preparing the false minutes, presenting those

15  minutes to Reyes for his signature, and passing the phony documentation along to the Company's

16  finance department.  Jensen screened the pricing information and directed her subordinates to choose

17  a date that was not always the lowest in order to conceal that she and Reyes were selecting low-price

18  dates;

19        (f)    ***Predicate Act No. 5***:  On or about January 24, 2002, Reyes, Canova,

20  Dempsey, Leslie, Neiman and Sonsini filed and signed, and caused Brocade to file, a Form 10-K

21  with the SEC for the fiscal year ended October 27, 2001, in which such defendants knowingly and

22  willfully made and caused Brocade to make untrue statements of material fact and to omit to state

23  material facts necessary to make the statements made not misleading.  Specifically, the Form 10-K

24  (1) falsely represented that Brocade did not incur compensation expenses in connection with its

25

26  _____

27  [12] References to witness statements derive from testimony taken during the jury trials of either
    Reyes or Jensen.  *See United States of America v. Reyes*, no. 3:06-cr-00556-CRB-1 & 2 (N.D. Cal.
    Jul. 20, 2006).

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  stock option grants made during fiscal year 2001; (2) omitted to disclose that Brocade granted stock

2  options during fiscal year 2001 with exercise prices that were below the market value of the

3  Company's stock on the grant dates and that Brocade incurred compensation expenses in connection

4  with such stock option grants; (3) falsely represented that Brocade accounted for its stock option

5  grants in accordance with the provisions of APB 25 whereby the difference between the exercise

6  price and the fair market value at the grant date is recognized as compensation expense; and (4)

7  omitted to disclose that fraudulent entries relating to stock option grants were made in the books and

8  records of the Company;

9     (g) **Predicate Act No. 6**:  On or about January 22, 2003, Reyes, Canova, Byrd,

10  Dempsey, Neiman, Paisley, Sonsini and KPMG filed, signed, or caused Brocade to file a Form 10-K

11  with the SEC for the fiscal year ended October 26, 2002, in which such defendants knowingly and

12  willfully made and caused Brocade to make untrue statements of material fact and to omit to state

13  material facts necessary to make the statements made not misleading.  Specifically, the Form 10-K

14  (1) falsely represented that Brocade did not incur compensation expenses in connection with its

15  stock option grants made during fiscal year 2002; (2) omitted to disclose that Brocade granted stock

16  options during fiscal year 2002 with exercise prices that were below the market value of the

17  Company's stock on the grant dates and that Brocade incurred compensation expenses in connection

18  with such stock option grants; (3) falsely represented that Brocade accounted for its stock option

19  grants in accordance with the provisions of APB 25 whereby the difference between the exercise

20  price and the fair market value at the grant date is recognized as compensation expense; and (4)

21  omitted to disclose that fraudulent entries relating to stock option grants were made in the books and

22  records of the Company.  KPMG audited the financial results in the Form 10-K and, notwithstanding

23  its knowledge of the falsity of the aforementioned statements in the Form 10-K, certified that the

24  financial statements complied in all respects with GAAP;

25     (h) **Predicate Act No. 7**:  On or about January 20, 2004, Reyes, Canova,

26  Dempsey, Neiman, Paisley, Sonsini, Moore and KPMG filed, signed, or caused Brocade to file a

27  Form 10-K with the SEC for the fiscal year ended October 25, 2003, in which such defendants

28  knowingly and willfully made and caused Brocade to make untrue statements of material fact and to

1  omit to state material facts necessary to make the statements made not misleading.  Specifically, the

2  Form 10-K (1) falsely represented that Brocade did not incur compensation expenses in connection

3  with its stock option grants made during fiscal year 2003; (2) omitted to disclose that Brocade

4  granted stock options during fiscal year 2003 with exercise prices that were below the market value

5  of the Company's stock on the grant dates and that Brocade incurred compensation expenses in

6  connection with such stock option grants; (3) falsely represented that Brocade accounted for its stock

7  option grants in accordance with the provisions of APB 25 whereby the difference between the

8  exercise price and the fair market value at the grant date is recognized as compensation expense; and

9  (4) omitted to disclose that fraudulent entries relating to stock option grants were made in the books

10  and records of the Company.  KPMG audited the financial results in the Form 10-K and,

11  notwithstanding its knowledge of the falsity of the aforementioned statements in the Form 10-K,

12  certified that the financial statements complied in all respects with GAAP;

13         (i)    *Predicate Act No. 8*: Jensen directed Brocade employees not to use e-mail or

14  voicemail when communicating about the stock option granting process.  Jensen also used Steven

15  Beyer and other human resource employees to delete and fabricate evidence of Brocade's

16  backdating;

17         (j)    *Predicate Act No. 9*: During February 2002, Byrd approved backdated

18  options for new hire Geruson and directed Brocade human resources employees to cover up the act;

19         (k)    *Predicate Act No. 10*: In 2005 and 2006, the RICO Defendants conspired to

20  cover up the racketeering activity by taking action to attempt to influence the legal and accounting

21  advisors to Brocade's Audit Committee that a restatement of Brocade's financial results was not

22  necessary.  On information and belief, as part of this process, Sonsini and other RICO Defendants

23  caused Brocade to procure an opinion from WSGR that Brocade's accounting treatment for stock

24  options issued under the "part-time" program was appropriate and that it complied with GAAP;

25         (l)    *Predicate Act No. 11*: In 2006, Klayko, Dempsey, House, Krause, Rose,

26  Jones, Vaswani and Walker took action as members of the Board to approve the Proposed

27  Settlement pursuant to which Brocade was to receive no monetary compensation and most of the

28  RICO Defendants and others were to receive complete releases for the illegal conduct.  Defendant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Wall played an active role in negotiating the Proposed Settlement. This conduct was an integral part

2    of the ongoing conspiracy to cover up the RICO Enterprise and, when that failed, to release the

3    culpable individuals and entities from liability. Sonsini's law firm, WSGR, provided legal advice to

4    Klayko, Dempsey, House, Krause, Rose, Jones, Vaswani and Walker to approve the Proposed

5    Settlement even though WSGR and Sonsini faced a material and incurable conflict of interest in

6    representing Brocade's interests in the settlement discussions.   Under the terms of the illusory

7    settlement, both Sonsini and WSGR were to receive complete releases from liability;

8               (m)    *Predicate Act No. 12*: In January 2007, House, Jones, Klayko, Krause, Rose,

9    Vaswani and Walker caused Brocade to amend its stockholder rights plan, commonly referred to as a

10   "poison pill," to accelerate the expiration of the plan to January 23, 2007, thus terminating the plan.

