JOHNSON BOTTINI, LLP
FRANK J. JOHNSON (174882)
frankj@johnsonbottini.com
FRANCIS A. BOTTINI, JR. (175783)
frankb@johnsonbottini.com
DEREK J. WILSON (250309)
derekw@johnsonbottini.com
655 W. Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile:  (619) 233-5535

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY E. BARBOUR, AS TRUSTEE OF THE MARY E. BARBOUR FAMILY TRUST ONE, Derivatively On Behalf of BROCADE COMMUNICATIONS SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GREGORY L. REYES, DAVID L. HOUSE, MICHAEL KLAYKO, RICHARD DERANLEAU, KUMAR MALAVALLI, ANTONIO CANOVA, MICHAEL J. BYRD, STEPHANIE JENSEN, NEIL DEMPSEY, SANJAY VASWANI, L. WILLIAM KRAUSE, ROBERT R. WALKER, GLENN C. JONES, MICHAEL J. ROSE, SETH D. NEIMAN, NICHOLAS G. MOORE, CHRISTOPHER B. PAISLEY, WILLIAM K. O'BRIEN, LARRY SONSINI, MARK LESLIE, TYLER WALL, RENATO A. DIPENTIMA, JOHN W. GERDELMAN, ROBERT D. BOSSI, KPMG, LLP, WILSON SONSINI GOODRICH & ROSATI, P.C. AND DOES 1-25, inclusive, <br><br> Defendants, <br><br> -and- <br><br> BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. C 08-02029 CRB <br><br> (Derivative Action) <br><br> [REDACTED]AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF AND CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; VIOLATIONS OF THE SARBANES OXLEY ACT OF 2002; VIOLATIONS OF SECTION 10B OF THE SECURITIES EXCHANGE ACT OF 1934; BREACHES OF AND CONSPIRACY TO BREACH FIDUCIARY DUTY; FRAUD; UNJUST ENRICHMENT; VIOLATIONS OF CALIFORNIA CORPORATIONS CODE SECTIONS 25402 AND 25403; WASTE OF CORPORATE ASSETS; DECLARATORY RELIEF; BREACH OF CONTRACT; PROFESSIONAL NEGLIGENCE; AND LEGAL AND ACCOUNTING MALPRACTICE <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1  Plaintiff, by her attorneys, submits this Amended Verified Shareholder Derivative Complaint

2  (the "Complaint") against the defendants named herein.

3  **INTRODUCTION**

4  1.  This is a shareholder derivative action brought by a shareholder of Brocade

5  Communications Systems, Inc. ("Brocade" or the "Company"), on behalf of the Company, against

6  certain of its current and former officers, directors and outside lawyers and accountants.[1]

7  2.  This action arises out of the pervasive misappropriation of Brocade assets through the

8  backdating of stock options – facilitated by the direct and indirect manipulation of stock option grant

9  dates, improper documentation and accounting, and false and misleading publicly-filed financial

10  reports and the resulting damages to Brocade.  Specifically, certain of Brocade's executives and

11  directors, aided and abetted by the Company's outside lawyers and accounting firm, oversaw a six-

12  year scheme designed to pay undeserved and hidden equity-based compensation to certain

13  employees, avoid accounting charges and taxation associated with such compensation, and lie to

14  shareholders about their misconduct.  Two of those executives, defendants Gregory Reyes ("Reyes"),

15  Brocade's former Chief Executive Officer ("CEO") and Chairman, and Stephanie Jensen ("Jensen"),

16  Brocade's former Vice President of Human Resources, have been convicted following jury trials on

17  multiple felony counts of violations of federal securities laws for their participation in the subterfuge.

18  Reyes now will spend 21 months in a federal penitentiary and must pay a $15 million fine.  Jensen

19  was sentenced to four months in prison and fined $1.25 million.

20

21

22  [1] Plaintiff bases her allegations herein upon information and belief, except those allegations concern-
ing herself, which are based upon her personal knowledge.  Plaintiff's information and belief is
23  derived from her counsel's investigation, which included counsel's review and analysis of the
following:  (1) Brocade's filings with the United States Securities and Exchange Commission
24  ("SEC"); (2) press releases, conference call transcripts, public statements, analyst reports, news
articles and other publications by or pertaining to Brocade and the defendants named herein; and (3)
25  pleadings, papers and any documents filed with and publicly available from the court's hearing on
the criminal, SEC enforcement and civil matters described herein.  All allegations herein are based
26  on such publicly-available sources of information.  Many of the additional facts supporting plaintiff's
allegations herein are within the sole knowledge of defendants, or remain within their custody,
27  control or possession.  Plaintiff believes that a reasonable opportunity for discovery will yield
additional substantial evidentiary support for the allegations herein.
28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       3.     The defendants' participation in the illegal manipulation of Brocade's stock options,

2 which violated state law as well as the Company's own shareholder-approved stock option plans, has

3 caused Brocade to incur massive damage. This derivative action thus seeks to hold those responsible

4 for the Company's losses accountable for their actions, and alleges causes of action against the

5 individually-named defendants for: (a) violations of the federal Racketeer Influenced and Corrupt

6 Organizations Act ("RICO"); (b) violations of the Sarbanes Oxley Action of 2002 ("SOX"); (c)

7 multiple breaches of fiduciary duties owed to Brocade; (b) engaging in a conspiracy to breach those

8 duties; (d) fraud; (e) unjust enrichment; (f) violations of state law prohibitions on insider selling

9 codified in California Corporations Code sections 25402 and 25403; (g) corporate waste; (h) legal

10 and accounting malpractice; and (i) a declaratory judgment that certain defendants are not entitled to

11 indemnification from Brocade. This Complaint concerns misconduct that occurred from October

12 1999 to the present (the "Relevant Period").

13               **NATURE AND SUMMARY OF THE ACTION**

14       4.     Brocade was founded in 1995. According to its website, Brocade "provides the

15 industry's leading platforms, solutions, and services for intelligently connecting, managing and

16 optimizing IT resources in shared storage environments." Brocade became a public company in

17 May 1999, which coincided with the "tech boom," a period during which companies specializing in

18 computer technology experienced rapid and substantial growth in revenues, profitability, and in the

19 size of operations. Not wanting to be left behind, Brocade embarked upon a rapid expansion of its

20 operations, fueled in part by the illegal stock option backdating scheme detailed herein. Between

21 October 1999 and October 2002, the Company hired over 1,150 employees, which increased the size

22 of its workforce more than six-fold.

23       5.     During the tech boom, Brocade faced fierce competition with other growing tech

24 companies over skilled workers – and stock options were the carrots that tech companies such as

25 Brocade used to attract new personnel. A stock option allows the recipient of the option to purchase

26 company stock at a specified price – referred to as the "exercise price" – for a specified period of

27 time. When the option recipient exercises the option, he or she purchases the stock from the

28 company at the exercise price, regardless of the stock's price at the time the option is exercised. If

- 2 -

1    the exercise price is backdated to a price that is lower than the market price on the true grant date,

2    the option holder pays less for the share and the company receives less when the stock option is

3    exercised.  As a result, the option holder enjoys a greater profit, while the company receives less

4    money.

5        6.    Defendant Reyes sought to get a leg up on Brocade's hiring competition by offering

6    backdated stock options to prospective employees.  Reyes, who owned approximately 4,796,440

7    shares in the Company at the end of 1999, would personally benefit from any price appreciation in

8    Brocade's stock as a result of the growing workforce.  The practice of "backdating," in which an

9    option grant date is directly or indirectly manipulated to reflect an earlier date when the stock price

10   was lower, guarantees that an employee receives an instant paper profit for his/her options.

11   Backdating is not technically illegal if: (i) the practice is clearly communicated to shareholders; (ii) it

12   does not violate a company's plans that define and authorize stock option grants; (iii) it is properly

13   accounted for and disclosed in the company's financial statements; and (iv) it is accurately reported

14   for tax purposes.  Defendants, however, intentionally failed to follow any of these requirements.

15   Reyes' personal view of backdating, as expressed to a former human resources employee, was that

16   *"it's not illegal if you don't get caught."*

17       7.    Defendant Reyes granted backdated stock options "as a committee of one" with

18   respect to the grant of stock options to non-executive employees.  Reyes succumbed to pressure to

19   "resign" as CEO in January 2005.  As the sole member of this "Compensation Committee," Reyes

20   even held "ad hoc" Board "meetings" with himself to approve his backdated options grants.

21   Wielding practically unchecked authority, Reyes granted many thousands of options to employees.

22   Brocade was eventually forced to recognize $375 million of expenses directly related to the illegally

23   backdated stock options.  Reyes also falsified corporate records at Brocade and other documents in

24   an effort to cover up his misfeasance.  Further, Brocade's auditors – first, Arthur Andersen, LLP

25   ("Arthur Andersen"), and later, defendant KPMG, LLP ("KPMG") – ignored evidence of the

26   backdated stock options when performing their audits.

27       8.    Defendant Reyes and Brocade's Compensation Committee also granted millions of

28   backdated stock options to Brocade executives and directors.  For example, on April 17, 2001, this

- 3 -

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   committee (then comprised of defendants Neil Dempsey ("Dempsey") and Mark Leslie ("Leslie"))

2   supposedly met with Reyes to approve 8,461,967 stock options to eight Brocade executives,

3   including Reyes himself. This meeting, however, did not appear on Dempsey's and Leslie's personal

4   calendars – and Reyes was at the Boston Marathon on that day. The option grants were dated April

5   18, 2001, which just happened to coincide with Brocade's lowest stock price for the month of April.

6   These facts lead to an inference as obvious as it is reasonable:   these defendants intentionally

7   fabricated the meeting date and falsified the grant date of the options.

8        9.     From 1999 through 2005, defendant Reyes, assisted by defendant Jensen, other

9   Brocade executives and the Compensation Committee, continued to illegally falsify employment

10  records, meeting minutes and option grants to conceal the manipulation of the stock option grants

11  awarded to themselves, directors, executives and employees. Specifically, these defendants directed

12  personnel in Brocade's human resources department to pull the Company's historical stock prices off

13  the internet and used those prices to determine the date and price for a potential stock option grant

14  that would land at or near the stock's lowest pricing point during a particular period.  The price of

15  Brocade shares on the reported option grant date, therefore, was lower than the share price on the

16  actual day options were issued, thus providing Brocade employees, prospective employees and

17  certain of the defendants with more favorably-priced, "in-the-money" options.

18       10.    The backdating scheme did not end there, however. Defendants Reyes, Jensen and

19  Michael J. Byrd ("Byrd"), with the blessing of the Board of Directors ("Board") and defendant

20  Wilson Sonsini Goodrich & Rosati P.C. ("WSGR"), Brocade's outside legal counsel, also concocted

21  a so-called "part-time" program by which Reyes and many Brocade executives could falsify a

22  particular employee's hire date. Ostensibly, the purpose of the program was to allow new hires to

23  work for a few weeks on a part-time basis to transition into their Brocade jobs. The real purpose of

24  the part-time program, however, was to allow new hires to benefit from having their stock options

25  priced with the benefit of hindsight to maximize their personal profits. Defendants Reyes, Jensen

26  and Brocade human resources personnel would routinely fabricate the start date of the individuals

27  who were not yet Brocade employees to take advantage of a low pricing point that appeared on

28  Brocade's Yahoo! Finance stock price printout.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    11.    KPMG took over as Brocade's auditors on or about June 2002, and became aware of

2  the part-time program shortly thereafter.  The part-time program continued unabated until the end of

3  2002.