11   The plan was terminated as part of the conspiracy to eliminate the liability of the RICO Defendants

12   for the racketeering activity, since termination of the plan would greatly facilitate acquisition of

13   Brocade by another corporation or entity and any merger or acquisition of the Company would

14   generally, absent certain exceptions, eliminate the liability of the RICO Defendants for shareholder

15   derivative claims;

16              (n)    **Predicate Act No. 13**: In the spring of 2007, defendants took action to urge

17   the federal district court to approve the Proposed Settlement;

18              (o)    *Predicate Act No. 14*: In May 2007, plaintiffs in the State Derivative Action

19   filed a motion to disqualify WSGR from representing Brocade or any other party in the State

20   Derivative Action or Federal Derivative Action due to WSGR's material and incurable conflicts of

21   interest.  As part of the conspiracy to cover up the RICO Enterprise and procure releases for the

22   RICO Defendants and others, Wall, DiPentima, Gerdelman, House, Jones, Klayko, Krause, Rose,

23   Vaswani, and Walker caused Brocade in 2007 to oppose this motion to disqualify WSGR as counsel

24   for the Company in such derivative actions under circumstances in which these defendants had a

25   fiduciary duty to ensure that Brocade utilized independent counsel and to ensure that WSGR did not

26   continue to represent parties who were adverse to Brocade;

27              (p)    *Predicate Act No. 15*: On February 26, 1998, while Brocade was still a

28   California corporation, the Board – including defendants Neiman and Dempsey – adopted the 1998

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Plan.  At the meeting, these directors – again including Neiman and Dempsey – also passed a

2    resolution delegating to the Company's CEO the authority to make stock option awards under the

3    1998 Equity Incentive Plan to employees other than Section 16 officers.  However, this authorization

4    was only effective upon the IPO, which subsequently happened in May 1999.  This resolution

5    constituted an abdication of the duties owed by Neiman and Dempsey to Brocade as members of the

6    Board and as members of the Compensation Committee.  Thus, when Reyes became CEO of

7    Brocade in January 1999, he was not authorized, acting alone, to issue any stock options because the

8    Company had not yet conducted an IPO of its stock.  Moreover, once the IPO occurred, Reyes was

9    only authorized to issue stock options *under the 1998 Plan and not under any other plan*.  The

10   Board never passed an authorization similar to the February 26, 1998 resolution that gave Reyes

11   authority to issue stock options under the 1999 Plan or any subsequent plan.  The Board never did so

12   until February 21, 2001.  Thus, all stock options issued by Reyes under Brocade's 1999 Stock Option

13   Plan at any time from 1999 to February 21, 2001 were and are completely void.  Moreover,

14   Brocade's Compensation Committee had actual knowledge that Reyes was not authorized to issue

15   stock options under the 1999 Plan or later plans.  As noted above Neiman and Dempsey were present

16   at the February 26, 1998 Board meeting and voted to authorize Reyes to issue options under the

17   1998 Plan.  Thus, they knew that Reyes, who was not a member of the Compensation Committee,

18   could only issue options pursuant to a valid resolution of the full Board.  The rest of the directors

19   also knew this because the stock options plans very clearly state that options may only be issued by

20   the full Board or a committee of the Board acting pursuant to a valid delegation of authority.  Thus,

21   all members of the Board acted with knowledge or gross recklessness in allowing Reyes to issue

22   options under the 1999 Plan and later plans with no authority to issue such options;

23           (q)    ***Predicate Act No. 16***:  In February 1999, Brocade was still a California

24   corporation and still was privately held.  It had not yet completed an IPO.  Nevertheless, Reyes

25   began to issue stock options as a "committee of one."  Between February 19, 1999 and May 23,

26   1999, Reyes issued hundreds of thousands of unauthorized and void stock options.  Defendants

27   Neiman, Dempsey, Leslie and Sonsini were aware that Reyes was acting without authority and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  conspired with Reyes by: (i) allowing him to issue stock options without a proper delegation; and (ii)

2  allowing him to issue backdated stock options;

3            (r)    **Predicate Act No. 17**:  At a March 17, 1999 Board meeting, defendants

4  Neiman, Dempsey, Leslie, Reyes and Sonsini passed a resolution combining the 1995 Equity

5  Incentive Plan, 1998 Plan and 1998 Executive Equity Incentive Plan into the 1999 Plan, effective

6  upon closing of the IPO.  However, they did not pass a resolution authorizing Reyes to act as a

7  "committee of one" with respect to options issued under the 1999 Plan.  Thus, they consciously

8  permitted Reyes to continue to issue awards under the 1999 Plan without a proper delegation.

9            (s)    **Predicate Act No. 18**: Reyes continued to issue stock options as a "committee

10  of one" throughout 1999 and up to and including February 21, 2001.  During that time, Reyes issued

11  hundreds of thousands of stock options.  During this entire time, the Board never passed a resolution

12  authorizing Reyes to issue stock options under the 1999 Plan.  Nevertheless, the members of the

13  Compensation Committee and the rest of the Board consciously continued to allow Reyes to issue

14  options as a "committee of one" and to issue backdated stock options; and

15            (t)    **Predicate Act No. 19**:  On February 21, 2001, defendants Reyes, Dempsey,

16  Leslie, Neiman and Sonsini, constituting all the members of the Board at the time, issued a

17  resolution pursuant to a "Unanimous Written Consent."  Under the February 21, 2001 UWC, these

18  defendants authorized Reyes for the first time to grant nonstatutory stock options to non-executive

19  officer employees at Brocade under Brocade's 1999 Plan.  The UWC authorized Reyes to issue such

20  options to the indicated employees "in his sole discretion."  This UWC represented a blatant breach

21  of fiduciary duty by Reyes, Dempsey, Leslie, Neiman and Sonsini since Reyes had already been

22  issuing options "in his sole discretion" under the 1999 Plan for two years.  Moreover, Dempsey,

23  Leslie, Neiman and Sonsini knew Reyes was backdating stock options, knew Reyes had no authority

24  to do so, and passed the UWC in furtherance of the conspiracy to facilitate and empower Reyes.

25  Further, as members of the Compensation Committee, Neiman, Dempsey and Leslie had been

26  explicitly vested with the responsibility to issue stock options under the 1999 Plan by the full Board

27  in October 1999.  The delegation of sole discretion to Reyes constituted an abdication of the

28  fiduciary duties owed by Neiman, Dempsey and Leslie as members of the Compensation Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    306.    Pursuant to 18 U.S.C. §1964, the RICO Defendants are liable to plaintiff derivatively

2    on behalf of Brocade for threefold the actual damages sustained by Brocade, plus the costs of

3    bringing this suit, including reasonable attorney's fees.

**Damages Caused by the RICO Enterprise**

5    307.    The RICO Defendants' violations of 18 U.S.C. §1962(c) directly and proximately

6    caused, and continue to cause, Brocade to be injured in its business or property by an aggregate

7    amount in excess of $100 million.   The damages caused to Brocade include, but are not limited to,

8    fines paid to the SEC, costs of investigation and restatement of its financial results, the advancement

9    of attorney fees to some of the RICO Defendants and others under indemnification agreements,

10   being named as a defendant in the securities fraud class action litigation before this Court, loss of

11   income when the manipulated stock options were exercised by the option recipients at lower exercise

12   prices, and tax and other damages.

**COUNT II**

**Against the RICO Defendants for Conspiracy to Violate RICO, 18 U.S.C. §1962(c)**

15   308.    Plaintiff incorporates by reference and realleges each and every allegation contained

16   above, as though fully set forth herein.