4    12.    Despite his knowledge of the illegal conduct of defendants Reyes, Jensen and the

5  Board, and the dramatically negative accounting implications for Brocade, defendant Antonio

6  Canova ("Canova"), the Company's Chief Financial Officer ("CFO") between mid-2001 and mid-

7  December 2005, refused to blow the whistle on the defendants' actions.  Instead, he became a

8  willing, active participant in the improper backdating scheme.  Canova instructed Brocade's finance

9  department personnel to ensure that the dates used for option grants in the fabricated Compensation

10  Committee minutes were consistent with the Company's financial records.  Defendants Reyes and

11  Canova then made and certified publicly-filed financial statements that misrepresented Brocade's

12  earnings, compensation expense and employee stock option practices.  When Brocade's stock option

13  scandal was publicly disclosed (at least in part) in 2004, Canova was revealed to be one of the

14  primary wrongdoers who attempted to eliminate his own liability and that of the Board for the illegal

15  conduct.  For example, when the internal investigation of backdating at Brocade first arose in 2004,

16  Canova feebly insisted to investigators that Brocade's stock option accounting treatment had been

17  correct and that there was no need for restatement.  Canova also engaged in obstructionist tactics and

18  lied during two Audit Committee investigations.  When Canova's scheming failed and Brocade was

19  forced to restate its financial results to make additional disclosures concerning the illegal stock

20  option backdating, Canova was eventually forced to resign in December 2005.

21    13.    Defendant Byrd, Canova's predecessor as CFO, also was a major participant in the

22  backdating activity.  Initially hired as CFO in 1999, he was later promoted to Chief Operating

23  Officer ("COO") and President, positions he held until he left Brocade in 2003. Byrd himself was a

24  principal architect of the part-time program at Brocade. Together with defendant Jensen, Byrd also

25  selected dates for the backdated stock options.  As a result, in-the-money options were granted to

26  such executives without being properly accounted for in Brocade's publicly-filed financial

27  statements. Through his knowledge of defendant Reyes' improper backdating activity – and his own

28  participation in the scheme – Byrd was an essential participant and co-conspirator in the illegal

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

conduct, which led to Brocade filing financial statements in which the Company materially understated its compensation expenses and falsely represented that it had incurred no costs for stock option grants.

14.    As a result of these defendants' backdating practices, thousands of employees and certain of the defendants received favorably valued – and falsely dated – stock option grants. For example, during FY:04, defendant Reyes made thirty-two option grants. Of those grants, nineteen grants went to over 1,000 employees (representing options to purchase a total of approximately 16 million shares), that were priced at the weekly low closing price for Brocade's stock – and for an additional three grants, within just $0.03 of the weekly low.

15.    Throughout the Relevant Period during which defendant Reyes and others were harming Brocade, the Board consciously disregarded the looming mountain of falsified and internally inconsistent paperwork; KPMG disregarded the backdated stock option entries found not only on its own workpapers, but also on those it had received from Arthur Andersen; and WSGR dispensed grossly improper legal advice, including advice concerning the part-time program. As a result, these illicit stock option backdating practices went undisclosed for almost seven years. And the scheme would have remained undisclosed if it had not been for Dan Cudgma ("Cudgma"), a Brocade employee who blew the whistle on the illegal stock option backdating at the Company.

16.    After Cudgma filed a complaint detailing the backdating at Brocade, the Audit Committee initiated an investigation and retained WSGR to purportedly conduct a preliminary investigation – wholly ignoring the fact that WSGR had been Brocade's long-time outside general counsel during the backdating activity at the Company and that its founding partner -- defendant Larry Sonsini ("Sonsini") -- was a Board member during the wrongdoing. The Audit Committee later retained Morrison & Foerster LLP ("Morrison") in connection with the investigation. Morrison attorneys eventually interviewed defendants Jensen and Reyes. During his interviews, however, Reyes repeatedly lied about his involvement in the backdating scheme.

17.    According to a February 13, 2006 article in Business Week, at some point in or about November 2004, Brocade entered into talks with Cisco Systems, Inc. ("Cisco") to discuss a potential sale of the Company. *See* Peter Burrows, *Brocade Stung by Stock Options*, BUSINESS WEEK, Feb.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    13, 2006. A successful sale of the Company would have potentially resulted in the creation of

2    substantial shareholder value. Unfortunately, the transaction would never come to pass because of

3    defendants' illegal backdating scheme, which had irreparably tarnished the Company's reputation.

4    Tellingly, the article noted that defendant Reyes "was in the final stages of selling Brocade to Cisco

5    Systems Inc. for $9 per share," when talks between the two companies broke down after the Board

6    disclosed the ongoing investigation into the stock option backdating at Brocade. The article stated

7    that "Cisco got cold feet after finding the accounting irregularities on its own but confirm that Reyes'

8    departure two months later further diminished its interest."

9        18.    Throughout the Audit Committee's investigation, defendant David L. House

10   ("House"), a Compensation Committee member, leaked information concerning the investigation to

11   defendant Reyes and continued to discuss plans to sell Brocade despite having been told to shut

12   Reyes out of the investigation.

13       19.    During the course of the internal investigation, attorneys with Morrison interviewed

14   defendants Jensen and Reyes. During his interview, Reyes lied about his involvement in the

15   backdating scheme. A mountain of incriminating evidence gathered from internal documents and

16   interviews of Brocade employees, however, revealed the truth.

17       20.    On January 24, 2005, the Company publicly announced the completion of the Audit

18   Committee's internal review. As a result of this investigation, the Audit Committee concluded there

19   was an "insufficient basis to rely on the Company's process and related documentation to support

20   recorded measurement dates used to account for certain stock options granted prior to August 2003."

21       21.    On January 31, 2005, Brocade filed a restatement of its fiscal 2002 and 2003 financial

22   statements to correct understated equity-based compensation expense of $303 million associated

23   with the manipulated stock options. This restatement was rushed and deficient, however. On

24   November 14, 2005, Brocade was forced to file a second restatement of its fiscal 1999 through 2004

25   financial statements to correct an additional $72 million in equity-based compensation expenses.

26   Even after these two restatements, the Board refused to take affirmative action against the

27   wrongdoers. In fact, the Board has done the opposite. During May 2006, the Board approved a

28

- 7 -

1    tender offer whereby the recipients of backdated options were allowed to exchange their options for

2    a cash payment. This tender offer cost Brocade approximately $3.5 to $4.5 million.

3        22.    The backdating of stock options at Brocade has resulted in substantial private civil

4    litigation, as well as criminal actions against defendants Reyes and Jensen and civil enforcement

5    actions initiated by the SEC.

6        a.    *Criminal actions against defendants Reyes and Jensen*. On July 20, 2006,

7    the United States Attorney for the Northern District of California filed criminal charges against

8    defendants Reyes and Jensen. *See United States of America v. Reyes*, No. 3:06-cr-00556-CRB-1 & 2

9    (N.D. Cal. Jul. 20, 2006). After a full trial, and in the first U.S. felony criminal conviction by a jury

10   arising out of the backdating of stock options, Reyes was convicted on August 7, 2007 of one count

11   of conspiracy, one count of securities fraud, three counts of filing false documents with the SEC, one

12   count of falsifying Brocade's books and records, and four counts of lying to an accountant.

13   Following the conviction, the U.S. Attorney stated that "the evidence at trial proved that [Reyes]

14   intentionally falsified Brocade's corporate records over a four-year period to avoid recognizing

15   compensation expenses for in-the-money stock option grants that materially misstated Brocade's

16   publicly filed income statements." Facing incarceration of up to twenty years, Reyes was sentenced

17   to twenty-one months in prison and ordered to pay a $15 million fine. Jensen fared no better. She

18   was convicted following a jury trial on December 5, 2007 of two criminal counts – conspiracy to

19   falsify books, records and accounts in violation of 18 U.S.C. §371; and falsifying books, records and

20   accounts in violation of 15 U.S.C. §§78m(b)(2)(A), 78M(b)(5), and 78ff, 17 C.F.R. §240.13b2-1, all

21   arising out of her role in the illegal employee compensation scheme that took place at Brocade.

22   Jensen was sentenced to four months in prison and ordered to pay a $1.25 million fine.

23       b.    *Enforcement actions filed by the SEC against defendants Reyes, Jensen,*

24   *Canova and Byrd*. On July 20, 2006, the SEC filed civil charges against defendants Reyes, Jensen

25   and Canova. The SEC alleged that these three defendants concealed millions of dollars in expenses

26   in order to benefit themselves, certain employees, officers and directors by falsifying various records

27   relating to employee stock option grants. *See Securities and Exchange Comm'n v. Reyes*, No. 06-

28   4435-CRB (N.D. Cal. Jul. 20, 2006) (the "SEC Action"). In August 2007, the SEC filed a new

- 8 -

1  enforcement action against defendant Byrd arising out of his role in the backdating activity at

2  Brocade. The complaint against Byrd was subsequently consolidated into the SEC Action. *See*

3  *Securities and Exchange Comm'n v. Byrd*, No. 3:07-cv-04223-CRB (N.D. Cal. Aug. 17, 2007).

4          c.    ***SEC enforcement action filed against Brocade.*** Since at least mid-2006,

5  Brocade had been in negotiations with the SEC to resolve a contemplated enforcement action against

6  the Company. In May 2007, the SEC filed an enforcement action against Brocade. *See Securities*

7  *and Exchange Comm'n v. Brocade Comm'ns Sys., Inc.*, No. 3:07-cv-02821-CRB (N.D. Cal. May 31,

8  2007). On August 27, 2007, a final judgment was entered against Brocade based on a settlement

9  between the Company and the SEC. In addition to a variety of permanent injunctive relief, Brocade

10 was ordered to pay a civil penalty of $7 million within ten days after entry of judgment.[2]

11         d.    ***Shareholder class actions against Brocade and the individual defendants.***

12 Shortly after the Company announced that it would need to file a second restatement of its financial

13 results for a portion of the Relevant Period to reflect additional stock-based compensation expense

14 that had been hidden from the public, a series of now-consolidated class actions were commenced

15 against Brocade and defendants Reyes, Canova, Sonsini, Seth D. Neiman ("Neiman") and Dempsey.

16 *See In re Brocade Securities Litig.*, Consolidated Case No. 3:05-cv-02042-CRB (N.D. Cal. May 19,

17 2005) (the "Federal Securities Class Action").[3] The federal court denied motions to dismiss filed by

18 all defendants. On May 30, 2008, Brocade reached an agreement to settle the Federal Securities

19 Class Action. As part of the settlement agreement, Brocade must pay $160 million.

20

21

_____

22 [2] The judgment permanently enjoins Brocade from violating the following: (1) Section 17(a) of the
   Securities Act, 15 U.S.C. §77q(a); (2) Section 10(b) of the Securities and Exchange Act of 1934 (the
23 "Exchange Act"), 15 U.S.C. § 8j(b) and Rule 10b-5 thereunder (17 C.F.R. §240.10b-5); (3) Section
   13(a) of the Exchange Act, 15 U.S.C. § 18m(a) and Rules 12b-20, 13a-1, 13a-11, 13a-13 thereunder
24 (17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13); and (4) Sections 13(b)(2)(A) and
   13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B).
25

26 [3] On October 23, 2007, a new class action arising out of the backdating activity at Brocade was
   filed. *See Huang v. Reyes et al.*, Santa Clara Superior Court case no. 1:07-cv-097163. On
   November 26, 2007, Brocade removed the action to the U.S. District Court for the Northern District
27 of California. *See Huang v. Reyes et al.*, case no. 3:07-cv-05950-CRB. On March 6, 2008, the
   Court denied a motion to dismiss and remanded this action to state court, where it is currently
28 pending.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          e.    *State and federal court shareholder derivative actions.*  In May 2005, a

2  Brocade shareholder filed the first of three related state court derivative actions arising out of the

3  restatement and stock option backdating activity.  All three actions are now consolidated in the

4  Superior Court of California, County of Santa Clara.  *See In re Brocade Comm'ns Sys., Inc.*

5  *Derivative Litig.*, Lead Case No. 1-05-cv-041683 (the "State Derivative Action").  About a week

6  after the first such action was filed, a Brocade shareholder brought the first of four derivative actions

7  filed in the U.S. District Court for the Northern District of California.  All of such actions were later

8  consolidated.  *See In re Brocade Comm'ns Sys., Inc. Derivative Litig.*, Lead Case No. 3:05-cv-

9  02233-CRB (the "Federal Derivative Action").  During February 2008, the Board formed a special

10  litigation committee ("SLC") to investigate the claims asserted in the State and Federal Derivative

11  Actions.  The SLC's investigation is currently pending.  Moreover, the derivative actions in both

12  venues are still pending.