17   309.    Throughout the Relevant Period, the RICO Defendants knowingly, willfully and

18   unlawfully conspired and agreed with each other to conduct or participate, directly and indirectly, in

19   the conduct of the affairs and activities of the RICO Enterprise, through a pattern of racketeering

20   activity, including acts chargeable under 18 U.S.C. § 71, 15 U.S.C. §§78j(b) and 78ff; 17 C.F.R.

21   §240.10b-5, 18 U.S.C. §2, and 15 U.S.C. §§8m(b)(2)(A), 78m(b)(5) and 78ff(a), in violation of 18

22   U.S.C. §1962(c) and (d), by agreeing to the objective of the conspiracy and/or by agreeing to commit

23   at least two of the criminal predicate acts alleged herein.   The predicate acts alleged above are

24   specifically incorporated herein by this reference and are realleged as if fully set forth herein

25   310.    The objects of the conspiracy were to illegally manipulate the granting of stock

26   options at Brocade, conceal such illegal manipulation, and eliminate the liability of the RICO

27   Defendants through securities fraud, conspiracy, making false entries in Brocade's books and

28   records, filing false financial statements with the SEC, causing Brocade to retain WSGR, a

- 138 -

1  materially conflicted law firm, and entering into and advocating court approval of the Proposed

2  Settlement. Such objections were to be achieved and were achieved through the wrongful predicate

3  acts alleged herein. The conspiracy and predicate acts alleged herein were affectuated through

4  Transmissions in order to conduct or facilitate interstate commerce.

5      311.    The RICO Defendants' violations of 18 U.S.C. §1962(d) directly and proximately

6  caused, and continue to cause, Brocade to be injured in its business or property by an aggregate

7  amount in excess of $100 million. The damages caused to Brocade include, but are not limited to,

8  fines paid to the SEC, costs of investigation and restatement of its financial results, the advancement

9  of attorney fees to the RICO Defendants and others under indemnification agreements, being named

10  as a defendant in the Federal Securities Class Action, loss of income when the manipulated stock

11  options were exercised by the option recipients at lower exercise prices, and tax and other damages.

12      312.    In accordance with 18 U.S.C. §1964, the RICO Defendants are liable to plaintiff

13  derivatively on behalf of Brocade for threefold the actual damages sustained by Brocade, plus the

14  costs of bringing this suit, including reasonable attorney's fees.

15  **COUNT III**

16  **Against the Individual Defendants for Breach of Fiduciary Duty for Approving**
**Improperly-Dated Stock Option Grants to Brocade's Employees and Executive Officers**

17  

18      313.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

19  

20      314.    The Individual Defendants owed and owe Brocade fiduciary obligations. By reason

21  of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe

Brocade the highest obligation of good faith, fair dealing, loyalty and due care.

22  

23      315.    The Individual Defendants, and each of them, violated and breached their fiduciary

24  duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

25      316.    Each of the Individual Defendants had actual or constructive knowledge that they had

26  approved the improper backdating of stock option grants and the corresponding issuance of

inaccurate financial results that did not properly account for the stock option grants and failed to

27  correct or prevent these improprieties. These actions could not have been a good faith exercise of

28  prudent business judgment to protect and promote the Company's corporate interests.

317.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Brocade has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

318.    Plaintiff on behalf of Brocade has no adequate remedy at law.

## COUNT IV

**Against Defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker for Breach of Fiduciary Duty for Approving the Proposed Settlement**

319.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

320.    Defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker owed and owe Brocade fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe Brocade the highest obligation of good faith, fair dealing, loyalty and due care.

321.    Defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker, and each of them, violated and breached their fiduciary duties of care, loyalty and good faith by approving the Proposed Settlement.

322.    Each of defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker approved the Proposed Settlement on behalf of the Company.  As detailed in great particularity herein, the Individual Defendants and KPMG were each involved in the egregious wrongdoing which caused Brocade substantial harm.  Under the terms of the Proposed Settlement, however, the Company will implement some corporate governance changes but will recover nothing for the substantial monetary losses alleged in the Federal Derivative Action, which are similar to those alleged here.

323.    As a direct and proximate result of Defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker's failure to perform their fiduciary obligations, if the Proposed Settlement is approved, Brocade will never recover for its losses which KPMG and the Individual Defendants, including defendants Dempsey, House, Klayko, Krause, Vaswani and Walker, caused the Company.  As a result of the misconduct alleged herein, Defendants Dempsey, House, Klayko, Krause, Rose, Vaswani and Walker are liable to the Company.

324.    Plaintiff on behalf of Brocade has no adequate remedy at law.

- 140 -

## COUNT V

### Against the Insider Selling Defendants for Violation of
### California Corporations Code Section 25402

325.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

326.    At the time that the Insider Selling Defendants sold their Brocade common stock as set forth herein, by reason of their high executive and/or directorship positions with Brocade, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts concerning defendants' backdating practices.  Further, the Insider Selling Defendants cashed in their illegally-backdated stock options and sold them for over $1.5 billion in proceeds.

327.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Brocade shares at that time.

328.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse, non-public information and thus sold their Brocade common stock in California in violation of California Corporations Code section 25402.

329.    Pursuant to California Corporations Code section 25502.5, the Insider Selling Defendants, and each of them, are liable to Brocade for damages in an amount up to three times the difference between the price at which Brocade common stock was sold by the defendants, and each of them, and the market value which that Brocade common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT VI

### Against the Director Defendants for Violation of
### California Corporations Code Section 25403

330.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

331.   The Director Defendants, through their positions, possessed control and influence over the Insider Selling Defendants' sale of Brocade common stock in violation of the California Corporations Code.  The Director Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code section 25403.

332.   The Director Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information and the Director Defendants were aware of the Insider Selling Defendants' intent to sell Brocade common stock while in possession material adverse non-public information.

333.   The Director Defendants are culpable for the Insider Selling Defendants' underlying violations of California Corporations Code section 25402 because of their knowledge and ability to control and influence the Insider Selling Defendants and because their involvement in preparing and/or approving financials that improperly accounted for the Company's compensation expenses related to grants of stock options to Brocade officers, directors and employees.

334.   Under California Corporations Code section 25403, the Director Defendants, and each of them, are liable to Brocade for damages in an amount up to three times the difference between the price at which Brocade common stock was sold by the Insider Selling Defendants, and each of them, and the market value which that Brocade common stock would have had at the time of the sale if the information known to the Individual Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

### COUNT VII

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

335.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

336.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Brocade common stock on the basis of such information.

337.   The information described above was proprietary non-public information concerning the Company's illegal granting of backdated stock options.  It was a proprietary asset belonging to

- 142 -

1   the Company, which the Insider Selling Defendants used for their own benefit when they sold

2   Brocade common stock.

3       338.    The Insider Selling Defendants' sales of Brocade common stock while in possession

4   and control of this material adverse, non-public information was a breach of their fiduciary duties of

5   loyalty and good faith.