13          23.    Despite the pendency of the above-described actions, during June 2006, the Board –

14  counseled by defendant WSGR and Brocade's in-house general counsel, defendant Tyler Wall

15  ("Wall") – directed Brocade to enter into a highly premature and improper settlement of the

16  derivative claims alleged in the Federal Derivative Action and State Derivative Action.  According

17  to the Amended Stipulation of Settlement that set forth the terms of the Proposed Settlement,

18  plaintiffs in the Federal Derivative Action agreed to release all defendants (except defendant Reyes)

19  in the Federal Derivative Action for *all derivative claims* alleged prior to January 2006 in exchange

20  for some illusory corporate therapeutics and $525,000 in attorney's fees (the "Proposed

21  Settlement").[4]  Under the terms of the Proposed Settlement, Brocade would have received absolutely

22  no compensation at all for the hundreds of millions of dollars in damages it has suffered and

23  continues to incur.  Moreover, the Proposed Settlement would have released all derivative claims

24  relating to defendants' backdating of stock options without providing for any monetary recovery to

25  Brocade.  The Proposed Settlement was later withdrawn after the federal court refused to approve it.

26

27  _____

[4]  The Amended Stipulation of Settlement is set forth at Docket No. 107 in the Federal Derivative
28  Action.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.     As a result of the defendants' improprieties, the Company has suffered massive damages, has expended millions of dollars, and will continue to do so as a result of the devastating consequences of the illicit backdating activity. These damages include the exhaustion of Brocade's applicable insurance coverage; costs of over $73 million paid to outside counsel, accounting firms and consultants to prepare the restatements, respond to the governmental investigations and enforcement actions, and advance legal fees incurred by the wrongdoers – Brocade's officers and directors; $7 million in fines in connection with the governmental investigations; and enforcement actions; and approximately $3.5 to $4.5 million paid in the tender offer. Additionally, Brocade faces millions of dollars in potential legal liability from the Federal Securities Class Action and its market capitalization has been damaged by over $9.1 billion. Moreover, Brocade has advanced at least $46,709,323 in legal fees and expenses to defendant Reyes and $7,140,253 in legal fees and expenses to defendant Jensen for their legal defenses.

25.     Certain of the defendants have fared much better than Brocade by selling over *$1.5 billion* worth of their Brocade stock while in possession of material, non-public information about the stock option backdating and false financial statements.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under RICO, 18 U.S.C. §§1962(c) and 1964 and under section 304 of SOX. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

27.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

1    28.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Brocade

2  maintains its principal place of business in the District; (ii) one or more of the defendants either

3  resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions

4  and wrongs complained of herein, including the defendants' primary participation in the wrongful

5  acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to

6  Brocade occurred in this District; and (iv) defendants have received substantial compensation in this

7  District by doing business here and engaging in numerous activities that had an effect in this District.

8                                    **THE PARTIES**

9    29.    At the time of the transaction complained of herein, the Mary E. Barbour Family

10  Trust One was an owner and holder of Brocade common stock. Plaintiff Mary E. Barbour brings

11  this action solely in her capacity as trustee of said trust. Plaintiff continues to hold Brocade common

12  stock.

13    30.    Nominal defendant Brocade is a corporation organized and existing under the laws of

14  the state of Delaware with its headquarters located at 1745 Technology Drive, San Jose, California.

15  Brocade was founded in 1995 and designs, develops, markets, sells and supports data storage

16  networking products and services. During the beginning portion of the Relevant Period, Brocade

17  was a California corporation.

18    31.    Defendant Reyes was Brocade's CEO from July 1998 to January 2005. Reyes was

19  also Brocade's President from July 1998 to May 2001; Brocade's Chairman of the Board from May

20  2001 to January 2005; a Brocade director from July 1998 to April 2005; and an advisor to Brocade

21  from January 2005 to July 2005. As alleged herein, Reyes was a chief architect and engineer of the

22  stock option backdating at Brocade, and was recognized as such on August 7, 2007, when a jury

23  convicted him on multiple felony charges stemming from his misconduct. Reyes also received at

24  least 10,532,133 options that were dated at or very close to the lowest stock price for the month

25  during which options were granted. Accordingly, on information and belief, plaintiff alleges that

26  Reyes backdated these stock options and received illegal compensation from Brocade that was not

27  disclosed to the Company's shareholders. Reyes sold 10,183,063 of his personally-held shares for

28  $580,227,132.41 in proceeds while in possession of material, non-public information concerning the

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

illegally-undisclosed backdating stock option grant practices.  Brocade paid defendant Reyes the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2005 | $112,273 | - | - | $262,560 |
| 2004 | $506,667 | $344,824 | 1,600,000 | $4,350 |
| 2003 | $500,000 | - | 1,703,214 | $4,141 |
| 2002 | $500,000 | - | - | $2,385 |
| 2001 | $500,000 | $74,250 | 10,032,133 | $2,175 |
| 2000 | $360,000 | $1,615,800 | 1,040,000 | $2,105 |
| 1999 | $200,000 | $150,000 | - | $576 |
| 1998 | $60,606 | - | 12,285,296 | $480 |

32.    Defendant House is Brocade's Chairman of the Board and has been since December 2005, and is a Brocade director and has been since 2004. House was Brocade's Executive Chairman of the Board from January 2005 to December 2005.  He also is a member of Brocade's Compensation Committee and has been since January 2006. House also sat on the Compensation Committee from November 2004 to January 2005. Because of House's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

33.    Defendant Michael Klayko ("Klayko") is Brocade's CEO and a Brocade director, and has been since January 2005. Klayko was Brocade's Vice President, Worldwide Sales from May 2004 to January 2005; Vice President, Worldwide Marketing and Support from April 2003 to May 2004; and Vice President, OEM Sales from January 2003 to April 2003. Because of Klayko's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Klayko sold 408,000 of his personally-held shares for $2,061,440 in proceeds while in possession of material, non-public information concerning the illegally-

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

undisclosed backdating stock option grant practices.  Brocade paid defendant Klayko the following

compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $605,000 | - | $1,042,457 | - | $1,125,975 | 1,299,314 | $18,333 |
| 2006 | $540,000 | $1,743,050 | $779,999 | 166,667 | - | - | $22,403 |
| 2005 | $481,364 | $341,951 | - | 1,600,000 | - | - | $3,587 |
| 2004 | $283,333 | $195,230 | - | 575,000 | - | - | $4,664 |
| 2003 | $175,000 | $42,464 | - | 713,781 | - | - | $3,324 |

34.    Defendant Richard Deranleau ("Deranleau") is Brocade's Chief Financial Officer

("CFO") and has been since May 2006.  Deranleau also is a Brocade Vice President and has been

since November 2005.  Deranleau was Brocade's interim CFO from December 2005 to May 2006,

and Brocade's Controller and Treasurer from May 2003 to December 2005.  Because of Deranleau's

positions, he knew or should have known that Brocade executives were improperly backdating stock

option grants to maximize their personal profits, via access to internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at

management meetings and committees thereof and via reports and other information provided to him

in connection therewith.  Deranleau sold 2,784 of his personally-held shares for $17,807.60 in

proceeds while in possession of material, non-public information concerning the illegally-

undisclosed backdating stock option grant practices.  Brocade paid defendant Deranleau the

following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Options Grants | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $327,803 | - | $415,152 | - | $595,843 | 336,820 | $41,735 |
| 2006 | $265,035 | $473,096 | $337,500 | 56,250 | - | - | $46,921 |
| 2005 | $206,766 | $81,845 | - | 80,000 | - | - | $2,154 |
| 2004 | $187,968 | $73,415 | - | 5,750 | - | - | $2,087 |

35.    Defendant Kumar Malavalli ("Malavalli") was Brocade's Vice President, Technology

from October 1995 until at least September 2000.  Malavalli was a founder of Brocade and was

involved with the establishment of the "committee of one."  Because of Malavalli's position, he knew

or should have known that Brocade executives were improperly backdating stock option grants to

maximize their personal profits, via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management meetings and

- 14 -

committees thereof and via reports and other information provided to him in connection therewith. Malavalli received at least 106,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Malavalli backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Malavalli sold 693,950 of his personally-held shares for $131,473,111 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid defendant Malavalli the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 1999 | $167,160 | $21,071 | 134,000 | $475 |
| 1998 | $162,840 | $13,027 | - | $1,188 |

36.    Defendant Canova was Brocade's CFO from May 2001 to December 2005; Vice President, Administration from November 2004 to December 2005; and Vice President, Finance from May 2001 to November 2004. Canova remained an employee of Brocade until January 2006. Because of Canova's position as CFO he knew that Brocade executives were improperly backdating stock option grants to maximize their personal profits. For example, during April 2001, Canova received an email from defendant Jensen that revealed that Brocade was regularly granting stock options at the lowest stock price between meetings when options were granted. Canova also knew from email that Brocade's part-time program was a vehicle for granting backdated options to newly-hired employees. Despite this knowledge, Canova took no action to expose the backdating at Brocade. In fact, Canova actively participated in the backdating. Canova received at least 556,506 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Canova backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Canova is currently facing civil charges from the SEC regarding his participation in the backdating scheme at Brocade. Canova sold 4,903 of his personally-held shares for $31,526.29 in proceeds while in possession of material, non-public information concerning the

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

illegally-undisclosed backdating stock option grant practices. Brocade paid defendant Canova the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2005 | $331,250 | $154,258 | 175,000 | $2,235 |
| 2004 | $252,050 | $151,750 | 375,000 | $3,863 |
| 2003 | $238,525 | $55,826 | 695,149 | $3,593 |
| 2002 | $235,000 | $36,954 | - | $2,004 |
| 2001 | $202,790 | $15,477 | 916,506 | $1,897 |

37.    Defendant Byrd was Brocade's President and COO from May 2001 to January 2003. Byrd was also Brocade's Vice President, Finance, and CFO from April 1999 to May 2001. As Canova's predecessor, he knew that Brocade executives were improperly backdating stock option grants to maximize their personal profits and actively participated in the backdating scheme. On several occasions, Byrd – together with defendant Jensen – selected low stock price dates for backdated options. Byrd also knew that the part-time program was a vehicle for granting backdated options to Brocade new hires and approved one such backdated grant for new hire Richard Geruson ("Geruson"). Byrd received at least 1,848,768 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Byrd was involved in the backdating of these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Byrd sold 653,380 of his personally-held shares for $73,068,872 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Byrd is currently facing civil charges from the SEC in regards to his participation in the backdating scheme at Brocade. Brocade paid defendant Byrd the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2002 | $325,000 | - | - | $720 |
| 2001 | $304,205 | $31,955 | 1,806,268 | $560 |
| 2000 | $250,000 | $413,900 | 85,000 | $420 |
| 1999 | $100,000 | - | 2,640,000 | $576 |

38.    Defendant Jensen was Brocade's Vice President of Human Resources from October 1999 to February 2004. Jensen was also a Brocade consultant from February 2004 to August 2004.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Jensen knew that Brocade executives were improperly backdating stock option grants to maximize

2  their personal profits because she was one of the principal actors in the backdating scheme. Among

3  other things, Jensen selected the dates for backdated grants and concealed those grants by falsifying

4  employment records, meeting minutes and option grant documents. Jensen also knew about, and

5  actively directed, Brocade's part-time program, which was a vehicle for backdating grants to newly-

6  hired personnel. Jensen was convicted of multiple felony counts for violations of the federal

7  securities laws and currently faces civil charges from the SEC.