6       339.    Since the use of the Company's proprietary information for their own gain constitutes

7   a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the

8   imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

9                                   **COUNT VIII**

10          **Against All Defendants for Conspiracy to Breach Fiduciary Duties**

11      340.    Plaintiff incorporates by reference and realleges each and every allegation set forth

12  above, as though fully set forth herein.

13      341.    In committing the wrongful acts alleged herein, the Individual Defendants, defendant

14  KPMG and defendant WSGR have pursued, or joined in the pursuit of, a common course of conduct,

15  and have acted in concert with and conspired with one another in furtherance of their common plan

16  or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the

17  Individual Defendants, KPMG and WSGR further aided and abetted and/or assisted each other in

18  breach of their respective duties.

19      342.    During all times relevant hereto, the Individual Defendants, KPMG and WSGR

20  collectively and individually initiated a course of conduct that was designed to and did: (i) conceal

21  the fact that Company executives were improperly backdating their stock option grants; (ii) maintain

22  the Individual Defendants' executive and directorial positions at Brocade and the profits, power and

23  prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the

24  shareholders of Brocade regarding the level of compensation being paid to the Company's executives

25  and the Company's financial condition; and (iv) artificially inflate the price of Brocade common

26  stock so they could dispose of over $1.5 billion of their personally-held stock. In furtherance of this

27  plan, conspiracy and course of conduct, the Individual Defendants, KPMG and WSGR collectively

28  and individually took the actions set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    343.    The Individual Defendants, KPMG and WSGR engaged in a conspiracy, common

2    enterprise and/or common course of conduct.  During this time the Individual Defendants, KPMG

3    and WSGR caused the Company to conceal the true fact that Brocade was misrepresenting its

4    financial results and that Brocade executives were improperly backdating their stock option grants.

5    344.    The purpose and effect of the conspiracy, common enterprise, and/or common course

6    of conduct by and among the Individual Defendants, KPMG and WSGR was, among other things, to

7    grant themselves undisclosed and unaccounted for compensation in the form of backdated stock

8    option grants and to disguise the Individual Defendants' violations of federal securities laws,

9    breaches of fiduciary duties, unjust enrichment, violations of state law prohibitions on insider selling

10    codified in California Corporations Code sections 25402 and 25403 and corporate waste.

11    345.    The Individual Defendants, KPMG and WSGR accomplished their conspiracy,

12    common enterprise and/or common course of conduct by causing the Company to purposefully,

13    recklessly or negligently misrepresent its financial results.  Because the actions described herein

14    occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary

15    and substantial participant in the conspiracy, common enterprise and/or common course of conduct

16    complained of herein.

17    346.    Each of the Individual Defendants, KPMG and WSGR aided and abetted and

18    rendered substantial assistance in the wrongs complained of herein.  In taking such actions to

19    substantially assist the commission of the wrongdoing complained of herein, each Individual

20    Defendant, KPMG and WSGR acted with knowledge of the primary wrongdoing, substantially

21    assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to

22    and furtherance of the wrongdoing.

23    347.    As a direct and proximate result of the conspiracy, common enterprise and/or

24    common course of conduct by and among the Individual Defendants, KPMG and WSGR to breach

25    their fiduciary obligations, Brocade has sustained significant damages.  As a result of the misconduct

26    alleged herein, the Individual Defendants, KPMG and WSGR are liable to the Company.

27    348.    Plaintiff on behalf of Brocade has no adequate remedy at law

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## COUNT IX

2

**Against the Defendants Reyes, Jensen, Canova and Byrd for Fraud and Deceit Pursuant to California Civil Code Sections 1709 and 1710**

3

349.    Plaintiff incorporates by reference and realleges each and every allegation set forth

4

above, as though fully set forth herein.

5

350.    California Civil Code section 1709 provides that "[o]ne who willfully deceives

6

another with intent to induce him to alter his position to his injury or risk, is liable for any damage"

7

suffered as a result of the deceit.

8

351.    California Civil Code section 1710 provides as follows:   "A deceit, within the

9

meaning of is either:

10

(1)    The suggestion, as a fact, of that which is not true, by one who does not believe it to

11

be true;

12

(2)    The assertion, as a fact, of that which is not true, by one who has no reasonable

13

ground for believing it to be true,

14

15

(3)    The suppression of a fact, by one who is bound to disclose it or who gives

16

information of other facts which are likely to mislead for want of communication of that fact; or

17

(4)    A promise, made without any intention of performing it."

18

19

352.    Due to the following, defendants Reyes, Jensen, Canova and Byrd committed

20

fraudulent deceit within the meaning of California Civil Code sections 1709 and 1710:

21

(a)    Said defendants knowingly manipulated internal Brocade documents as

22

alleged herein to provide false grant dates of stock options granted by the Company;

23

(b)    Said defendants had actual knowledge that the backdated stock option grants

24

were not granted on the stated date and therefore did not conform to Brocade's stock option plans,

25

employment contracts or other applicable compensation policies under which the Board had

26

authorized such options to be awarded;

27

(c)    Said defendants intended that Brocade rely on their false, material

28

representations as alleged above to the detriment of the Company;

1           (d)     Brocade reasonably believed and relied on the actions taken and

2 representations made by said defendants in connection with the backdating of stock options; and

3           (e)     As a proximate result of such reliance, the Company incurred damages,

4 including costs of over $73 million paid out to outside counsel, accounting firms and consultants to

5 prepare the restatements and to respond to the governmental investigations and enforcement actions

6 and $7 million in fines in connection with the governmental investigations and enforcement actions,

7 a market capitalization loss of over $9.1 billion and approximately $3.5 to $4.5 million paid in the

8 tender offer. Moreover, Brocade has advanced at least $46,709,323 in legal fees and expenses to

9 Reyes and $7,140,253 in legal fees and expenses to Jensen for their legal defenses.

10     353.   Pursuant to California Civil Code sections sections 1709 and 1710, Reyes, Jensen,

11 Canova and Byrd are liable to Brocade for punitive damages.

## COUNT X

### Against All Defendants for Unjust Enrichment

14     354.   Plaintiff incorporates by reference and realleges each and every allegation set forth

15 above, as though fully set forth herein.

16     355.   By their wrongful acts and omissions, the Individual Defendants were unjustly

17 enriched at the expense of and to the detriment of Brocade. These wrongful acts included the

18 approval of improperly-backdated stock options by the Director Defendants as well as the receipt of

19 underserved compensation in connection with those options by the Officer Defendants.

20     356.   Plaintiff, as a shareholder and representative of Brocade, seeks restitution from these

21 defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and

22 other compensation obtained by these defendants, and each of them, from their wrongful conduct

23 and fiduciary breaches.

## COUNT XI

### Against the Individual Defendants for Waste of Corporate Assets

26     357.   Plaintiff incorporates by reference and realleges each and every allegation contained

27 above, as though fully set forth herein.

28

1     358.    As a result of the improprieties alleged herein, and by failing to properly consider the

2  interests of the Company and its public shareholders by failing to conduct proper supervision,

3  defendants have caused Brocade to waste valuable corporate assets and incur costs to conduct

4  investigations, hire outside counsel, accounting firms and consultants, and to direct manpower to the

5  task of restating Brocade's past financials to correct for the improperly-backdated stock option

6  grants.