8      39.    Defendant Robert D. Bossi ("Bossi") was Brocade's Controller from 2001 to at least

9  2003. In that position, Bossi reviewed and facilitated the backdating of stock option grants to

10  various Brocade employees and new hires. In one poignant example, Bossi reviewed and facilitated

11  a backdated stock option grant for 600,000 shares to Brocade new hire Geruson. Bossi was also

12  involved in the preparation of Brocade's falsified financials that did not properly account for the

13  Company's stock option expenses.

14      40.    Defendant Dempsey was a Brocade director from 1995 to April 2007. Dempsey was

15  a member of Brocade's Compensation Committee from at least 2000 to April 2007, and was

16  Chairman of Brocade's Compensation Committee from 2005 to April 2007. Dempsey was a

17  member of the Audit Committee from at least 2000 to 2004. Because Dempsey was a member of the

18  Compensation Committee throughout the backdating, he knew that Brocade executives were

19  improperly backdating stock option grants to maximize their personal profits. As a Compensation

20  Committee member, he approved those backdated grants. For example, on April 17, 2001, Dempsey

21  and defendant Leslie supposedly met with defendant Reyes to approve 8,461,967 shares underlying

22  option grants to eight Brocade executives, including Reyes himself. This meeting, however, did not

23  appear on Dempsey's and Leslie's personal calendars – and Reyes was at the Boston Marathon on

24  that day. Dempsey sold 136,824 of his personally-held shares for $15,205,898.50 in proceeds while

25  in possession of material, non-public information concerning the illegally-undisclosed backdating

26  stock option grant practices.

27      41.    Defendant Sanjay Vaswani ("Vaswani") is a Brocade director and has been since

28  April 2004. Vaswani is also Chairman of Brocade's Compensation Committee and has been since

1  2007, and a member of Brocade's Compensation Committee and has been since 2004. Because of

2  Vaswani's positions, he knew or should have known that Brocade executives were improperly

3  backdating stock option grants to maximize their personal profits, via access to internal corporate

4  documents, conversations and connections with other corporate officers and employees, attendance

5  at Board meetings and committees thereof and via reports and other information provided to him in

6  connection therewith.

7      42.    Defendant L. William Krause ("Krause") is a Brocade director and has been since

8  2004. Krause is also a member of Brocade's Compensation Committee and has been since 2004.

9  Krause was a member of Brocade's Audit Committee from 2005 to April 2006. Because of Krause's

10  positions, he knew or should have known that Brocade executives were improperly backdating stock

11  option grants to maximize their personal profits, via access to internal corporate documents,

12  conversations and connections with other corporate officers and employees, attendance at Board

13  meetings and committees thereof and via reports and other information provided to him in

14  connection therewith.

15      43.    Defendant Robert R. Walker ("Walker") was a Brocade director from April 2005 until

16  April 2008. Walker was also Chairman of Brocade's Audit Committee from April 2006 until April

17  2008, and a member of Brocade's Audit Committee from April 2005 until April 2008. Walker had

18  actual knowledge that Brocade executives were improperly backdating stock option grants to

19  maximize their personal profits, since he was advised of the Audit Committee investigation results.

20  Nonetheless, he wrongfully approved the settlement of the Federal Derivative Action.

21      44.    Defendant Glenn C. Jones ("Jones") is a Brocade director and has been since April

22  2006. Jones is also a member of Brocade's Audit Committee and has been since April 2006. Jones

23  had actual knowledge that the Brocade executives were improperly backdating stock option grants to

24  maximize their personal profits, since he was advised of the audit committee investigation results.

25  Nonetheless, he wrongfully approved the settlement of the Federal Derivative Action.

26      45.    Defendant Michael J. Rose ("Rose") is a Brocade director and has been since April

27  2006. Rose is also a member of the Audit Committee and has been since April 2006. Rose had

28  actual knowledge that the Brocade executives were improperly backdating stock option grants to

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    maximize their personal profits, since he was advised of the audit committee investigation results.
2    since he was advised of the audit committee investigation results.   Nonetheless, he wrongfully
3    approved the settlement of the Federal Derivative Action.

4          46.    Defendant Neiman was Brocade's Chairman of the Board from August 1995 to May
5    2001. Neiman was also Brocade's CEO from August 1995 to June 1996 and a Brocade director from
6    1995 to April 2006.  Neiman was a member of Brocade's Compensation Committee from 2002 to
7    2004, and a member of Brocade's Audit Committee from at least 2000 to 2001.  Because Neiman
8    was a member of the Compensation Committee throughout the backdating, he knew that Brocade
9    executives were improperly backdating stock option grants to maximize their personal profits. As a
10   Compensation Committee member, he approved those backdated grants.  Neiman sold 1,100,445 of
11   his personally-held shares for $250,579,947.73 in proceeds while in possession of material, non-
12   public information concerning the illegally-undisclosed backdating stock option grant practices.

13         47.    Defendant Nicholas G. Moore ("Moore") was a Brocade director from April 2003 to
14   November 2005. Moore was also a member of Brocade's Audit Committee from 2003 to November
15   2005. Because of Moore's positions, he knew or should have known that Brocade executives were
16   improperly backdating stock option grants to maximize their personal profits, via access to internal
17   corporate documents, conversations and connections with other corporate officers and employees,
18   attendance at Board meetings and committees thereof and via reports and other information provided
19   to him in connection therewith.

20         48.    Defendant Christopher B. Paisley ("Paisley") was a Brocade director from August
21   2002 to April 2006. Paisley was also Chairman of the Audit Committee from August 2002 to April
22   2006.  Because of Paisley's positions, as well as his extensive, expert knowledge of applicable
23   accounting standards, he knew or should have known that Brocade executives were improperly
24   backdating stock option grants to maximize their personal profits, via access to internal corporate
25   documents, conversations and connections with other corporate officers and employees, attendance
26   at Board meetings and committees thereof and via reports and other information provided to him in
27   connection therewith.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    49.    Defendant William K. O'Brien ("O'Brien") was a Brocade director from July 2004 to
2    January 2005. O'Brien was a member of Brocade's Audit Committee from October 2004 to February
3    2005 and a member of the Compensation Committee from November 2004 to December 2004.
4    Because of O'Brien's positions, he knew or should have known that Brocade executives were
5    improperly backdating stock option grants to maximize their personal profits, via access to internal
6    corporate documents, conversations and connections with other corporate officers and employees,
7    attendance at Board meetings and committees thereof and via reports and other information provided
8    to him in connection therewith.

9    50.    Defendant Sonsini was a director of Brocade from January 1999 to March 2005.
10   Sonsini was also a member of Brocade's Audit Committee from 2001 to 2003. Further, Sonsini's
11   law firm, defendant WSGR, acted as principal legal counsel to Brocade. Additionally, Sonsini was
12   considered to be the law expert on the Board. Defendant Sonsini held 144,232 shares of Brocade
13   stock as of February 28, 2005. Because of Sonsini's positions on the Board as well as the role that he
14   and his law firm played as Brocade's long-time general outside legal counsel, he knew or should
15   have known that Brocade executives were improperly backdating stock option grants to maximize
16   their personal profits, via access to internal corporate documents, conversations and connections
17   with other corporate officers and employees, attendance at Board meetings and committees thereof
18   and via reports and other information provided to him in connection therewith. Sonsini sold 12,500
19   of his personally-held shares for $1,738,562.50 in proceeds while in possession of material, non-
20   public information concerning the illegally-undisclosed backdating stock option grant practices.

21   51.    Defendant Leslie was a Brocade director from January 1999 to May 2002. Leslie was
22   a member of Brocade's Audit Committee in 2002 and a member of the Compensation Committee
23   from 2000 to 2001. Because Leslie was a member of the Compensation Committee throughout the
24   backdating, he knew that Brocade executives were improperly backdating stock option grants to
25   maximize their personal profits.  As a Compensation Committee member, he approved those
26   backdated grants. Leslie sold 432,612 of his personally-held shares for $32,284,184.58 in proceeds
27   while in possession of material, non-public information concerning the illegally-undisclosed
28   backdating stock option grant practices.

- 20 -

1    52.    Defendant Wall is Brocade's Vice President and General Counsel and has been since

2    June 2005. Wall is also Brocade's Chief Compliance Officer and Corporate Secretary and has been

3    since July 2005.  On information and belief, Wall negligently supplied erroneous and ill-advised

4    legal advice to Brocade for the Company to enter into the Proposed Settlement and to seek

5    preliminary and final approval of such Proposed Settlement from the federal court, despite the fact

6    that the Proposed Settlement did not and does not represent a fair, reasonable or adequate resolution

7    of the claims asserted in the Federal Derivative Action or State Derivative Action.  Defendant Wall

8    currently holds approximately 123,372 Brocade shares.

9    53.    Defendant Renato A. DiPentima ("DiPentima") is a Brocade director and has been

10    since January 2007. DiPentima was appointed to the Board in connection with Brocade's acquisition

11    of McDATA Corporation.

12    54.    Defendant John W. Gerdelman ("Gerdelman") is a Brocade director and has been

13    since January 2007.  Gerdelman is also a member of Brocade's Compensation Committee and has

14    been since February 2007.  Gerdelman was appointed to the Board in connection with Brocade's

15    acquisition of McDATA Corporation.

16    55.    Defendant KPMG was engaged by Brocade to provide independent auditing and/or

17    consulting services to Brocade, including the preparation, examination and/or review of Brocade's

18    annual and interim financial statements for the period of time from 2002 to the present, which

19    financial statements were disseminated to Brocade shareholders and filed with the SEC. KPMG was

20    engaged to perform and performed these services so that Brocade's financial statements would be

21    presented to, and reviewed and relied upon by Brocade shareholders, governmental agencies, the

22    investing public and members of the financial community.  As a result of the services it rendered to

23    Brocade, KPMG's representatives were frequently present at Brocade's corporate headquarters and

24    financial offices from 2002 to the present, and had virtually limitless access to Brocade's confidential

25    corporate financial and business information, including information concerning Brocade's executive

26    compensation and stock option practices along with Brocade's true financial condition which KPMG

27    was aware of and/or negligently disregarded.  KPMG personnel also received and reviewed audit

28    work papers created by or at the direction of Arthur Andersen, which had been engaged by Brocade

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   to perform independent auditing and/or consulting services to the Company prior to the retention of

2   KPMG. Said work papers directly disclosed the existence of backdated stock options at Brocade.

3   KPMG actively participated in the presentation, review and issuance of Brocade's false financial

4   statements. KPMG issued unqualified audit reports on Brocade's financial statements for the period

5   from 2002 to the present. KPMG also reviewed the Company's interim financial statements.

6   Despite the fact that KPMG performed grossly negligent or reckless audits for Brocade, and

7   recklessly or intentionally ignored evidence of the backdating of stock options, the Brocade directors

8   have failed to fire KPMG.

9       56.    Defendant WSGR is engaged by Brocade as the Company's outside counsel. In that

10  capacity, WSGR provided legal advice with respect to the granting, documenting, accounting and

11  reporting of stock options issued by Brocade including the implementation of a so-called part-time

12  employment program designed and implemented from its inception to facilitate the backdating of

13  stock option grants for new hires and to surreptitiously falsify Brocade's overall treatment of the

14  accounting for stock option grants. On information and belief, WSGR also counseled that Brocade

15  attempt to sell itself to Cisco in order to expunge defendants' liability for the stock options

16  manipulation. When that transaction fell apart, WSGR counseled that Brocade enter into the

17  Proposed Settlement, which would have provided for illusory corporate governance reforms and no

18  monetary compensation for the Company in exchange for a broad release for the vast majority of

19  defendants herein. WSGR also acted as counsel of record for Brocade in the Federal Derivative

20  Action, the State Derivative Action, and the securities fraud class action. By May 2007, however, in

21  direct response to a motion to disqualify WSRG filed by plaintiffs in the State Derivative Action,

22  WSGR withdrew as Brocade's counsel in the State Derivative Action. In September 2007, after a

23  hearing on plaintiffs' motion to disqualify WSGR in the State Derivative Action. WSGR also was

24  forced to withdraw from representing the individual defendants in the case. WSGR, however,

25  remains as Brocade's general outside counsel for other matters.