7     359.    As a result of the waste of corporate assets, the Individual Defendants are liable to the

8  Company.

9     360.    Plaintiff on behalf of Brocade has no adequate remedy at law.

10                                    **COUNT XII**

11                    **Against Defendant Reyes for Declaratory Relief**

12     361.    Plaintiff incorporates by reference and realleges each and every allegation contained

13  above, as though fully set forth herein.

14     362.    On July 20, 2006, the United States Attorney for the Northern District of California

15  brought criminal charges against defendant Reyes. On August 7, 2007, following a trial by jury,

16  Reyes was convicted for one count of conspiracy to commit securities and mail fraud in violation of

17  18 U.S.C. §371, one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, 17 C.F.R.

18  §240.10b-5; 18 U.S.C. §2, three counts of filing false documents with the SEC in violation of 15

19  U.S.C. §§78j(b) and 78ff, 17 C.F.R. §240.10b-5; 18 U.S.C. §2, one count of falsifying Brocade's

20  books, and records and accounts in violation of 15 U.S.C. §§78m(b)(2)(A), 78m(b)(5) and 78ff, 17

21  C.F.R. §240.13b2; 18 U.S.C. §2, and four counts of making a false statement to an accountant in

22  violation of 15 U.S.C. §§78ff, 17 C.F.R. §240.13b2-2, and 18 U.S.C. §2.

23     363.    Brocade has advanced at least $46,709,323 in legal fees and expenses to Reyes

24  pursuant to, *inter alia*, the Company's certificate of incorporation, bylaws, Reyes' indemnification

25  agreement, California Corporations Code section 317, California Labor Code section 2802 and 8

26  Delaware Code section 145. The Company advanced such funds to Reyes to defray legal fees and

27  expenses that he incurred in connection with his defense of the criminal action filed against him, as

28  well as in connection with investigations and other litigation arising out of the same misconduct that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   gave rise to the criminal action, including investigations by the Company and SEC, shareholder class

2   and derivative actions, and the enforcement action filed by the SEC.

3       364.   Reyes must return all monies advanced to him as alleged herein to Brocade, because

4   under applicable law the Company may not indemnify Reyes for acts that: (i) were not in good faith;

5   (ii) were not in the best interests of the Company; and (iii) were unlawful.  As alleged herein and

6   found by a jury at his criminal trial, Reyes' actions were in bad faith, not in Brocade's best interest,

7   and were unlawful.

8       365.   Accordingly, plaintiff seeks a declaration that Reyes is not entitled to indemnification

9   from Brocade and must therefore return all advanced legal fees, expenses and other monies to the

10  Company.

11      366.   Plaintiff does not concede the validity of any indemnification agreements entered into

12  between Brocade and defendant Reyes.

13                          **COUNT XIII**

14              **Against Defendant Jensen for Declaratory Relief**

15      367.   Plaintiff incorporates by reference and realleges each and every allegation contained

16  above, as though fully set forth herein.

17      368.   On July 20, 2006, the United States Attorney for the Northern District of California

18  brought criminal charges against defendant Jensen.  On December 5, 2007, following a jury trial,

19  Jensen was convicted following a jury trial on December 5, 2007 on two criminal counts –

20  conspiracy to falsify books, records and accounts in violation of 18 U.S.C. §371; and falsifying

21  books, records and accounts in violation of 15 U.S.C. §§78m(b)(2)(A), 78m(b)(5), 78ff, and 17

22  C.F.R. §240.13b2-1, all arising out of her role in the illegal employee compensation scheme that

23  took place at Brocade.

24      369.   Brocade has advanced at least $7,140,253 in legal fees and expenses to Jensen

25  pursuant to, *inter alia*, the Company's certificate of incorporation, bylaws, Jensen's indemnification

26  agreement, California Corporations Code section 317, California Labor Code section 2802 and 8

27  Delaware Code section 145.  The Company advanced such funds to Jensen to defray legal fees and

28  expenses that she incurred in connection with her defense of the criminal action filed against her, as

1  well as in connection with investigations and other litigation arising out of the same misconduct that

2  gave rise to the criminal action, including investigations by the Company and SEC, shareholder class

3  and derivative actions, and the enforcement action filed by the SEC.

4      370.   Jensen must return all monies advanced to her as alleged herein to Brocade because

5  under applicable law, the Company may not indemnify Jensen for acts that: (i) were not in good

6  faith; (ii) were not in the best interests of the Company; and (iii) were unlawful.  As alleged herein

7  and found by a jury at her criminal trial, Jensen's actions were in bad faith, not in Brocade's best

8  interest, and were unlawful.

9      371.   Accordingly, plaintiff seeks a declaration that Jensen is not entitled to indemnification

10  from Brocade and must therefore return all advanced legal fees, expenses and other monies to the

11  Company.

12      372.   Plaintiff does not concede the validity of any indemnification agreements entered into

13  between Brocade and defendant Jensen.

## COUNT XIV

**Against Defendants House, Klayko, Deranleau, Malavalli, Canova, Byrd, Dempsey, Vaswani, Krause, Walker, Neiman, Moore, Paisley, O'Brien, Sonsini and Leslie for Declaratory Relief**

17      373.   Plaintiff incorporates by reference and realleges each and every allegation contained

18  above, as though fully set forth herein.

19      374.   As alleged herein, defendants House, Klayko, Deranleau, Malavalli, Canova, Byrd,

20  Dempsey, Vaswani, Krause, Walker, Neiman, Moore, Paisley, O'Brien, Sonsini and Leslie engaged

21  in willful breaches of fiduciary duties owed to Brocade in bad faith.  In connection with this and

22  other lawsuits, Brocade has advanced millions of dollars in legal fees and expenses to such

23  defendants based upon the Company's obligations pursuant to, *inter alia*, its certificate of

24  incorporation, bylaws, indemnification agreements, California Corporations Code section 317,

25  California Labor Code section 2802 and 8 Delaware Code section 145.

26      375.   Defendants House, Klayko, Deranleau, Malavalli, Canova, Byrd, Dempsey, Vaswani,

27  Krause, Walker, Neiman, Moore, Paisley, O'Brien, Sonsini and Leslie must return all monies

28  advanced to them as alleged herein to Brocade, because under applicable law, the Company may not

- 149 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   indemnify these defendants for acts that: (i) were not in good faith; (ii) were not in the best interests

2   of the Company; and (iii) were unlawful. As alleged herein, actions taken by these defendants were

3   in bad faith, not in Brocade's best interest, and were unlawful.

4        376.    Accordingly, plaintiff seeks a declaration that defendants House, Klayko, Deranleau,

5   Malavalli, Canova, Byrd, Dempsey, Vaswani, Krause, Walker, Neiman, Moore, Paisley, O'Brien,

6   Sonsini and Leslie are not entitled to indemnification from Brocade and must therefore return all

7   advanced legal fees, expenses and other monies to the Company.