26      57.    The defendants identified in ¶¶31-33, 40-51, 53-54 may be referred to herein as the

27  "Director Defendants." The defendants identified in ¶¶31, 33-38, 46, 52 may be referred to herein as

28  the "Officer Defendants." The defendants identified in ¶¶31, 35-37 may be referred to herein as the

- 22 -

1   "Options Defendants." The defendants identified in ¶¶31, 33-37, 40, 46, 50-51 may be referred to

2   herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer

3   Defendants may be referred to herein as the "Individual Defendants."

4                  **NON-PARTIES WHO RECEIVED BACKDATED STOCK OPTIONS**

5          58.    Jack Cuthbert ("Cuthbert") was Brocade's Vice President, OEM Sales from August

6   2002 until at least May 2004. Cuthbert was Brocade's Vice President, Worldwide Sales from

7   November 2001 to August 2002; Vice President, Worldwide Sales, Marketing and Support, from

8   November 2000 to November 2001; and Vice President, Worldwide Marketing from April 2000 to

9   November 2000. Because of Cuthbert's positions, he knew or should have known that Brocade

10  executives were improperly backdating stock option grants to maximize their personal profits, via

11  access to internal corporate documents, conversations and connections with other corporate officers

12  and employees, attendance at management meetings and committees thereof and via reports and

13  other information provided to him in connection therewith. Cuthbert received at least 1,525,043

14  options that were dated at or very close to the lowest stock price for the month during which options

15  were granted. Accordingly, on information and belief, plaintiff alleges that Cuthbert received illegal

16  compensation from Brocade that was not disclosed to the Company's shareholders. Brocade paid

17  Cuthbert the following compensation:

18

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2003 | $270,000 | $61,974 | 1,167,593 | $2,549 |
| 2002 | $270,000 | $55,080 | - | $882 |
| 2001 | $270,000 | $20,269 | 1,289,211 | $808 |
| 2000 | $120,000 | $278,750 | 543,328 | $427,460 |
| 1999 | $114,000 | $20,000 | 560,000 | $102,448 |
| 1998 | $95,000 | $12,500 | 440,000 | $19,850 |

23         59.    David A. Smith ("D. Smith") was Brocade's Vice President, Service, Support and

24  SAN Integration from January 2000 to at least February 2002. Because of D. Smith's position, he

25  knew or should have known that Brocade executives were improperly backdating stock option grants

26  to maximize their personal profits, via access to internal corporate documents, conversations and

27  connections with other corporate officers and employees, attendance at management meetings and

28  committees thereof and via reports and other information provided to him in connection therewith.

                                           - 23 -

D. Smith received at least 291,636 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that D. Smith received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Brocade paid D. Smith the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $250,000 | $26,125 | 291,636 | $250,675 |
| 2000 | $145,538 | $154,640 | 800,000 | $182,670 |

60.    Paul R. Bonderson, Jr. ("Bonderson") was Brocade's Chief Technology Officer from April 2003 until at least June 2004. Bonderson was also Brocade's Chief Engineer from April 2003 until at least January 2004; Vice President, Engineering from January 2003 to April 2003; Vice President Strategic Development from November 2001 to January 2003; and Vice President, Engineering from August 1995 to November 2001. Bonderson is a co-founder of Brocade. Because of Bonderson's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Bonderson received at least 752,446 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Bonderson received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Bonderson sold 2,018,320 of his personally-held shares for $271,440,260 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid Bonderson the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $270,000 | $27,844 | 486,446 | $2,235 |
| 2000 | $220,000 | $396,567 | 532,000 | $1,870 |
| 1999 | $165,000 | $9,901 | 268,000 | $475 |
| 1998 | $165,000 | $12,375 | - | $504 |

- 24 -

61.    Victor M. Rinkle ("Rinkle") was Brocade's Vice President, Operations, from January 1998 until at least March 2004. Because of Rinkle's position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Rinkle received at least 346,536 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Rinkle received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Rinkle sold 462,600 of his personally-held shares for $72,974,793 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices. Brocade paid defendant Rinkle the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 1999 | $171,875 | $20,188 | 160,000 | $504 |
| 1998 | $115,340 | $39,375 | 800,000 | $990 |

62.    Charles W. Smith ("C. Smith") was Brocade's Vice President, OEM Sales from November 2000 until at least August 2002. C. Smith was also Brocade's Vice President, Worldwide Sales from February 1997 until at least August 2002. Because of C. Smith's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. C. Smith received at least 294,194 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that C. Smith received illegal compensation from Brocade that was not disclosed to the Company's shareholders. C. Smith sold 343,900 of his personally-held shares for $59,051,185 in proceeds while in possession of material, non-public information concerning the illegally-

undisclosed backdating stock option grant practices.    Brocade paid C. Smith the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2000 | $160,000 | $358,250 | 288,328 | $642,123 |
| 1999 | $120,000 | $62,250 | 280,000 | $272,782 |
| 1998 | $118,500 | - | 280,000 | $87,306 |

63.    Peter J. Tarrant ("Tarrant") was Brocade's Vice President, Marketing and Business Development from December 1997 until about February 2001, and Vice President, Strategic Marketing in February 2001.    Because of Tarrant's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith.    Tarrant received at least 166,664 options that were dated at or very close to the lowest stock price for the month during which options were granted.    Accordingly, on information and belief, plaintiff alleges that Tarrant received illegal compensation from Brocade that was not disclosed to the Company's shareholders.    Tarrant sold 265,000 of his personally-held shares for $45,026,665 in proceeds while in possession of material, non-public information concerning the illegally-undisclosed backdating stock option grant practices.    Brocade paid Tarrant the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2001 | $270,000 | $27,844 | 486,446 | $2,235 |
| 2000 | $220,000 | $396,567 | 532,000 | $1,870 |
| 1999 | $165,000 | $9,901 | 268,000 | $475 |
| 1998 | $165,000 | $12,375 | - | $504 |

## SUBSTANTIVE ALLEGATIONS

### Brocade's Stock-Based Compensation Policies

64.    Pursuant to various shareholder-approved stock option plans ("Plans"), during the Relevant Period Brocade granted options for shares of the Company's common stock to its

- 26 -

1  employees, directors and consultants. During February 1998, the Board adopted the 1998 Equity

2  Incentive Plan ("1998 Plan"), which provided for the granting of stock options to employees,

3  officers, directors and independent contractors. The 1998 Plan was succeeded by the 1999 Stock

4  Plan (the "1999 Plan"), which provided for the granting of stock options to Brocade officers and

5  employees. Also during 1999, the Company's Board approved the 1999 Nonstatutory Stock Option

6  Plan (the "Nonstatutory Plan"), which authorizes Brocade to grant the Company's common stock to

7  non-employee directors. Additionally, since 1999, Brocade's officers and/or directors consistently

8  represented in the Company's filings with the SEC that employee stock options were granted with an

9  exercise price that was "equal to the fair market value of our Common Stock as determined by

10  reference to the closing price reported on the NASDAQ National Market on the date of the grant."

11       65.    Tax rules and accounting standards in effect from the time Brocade became a public

12  company in 1999, through 2004, turned on whether an option was "at-the-money" – that is, with a

13  strike price at or above the market's closing price for the stock on the day the option was granted –

14  because such a strike price makes the option incentive compensation, and thus a deductible expense

15  for tax purposes. Under applicable law and accounting standards, "at-the-money" option grants did

16  not have to be counted as an expense by United States public companies when figuring out their

17  taxable earnings. However, as detailed with more particularity herein, defendants Reyes, Jensen and

18  Canova routinely recorded grant dates that were retroactively manipulated to when the market price

19  was lower than it was when they were actually awarded, meaning the options certain Brocade

20  executives received were actually "in-the-money" – and would not have qualified as tax deductions.

21  Accordingly, if it turns out that the exercise price of an option has been changed, a previously-issued

22  option may be disallowed altogether, and previously-recognized tax benefits from employee stock

23  option exercises recognized by the Company may have to be either be adjusted or eliminated. As

24  these tax benefits represented a significant source of cash flow for Brocade since 1999, which was

25  unsatisfactorily accounted for in Brocade's recent restatement, the resulting impact on the Company's

26  taxable income may be devastating.

27       66.    While the Generally Accepted Accounting Principles ("GAAP") does not restrict a

28  company's ability to grant "in-the-money" options, it does require that companies expense the excess

of the market price of the stock at the date of grant over the exercise price of the option. One of the primary reasons options were issued "at-the-money" in the past was to avoid having to record stock option expense. Indeed, defendants Reyes, Jensen and Canova were motivated to avoid Company policies prohibiting the issuance of certain "in-the-money" options by the desire to provide themselves, other executives, directors and Brocade employees with more lucrative compensation and avoid recognition of compensation expense under accounting conventions, standards and rules in effect at the time. They further wanted to avoid the millions of dollars of compensation expenses.

**Stock Options Awarded by Defendant Reyes Under Brocade's 1998 Plan, 1999 Plan, the Nonstatutory Plan and Later Plans Were Void**

67.    Defendant Reyes issued many stock options to employees and non-Section 16 officers at Brocade. But Reyes was never a member of Brocade's Compensation Committee. Until February 21, 2001, Reyes was only authorized to act as a "Committee of One" to issue stock options under the 1998 Plan. Thus, until February 21, 2001, all stock options issued by Reyes under the 1999 Plan or any later plans were void. Moreover, with respect to the 1998 Plan, Reyes only had authority to issue options subsequent to an Initial Public Offering ("IPO") of the Company's stock. Nonetheless, he issued hundreds of thousands of stock options under the 1998 Plan prior to the Company's IPO. Thus, all such options were void.

68.    The stock option plans described herein required stock options to be awarded by the "Administrator," which was defined as the full Board or a committee of the Board. *See, e.g.,* Nonstatutory Plan, §§2(a), 4. If the Administrator acted as such a committee, the committee could only act pursuant to "the specific duties delegated by the Board to such Committee." *Id.* at §4(b).

69.    On February 26, 1998, while Brocade was still a California corporation, the Board, including defendants Neiman and Dempsey, adopted the 1998 Plan. At this Board meeting, the directors, including Neiman and Dempsey, also passed a resolution delegating to the Company's CEO the authority to make stock option awards under the 1998 Plan to employees other than Section 16 officers. This authorization, however, only took effect upon the IPO of the Company's stock, which subsequently happened in May 1999. This resolution constituted a breach of the fiduciary duties owed by Neiman and Dempsey to Brocade because it delegated too much authority to the CEO and constituted an abdication of the duties owed by Neiman and Dempsey to Brocade as

- 28 -

1  directors and as members of the Compensation Committee.

2      70.   Thus, when defendant Reyes became Brocade's CEO in January 1999, he was not

3  authorized, acting alone, to issue any stock options because the Company had not yet conducted an

4  IPO of its stock. Moreover, once the IPO occurred, Reyes was only authorized to issue stock options

5  under the 1998 Plan and not under any other plan. The Board did not pass an authorization similar

6  to the February 26, 1998 resolution which gave Reyes authority to issue stock options under the

7  1999 Plan or any subsequent plan. The Board never did so until February 21, 2001. Thus, all stock

8  options issued by Reyes under the 1999 Plan or the Nonstatuory Plan at any time from 1999 to

9  February 21, 2001 were and are completely void.

10      71.   Moreover, Brocade's Compensation Committee had actual knowledge that defendant

11  Reyes was not authorized to issue stock options under the 1999 Plan, Nonstatuory Plan or later

12  plans. As noted above, defendants Neiman and Dempsey were present at the February 26, 1998

13  Board meeting and voted to authorize the CEO to issue options under the 1998 Plan. Thus, they

14  knew that Reyes, who was not a member of the Compensation Committee, could only issue options

15  pursuant to a valid resolution of the full Board. The rest of the directors also knew this because the

16  Plans very clearly stated that options may only be issued by the full Board or one of its committees

17  acting pursuant to a valid delegation of authority. Thus, all members of the Board acted with

18  knowledge or gross recklessness in allowing Reyes to issue options under the 1999 Plan and later

19  plans with no authority to issue such options.

20      72.   Even defendant Reyes' authority to issue stock options under the 1998 Plan was

21  suspect. At the time the Board passed the resolution delegating this authority to Reyes, Brocade was

22  a California corporation. California law does not authorize a board of directors to delegate authority

23  to a "committee of one." Thus, even the Board's delegation to Reyes to issue options under the 1998

24  Plan was improper, unfounded and a breach of the Board's fiduciary duties.

25      73.   In addition, the stock options issued by defendant Reyes under the 1998 Plan that

26  were backdated, as alleged herein, were also void due to the fact that they were issued in a manner

27  clearly contrary to the explicit contractual provisions of the 1998 Plan, which required all options

28  issued under the Plan to be issued at a strike price no less than the fair market value of Brocade's

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    stock on the grant date.