8        377.    Plaintiff does not concede the validity of any indemnification agreements entered into

9   between Brocade and any defendant or non-party.

### COUNT XV
### Against the Individual Defendants for Declaratory Relief

10
11
     378.    Plaintiff incorporates by reference and realleges each and every allegation contained
12
above, as though fully set forth herein.
13
     379.    As alleged herein, Reyes granted numerous stock options under the Plans at times in
14
which he had no authority to grant such options. All stock options granted by Reyes between May
15
1999 and February 2001 are void because Reyes did not have authority to grant such options.
16
     380.    All stock options granted by Reyes after February 2001 are also void because the
17
Board did not properly delegate its authority to grant stock option under the 1999 Plan. The Board
18
attempted to make this delegation via a UWC, which was not effective because it was not preceded
19
by an in-person meeting of the Board and after consultation with counsel.
20
     381.    All backdated stock option grants, whether or not granted by Reyes, are void because
21
such options violated the Plans under which they were granted.
22
     382.    Accordingly, plaintiff seeks a declaration that the stock options grants described
23
above are void and incapable of ratification. Plaintiff also seeks a declaration that all attempted
24
ratifications of these stock option grants were ineffectual.
25
26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT XVI

### Direct Individual Claim for Declaratory and Injunctive Relief
### Against the Individual Defendants

383.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

384.    Plaintiff brings this cause of action directly in her individual capacity, and in such capacity, seeks only declaratory and injunctive relief.

385.    The stock options granted by Brocade were not issued in conformity with the Company's shareholder-approved stock option plans, violated applicable laws and regulations, and therefore were and are void.  The stock options were also issued for an improper purpose – *i.e.* to unjustly enrich the recipients of the options.

386.    The recipients of the stock options were unjustly enriched as a result of their receipt of the stock option grants, which has proximately caused damage to Brocade.

387.    Brocade also has been damaged by the improper granting, documenting, accounting and reporting of the backdated stock option grants.

388.    Plaintiff seeks a declaration and determination that the Brocade stock options that were issued in non-conformity with the shareholder-approved stock option plans, and which violated applicable laws and regulations, were and are void and/or constitute waste.  Plaintiff also seeks injunctive relief in two forms:  (a) a constructive trust imposed over whatever profits or other benefits the Individual Defendants may have received upon the exercise of any backdated stock options so that such funds are not dissipated pending a ruling on the declaratory relief sought by plaintiff; and (b) a preliminary and permanent injunction that prohibits the Individual Defendants from exercising any backdated stock option grant.

- 151 -

## COUNT XVII

### Professional Negligence and Accounting Malpractice
### Against Defendant KPMG

389.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

390.    KPMG issued "clean" or unqualified opinions on Brocade's financial statements issued between 2002 and the present, stating that those financial statements were presented in accordance with GAAP based on KPMG's audits which were performed in accordance with GAAS. GAAS, as approved and adopted by the AICPA, governs the conduct of audit engagements. In fact, the audit reports were false and misleading due to, among other things, KPMG's failure to conduct the audits in accordance with GAAS, and the fact that Brocade's financial statements issued between 2002 and 2004 were not prepared in conformity with GAAP. KPMG's reports were therefore in violation of GAAS, GAAP and SEC rules.

391.    The objective of audits of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations and cash flows in conformity with GAAP. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states his audit has been in accordance with GAAS. These standards require him to state whether, in his opinion, the financial statements are presented in accordance with GAAP and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period. American Institute of Certified Public Accountants, Professional Standards ("AU") § 110.01.

392.    GAAS as approved and adopted by the membership of the AICPA, are comprised of ten general standards. These standards to a great extent are interrelated and interdependent. The independent auditor is responsible for compliance with GAAS in an audit engagement. The ten general standards are as follows:

1            (a)      **General Standards**

2                 (i)      The audit is to be performed by a person or persons having adequate

3 technical training and proficiency as an auditor.

4                (ii)     In all matters relating to the assignment, independence in mental

5 attitude is to be maintained by the auditor or auditors.

6               (iii)    Due professional care is to be exercised in the performance of the audit

7 and the preparation of the report.

8            (b)      **Standards of Fieldwork**

9               (iv)    The work is to be adequately planned and assistants, if any, are to be

10 properly supervised.

11              (v)     A sufficient understanding of the internal control structure is to be

12 obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

13             (vi)    Sufficient competent evidential matter is to be obtained through

14 inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion

15 regarding the financial statements under audit.

16           (c)      **Standards of Reporting**

17             (vii)   The report shall state whether the financial statements are presented in

18 accordance with GAAP.

19             (viii)  The report shall identify those circumstances in which such principles

20 have not been consistently observed in the current period in relation to the preceding period.

21             (ix)    Informative disclosures in the financial statements are to be regarded

22 as reasonably adequate unless otherwise stated in the report.

23            (x)     The report shall either contain an expression of opinion regarding the

24 financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be

25 expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In

26 all cases where an auditor's name is associated with financial statements, the report should contain a

27 clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the

28 auditor is taking.

1    393.    KPMG's audits of Brocade's financial statements issued for fiscal years 2002 through

2    2004, inclusive, violated each of the general standards.

3    394.    KPMG is one of the largest international firms of certified public accountants.

4    KPMG was the auditor of Brocade's financial statements from fiscal year 2002 to the present. In

5    addition, they were paid to review the quarterly financial statements of Brocade throughout this

6    period. KPMG audited Brocade's financial statements issued from fiscal year 2002 to the present,

7    and issued their audit opinions stating that those financial statements were fairly presented in

8    accordance with GAAP, and that they had audited those financial statements in accordance with

9    GAAS. Both of those statements were false. KPMG either knew or should have been aware of facts

10   that undeniably precluded them from making those statements at the time they were made.

11   Brocade's financial statements and KPMG's opinions on them were then used by the Company with

12   KPMG's consent to publicly disseminate Brocade's financial results in the filing of their annual

13   Forms 10-K with the SEC.

14   395.    KPMG was negligent in failing to comply with GAAS as Brocade's independent

15   accountant. Brocade issued unqualified opinions stating that the financial statements of Brocade

16   were fairly presented in accordance with GAAP, when they were aware of or should have been

17   aware of facts and circumstances that undermined such unqualified opinions and rendered them false

18   and misleading.

19   396.    In the course of performing their audit services, KPMG reasonably could have

20   obtained evidential matter revealing the adverse facts detailed above about Brocade's undisclosed

21   compensation, but improperly failed to require them to adjust their financial statements or make

22   disclosure of such facts. As a result of their investigations and audit work, KPMG reasonably should

23   have known that the reports and financial statements described herein were materially misleading or

24   negligently disregarded facts that showed that all such statements were materially misleading.