2    **Defendant Reyes Takes Over as CEO and Immediately Begins to Exceed the Authority Granted to Him to Issue Stock Options**

3

4    74.    By January 1999, defendant Reyes had been appointed CEO of Brocade.

5    75.    On January 29, 1999, defendant Sonsini became a member of the Board as well as Brocade's Secretary. Defendants Reyes, Neiman, and Dempsey, as the only directors present at a

6    January 29, 1999 Board meeting, immediately granted Sonsini 124,000 stock options.

7    76.    As noted above, the February 26, 1998 resolution passed by the Board only allowed

8    defendant Reyes to act as a "committee of one" with respect to stock options authorized under the

9    1998 Plan and granted after Brocade's IPO.

10   77.    As of February 1999, Brocade was still a privately-held California corporation.

11   Nevertheless, defendant Reyes immediately began to issue stock options as a "committee of one."

12   For example, on February 19, 1999, Reyes signed a resolution issuing 20,000 stock options to Kent

13   Bernat under the 1998 Plan. Defendants Neiman and Dempsey knew that this stock award was void

14   because they had passed a resolution less than one year earlier that only had granted Reyes' limited

15   authority to grant options after the IPO. Defendant Sonsini also knew Reyes' conduct was improper

16   because he was a corporate law expert and was the Company's Secretary. Defendant Leslie was also

17   a member of Brocade's Board at this time and was aware of the unauthorized nature of Reyes'

18   conduct. Nonetheless, Neiman, Dempsey, Leslie and Sonsini condoned Reyes' stock option grants.

19   78.    On February 22, 1999, defendant Reyes issued 2,500 stock options to Kari Fields. On

20   February 26, 1999, Reyes issued over 160,000 stock options to various individuals. Between March

21   1, 1999 and March 10, 1999, Reyes issued another 83,000 unauthorized and void stock options. At a

22   Board meeting on March 17, 1999, defendants Dempsey, Neiman, Leslie and Sonsini "ratified and

23   approved" those stock options. However, this supposed ratification and approval was ineffectual.

24   As indicated above, Brocade's stock option plans required the stock options to be awarded by the

25   Administrator, which had to be the full Board or a committee of the Board acting pursuant to a valid

26   delegation of authority. The stock options issued by Reyes were void because they were not

27   awarded by the full Board or a valid committee. Void acts cannot be ratified or approved. Thus,

28   Reyes' conduct in improperly acting as the Administrator during January, February, and March 1999

- 30 -

1  (prior to the IPO) caused the options awarded by Reyes to be void and thus incapable of ratification

2  by the Board.

3      79.    At the March 17, 1999 Board meeting, defendants Neiman, Dempsey, Leslie, Reyes

4  and Sonsini authorized the Company to begin the process of preparing for an IPO. They also passed

5  a resolution combining Brocade's 1995 Equity Incentive Plan, the 1998 Plan and the 1998 Executive

6  Equity Incentive Plan into the 1999 Plan, effective upon closing of the IPO. However, the Board did

7  not pass a resolution authorizing Reyes to act as a "committee of one" with respect to options issued

8  under the 1999 Plan. At the meeting, Leslie was also elected as a member of the Compensation

9  Committee.

10      80.    As indicated above, the 1999 Plan only authorized stock options to be issued by the

11  Administrator.

12      81.    On April 1, 1999, defendant Reyes granted 151,000 options, again without proper

13  authority. Reyes issued another 19,000 options on April 28, 1999, and another 40,000 on April 30,

14  1999.

15      82.    Defendant Byrd was named CFO, Vice President of Finance, and Assistant Secretary,

16  on May 3, 1999.

17      83.    Defendant Reyes issued another 50,000 options on May 5, 1999. On May 19, 1999,

18  Reyes issued another 173,500 stock options.

19      84.    On May 24, 1999, Brocade conducted the IPO of its stock at $19 per share.

20      85.    On June 24, 1999, the Board met and voted, among other things, to "ratify and

21  approve" the stock options awarded by defendant Reyes on April 28, April 30, May 5, May 7, and

22  May 19, 1999. As noted above, however, Reyes' issuance of these options was void. Thus, the

23  Board could not approve or ratify a void act.

24      86.    By August 4, 1999, Brocade's stock price had increased to $98 per share. On that

25  day, and acting alone, defendant Reyes issued 245,000 stock options.

26      87.    Defendant Reyes continued to issue stock options as a "committee of one" throughout

27  1999 and up to and including February 21, 2001. During that time, Reyes issued hundreds of

28  thousands of stock options. During this entire time, the Board never passed a resolution authorizing

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Reyes to issue stock options under the 1999 Plan. Indeed, to the contrary, in October 1999 the Board

2    updated the charter of the Compensation Committee to state, among other things, that it was the job

3    of the Compensation Committee, not Reyes, to act as the Administrator under the 1999 Plan (*i.e.* to

4    issue stock options). Nonetheless, the members of the Compensation Committee and the rest of the

5    Board continued to allow Reyes to issue options as a "committee of one."

6         88.    On February 21, 2001, defendants Reyes, Dempsey, Leslie, Neiman and Sonsini, who

7    comprised all of the members of Board at the time, purported to issue a resolution pursuant to a

8    "Unanimous Written Consent" ("UWC"). A UWC is a procedure pursuant to which the Board

9    makes a decision without an actual meeting – the Board simply disseminates a piece of paper and

10   each director signs the paper. Under the February 21, 2001 UWC, Reyes, Dempsey, Leslie, Neiman

11   and Sonsini authorized Reyes for the first time to grant nonstatutory stock options to non-executive

12   officer employees at Brocade under Brocade's 1999 Plan. The UWC authorized Reyes to issue such

13   options to the indicated employees "in his sole discretion." This UWC represented a blatant breach

14   of fiduciary duty by Reyes, Dempsey, Leslie, Neiman and Sonsini since Reyes had already been

15   issuing options "in his sole discretion" under the 1999 Plan for two years. In addition, actions by

16   "Unanimous Written Consent," whether or not technically permitted, do not constitute good

17   corporate governance with respect to important issues such as authority to grant stock options. Such

18   critical decisions should only be made at in-person Board meetings where an opportunity exists for

19   full discussion of the advantages and disadvantages of the decision. Such decisions should also only

20   be made after consultation with the company's counsel. As members of the Compensation

21   Committee, moreover, Neiman, Dempsey and Leslie had been explicitly vested with the

22   responsibility to issue stock options under the 1999 Plan by the full Board in October 1999. The

23   delegation of sole discretion to Reyes constituted an abdication of the fiduciary duties owed by

24   Neiman, Dempsey and Leslie as members of the Compensation Committee.

25         89.    Even after the February 21, 2001 resolution, the options issued by defendant Reyes

26   under the 1999 Plan that were backdated, as alleged herein, were void because they did not comply

27   with the explicit contractual requirements of the 1999 Plan that all stock options must be issued at a

28   strike price no less than the fair market value of Brocade's stock on the grant date.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

90.


**Defendants Reyes, Jensen, Canova and Byrd Violated Brocade's Stock-Based
Compensation Policies**

91.     Dating back to at least 1999, defendants Reyes and Jensen initiated an illicit course of conduct by which they manipulated stock option grant dates so as to illegally maximize stock profits for themselves and Brocade insiders.  Specifically, Reyes and Jensen directly or indirectly changed the grant dates on an untold number of stock options to reflect lower exercise prices than the price on the actual grant date in order to unjustifiably benefit Reyes, certain of the Officer and Director Defendants and many Brocade employees.  Not only did their actions violate Brocade's stated stock option granting practices, they also ran afoul of applicable accounting rules in effect until 2004, because they willfully and intentionally **_did not_** record the required compensation expense and make the necessary disclosures to render the financial statements not misleading.

92.     Despite their knowledge of the illegitimacy of defendants Reyes' and Jensen's practices, defendant Byrd and later defendant Canova, who replaced Byrd as CFO during mid-2001 (Byrd was promoted to COO at the time) refused to blow the whistle on their illicit actions.  Rather, Byrd and Canova became willing, active participants in the illicit backdating of options.  Byrd and Canova instructed finance department personnel to ensure that the dates used for option grants in the fabricated Compensation Committee minutes were consistent with the Company's financial records.  Reyes, Byrd and Canova then made material misrepresentations about the Company's earnings, compensation expense and employee stock option practices.  As a result of these defendants'

- 33 -

1  manipulative backdating option practices, numerous employees and certain of the defendants

2  received favorably valued – albeit illicit – stock option grants.

3      93.    Though this backdating scheme was designed and implemented by Reyes, Jensen,

4  Byrd and Canova, the Director Defendants, in turn, acquiesced in this scheme by implicitly

5  approving these grants to the Options Defendants, among others, even though those options were

6  improperly backdated.  In fact, the Director Defendants did nothing to prevent Reyes' improper

7  actions as a "committee of one." Further, the Insider Selling Defendants benefited by disposing of

8  16,718,281 shares which were traded based on material, nonpublic information, collecting

9  approximately $1.5 billion in illegitimate proceeds.

10      94.    Defendant Reyes, as CEO and Chairman, caused the Company to make knowingly

11  false representations to Brocade's shareholders and the investing public in its annual and quarterly

12  filings concerning the Company's stock option practices. In embarking upon this scheme to conceal

13  the true nature of Brocade's stock option granting practices and make it appear as if Brocade was in

14  compliance with applicable tax, GAAP and SEC rules, as detailed more particularly herein, Reyes

15  and certain other Brocade executives falsified records and documents in support of their backdated

16  option grants.

17      95.    In furtherance of their scheme, defendants Reyes, Jensen, Byrd and Canova put in

18  place a system for falsifying other documentation to conceal the manipulation of grant dates and thus

19  avoid detection of their backdating scheme.  Specifically, these defendants: (i) fabricated

20  Compensation Committee minutes and similar documents so that it appeared that Reyes, as the sole

21  Compensation Committee member, granted stock options at the market value of Brocade's stock on

22  dates when the value of the Company's stock was relatively low; (ii) fabricated personnel records for

23  certain employees so that they could benefit from stock option grants that were purportedly made

24  and priced when the market value of Brocade's stock was relatively low; (iii) fabricated employment

25  offer letters and other records for certain employees, all of which depicted false employment dates so

26  that they could benefit from stock option grants that were purportedly made and priced when the

27  market value of Brocade's stock was relatively low; and (iv) caused false entries to be made into the

28  Company's financial books and records, which were then reflected in Brocade's financial statements

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   that were publicly filed with the SEC. By engaging in these illicit activities in an attempt to conceal

2   their backdating practices, Reyes, Jensen, Byrd and Canova violated Brocade's stock option plans.

3         **The Particulars of the Pervasive Stock Option Manipulation Scheme at Brocade**

4        96.    Beginning in January 1999, as alleged above, the Board gave defendant Reyes

5   sweeping powers over Brocade's stock option granting process. In particular, the Board granted

6   Reyes the authority to act as a "compensation committee of one" with respect to stock option grants

7   under the 1998 Plan with respect to options granted after the IPO. Although Reyes was only granted

8   explicit authority to grant options to employees, in practice, Reyes granted options to executives as

9   well. Certain of Reyes' executive stock option grants were later allegedly ratified by defendants

10  Dempsey and Neiman, who were members of Brocade's Compensation Committee at times during

11  1999 through 2001.

12       97.    The Compensation Committee and the Board then consciously disregarded defendant

13  Reyes' abuse of those powers and conspired with him to conceal those abuses. These powers were

14  continually granted to him until Reyes' "resignation" in January 2005. In essence, Reyes was given

15  authority to dole out stock options "as a committee of one." Under the virtually unchecked authority

16  delegated to him, Reyes granted options to employees that were improperly backdated, and also

17  falsified records and other documents, including Compensation Committee minutes, in an effort to

18  cover up his misfeasance and avoid detection by the Company's shareholders and auditors.