25   397.    Because: (a) KPMG spoke regularly with Brocade Board and Audit Committee

26   members who were knowledgeable about the undisclosed option practices; and (b) KPMG attended

27   certain of Board and Audit Committee meetings where legal compliance was discussed, KPMG

28   knew or negligently disregarded facts that indicated that they should have: (i) qualified their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   opinions on Brocade's financial statements issued for fiscal years 2002 through 2004, inclusive; or

2   (ii) required the Company to adjust its financial statements; or (iii) refused to give opinions in light

3   of the materially adverse effects of the undisclosed facts about Brocade's financial condition,

4   including the material overstatement of earnings based on the fact that Brocade's compensation

5   expenses were being materially understated.  The failure to make such qualification, correction,

6   modification or withdrawal was a violation of GAAS, including the Fourth Standard of Reporting.

7        398.    KPMG failed to require Brocade to disclose material adverse facts and allowed the

8   Company to make material misrepresentations to their shareholders and to the investing public.

9        399.    KPMG violated GAAS General Standard No. 3, which requires that due professional

10  care must be exercised by the auditor in performance of the examination and the preparation of the

11  audit report.

12       400.    KPMG violated GAAS Standard of Field Work No. 2, which requires the auditor to

13  make a proper study of existing internal controls, to determine whether reliance thereon was

14  justified, and if such controls are not reliable, to expand the nature and scope of the auditing

15  procedures to be applied.  KPMG reasonably should have known that Brocade's internal controls

16  were insufficient yet still failed to expand their auditing procedures.

17       401.    KPMG violated GAAS Standard of Field Work No. 3, which requires sufficient

18  competent evidential matter be obtained through inspection, observation, inquiries and confirmations

19  to afford a reasonable basis for an opinion to be issued on the subject financial statements.  As

20  described above, KPMG failed to obtain sufficient competent evidential matter as to Brocade's

21  accounting and disclosure practices related to the timing and granting of stock option grants.

22       402.    KPMG violated GAAS Standard of Reporting No. 1, which requires the audit report

23  to state whether the financial statements are presented in accordance with GAAP.  KPMG's opinions

24  falsely represented that Brocade's financial statements complied with GAAP, when KPMG knew or

25  negligently disregarded that they did not for the reasons herein alleged.

26       403.    KPMG violated GAAS Standard of Reporting No. 4, which requires, when an

27  opinion on the financial statements as a whole cannot be expressed, that the reasons be stated.

28  KPMG should have either stated that no opinion could be issued by them on Brocade's financial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  statements or issued an adverse opinion stating that the financial statements were not fairly

2  presented.

3      404.    KPMG violated Standard of Field Work No. 1 and the standards set forth in AU

4  sections 310, 320 and 327 by, among other things, failing to adequately plan their audit and properly

5  supervise the work of their assistants so as to establish and carry out procedures reasonably designed

6  to search for and detect the existence of errors and irregularities that would have a material effect

7  upon the financial statements.

8      405.    KPMG violated SAS No. 16 in that they failed to perform their examination with an

9  attitude of professional skepticism and, in connection with the audits of Brocade's financials, ignored

10  numerous "red flags" that would reasonably have led to the discovery of the Individual Defendants'

11  backdating practices and the resulting gross understatement of compensation expenses and

12  overstatement of Brocade's earnings.

13      406.    KPMG violated AU section 316.20, which requires that additional procedures should

14  be performed when evaluation at the financial-statement level indicates significant risk.

15      407.    As a result of the foregoing, KPMG's certification of Brocade's financial statements

16  issued between 2002 and the present falsely represented that the statements were audited pursuant to

17  GAAS and that Brocade's financial statements were presented in conformity with GAAP.  KPMG

18  knew that such certification was false and misleading because, as detailed herein: (a) KPMG knew

19  or were negligent in not knowing that the Company's financial statements violated GAAP; and (b)

20  KPMG knew they had not complied with GAAS.

21      408.    As a result of the services rendered to Brocade, KPMG's personnel were present at

22  their corporate headquarters and major operating offices and examined or participated in reviews,

23  investigations and audit procedures regarding the financial condition, business operations and

24  financial, accounting and management-control systems of Brocade.  In the course of performing such

25  services, KPMG had virtually unlimited access to substantial evidential matter revealing the adverse

26  facts about the Company's compliance with educational finance reporting requirements and laws and

27  the finances of Brocade, but improperly failed to require adjustment for or disclosure of such facts.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

409.    KPMG: (a) knew or were negligent in not knowing of the material, adverse, non-public information about the financial statements of Brocade, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Brocade pleaded herein, involving the SEC reports on Form 10-K.

410.    In performing auditing and accounting services on behalf of Brocade and engaging in the wrongful acts alleged herein, KPMG knew or should have known that their clients would, and did, transmit false and misleading financial information to the investing public. However, KPMG failed to discharge their duties in adherence to GAAP and GAAS to detect errors and irregularities.

411.    In performing the auditing and accounting services to Brocade in the manner alleged herein, KPMG owed a duty to Brocade and their shareholders to use such skill, care and diligence as other members of its profession commonly exercised. KPMG, however, breached such duty by committing the wrongful acts and conduct alleged herein.

412.    Brocade reasonably relied to its detriment on KPMG and was damaged thereby.

413.    As a direct, foreseeable and proximate result of KPMG's breach of duties owed to Brocade, the Company suffered damages.

## COUNT XVIII

### Against KPMG for Breach of Contract

414.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

415.    At times relevant hereto, KPMG and Brocade were parties to written contracts pursuant to which KPMG agreed to provide audit services to Brocade in accordance with GAAS.

416.    KPMG breached its contracts with Brocade by, among other things, failing to render services in accordance with GAAS and preparing and/or approving financial statements that were not prepared in accordance with GAAP.

417.    As a direct and proximate result of KPMG's breaches of contract, Brocade has sustained damages, as alleged herein.

# COUNT XIX

### Professional Negligence and Legal Malpractice
### Against Defendant WSGR

418.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

419.    WSGR committed professional negligence and legal malpractice with respect to the legal opinions that the firm gave to the Board with respect to legality of the steps taken by defendants alleged herein to carry out the stock option backdating, including, *inter alia*, the advice given by WSGR to Brocade with respect to the part-time program.   WSGR also committed professional negligence and legal malpractice in connection with its advice that Brocade should enter into the Proposed Settlement to resolve the derivative claims alleged in the State Derivative Action and Federal Derivative Action arising out of the backdating activity alleged herein on terms and conditions that were did not represent a fair, reasonable or adequate resolution of such claims.

420.    Further, WSGR violated Rule 3-110 of the California Rules of Professional Conduct in that it intentionally, recklessly and repeatedly failed to perform legal services with competence. WSGR also violated Rule 3-210 because it advised Brocade to violate applicable law with respect to the disclosure of backdated stock options and with respect to the part-time program.

421.    WSGR also violated Rule 3-310(c) because it failed to properly obtain a waiver of a conflict of interest arising from the firm's representation of the Company and defendant Sonsini and the other Individual Defendants' interests.

422.    The negligent acts or omissions by WSGR alleged herein constitute failures by WSGR to use such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of similar tasks of which they undertake.

423.    Such negligent acts or omissions by WSGR caused and will continue to proximately cause damage to Brocade, which reasonably relied to its detriment upon the negligent legal advice proffered to the Company by WSGR.