19       98.    Defendant Reyes carried out this scheme by enlisting Brocade's human resources

20  department to (i) provide historical stock data; and (ii) fabricate employment offer letters, personnel

21  records, compensation and Board committee minutes and other financial books and records. Reyes

22  primarily worked with defendants Jensen and Byrd to compile the stock data and fabricate the

23  documents.

24       99.    At defendant Jensen's request, Steven Beyer ("Beyer"), Brocade's Senior

25  Compensation and Benefits Manager from October 2001 to August 2002, would pull historical stock

26  prices from the Yahoo! Finance webpage for at least the preceding forty-five days (or longer). Beyer

27  would then circle or highlight two or three of the lowest closing prices. At other times, Jensen and

28

1   defendant Byrd would highlight or circle the historical low stock prices that appeared on the stock
2   price printouts.

3         100.    Beyer's next step was to pull a list of new hire employees. He typically received that
4   list from Margaret Lee ("Lee"), Brocade's staffing infrastructure manager. Lee was responsible for
5   Brocade's hiring process, including the extension of employment offer letters and the processing of
6   signed offer letters. Lee was also involved in Brocade's stock option granting process as to new
7   hires. Lee reported to Theresa Uchida ("Uchida"), Brocade's recruiting director. For a short time,
8   Lee reported to defendant Jensen before Uchida was hired.

9         101.    Beyer then took the new hire list and formatted it into a template to show the
10   employee's name, their start dates, the number of options they would receive and a signature line.
11   Beyer selected the employee start dates based upon instructions from defendants Jensen and Reyes.
12   These start dates corresponded with the low closing price dates that Beyer circled on the historical
13   price lists.

14         102.    In calculated hindsight, defendant Reyes would then backdate the grant
15   documentation to one of the dates highlighted on the Yahoo! Finance printout to make it appear that
16   the options had been granted on that earlier date. Defendant Jensen would then prepare fictitious
17   Compensation Committee minutes to match the grants that Reyes had deceitfully chosen. Because
18   Reyes and Jensen supplied documentation that falsely represented that the options were granted on
19   an earlier date and that the exercise price for the grants was the earlier market value, both knew that
20   the grants should be recorded as compensation expense in its financial statements.

21         103.    Beyer also had a role in dating the fictitious Compensation Committee minutes that
22   reflected an authorization of the option grants. Defendant Jensen would provide a date for Beyer to
23   write onto the minutes. This date would correspond to one of the dates that Beyer had highlighted
24   on the Yahoo! Finance printout. The minutes were never signed at the time that Beyer handed them
25   to Jensen, but were typically returned to him within a day with the requisite signature. Defendants
26   Dempsey and Neiman, who were members of the Compensation Committee during 1999 through
27   2001, consciously disregarded the fact that the Compensation Committee meeting minutes were
28   never dated as of the date that meeting actually occurred.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    104.    At certain times, Lee was responsible for fabricating the Compensation Committee

2    minutes.  Defendant Jensen would provide Lee with a print out of Brocade's closing stock price

3    during the last thirty days with specific dates highlighted that corresponded to historical low stock

4    prices.  These prices may not have been the lowest stock price, but they were generally priced close

5    to the lowest.  Jensen would then tell Lee to prepare the Compensation Committee minutes for those

6    dates.  Jensen also instructed Lee to prepare the minutes with a short time frame because defendant

7    Reyes needed to sign the minutes.

8    105.    After the fabricated Compensation Committee minutes were prepared, Lee, under

9    defendants Reyes' and Jensen's direction, would shred the highlighted historical stock price printouts.

10    106.    Beyer or Lee would then forward the fabricated Compensation Committee minutes to

11    Elizabeth Moore ("E. Moore"), who worked in Brocade's stock administration organization.  E.

12    Moore was responsible for collecting signed documents and inputting the data into the stock

13    administration system.  There was always a sense of urgency in getting the signed minutes and other

14    option grant documentation to E. Moore because the new employees wanted to be advised as to the

15    actual pricing of their options and what their "paper value" was.  Brocade employees who received

16    options knew that the options were manipulated because they did not receive their documentation

17    until well after they started working at Brocade.

18    107.    When prospective employees sent in their signed employment offer letters too late to

19    be included in a favorable option grant, Lee, under defendant Jensen's direction, would cut and paste

20    particular employees onto a previous set of signed Compensation Committee minutes.  Lee would

21    get the earlier set of signed minutes from E. Moore.  The revised Compensation Committee minutes

22    were not re-signed.  Lee did this on at least six occasions.

23    108.    Lee was responsible for communicating with prospective employees regarding when

24    stock options were going to be priced.  Defendant Jensen instructed Lee on how to respond.  In

25    particular, Jensen told Lee to tell prospective employees that the options were priced when the

26    Compensation Committee meets and that the committee would try to meet at opportune times to get

27    the most out of advantageous stock prices.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

109.    Prior to the implementation of the part-time program in the Summer of 2000, aimed at papering the improper backdating of options, defendants Reyes, Byrd, Jensen and others executed the backdating scheme through other equally problematic means. First, Brocade put in place a six-month "look-see" plan which allowed option grantees to pick a low stock price during the first six months of employment, a plan that ran afoul of the Company's stock option plans. After this program was dropped for its obvious flaw, the defendants instituted the "offer/acceptance" plan which provided that the grant's pricing was determined by the low of either the date the grantee's employment offer was made or accepted. At each instance the plans were changed, defendant Byrd explained to department hiring managers that "changes" in accounting rules caused the need for the scheme's various formulations. However, briefings of these plans were missing for Compensation Committee members. Defendants Leslie and Dempsey specifically stated under oath that they had no knowledge of the "look-see", "offer/acceptance" and part-time programs.

110.    By June 2003, the fraudulent backdating practice, including the manipulation of the timing and granting of stock option grants facilitated by doctored paperwork from Brocade's human resources department, had become so routine that an employee of that department prepared a memorandum describing the practice. The memorandum titled "New Hire Stock Processing" explicitly directed human resources employees to recommend a pricing date by printing out historical closing prices for Brocade's stock and identify the closing price that is the lowest since the last pricing date. In particular, the memo stated: "Discern which date is the lowest since the last pricing date and create a New Hire Pricing Report." This memorandum was shared by lower level human resources employees who helped implement the process, which continued into 2004.

111.    Defendant Jensen directed Beyer and Lee to not use email or voice mail to discuss the stock option pricing process. In fact, Jensen told Beyer and Lee to limit all communications concerning the stock option granting process to face-to-face communications. On one occasion, Lee forgot about this directive and left Jensen a voice mail concerning the option granting process. Lee was met with a stern reprimand from Jensen after she discovered the voice mail.

112.    At another point, Beyer expressed his concern regarding the legality of Brocade's stock option pricing process to defendant Jensen. Jensen responded that she was not concerned with

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  the legality of the process.  Rather, she was concerned with completing the process as directed by

2  defendant Reyes.

3                                    **The "Part-Time" Program**

4           113.    From August 2000 to October 2002, under defendant Reyes' direction and with the

5  blessing of the Board, defendant Sonsini and later defendant KPMG, Brocade used a so-called "part-

6  time" program for new hires.  Defendant Byrd was credited with being the architect of the part-time

7  program.  Ostensibly, the purpose of the program was to allow new hires to work for a few weeks on

8  a part-time basis to become indoctrinated into the Brocade culture.  New hires who participated in

9  the program were required to work only four hours to ten hours per week.

10          114.

11

12

13

14

15

16

17

18

19          115.    Under the part-time program, prospective employees who elected to participate were

20  required to work only four to ten hours per week, and were offered cash and stock compensation

21  during the program, including stock options.  In exchange for such compensation, prospective

22  employees were supposed to transition into working at Brocade by, for example, researching

23  Brocade's products, markets and business strategy.  The actual activities were supposed to be set by

24  the prospective employee's managers.  In some cases, however, no activities were established.

25  Moreover, prospective employees were allowed to continue working with their former employers

26  during their supposed participation in the part-time program.

27          116.    Beyer was one of the new hires whose hire date was backdated to take advantage of a

28  historical low in Brocade's stock price.  Dean Traut was another.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendant Reyes Used the Part-Time Program as a Recruiting Perk to Attract Employees**

117.     Brocade became a public company in May 1999, which coincided with the "tech boom," a period during which companies specializing in computer technology experienced rapid and substantial growth in revenues, profitability and in the size of operations. Due to its specialization in areas of computer technologies, the Company benefited from a blistering rate of growth with a one time market capitalization of $24 billion. As a result of this accelerated ascension in revenue and in the size of operations, between October 1999 and October 2002, Brocade hired over 1,150 employees, increasing the size of its workforce by more than six-fold.

118.     During the tech boom, lean and fast-growing tech companies facilitated a frenetic hiring environment marked by increasingly fierce competition over skilled workers. Stock options were the fastest-growing segment of executive pay in 2000. A survey reported in the CPA JOURNAL (May 2001, p. 15) showed that average total compensation for chief executive officers of publicly-traded companies in the United States increased 16% in 2000 to $10.89 million, with an average stock option value of $6.45 million, representing 60% of total remuneration. This environment fostered a culture of cheating by greedy corporate executives who felt they could disregard the rules. Brocade was run by one such executive, defendant Reyes, who implemented a pervasive scheme to use deliberately backdated option grants as a recruiting tool. As a result, Brocade violated GAAP, securities laws and tax laws as detailed more particularly herein. In addition, under the influence of Reyes, the Director Defendants allowed the practice of improperly backdating options to flourish, which caused the outright violation of Brocade's own rules for granting options.

119.     Specifically, to recruit and retain certain employees, defendant Reyes, assisted by defendants Jensen and Byrd, and later by defendant Canova, made liberal use of employee stock options as a form of compensation. The stock options gave employees the right to buy Brocade's stock at a set price, called the exercise price or "strike" price. The positive paper value of the options to these employees was instant to the extent the market price of Brocade's stock exceeded the strike price of the options on the actual grant date.

120.     With the part-time program in place, defendant Reyes had unfettered control over the particular strike price that he could offer potential employees. For example, particularly valuable

- 40 -

1  prospective employees could be offered stock options that became even more valuable via the

2  manipulation of that employee's part-time start date.

3      121.

10     122.

16     123.

25              **The Roles Played By Defendants WSGR and Sonsini**

26     124.    Defendant WSGR has acted as Brocade's general outside legal counsel since 1999.

27  During that time, WSGR provided legal advice to the Board on a number of compensation issues,

28  including the part-time program and defendant Reyes' "committee of one" role with respect to stock

- 41 -

1  option grants.  In his capacity as a Brocade director, defendant Sonsini signed the February 21, 2001

2  resolution that belatedly gave Reyes "sole discretion" to issue stock options to non-executive

3  employees under the 1999 Plan.  Sonsini, who was chairman of WSGR and a director from 1999 to

4  March 2005, was considered by other directors to be the "law expert" on the Board.  In that capacity,

5  Sonsini also provided legal advice on issues related to stock-based compensation.

6    125.

10   126.

16   127.

23   128.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3      129.    Moreover, as reported on March 29, 2007 in *The Wall Street Journal* Law Blog, Stern

4  and fellow WSGR attorney Bret DiMarco were tackling similar issues during early 2001 at KLA-

5  Tencor ("KLA"). According to the blog entry, Stern and DiMarco advised KLA on the accounting

6  and regulatory issues surrounding options backdating. This was contemporaneous with Stern's

7  advice to defendant Jensen regarding Brocade's accounting treatment of options granted in

8  connection with the part-time program.

9      130.



10

11

12

13

14

15

16

17                    **Defendant KPMG's Role In The Backdating Scheme**

18      131.    Defendant KPMG began auditing Brocade on or about June 2002, when it took over

19  for Arthur Andersen, the Company's previous auditors. After assuming its duties as Brocade's

20  auditors, KPMG audit personnel assigned to work on Brocade's account received and reviewed

21  Arthur Andersen's work papers, which contained indications of the backdating of stock options, and

22  which accorded inappropriate accounting treatment for the part-time program.

23      132.    During mid to late 2002, defendant KPMG's New York office reviewed Brocade's

24  accounting treatment for its part-time program. After examination, the office rejected the accounting

25  treatment as inappropriate because there was insufficient documentation to establish that employees

26  who purportedly held a "part-time" status actually were working. Nevertheless, the part-time

27  program continued unabated for several months under KPMG's watch.

28

133.   At all relevant times, defendant KPMG was a necessary and active participant in the Individual Defendants' improper accounting and financial reporting. In an effort to preserve its relationship with Brocade, pursuant to which it received millions in dollars in fees, KPMG knowingly or recklessly disregarded the Individual Defendants' improper accounting and financial reporting practices, ignored repeated grants of stock options at monthly, quarterly and annual lows and actively assisted the Individual Defendants in concealing its wrongdoing from the market by, *inter alia*, improperly issuing unqualified audit opinions certifying that Brocade had complied with GAAP. For the relevant years 2000 through 2005, Brocade paid KPMG the following fees:

| Fiscal Year | Fees Paid to KPMG |
|---|---|
| 2005 | $2,424,000 |
| 2004 | $733,000 |
| 2003 | $1,012,000 |
| 2002 | $328,010 |
| Total | $4,497,010 |

134.   During their yearly audits and quarterly reviews of Brocade's books, records and financial statements, members of defendant KPMG's engagement team had virtually limitless access to information concerning Brocade's true financial condition. KPMG had unfettered access to Arthur Andersen's work papers, Brocade documents and employees, and had conversations with Company management and employees about the Individual Defendants' financial reporting and accounting practices. As part of its audit process, KPMG reviewed Board and Compensation Committee minutes and resolutions that authorized stock option grants. KPMG also reviewed share data reports that included information concerning option grants, exercises and cancellations. KPMG even reviewed the time lag between the effective date of a stock option grant and the date upon which the option grant was entered into Brocade's computer system.

135.   Defendant KPMG knew or recklessly disregarded that the Individual Defendants were, contrary to GAAP, backdating stock options at Brocade without appropriately documenting, accounting for or reporting such activity under applicable law and accounting standards. Indeed, KPMG's audit work papers reflected that the auditors knew that Brocade stock options were backdated. For example, a KPMG work paper titled "Summary of All Stock Option Plans FY 2002

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Rollforward/ Reconcilliation" contained an entry that stated, "Option grants entered in FY2002 but

2  effective FY 2001 ... (182,251) ...." This entry shows that KPMG auditors knew that options that

3  were entered in fiscal 2002 were given an effective date during fiscal 2001.

4      136.    The engagement partner for KPMG on the Brocade account was Neil Miotto

5  ("Miotto"), who offered sworn testimony during his deposition taken in connection with the SEC

6  Action. Miotto admitted that when KPMG took over the Brocade account, the KPMG audit team

7  had received all of Arthur Andersen's work papers, and that he met with former Arthur Andersen

8  partner Kevin Reagan (who later became a KPMG partner) during the account turnover process. He

9  stated that when the part-time program was being reviewed by KPMG during the 2004 investigation,

10  the review was handled by KPMG's Department of Professional Practice, which is the top technical

11  group within KPMG. Miotto said that KPMG then concluded that the part-time program was not an

12  effective or viable program because Brocade could produce no evidence that it was a substantive

13  program. Miotto testified that he understood that the part-time program's rationale, from Brocade's

14  perspective, was to grant a stock option to an employee sooner as a part-time employee rather than

15  later, when that person would assume full-time status, so that the employee could receive a more

16  favorably-priced option. He also stated that at the time KPMG concluded that the part-time program

17  was not effective or viable, KPMG realized that the Company's financial statements could no longer

18  be relied upon.

19      137.    Moreover, Miotto testified during an SEC deposition that a former Arthur Anderson

20  auditor who had worked on the Brocade engagement team had joined KPMG as a partner. Miotto

21  testified: "Kevin Reagan is now a partner with KPMG. He was on the Anderson [sic] engagement

22  for '01. I don't know if he was a signing partner, but it was my understanding he was working on the

23  engagement about to take over."

24      138.    Further, defendant KPMG knew that Brocade options were being manipulated from a

25  review of Arthur Andersen's work papers. Those work papers revealed that Brocade had a policy of

26  awarding stock options to new hires priced as of the date they signed or accepted their offer letters.

27  One such work paper generated during the course of the fiscal 2001 audit contained an entry that

28

- 45 -

1  stated: "Option grants entered after 2000 FYE with grant dates prior to 2000 FYE (12,000). For

2  reporting purposes these should be considered additional FY2001 grants ...."

3      139.    Despite defendant KPMG's knowledge of serious irregularities with respect to

4  Brocade's reported stock option compensation and in particular the part-time program, KPMG failed

5  to raise issues concerning those financials until Cudgma filed his whistleblower lawsuit during 2004.

6  Moreover, even though KPMG insisted that Brocade terminate the part-time program because,

7  according to Miotto, Brocade "could provide no evidence of substantiveness," KPMG failed to

8  investigate whether or not the part-time program had resulted in false and misleading financials.

9      140.    Moreover, defendant WSGR and Stern were well aware of the irregularities of the

10  part-time program and had strongly cautioned defendant Jensen that it would not fly with the

11  auditors. Nevertheless, even though KPMG was privy to the same financials that WSGR and Stern

12  were privy to, KPMG failed to question the financials until Cudgma's lawsuit.

**Documented Instances of Options Manipulation as to Brocade New Hires**

13

14      141.



18      142.

23      143.



144.

145.

146.

147.

- 47 -
AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   148.
2
3
4
5
6
7
8
9
10
11
12

13   149.
14
15
16
17
18
19
20
21
22
23
24
25

26   150.
27
28



AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



151.

152.

153.

154.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



155.

156.

157.

158.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3

159. 

4
5
6
7
8
9

160.

10
11
12
13
14
15

161.

16
17
18
19
20
21

162.

22
23
24

163.

25
26
27
28

164.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



1

2

3

4        165.

5

6

7

8

9

10        166.

11

12

13

14

15

16        167.

17

18

19

20

21

22

23

24

25

26        168.    On May 22, 2003, iQuantic made a presentation to the Board about expensing stock

27    options.  Defendant Reyes was particularly concerned about iQuantic's presentation because if

28    Brocade had to properly expense stock options, his ability to entice new employees with backdated

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  stock options would be severely constrained.  June Weaver ("Weaver"), Brocade's former human

2  resources administrator, testified at Reyes' trial that Jensen told her that Reyes was "very, very

3  interested in changes that were going to be coming to the stock option process."

4      169.



5

6

7

8

9

10

11

12      170.

13

14      171.

15

16

17

18      172.

19

20

21

22      173.

23

24

25

26

27      174.    During defendant Reyes' criminal trial, Weaver also testified that she had discussed

28  the legality of Brocade's option grant process with Reyes during the time that he was backdating

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock options.  Weaver testified that Reyes brazenly told her that "*it's not illegal if you don't get caught*."  Weaver also testified that she remembered Reyes making that statement to her "very well." But Reyes' shameless attitude eventually caught up to him.

### Illustrations of the Backdated New Hire and Other Employee Grants

175.    On at least nine occasions between January 2, 2001 and July 2, 2002, defendant Reyes, with defendant Jensen's assistance, backdated grant dates to provide new hires and other employees with "in-the-money" options while evading the requirements of applicable law and accounting standards to properly and timely document, account for and report the compensation expense incurred by Brocade related to those grants.  As indicated by the charts below, those grants were backdated as of the following dates: January 2, 2001, April 17, 2001, July 23, 2001, October 1, 2001, October 30, 2001, November 28, 2001, January 22, 2002, February 28, 2002 and July 2, 2002.

176.    In fact, as illustrated in the below charts, between 3Q:00 and 4Q:02, defendant Reyes granted stock options to employees at the quarterly low stock price in eight of the ten quarters and with exercise prices near the quarterly low stock price in the other two quarters.



- 54 -



(1) Antonio Canova received 377,750 shares. Defendant Canova disclosed this grant on a Form 3 filed May 16, 2001.
(2) David A. Smith received 207,810 shares; Jack Cuthbert received 541,760 shares. Defendants and non-parties disclosed these grants on a Form 4 filed June 8, 2001.
(3) Paul R. Bonderson received 260,450 shares; Michael J. Byrd received 1,139,050 shares; Gregory Reyes received 3,970,080 shares; Victor Rinkle received 172,540 shares and Charles W. Smith received 110,030 shares. Defendants and non-parties disclosed these grants on a Form 5 filed December 11, 2001.
(4) Larry Sonsisni received 60,000 shares; Seth Neiman received 80,000 shares; Mark Leslie received 60,000 shares; Neil Dempsey received 60,000 shares. Defendants disclosed these grants on a form 5 filed February 7, 2002.



AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



(1) Paul R. Bonderson received 5,996 shares; Michael J. Byrd received 257,218 shares; Antonio Canova received 178,756 shares; Gregory Reyes received 1,262,113 shares; Victor Rinkle received 3,996 shares; David A. Smith received 3,826 shares. Defendants and non-parties disclosed these grants on a Form 5 filed December 11, 2001.
(2) Jack Cuthbert received 205,451 shares. Cuthbert disclosed this grant on a Form 4 filed December 7, 2001.
(3) Seth Neiman received 75,000 shares. Defendant Neiman disclosed this grant on a Form 5 filed February 7, 2002.



AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



177.    Year after year, defendant Reyes' transgressions continued unabated as his sweeping

authority remained unchecked by the Board.  On at least six occasions between August 15, 2003 and

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  October 20, 2004, Reyes backdated options grants to provide employees with "in-the-money"

2  options while evading the requirement that Brocade properly document, account for and report the

3  compensation expense related to those grants. Those grants were backdated as of the following

4  dates: August 15, 2003, October 20, 2003, January 22, 2004, February 26, 2004, March 22, 2004 and

5  June 21, 2004.

6        178.    Indeed, as depicted in the following charts, during Brocade's FY:04, defendant Reyes

7  made thirty-two option grants. Of those grants, nineteen grants were to over 1,000 employees

8  (granting options to purchase a total of approximately 16 million shares), that were priced at the

9  weekly low closing price for Brocade's stock and for an additional three grants, within just $0.03 of

10  the weekly low.



(1) On August 15, 2003 Paul Bonderson received 200,000 shares; Jack Cuthbert received 250,000 shares; Michael Klayko received 250,000 shares; Defendants and non-parties disclosed these grants on a Form 4 filed August 19, 2003.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



October 31, 2003 - January 29, 2004 Stock Option Grants

On January 22, 2003, defendants Reyes, Jensen, and Canova granted options at an exercise price of $6.63 per share.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



January 30, 2004 - April 29, 2004 Stock Option Grants

On February 26, 2004, defendants Reyes, Jensen, and Canova granted options at an exercise price of $6.58 per share.

On March 22, 2004, defendants Reyes, Jensen, and Canova granted options at an exercise price of $6.60 per share.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



**Defendant Canova Perpetuated the Backdating Scheme by Consciously Refusing to Expose It**

179.    Defendant Canova joined Brocade in late 2000 after working previously as a CPA. Canova, with his relevant financial expertise, was wholly familiar with the cardinal principle that "in-the-money" stock options must be recorded as a compensation expense. In complete disregard of this tenet, however, Canova facilitated the backdating subterfuge by turning a blind eye when presented with evidence that suggested the existence of an improper option backdating scheme and neglected to discuss the matter with the Company's external auditors despite having ample opportunity to do so. Indeed, Canova ultimately participated in defendants Reyes and Jensen's illegal activities.

180.    Beginning in April 2001, after defendant Canova was promoted to the position of CFO, he learned of multiple facts calling into question the integrity of Brocade's financial statements based on the Company's option grants. Canova thus received first-hand knowledge of the backdating scheme in place at Brocade through his elevated role in the Company. Specifically, in April 2001, Canova received an email from Jensen in which a Brocade manager had stated that the Company's option price was "usually the lowest closing price" experienced between meetings when