1

**COUNT XX**

2

**Against WSGR for Breach of Contract**

3      424.    Plaintiff incorporates by reference and realleges each and every allegation set forth

4   above, as though fully set forth herein.

5      425.    At times relevant hereto, WSGR and Brocade were parties to written contracts

6   pursuant to which WSGR agreed to provide legal services to Brocade in accordance with the

7   California Rules of Professional Conduct.

8      426.    WSGR breached its contracts with Brocade by, among other things, failing to use

9   such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and

10  exercise in the performance of similar tasks of which they undertake, and its failure to render

11  services in accordance with the California Rules of Professional Conduct.

12     427.    As a direct and proximate result of WSGR's breaches of contract, Brocade has

13  sustained damages, as alleged herein.

14

**PRAYER FOR RELIEF**

15     WHEREFORE, plaintiff demands judgment as follows:

16     A.    Against all of the Individual Defendants and in favor of Brocade for the amount of

17  damages sustained by the Company as a result of the Individual Defendants' violations of and

18  conspiracy to violate RICO breaches of fiduciary duties and conspiracy to breach such duties, unjust

19  enrichment, violations of state law prohibitions on insider selling codified in California Corporations

20  Code sections 25402 and 25403 and corporate waste;

21     B.    Determining and awarding Brocade treble damages pursuant to 18 U.S.C. §1964 for

22  the RICO Defendants' violations of RICO, 18 U.S.C. §1962(c);

23     C.    Determining and awarding Brocade treble damages pursuant to California

24  Corporations Code section 25502.5(a) for the Insider Selling Defendants' violations of California

25  Corporations Code section 25402;

26     D.    Determining and awarding Brocade treble damages against the Director Defendants

27  pursuant to California Corporations Code section 25403 for the Insider Selling Defendants'

28  violations of California Corporations Code section 25402;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      E.      Determining and awarding Brocade punitive damages against defendants Reyes,

2   Jensen, Byrd and Canova pursuant to California Civil Code sections 1709 and 1710;

3      F.      Directing Brocade to take all necessary actions to reform and improve its corporate

4   governance and internal procedures to comply with applicable laws and to protect the Company and

5   its shareholders from a repeat of the damaging events alleged herein, including, but not limited to,

6   putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or

7   Articles of Incorporation and taking such other action as may be necessary to place before

8   shareholders for a vote the following enhancements to and improvements for Brocade's corporate

9   governance policies:

10      1.      a proposal to strengthen the Board's supervision of operations and develop and

11   implement procedures for greater shareholder input into the policies and guidelines of the Board;

12      2.      a proposal to ensure that all stock options granted to executive and non-

13   executive employees are properly awarded, valued and administered;

14      3.      control and limit insider stock selling;

15      4.      a provision to permit the shareholders of Brocade to nominate at least three

16   candidates for election to the Board; and

17      5.      appropriately test and then strengthen internal audit and control functions.

18      6.      a proposal to remove all defendants in this case from Brocade's board of

19   directors.

20      G.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

21   statutory provisions sued hereunder, including attaching, impounding, enjoining the indemnification

22   of any defendant who failed to act in good faith and in a manner that he or she reasonably believed

23   to be in the best interest of the Company and who did not have reasonable cause to believe that his or

24   her conduct was unlawful, imposing a constructive trust on or otherwise restricting the proceeds of

25   defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Brocade

26   have an effective remedy;

27      H.      Directing an accounting of all stock option grants awarded from November 1999 to

28   the present, including, without limitation, the grant dates, exercise dates, value, amount and

1   recipients of all such grants, as well as the disposition of any proceeds received by the recipients of

2   any options that were backdated via an exercise, sale, gift or any other transfer of any such option;

3       I.      Directing that all the unexercised backdated options granted to defendants since 1999

4   be cancelled, ordering the financial gains obtained via the exercise of such stock options returned to

5   the Company, and ordering to have Brocade revise the Company's financial statements to reflect the

6   truth concerning these option grants;

7       J.      Declaring that any improperly-backdated stock options, and all proceeds derived from

8   exercise thereof, and any assets or other property acquired in connection therewith, are and have

9   been held in constructive trust for the Company's benefit from the true grant date of the manipulated

10  stock options and other equity or incentive-based compensation;

11      K.      Imposing a constructive trust on all proceeds derived from the exercise of any

12  improperly-backdated stock options and any property acquired in connection therewith;

13      L.      Awarding to Brocade restitution from defendants, and each of them, and ordering

14  disgorgement of all profits, benefits and other compensation obtained by defendants through the

15  improper backdating of stock option grants;

16      M.      Imposing a constructive trust on any profits the Insider Selling Defendants obtained

17  by the sale of any Brocade shares while in possession and control of material adverse, non-public

18  information relative to the backdating of Brocade stock options as alleged herein;

19      N.      Declaring that defendants Reyes, Jensen, House, Klayko, Deranleau, Malavalli,

20  Canova, Byrd, Dempsey, Vaswani, Krause, Walker, Neiman, Moore, Paisley, O'Brien, Sonsini and

21  Leslie are not entitled to indemnification from Brocade and must therefore return all advanced legal

22  fees, expenses and other funds;

23      O.      Awarding to Brocade restitution from defendant KPMG and ordering disgorgement

24  of all profits, benefits and other compensation obtained by KPMG for its failure to properly audit the

25  Company's financial statements in accordance with professional standards;

26      P.      Awarding to Brocade restitution from defendant WSGR and ordering disgorgement

27  of all profits, benefits and other compensation obtained by WSGR for its failure to properly perform

28  legal services in accordance with the California Rules of Professional Conduct;

1    Q.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

2  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

3    R.    Granting such other and further relief as the Court deems just and proper.

JURY DEMAND

4

5    Plaintiff demands a trial by jury.

6  DATED:  April 11, 2008                    JOHNSON BOTTINI, LLP
                                            FRANK J. JOHNSON
7                                            FRANCIS A. BOTTINI, JR.
                                            DEREK J. WILSON
8

9

10                                           FRANCIS A. BOTTINI, JR.

11                                           655 W. Broadway, Suite 1400
                                            San Diego, CA 92101
12                                           Telephone: (619) 230-0063
                                            Facsimile:  (619) 233-5535
13
                                            Attorneys for Plaintiff
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 162 -

1

2
<u>VERIFICATION</u>

3
     I hereby verify that I am a shareholder of Brocade Communications Systems, Inc.

4
(the "Company"), and am ready, willing, and able to pursue this action in the hope of
improving the Company and recovering damages for the Company caused by defendants'

5
conduct. I have reviewed the allegations made in this Shareholder Derivative Complaint.
The allegations pertaining to me and my holdings of stock in the Company are true based

6
on my personal knowledge. As to those allegations of which I do not have personal

7
knowledge, I rely upon my counsel and their investigation and believe them to be true.
Having received a copy of this Complaint, having reviewed it with my counsel, I hereby

8
authorize its filing.

9
Date: 4-07-08 *Mary E. Barbour*

10
Mary E. Barbour, as Trustee of the Mary E. Barbour Family Trust One

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -