1  options were granted. In a comment darkly alluding to a cover-up, Canova instructed that Jensen

2  should caution the manager "not to make statements about the board granting shares at the lowest

3  price."

4      181.   Shortly thereafter, during a discussion between defendant Canova and Brocade's

5  controller, the controller expressed concerns about the delay between purported option grant dates

6  and the dates when the finance department employees received documentation of the grants.

7  Although the delay was a result of, and suggested the existence of, the options backdating scheme,

8  Canova did nothing to investigate other than speaking with defendant Reyes.

9      182.   In early 2002, defendant Canova was presented with further evidence of the stock

10  option backdating scheme. In particular, the options of two Company executives, Geruson and

11  Cudgma, were backdated and supported by falsified offer letters with earlier than actual start dates,

12  as alleged above. Then, in October 2002, Canova again received an email describing the process for

13  granting options to Geruson as "forging paperwork and offer letters so he could get better priced

14  options." Indeed, it is impossible for a person of Canova's financial acumen to even argue that he

15  was unaware that the Company was the victim of an options backdating scheme. Specifically,

16  Canova consciously or recklessly ignored evidence of falsified records and documentation,

17  unscrupulous options pricing conventions, and the absence of effective controls and coordination

18  between the finance and human resource departments, as well as between those departments and the

19  Board. He neither investigated nor reviewed the impact of these improprieties and manipulations on

20  Brocade's financial statements and also failed to alert the Audit Committee or external auditors to

21  their existence. As a result, Brocade failed to timely record any compensation expense related to the

22  backdated options grants.

23      183.   Instead, after learning of these facts, defendant Canova facilitated the backdating

24  scheme by directing finance department employees to ensure that the dates used for option grants in

25  the fabricated Compensation Committee minutes were consistent with the falsified employee records

26  reflecting their purported hiring dates. When inconsistencies were found between these documents,

27  Canova directed finance department employees to alter the documents so that they were consistent.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  This way, the Company's external auditors would not be able to discover the true nature of Brocade's

2  options granting practices.

3      184.    In light of all these facts and in conjunction with defendant Canova's willful

4  ignorance of the existence of numerous improprieties and manipulations, it is clear that Canova

5  knew the documentation of options grants used to prepare the Company's financial statements were

6  not reliable.

7  **Defendants Reyes, Jensen, Byrd and Canova Caused Brocade to Report Materially**
   **Inaccurate Financial Information.**

8

9      185.    Defendants Reyes, Jensen, Byrd and Canova knew about the accounting rules and

10  reporting requirements applicable to Brocade stock option grants, and thus knew their falsifications

11  of official option grant date documents and corresponding fabrications of Compensation Committee

12  minutes violated these rules. Specifically, these defendants were aware of the requirement that "in-

13  the-money" option grants be recorded as a compensation expense through instruction, advisement

14  and participation in conversations regarding the rules with persons at the Company, with Brocade's

15  outside auditors and with various consultants, including, without limitation, defendants WSGR and

16  Sonsini. In particular, Reyes spoke frequently, within the Company, with persons outside Brocade,

17  and publicly, about the rules requiring public companies to record, properly document, account for

18  and report an expense for "in-the-money" options grants.

19  **Defendant Reyes Engaged in Self-Dealing to the Detriment of the Company and**
   **Shareholders**

20      186.    Defendant Reyes was motivated, in part, to conceal the backdating scheme from

21  shareholders, external auditors and the SEC due to the fact that he and other Company officers

22  derived substantial personal benefits from the wrongdoings. Specifically, Reyes knew that he and

23  other officers of the Company received options backdated as of the same dates as the backdated

24  employee options. Thus, Reyes abused his position as Chairman of the Board and CEO of the

25

26

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Company in recommending that the Director Defendants compensate officers, including himself,

2  through options grants.[5]

3      187.    In a June 2003 resolution, the Director Defendants accepted a recommendation that

4  defendant Reyes, in his position as CEO, be granted a total of 1.1 million options divided into two

5  grants during two fiscal quarters.  Relying only on the resolution, Reyes included himself in two

6  options grants that were otherwise made to employees of Brocade.  Although nothing in the Board's

7  resolution specified the dates of the grants to Reyes or the strike prices, Reyes granted himself

8  600,000 options as of August 15, 2003 and 500,000 options as of December 10, 2003.  Only after the

9  grants were made and recorded in Brocade's books and records did the Board approve the grants.

10      188.    Further, specifically, defendants Neiman, Leslie and Dempsey, as members of the

11  Compensation Committee, failed to execute their necessary responsibilities.  Falsified committee

12  minutes were signed by the defendants.  The committee met once or twice a year to approve grants

13  and approvals typically occurred by telephone.  Committee members later testified at defendant

14  Reyes' trial and during depositions taken by the SEC that there was either no definitive process for

15  option grants or that they were unaware of the guidelines, procedures or policies governing the grant

16  process.  Moreover, the defendants did not provide Reyes with any guidelines to execute his

17  delegated authority.  Indeed, defendants testified that this level of review was beyond the scope of

18  the Committee despite their explicit approval of option grants.  Suggestions that the Compensation

19  Committee exercise oversight of the processes for the issuance of stock options were dismissed as

20  "silly" by one committee member.  The defendant's delegation to Reyes as the "Committee of One"

21  and their complete withdrawal from their Compensation Committee duties was an abdication of

22  responsibility.

23

24

25

26  [5]  Ownership of company stock by executives and insiders is usually considered a positive development because it shows a belief in the company's prospects.  However, not all ownership positions are created equal.  An executive's insider purchases on the open market show a far more real commitment than *gratis* stock options.  Although at-the-money stock option grants are supposed to align the interests of management and shareholders, the granting of backdated stock options present insiders with a hidden mechanism to enrich themselves at the expense of shareholders.

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

189.    The Compensation Committee and Audit Committee members made no effort to inform themselves as to the accounting impacts and rules that the Company's stock options grants imposed on Brocade.  Compensation and Audit Committee members testified specifically that they had no or very little understanding of the accounting rules relating to Brocade's stock option grants. Indeed, defendant Dempsey, a member of both the Compensation and Audit Committees, testified that his "competency doesn't enter the financial arena."  Defendant Sonsini admitted to having only a very general knowledge of the accounting rules and could not recall even generally of discussions regarding the rules and their impacts on the Company's stock option plans and grants by either defendants Byrd or Canova.  There was also no discussion at the Board level regarding these rules and impacts during the ongoing backdating scheme.

190.    The Director Defendants' disregard for the Company's stock option plans was shown by the option grants to defendant Sonsini in January and April 2001.  On January 18, 2001, the plan was amended specifically to provide for grants to defendant Sonsini with the expressed understanding that the grant was to be the only one for Sonsini for 2001.  Yet, at the next available opportunity, on April 17, 2001 – the claimed date of a Compensation Committee meeting – defendant Sonsini was awarded 60,000 options.  The April 17 grant price was very close to the lowest share price for the fiscal quarter.  The grant was also not disclosed until February 7, 2002, a full year after the plan had been amended to specifically state the defendant Sonsini was to receive but one grant for 2001.

191.    Also, on at least two other occasions, defendant Reyes received large options grants that were dated as of the same dates on which he had granted other employees backdated options. Those grants to Reyes were backdated to April 17, 2001 and October 1, 2001.  Further, defendant Klayko was granted over 575,000 backdated options between May 21, 2004 and December 10, 2004.

### Brocade's Board Is Culpable for Allowing the Scheme to Continue

192.    One of the most troubling aspects of the illicit option backdating scheme is that the Director Defendants blindly relinquished total responsibility for setting option grant dates to defendant Reyes and other executives and knowingly failed to correct their illicit scheme.  In effect, options backdating opens the door to executive self-dealing, which is exactly what happened here.

- 64 -

1    The Director Defendants never disclosed what role, if any, Brocade executives like Reyes played in

2    the Company's stock option grant decision-making process.  In sum, the Director Defendants, as

3    Brocade's guardians, utterly failed to implement effective internal controls that would have ensured

4    that Company executives would have followed the shareholder-approved Plans with proper and

5    transparent policies and procedures.

6           193.    Not only did the Director Defendants improperly delegate sweeping authority to

7    defendant Reyes in the granting of stock options to employees and executives, they implicitly

8    acquiesced in the improper arrangements described herein by wholly failing to take any reasonable

9    steps or actions to assure themselves that the Company's compensation policies were being properly

10   followed.  Specifically, the Director Defendants failed to establish an effective system of internal

11   controls, which directly and proximately led to the years of illicit backdating activity at the

12   Company.  For example, the Director Defendants did not compile the required paperwork, utterly

13   failed to implement internal controls to prevent or timely detect problems associated with falsified

14   paperwork, and allowed inaccurate and incomplete minutes of Board meetings to be fabricated while

15   at the same time knowing such deceptive records were being used to document when directors

16   supposedly had approved grants.  Further, when presented with the opportunity to actually

17   investigate the Company's compensation practices, the Director Defendants chose to conduct a sham

18   restatement instead.  Finally, these defendants attempted to extinguish their own liability, as well as

19   the liability faced by many others, by voting to approve the Proposed Settlement, which was patently

20   unfair, inadequate and unreasonable.

21          194.    The Director Defendants' misfeasance calls into question the unscrupulous corporate

22   culture at Brocade, the lack of integrity of the Company's executives and its directors, the Director

23   Defendants' non-existent oversight, and accentuates Brocade's deficient internal controls over its

24   compensation practices in general.

25   **SEVERAL OF THE INDIVIDUAL DEFENDANTS RECEIVED MANIPULATED**
     **STOCK OPTION GRANTS**
26

27          195.    In addition to the untold numbers of Brocade employees and new hires who benefited

28   from the illicit backdating scheme hatched by defendants Reyes, Jensen, Byrd and Canova, several

of the Individual Defendants also received backdated option grants.  As the charts below demonstrate, numerous options were suspiciously granted at or near the lowest price of the month in which the options were granted

### FY:99 Option Grants

196.    During FY:99, defendants Reyes, Byrd, Malavalli and non-parties C. Smith, Cuthbert Bonderson, Tarrant, and Rinkle received options at the lowest price of the month in which the options were granted.  Specifically, options granted on November 20, 1999 were recorded at $128.50 per share – the lowest stock price for the month of November.



### FY:00 Option Grants

197.    During FY:00, defendants Reyes and Byrd, together with non-parties C. Smith, Cuthbert, D. Smith, Rinkle and Bonderson, received options at or near the lowest price of the month in which the options were granted.  Specifically, options granted on February 1, 2000 were recorded at $76.88 per share – the lowest stock price for the month of February. Similarly, options on November 30, 2000 were recorded at $76.88 per share – the lowest stock price for the month of November.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



(1) On December 11, 2001, defendant Reyes and C. Smith disclosed this grant on a Form 5.
(2) On December 12, 2001, D. Smith disclosed this grant on a Form 5.
(3) On December 13, 2001, Cuthbert disclosed this grant on a Form 5.
(4) On December 14, 2001, Byrd disclosed this grant on a Form 5.
(5) On December 15, 2001, Bonderson disclosed this grant on a Form 5.
(6) On December 16, 2001, Rinkle disclosed this grant on a Form 5.

**FY:01 Option Grants**

198. During FY:01, defendants Reyes, Byrd and Canova, together with non-parties C. Smith, Cuthbert, D. Smith, Bonderson and Rinkle, received at least 8,461,967 options at the lowest price of the month in which the options were granted. Specifically, options granted on April

1  18, 2001 were recorded at $20.70 per share – the lowest stock price for the month of April.

2  Similarly options granted on October 2, 2001 were recorded at $12.90 per share – the lowest stock

3  price for the month of October.

4       199.  In connection with the April 18, 2001 grant, defendants Reyes and Dempsey executed

5  a UWC form that approved stock options to purchase 260,450 shares to Bonderson.  The consent

6  form was dated April 17, 2001.

7       200.  A set of Compensation Committee minutes were also purportedly dated on April 17,

8  2001.  These minutes reflect option grants to defendants Reyes, Byrd and Canova, together with

9  non-parties C. Smith, Cuthbert, D. Smith, Bonderson and Rinkle.  According to the minutes,

10  defendants Dempsey, Leslie and Reyes attended the April 17, 2001 meeting.  This meeting,

11  however, did not appear in the personal calendars for Dempsey and Leslie.  Moreover, Reyes was in

12  Boston, Massachusetts for the Boston Marathon on that day.  This leads to the strong inference, of

13  course, that a meeting of the Compensation Committee never occurred on April 17, 2001 and that

14  the minutes were fabricated.

15       201.



22       202.  As the following chart illustrates, the shares reflected in the April 17, 2001

23  unanimous consent form and Compensation Committee minutes were purportedly granted on April

24  18, 2001 at the lowest share price for April 6, 2001 through July 2, 2001.  On information and belief,

25  the dates on the April 17, 2001 Compensation Committee minutes and the unanimous consent form

26  were falsified.

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





**April 2001 Stock Option Grants**

On April 18, 2001, defendants and non-parties purportedly granted the following options at an exercise price of $20.70 per share the lowest share price for the period beginning April 6, 2001 through July 2, 2001 - to the following Brocade insiders:

| | | | |
|---|---|---|---|
| Paul R. Bonderson, Jr. (1) | 260,450 | Gregory Reyes (1) | 3,970,920 |
| Michael J. Byrd (1) | 1,139,050 | Victor Rinkle (1) | 172,840 |
| Jack Cuthbert | 541,760 | Charles W. Smith (1) | 110,030 |
| David A. Smith | 207,810 | Antonio Canova | 877,780 |

On May 16, 2001 defendant Canova disclosed this grant on a Form 3.

On June 8, 2001 defendants D. Smith and Cuthbert disclosed these grants on a Form 4. Form 4 was filed late

(1) On December 11, 2001 defendants and non-parties disclosed these grants on a Form 5.

203.    In connection with the October 2, 2001 grant, defendants Dempsey and Neiman executed a unanimous written consent form that was dated October 1, 2001. An exhibit attached to the form lists option grants to defendants Reyes, Byrd, Canova, Jensen, Cuthbert and several other Brocade employees. The form was signed by Dempsey and Neiman.

204.    A set of Compensation Committee minutes were also purportedly dated on October 1, 2001. According to the minutes, defendants Dempsey, Neiman, Reyes, Jensen and Canova attended the meeting.    Also according to the minutes, the Compensation Committee reviewed recommendations for executive compensation programs.    The committee approved these recommendations.

205.    As the following chart illustrates, the shares reflected in the October 1, 2001 unanimous consent form and reviewed during the October 1, 2001 Compensation Committee meeting were purportedly granted on October 2, 2001 at the lowest share price for the period of May 21, 2001 through December 11, 2001. On information and belief, the dates on the October 1, 2001 unanimous consent form and Compensation Committee minutes were falsified.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



206.    The following table provides an estimate as to the illegal paper profit that the defendants and non-parties identified in the prior charts gained as a result of their stock option manipulations:

| Defendants and Non-Parties | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Grant Date | Estimated Actual Exercise Price Range | | Estimated Paper Profit | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Bonderson | 12/10/1999 | 266,000 | $128.50 | $151.50 | $160.00 | $6,118,000.00 | $8,379,000.00 |
| | 12/11/2001 | 260,450 | $20.70 | $31.34 | $53.26 | $2,771,188.00 | $8,480,252.00 |
| | 12/11/2001 | 5,996 | $12.90 | $13.43 | $38.80 | $3,177.88 | $155,296.40 |
| | 12/15/2001 | 220,000 | $76.88 | $167.94 | $225.13 | $20,033,200.00 | $32,615,000.00 |
| Byrd | 12/10/1999 | 42,500 | $128.50 | $151.50 | $160.00 | $977,500.00 | $1,338,750.00 |
| | 12/11/2001 | 1,139,050 | $20.70 | $31.34 | $53.26 | $12,119,492.00 | $37,087,468.00 |
| | 12/11/2001 | 257,218 | $12.90 | $13.43 | $38.80 | $136,325.54 | $6,661,946.20 |
| | 12/14/2001 | 410,000 | $76.88 | $167.94 | $225.13 | $37,334,600.00 | $60,782,500.00 |
| Canova | 5/16/2001 | 377,750 | $20.70 | $31.34 | $53.26 | $4,019,260.00 | $12,299,540.00 |
| | 12/11/2001 | 178,756 | $12.90 | $13.43 | $38.80 | $94,740.68 | $4,629,780.40 |
| Cuthbert | 8/8/2000 | 35,832 | $128.50 | $151.50 | $160.00 | $824,136.00 | $1,128,708.00 |
| | 8/8/2000 | 200,000 | $81.00 | $89.32 | $213.69 | $1,664,000.00 | $26,538,000.00 |
| | 6/8/2001 | 541,760 | $20.70 | $31.34 | $53.26 | $5,764,326.40 | $17,639,705.60 |
| | 12/7/2001 | 205,451 | $12.90 | $13.43 | $38.80 | $108,889.03 | $5,321,180.90 |
| | 12/13/2001 | 542,000 | $76.88 | $167.94 | $225.13 | $49,354,520.00 | $80,351,500.00 |
| Malavalli | 12/10/1999 | 106,000 | $128.50 | $151.50 | $160.00 | $2,438,000.00 | $3,339,000.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| Reyes | 12/10/1999 | 500,000 | $128.50 | $151.50 | $160.00 | $11,500,000.00 | $15,750,000.00 |
| | 12/11/2001 | 4,800,000 | $76.88 | $167.94 | $225.13 | $437,088,000.00 | $711,600,000.00 |
| | 12/11/2001 | 3,970,020 | $20.70 | $31.34 | $53.26 | $42,241,012.08 | $129,263,851.20 |
| | 12/11/2001 | 1,262,113 | $12.90 | $13.43 | $38.80 | $668,919.89 | $32,688,726.70 |
| Rinkle | 12/10/1999 | 90,000 | $128.50 | $151.50 | $160.00 | $2,070,000.00 | $2,835,000.00 |
| | 12/11/2001 | 172,540 | $20.70 | $31.34 | $53.26 | $1,835,825.60 | $5,617,902.40 |
| | 12/11/2001 | 3,996 | $12.90 | $13.43 | $38.80 | $2,117.88 | $103,496.40 |
| | 12/16/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Smith, C. | 12/10/1999 | 104,164 | $128.50 | $151.50 | $160.00 | $2,395,772.00 | $3,281,166.00 |
| | 12/11/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| | 12/11/2001 | 110,030 | $20.70 | $31.34 | $53.26 | $1,170,719.20 | $3,582,576.80 |
| Smith, D. | 6/8/2001 | 207,810 | $20.70 | $31.34 | $53.26 | $2,211,098.40 | $6,766,293.60 |
| | 12/11/2001 | 3,826 | $12.90 | $13.43 | $38.80 | $2,027.78 | $99,093.40 |
| | 12/12/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Tarrant | 12/10/1999 | 166,664 | $128.50 | $151.50 | $160.00 | $3,833,272.00 | $5,249,916.00 |
| **Total Estimated Paper Profits** | | - | | - | | $670,634,521.08 | $1,259,165,650.00 |

## BACKDATING ISSUES RUIN A POTENTIAL ACQUISITION BY CISCO

207.    In mid-2004, Cudgma filed a whistleblower complaint alleging, *inter alia*, that Brocade had engaged in improper practices concerning the granting of stock options. In reaction to the complaint, the Audit Committee initiated an investigation and retained defendant WSGR to conduct a preliminary investigation – wholly ignoring the fact that WSGR had been Brocade's long-time outside general counsel during the thick of the backdating activity at the Company. As part of that investigation, WSGR interviewed several members of Brocade's human resources department, including defendant Jensen. Brocade later retained Morrison to further investigate Cudgma's complaint.

208.    During the course of the internal investigation, Morrison attorneys interviewed defendants Jensen and Reyes. During his interview, Reyes lied about his involvement in the backdating scheme. A mountain of incriminating evidence gathered from internal documents and interviews of Brocade employees, however, would later reveal the truth.

209.



AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



210.

211.    In the midst of the investigation, at some point in or about November 2004, Brocade entered into discussions with Cisco regarding a potential sale of the Company. Such a sale may have substantially enhanced shareholder value. Unfortunately, the deal would never materialize because Cisco would eventually learn about defendants' backdating scheme.

212.    On information and belief, defendant Sonsini played a role in orchestrating or facilitating the sale of Brocade to Cisco. Defendant Sonsini, as well as defendants Reyes and Canova, hoped that the successful sale of Brocade to Cisco would extinguish his liability for his involvement in the backdating of Brocade. Ultimately, however, the backdating proved to be a deal breaker.

213.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



214.

215.

216.

217.

218.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  223.  ███████████████████████████████████████

2  ███████████████████████████████████████

3  ███████████████████████████████████████

4  ███████████████████████████████████████

5  224.  On January 24, 2005, the Board decided to disclose the investigation findings and

6  pending restatement on January 24, 2005. The potential transaction with Cisco completely fell apart

7  soon after.

8  225.  ███████████████████████████████████████

9  ███████████████████████████████████████

10  ███████████████████████████████████████

11  **THE TRUTH BEGINS TO EMERGE**

12  226.  Despite attempts by defendants defendants Reyes, Jensen, Byrd and Canova to

13  conceal their illicit backdating practices, the impact of their actions on the Company began to be

14  incrementally disclosed in January 2005.  For example, on January 24, 2005, the Company

15  announced that, as a result of an internal review conducted by Brocade's Audit Committee, the

16  Company expected to record additional stock-based compensation charges from FY:99 through

17  3Q:03.  The press release further stated that "[f]or years prior to 2002, the Company will reduce

18  previously reported net income by approximately $304 million (consisting of a reduction to net

19  income in years 1999 and 2000 of $15 million and $1,019 million, respectively, and an increase to

20  net income in 2001 of $730 million) relating solely to stock based compensation and associated

21  income tax adjustments." Finally, it was disclosed that the Company would calculate the additional

22  historical stock-based compensation charges using the variable method of accounting under APB 25.

23  227.  On that same day, the Company announced that Reyes would no longer serve as

24  Brocade's Chairman and CEO.  Reyes, however, was not truly departing from the Company.

25  Instead, he was allowed to remain a director of Brocade and as an advisor to the Board and the new

26

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  CEO, defendant Klayko.[6]

2      228.    On January 31, 2005, Brocade filed a restatement of its fiscal 2002 and 2003 financial

3  statements. The Form 10-K containing the restatement was signed by defendants Klayko, Reyes,

4  Canova, Neiman, House, Krause, Dempsey, Sonsini, Moore, Paisley and Vaswani.

5      229.    According to the Company's Form 10-Q filed with the SEC on March 9, 2005,

6  Brocade incurred internal review costs of $3.7 million, primarily related to professional service fees.

7  Furthermore, Brocade estimated the Company will make adjustments pertaining to stock option

8  grants totaling $304 million in years 1999 and 2000 only. Estimates for adjustments to the

9  Company's cost of stock based compensation for FY:04, FY:03, FY:02 and FY:01 may exceed $52.6

10  million.

11      230.    Notwithstanding the fact that Brocade was forced to restate two years of financial

12  results as a result of the Director Defendants' acquiescence to misfeasance by Reyes, Jensen, Byrd

13  and Canova, on February 18, 2005, the Director Defendants announced they had unanimously

14  approved an *increase* in their own compensation as directors. Under this increase, in addition to

15  annual fees for sitting on the Board and each respective meeting thereof, each non-employee

16  receives $1,500 for each committee meeting the director attends in person and $1,000 for each

17  committee meeting in which the director participates telephonically. Moreover, the chairman of

18  each committee receives an additional cash payment of $5,000, and the non-employee lead director

19  will receive an annual cash payment of $15,000. The Director Defendants made this increase

20  retroactive to apply to all meetings conducted during FY:05, including meetings that had occurred

21  prior to the date of approval.

22      231.    Then, on May 16, 2005, Brocade announced that it would need to file a second

23  restatement of its fiscal year 2002 through 2004 financial results. On that same day, Brocade issued

24  a press release titled "Brocade Restates Financial Statements to Reflect Additional Stock-Based

25  _____

26  [6] The 2005 Proxy, filed with the SEC on February 28, 2005, announced that under the terms of the
employment agreement between Brocade and Reyes, the Company would pay Reyes $520,000 per
27  year for two years to serve as a consultant to the Company. Reyes also remained eligible for
incentive compensation of $390,000 per year plus reimbursement for expenses "incurred by Reyes in
28  the operation and use of his private plane and properties when used for Brocade business."

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Compensation Expense; Company Affirms That None of the Adjustments Impact Historical Revenues, Cash Positions, or Non-Stock Option Related Operating Expenses." The press release provided as follows:

> Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that none of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.

> Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

> After discovering the additional information regarding *non-compliance of its guidelines*, the Company commenced a review of certain other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods for up to three months from the start of the LOA. The expected charges relate principally to options that continued to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. *Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.*

> Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

> The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
|---|---|---|
| 2001 | $12.0 - $26.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.08 - $0.09 |

- 77 -

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

*The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices.* Brocade has no further information regarding the timing or scope of the investigation.

"It is not unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. "We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

232.    On June 8, 2005, the Company announced the delayed filing of its 2Q:05 Form 10-Q.

233.    On June 9, 2005, the SEC raised the level of its investigation from an informal inquiry to a formal order of investigation, which indicated that the agency was taking a much more serious view of the defendants' misconduct.

234.    On June 13, 2005, the Company issued a press release entitled "Brocade Receives NASDAQ Notification Related to Late Filing of Form 10-Q for Second Quarter of Fiscal 2005." The press release stated in part:

Brocade Communications Systems, Inc. today announced that on June 10, 2005, it received a notice from the Nasdaq Stock Market stating that the Company is not in compliance with Nasdaq's Marketplace Rule 4310(c)(14) because the Company has not timely filed its Report on Form 10-Q for the fiscal quarter ended April 30, 2005. As a result of the filing delay, an "E" will be added to Brocade's ticker symbol and Brocade will begin trading under the symbol "BRCDE" effective at the opening of business on June 14, 2005. The presence of an "E" does not constitute a trading halt or delisting.

235.    On June 30, 2005, the Company filed a Form 8-K with the SEC, which stated in part:

In a Form 8-K filed with the SEC on June 8, 2005, Brocade Communications Systems, Inc. (the "Company") announced that it was delaying the filing of its Form 10-Q for its second fiscal quarter ended April 30, 2005. In that same filing, the Company stated that its Audit Committee has been performing an independent review of the Company's stock option accounting regarding leaves of absence and transition and advisory roles from 2001 through 2004. The Company is working diligently to complete and file its amended Form 10-K for the fiscal year ended October 29, 2004, along with the restatement of its financial statements for prior fiscal years. However, until the Audit Committee review is completed, the Company is unable to complete and file its Form 10-Q for the second fiscal quarter ended April 30, 2005 and the amended 2004 Form 10-K.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*On June 24, 2005, the Company received a letter from the Trustee for the holder of the Company's 2% Convertible Subordinated Notes stating that the Company failed to provide to the Trustee its Form 10-Q for the second fiscal quarter ended April 30, 2005.* The letter further stated that if the Company does not file its Form 10-Q for the second fiscal quarter ended April 30, 2005 with the Trustee within 60 days of June 24, 2005, the date of the letter, *an Event of Default, as defined under the Indenture governing the Notes, will have occurred. If an Event of Default were to occur, the Trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding could attempt to declare all unpaid principal and premium, if any, and accrued interest on the Notes then outstanding to be immediately due and payable. Approximately $279 million in unpaid principal was outstanding under the Notes as of June 29, 2005.* The Company's total cash and investments as of April, 30, 2005, the end of the Company's second fiscal quarter, was approximately $746 million.

236.    In a Form 8-K filed with the SEC on July 27, 2005, Brocade announced the termination of the "agreement and employment arrangement between the Company and [defendant] Reyes." Additional information concerning the termination of Reyes' employment was not released.

237.    On August 23, 2005, Brocade filed a Form 8-K with the SEC that stated in part:

*On August 23, 2005, Brocade Communications Systems, Inc. (the "Company") made an irrevocable call for redemption of all of the Company's outstanding 2% Convertible Subordinated Notes Due 2007 (the "Notes") as of August 22, 2006 (the "Redemption Date") in accordance with the terms of the Indenture dated as of December 21, 2001 between the Company and U.S. Bank National Association* (as successor trustee to State Street Bank and Trust of California N.A.), as Trustee (the "Indenture"). *In connection with the call for redemption of the Notes, the Company deposited with the Trustee $276.1 million in interest-bearing U.S. Treasury securities* (the "Funds"), which will cover all interest scheduled to become due and owing on the Notes prior to the Redemption Date (which will continue to be paid from the Funds to the noteholders when due and payable) and all accrued interest, principal and call premium owing on the Notes on the Redemption Date, thereby fulfilling the Company's obligations to the noteholders. The Funds will remain on the Company's balance sheet as restricted securities until the Redemption Date. The Company's call for redemption of the Notes and deposit of the requisite principal, interest and call premium amount with the Trustee for the benefit of the noteholders discharged the Indenture effective as of August 23, 2005, subject only to the rights of the noteholders to receive payments of interest, principal and call premium from the Funds deposited with the Trustee and certain related rights. A call premium of 0.4% of the face value of the Notes will be due because the Notes will be redeemed prior to their due date of January 1, 2007.

*The Company expects to record a loss on investments of approximately $4.7 million in the quarter ending October 29, 2005* with respect to the disposition of certain short-term and long-term investments that was necessary to deposit the Funds with the Trustee.

In the event that the Company had not exercised the call for redemption of the Notes, the Company expected to be declared in default under the Notes due to the Company's inability to file its Form 10-Q for the quarter ended April 30, 2005 on or before August 23, 2005. *In such an event, $279.7 million in principal and accrued interest would have become immediately due and payable under the Notes.* The Notes would have otherwise been due in January 1, 2007.

- 79 -

The Company's total cash and investments as of July 30, 2005, the end of the Company's third fiscal quarter, was $733.8 million. As noted above, *the Funds deposited with the Trustee on August 23, 2005 will remain on the Company's balance sheet as restricted securities until the Redemption Date.*

238.    On September 9, 2005, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC for its 3Q:05 Form 10-Q. Brocade still had yet to file its 2Q:05 Form 10-Q.

239.    On November 14, 2005, the Company filed its second restatement of its fiscal 2002 through first fiscal quarter 2005 financial results. A Form 8-K filed by Brocade on that date stated in pertinent part:

As previously disclosed on Form 8-K filed with the Securities and Exchange Commission on May 16, 2005, Brocade Communications Systems, Inc. (the "Company") determined that *the Company's financial statements for the fiscal years ended October 30, 2004, October 25, 2003, and October 26, 2002, and the interim periods contained therein, should no longer be relied upon because of errors in such financial statements.* The Company has restated those financial statements, which appear in the Company's Annual Report on Form 10-K/A for the fiscal year ended October 30, 2004 (the "Form 10-K/A"). As a result of such restatements, on November 10, 2005, the Company, on management's recommendation and in consultation with the Company's Audit Committee and KPMG, LLP, the Company's independent registered public accounting firm, concluded that *the financial statements for the first fiscal quarter of 2005 ended January 29, 2005, should no longer be relied upon because of an error in such financial statements.*

Specifically, the Company concluded that the Company's balance sheet for the first quarter of fiscal 2005 ended January 29, 2005 needs to be restated to reflect the cumulative effect of the restatements previously announced on additional paid-in capital and retained earnings. The restatement of the financial statements for the quarter ended January 29, 2005 relates exclusively to reclassifications within shareholders equity related to the cumulative effect of the foregoing restatements.

240.    Although the Director Defendants failed and refused to adequately investigate the cause of Brocade's restatements, on November 14, 2005, they caused or allowed the Company to list a number of changes it had made to its stock option program's internal controls in response to certain of the material weaknesses present in Brocade's internal controls. In this second restatement, the Company added approximately *$71 million* in stock-based compensation expenses. The amended FY:04 Form 10-K stated in pertinent part:

*Changes from December 2002 through October 30, 2004*

1.    Improvements in Disclosure Controls and Internal Control over Financial Reporting:

- We improved the documentation of our significant accounting policies, which are reviewed with our Audit Committee.

- Improvements have been made to the Audit Committee charter and committee functions. The Audit Committee charter was expanded to include in its scope the responsibility to review and approve all new or changes to, significant accounting policies and positions. In addition, we expanded both the number of Audit Committee meetings from four to eight standing meetings, and the duration of those meetings. This allows a more in-depth review of complex accounting issues.

- We formed a Disclosure Committee composed of representatives from our accounting, legal and investor relations departments, and our financial management, the minutes of which are reviewed with the Audit Committee.

2. *Improvements in stock option granting process and related Internal Controls*:

- We implemented cross functional teams composed of members of our legal, accounting and human resources departments to develop improvements in the stock option granting process.

- We formalized guidelines relating to the size and vesting schedule of stock option grants for all new employees and on-going employee grants.

- We improved the documentation of the actions of the Compensation Committee and grant subcommittee regarding stock option granting.

- We made personnel changes in areas associated with the stock option granting process to increase the levels of experience of the personnel involved.

- We increased the frequency of stock option grants, moving to grants on a two to three week routine cycle, and significantly reduced the processing time between grant dates and the delivery of option paperwork to employees.

**Changes Subsequent to October 30, 2004**

Subsequent to October 30, 2004, we have taken a number of steps to strengthen our disclosure controls and procedures and internal control over financial reporting. These remedial measures include personnel and procedural changes to improve the stock option granting and employee change in status processes. Specifically, we have implemented the following additional internal control improvements:

- Increased the Compensation Committee of the Board of Directors to three independent members.

- The Compensation Committee refined and limited delegation of authority to a subcommittee to grant stock options.

- Documented into a formal written policy our stock option granting process.

- 81 -

- Created a pre-determined schedule for employee stock option grants, including enhancements with respect to the grant routine cycle.

- Adopted a policy not to grant executive officers options when trading is restricted for executives under the Company's Insider Trading Policy.

- Improved the documentation and revised the approval process for initial, or changes to, policies associated with change in employee status, including leaves of absence and in transition and advisory roles.

- Established cross-functional teams comprised of members of our accounting, information technology and human resource departments to develop improvements in the employee change of status systems and processes.

- Performed additional training for personnel in areas associated with the stock option granting and employee change in status processes to increase competency levels of the personnel involved.

We also completed further testing of the policies and procedures and related controls that we recently implemented as discussed above.

241.    On November 16, 2005, the Company issued a press release announcing its preliminary 4Q:05 financial results.  In it, Brocade stated that its GAAP earnings per share was expected to include charges of approximately: (i) *$4.9 million related to the internal review and SEC investigation*; and (ii) $0.7 million for stock-based compensation.

242.    On November 22, 2005, the Company issued a press release announcing the resignation of defendant Moore from the Company's Board.  Brocade disclosed no reasons for his departure.

243.    On December 6, 2005, the *Silicon Valley/San Jose Business Journal* published an article entitled "*Probe Costs Drag Down Brocade Earnings.*"  The article stated in pertinent part:

Earnings reported Tuesday by Brocade Communications Systems Inc. fell sharply on the costs of an internal probe related to a Securities and Exchange Commission inquiry.

San Jose-based Brocade's posted net income of $1.1 million, or 0 cents per share, compared to $20.3 million, or 8 cents a share, a year ago.

*This year's fourth quarter results included $5 million in inquiry expenses and a $5.2 million pretax loss on investments. The Securities and Exchange Commission and Justice Department are investigating Brocade's treatment of stock options expensing.*

Without the special charges, Brocade would have earned $19 million, or 7 cents a share, in the quarter, 2 cents better than a survey of analysts predicted.

Revenue fell 6 percent from a year ago to $145.5 million.

- 82 -

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

244.    On December 21, 2005, the Company announced defendant Canova's resignation as CFO. Brocade disclosed no explanation for his departure.

245.    On January 13, 2006, the Company filed a Form NT 10-K, indicating that it would not be able to timely file its FY:05 Form 10-K.

246.    On January 23, 2006, the Company filed a Form 8-K with the SEC that announced that Brocade and its Board, along with defendants House, Krause, Moore, O'Brien, Paisley, Sonsini, Neiman, Dempsey and Vaswani, had entered into a tolling agreement with defendant Reyes (the "Tolling Agreement"). Under the terms of this agreement, all periods of limitation (statutory or otherwise) affecting any claims or causes of action that Reyes may have against Brocade and its directors or any of them, or which Brocade and the above-mentioned defendants may have against Reyes, shall be tolled from January 1, 2006 until the earlier of (1) January 1, 2008, or (2) forty-five days from the date of service upon the attorneys for the parties hereto of a written notice terminating this agreement. This announcement centered on Reyes' plan to file a lawsuit against the directors on January 24, 2006. Apparently, the Board was able to persuade Reyes to delay the filing of his suit by extending the statute of limitations on a potential wrongful termination charge.

247.    On February 13, 2006, BUSINESS WEEK published an article entitled "Brocade: Stung By Stock Options," which discussed the supposed disputes between members of the Board. Significantly, defendant Reyes is reported to have said that defendant Sonsini urged the Board to make Reyes a "committee of one" to dole out options as he wished in 1999. The article stated, in pertinent part:

> After Greg Reyes suddenly resigned as chief executive of Brocade Communications Inc. a year ago, the reputation of the swashbuckling onetime billionaire immediately went from gold to mud. The reason: His ouster came just weeks after Brocade announced options accounting irregularities that required a restatement of earnings. But now, more than his image is on the line. Three sources tell BusinessWeek that the Securities & Exchange Commission is likely to bring civil charges against him in the coming weeks. The Justice Dept. is also investigating a criminal case. "I'm scared," says Reyes.
>
> He should be. *Twice in the last year, Brocade admitted that it incorrectly accounted for options it granted new hires. The probe comes when the government is investigating many former tech high-fliers for similar practices. Predicts one tech lawyer, "Someone is going to get the opportunity to be the Martha Stewart of options pricing, and Brocade is a leading candidate."*

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

But Reyes, who loves to hunt big game, plans to fight back. And he plans to do it in a way that could put a spotlight on Brocade's board -- including Silicon Valley super-lawyer Larry W. Sonsini, who left the board soon after Reyes' departure. The 43-year-old Reyes insists he did nothing to enrich himself and says the mistakes were primarily paperwork errors by a former human resources executive. *Even if he had approved the practices, he says, it would have been within his authority, given the sweeping powers the board gave him in 1999.* Now, he argues, seven current and former directors are scapegoating him to minimize their own liability. "What better way to do that than to throw me under the bus," he says. Neither Brocade, Sonsini, the SEC, or the Justice Dept. would comment for this story.

Reyes was planning to file a civil suit against the directors on Jan. 24, before Brocade persuaded him to hold off by extending the statute of limitations on a potential wrongful termination charge. And he's also mulling a shareholder suit, alleging that the investigation by the board's audit committee did far more to hurt investors than the alleged accounting miscues. In particular, he says he was in the final stages of selling Brocade to Cisco Systems Inc. (CSCO ) for $9 a share in November, 2004. Brocade makes data storage gear and was one of the hottest stocks of the Net bubble, with a onetime market cap of $24 billion. But talks with Cisco stalled after the board disclosed the investigation. Other inside sources say that Cisco got cold feet after finding the accounting irregularities on its own but confirm that Reyes' departure two months later further diminished its interest. Cisco declined to comment.

Much of Reyes' ire is saved for Sonsini, a power broker who has advised everyone from Steve Jobs to Google (GOOG ) during a storied 40-year-career. *Reyes says Sonsini urged the board to make Reyes a "committee of one" to dole out options as he wished in 1999.* The next he heard from the board, he claims, was after a disgruntled former employee threatened to file a whistleblower suit in 2004 alleging improprieties related to options.

*After an investigation, Reyes says Sonsini persuaded him to resign because the evidence pointing to him was "overwhelming and conclusive." Only after Reyes had seen the evidence and, unimpressed, tried to rescind his resignation did Sonsini reveal that Brocade's outside auditor had refused to certify Brocade's financials with Reyes as CEO, says Reyes. His argument: that members of the board overstated his role in order to deflect the auditor's attention from themselves.*

With possible SEC charges looming, Reyes is pressing his demands. He told Brocade he would drop talk of lawsuits if it publicly exonerates him, puts him back on the board, and pays him a rich consulting package it rescinded last summer. But if the government's case is as strong as some insiders close to Brocade hint it is, this big-game hunter may be feeling less like the pursuer and more like prey.

248.    On February 8, 2006, the Company filed a Form 8-K with the SEC, which announced that Brocade's Nominating and Corporate Governance Committee approved a one-time payment of $100,000 to defendant House in recognition of his role as Chairman during the previous year. The filing also announced that defendants Paisley and Neiman notified the Company that they would not be standing for re-election to the Board at the Company's 2006 Annual Meeting of Stockholders.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

249.    On February 17, 2006, BUSINESS WEEK published an article entitled "The Plot Thickens at Brocade," which highlighted the personnel-related disclosures made on February 8, 2006. The article stated in pertinent part:

> Turns out that, according to a Feb. 8 government filing, two of Brocade's board members will not stand for reelection at the company's annual meeting on April 17.
>
> One of those directors is **Seth Neiman**, a managing partner at Crosspoint Venture Partners. *He's considered a father of the company, given that he provided initial funding and management aid even before there was a business plan.* My sources suggest his departure is no big surprise, as Nieman has talked about wanting to step off the board for the last few years.
>
> More interesting is the departure of former 3Com Corp. chief financial officer **Chris Paisley**. *As head of the board's audit committee, he's had a central role in the saga of the past year.* He launched the sweeping internal investigation into the company's books that began in late 2004, after a disgruntled former sales manager threatened to bring a whistleblower suit to the SEC alleging options accounting naughtiness, if the company didn't renege on a threat to foreclose on his house to get repayment of a loan granted to him when he was hired. The investigation led to massive restatements, a public acknowledgement of accounting problems and possibly "improprieties", and the ouster of Reyes, a larger-than-life personality in this niche of the networking market who was seen as the driving force behind the company.
>
>        \* \* \*
>
> While on the topic of Brocade, there's one more recent item of note, also announced in that 8-K filing from Feb. 8. *The company announced it was paying boardmember Dave House, a former executive at Intel and Nortel, a one-time $100,000 bonus for his work over the past year. That's interesting because, according to multiple sources, House was originally picked to replace Reyes.* Only after many top executives protested that House lacked sufficient knowledge of the close-knit storage networking business did the board decide to give the job to company executive Mike Klayko, who was running sales at the time.
>
> Brocade, House and Klayko all declined to comment, citing the SEC investigation.

250.    On May 12, 2006, Brocade filed a Form 8-K with the SEC that announced in pertinent part:

> On May 12, 2006, Brocade Communications Systems, Inc. filed a Schedule TO ("Tender Offer") with the Securities and Exchange Commission. *The Tender Offer was filed to address recent changes to tax laws that could have serious, unfavorable personal tax consequences for some of Brocade's employees who received certain stock options that were or may have been granted at a discount from fair market value at the time of grant.* Specifically, under Section 409A of the Internal Revenue Code, certain options granted at a discount may trigger certain adverse tax consequences, including income tax at vesting, an additional 20% tax and interest charges, in addition to standard federal, state and other applicable taxes.

- 85 -

1     251.    On June 5, 2006, MercuryNews.com released an article entitled "Company's

2 Recruiting Perks Under Fire in Suit," which elaborated on certain disreputable hiring practices by

3 Brocade since at least 1999. The article stated in pertinent part:

4        It was boom time in Silicon Valley and Greg Reyes wouldn't take no for an answer.

5            The CEO of Brocade Communications wanted David Smith, a senior
         executive at a Houston software firm, to join the hot, newly public company. So he
6        dangled a big relocation bonus and 200,000 options to buy Brocade's stock at
         $149.06 a share.

7
             *Reyes set the price in a Jan. 6, 2000, offer letter -- well before Smith started*
8        *working at Brocade in April. With Brocade's stock surging, that gave Smith a big*

9        *head start to millions of dollars in potential profits.*

10            *Smith, a shareholder lawsuit claims, was among a number of employees*
         *who benefited from Brocade's "pervasive scheme" to manipulate option grants.*
11
             *The suit provides a glimpse at how one company allegedly used deliberately*
12       *timed option grants as a recruiting tool during the dot-com boom.* Brocade is one of
         more than two dozen companies nationwide where options practices -- including
13       backdating of grants to take advantage of lower stock prices -- are now being
         investigated by federal regulators or the companies themselves.
14
             Reyes couldn't be reached for comment and his attorney didn't return calls or
15       e-mails. A spokeswoman for Brocade wouldn't comment on pending litigation.
         Smith, who was later fired by Brocade and now lives in Florida, declined to
16       comment.

17           Smith eventually netted $7.4 million from his sale of Brocade shares in 2000
         and 2001, the San Jose-based data storage networking company said in court
18       documents.

19                                         *   *   *

20           The 112-page shareholder lawsuit, initially filed in May 2005 and
         consolidated as a class action in April, cites Smith's situation as *one of several*
21       *examples of how Brocade allegedly violated its own rules for granting options, hid*
         *the actual costs from shareholders and regulators, and defrauded investors.*
22
             Much of the activity occurred during the dot-com boom, when Silicon Valley
23       companies were competing fiercely for skilled workers.

24           "You had a hiring frenzy and stocks going through the roof. Mix in some
         desperate hiring managers and lax controls around option grants, and it's not
25       surprising that some of the sloppiness evolved into abuse. This is where it all ends
         up," said Tim Sparks, president of Compensia, a compensation consultant in San
26       Jose. His firm was hired in May to advise Brocade's current board.

27           *The lawsuit in San Francisco federal district court claims Brocade*
         *recruited employees by giving them offer letters with early, often false, start dates*
28       *for employment — so they could get the lowest possible price on options. Some*
         *came in to fill out paperwork just to get an early start date and were put on leaves*

                                         - 86 -

*of absence from Brocade while they finished their employment at another company, the suit says.*

*The suit alleges that Reyes had the authority to ``dole out'' options ``as a committee of one'' and that he also at times held ``ad hoc'' board meetings with other executives to approve option grants.*

Reyes stepped down as CEO in January 2005, a few weeks after the company's first announcement that it would restate financials. But he stayed on as a consultant until June 2005.

Brocade disclosed May 16, 2005, that the Justice Department and the Securities and Exchange Commission were investigating its option-granting practices.

Leslie Davis, a spokeswoman for Brocade, said the company will address some of the litigation issues in its next quarterly SEC filing. Brocade is in "active" settlement talks with the SEC and has set aside $7 million for a potential settlement, she added.

Spokesmen for the SEC and the Justice Department declined to comment on Brocade.

Attorneys at Wilson Sonsini Goodrich & Rosati, who represent Brocade and its board, did not return calls seeking comment.

Making changes

Brocade recently has moved to improve its controls and accounting practices. The company, which went public in 1999, has restated every year of its financials through 2004.

*One of its most telling restatements was for fiscal 2000, ended Oct. 31, 2000. Brocade said that it actually lost $951.2 million or $4.59 a share, instead of earning $68 million, or 65 cents a share. The $1 billion difference, the company said, was related to its stock-based compensation and associated income tax adjustments.*

Brocade also said in SEC filings in 2005 that restatements were necessary because it had incorrectly accounted for option grants to new hires, part-time employees, employees on leaves of absence or in transitory roles with the company, from 1999 to 2004.

*The shareholder suit against Brocade was based on information from nine former employees, several of whom were recruiters or worked in human resources handling offer letters and other paperwork.* The Arkansas Public Employee Retirement System, claiming a loss of $1.9 million, is the lead plaintiff in the shareholder suit.

Smith's Jan. 6, 2000, letter offered him a job as a vice president, with a base salary of $240,000 a year and 200,000 options, with the grant date being his first day of employment. "Therefore, with your start date of Jan. 6, 2000, your stock will be priced at $149.063 per share," wrote Reyes, in the letter, which was an exhibit in a separate lawsuit by Brocade against Smith.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        In that suit, Smith stated that he started working full time at Brocade in April
2000 -- significantly later than the supposed January start date.

2

3       *Another former Brocade employee who allegedly had a confrontation with*
*Reyes was named in the shareholder suit as the whistle-blower in the federal*
*investigations of Brocade. Daniel Cudgma was hired as a vice president in sales,*
4    *the suit says. A former employee in the recruiting department quoted in the suit*
*recalled "a rush to get approvals and the t's crossed and i's dotted so Cudgma*
5    *could take advantage of a lower strike price.*

6       *After a disagreement with Reyes, the suit contends, Cudgma "threatened to*
*expose the whole backdating thing" and was fired.*

7

8       Cudgma, who is now a vice president of sales of Gryphon Networks outside
of Boston, did not return calls.

9    252.    The Individual Defendants have thus far refused to admit that they caused and/or

10  allowed Brocade to engage in improper backdating of stock options. Instead, their acquiescence to

11  the backdating scheme by defendants Reyes, Jensen, Byrd and Canova continue as they attempted to

12  fortify any losses they themselves might incur. For example, in a Form 8-K filed with the SEC on

13  May 12, 2006, the Individual Defendants acknowledged that the tender offer was intended to

14  alleviate "serious, unfavorable personal tax consequences for some of Brocade's employees who

15  received certain stock options that were or may have been granted at a discount from fair market

16  value at the time of grant."

17    253.    On June 12, 2006, Brocade filed a Form 8-K with the SEC in which the Company

18  detailed agreements, totaling over $683,000, entered into with certain of the Individual Defendants,

19  among others, pursuant to the Tender Offer announced on May 12, 2006. The Form 8-K stated in

20  pertinent part:

21    Effective June 12, 2006, Brocade Communications Systems, Inc. (the "Company")
completed its previously disclosed Tender Offer (see Form 8-K filed May 12, 2006).
22    As previously announced, the Tender Offer was filed to address recent changes to tax
laws that could have adverse personal tax consequences for some of Brocade's
23    employees who received stock options that were or may have been granted at a
discount from fair market value at the time of grant. Four of the Company's executive
24    officers elected to participate in the Tender Offer and, as a result, have entered into
definitive agreements with the Company in connection with the Tender Offer,
25    effective as of June 12, 2006. Each of the agreements with the executive officers who
participated in the Tender Offer is detailed below and was entered into on the same
26    terms and conditions as were available to all participants in the Tender Offer:

27    •   *Michael Klayko*, Chief Executive Officer, elected to amend a portion
of his nonqualified stock option grant dated August 15, 2003 to increase the
28    exercise price per share from $5.53 to $5.64. In consideration for the

1    amendment to his option, Mr. Klayko will receive a cash payment of
2    *$18,333.37* promptly following January 1, 2007.

3    •    **Richard Deranleau**, Chief Financial Officer, Vice President and
     Treasurer, elected (i) to amend a portion of his nonqualified stock option
     grant dated December 10, 2003 to increase the exercise price per share from
4    $5.52 to $5.78 and to receive a cash payment promptly following January 1,
     2007 of *$1,040.00* in consideration for the amendment to such option, (ii) to
5    amend a portion of his nonqualified stock option grant dated June 9, 2004 to
     increase the exercise price per share from $5.68 to $5.71 and to receive a
6    cash payment promptly following January 1, 2007 of *$367.50* in
     consideration for the amendment to such option, and (iii) to cancel a portion
7    of his nonqualified stock option grant dated July 28, 2003 in consideration
     for a cash payment to be made promptly following January 1, 2007 of
8    *$40,327.53*.

9    254.    Thus, rather than pursuing action against the recipients of the benefits of the

10   Company's fiscal woes, the defendants on the Board at the time of the Tender Offer remained more

11   concerned with preventing any financial loss to themselves or their colleagues.

12                              **THE PROPOSED SETTLEMENT**

13   255.    Not only did the Board, defendants KPMG, Sonsini and WSGR fail to uncover and/or

14   stop the improper option backdating and refuse to completely scrutinize the causes of the Company's

15   four-year restatement, which was rendered inaccurate by the lack of any meaningful investigation,

16   the Board has further caused Brocade to enter into the Proposed Settlement. According to the

17   Amended Stipulation of Settlement, the Federal Derivative Action plaintiffs have agreed to release

18   all defendants, except defendant Reyes, in the Federal Derivative Action for *all derivative claims*

19   alleged prior to January 2006 in exchange for some illusory corporate therapeutics and $525,000 in

20   attorney's fees. Under the terms of the Proposed Settlement, Brocade would have received no

21   compensation at all for the damages it incurred, the extent of which is still unfolding and being

22   revealed. Moreover, the Proposed Settlement would have released all claims relating to defendants'

23   backdating of stock options that are now the subject of civil and criminal charges against several of

24   defendants herein without any monetary recovery for Brocade. The unfair, unreasonable and

25   inadequate Proposed Settlement was the latest act in defendants' continuing conspiracy to cover up

26   their rampant backdating and escape liability. In effect, they hoped that his settlement would be

27   their "get out of jail free card."

28

1    256.    Defendant Wall played an active role in the events leading up to the Proposed

2    Settlement.  For example, during a September 21, 2007 hearing in the State Derivative Action, the

3    Court asked counsel for Brocade the following question: "Was [Wall] involved in the negotiation

4    for the settlement that is currently pending in federal court?"  Brocade's counsel responded that "he

5    was."  On information and belief, plaintiff alleges that defendant WSGR played a similarly active

6    role in the negotiation of the Proposed Settlement.

7    257.    On August 18, 2006, United States District Court Judge Charles Breyer refused to

8    approve the Proposed Settlement stating that attorneys on both sides had not "presented [him] with

9    anything other than the lawyers saying we think this is a good idea."  On October 6, 2006, the parties

10   in the Federal Derivative Action provided Judge Breyer with supplemental briefing on the supposed

11   adequacy of the Proposed Settlement.  The federal court never granted final approval to the Proposed

12   Settlement.

13   258.    It is no surprise that the Court refused to approve the Proposed Settlement.  As it

14   stood, apart from the uncertain and wafer-thin proposed corporate therapeutics, Brocade would have

15   received no compensation for the monumental damages that it has incurred and continues to suffer,

16   the extent of which is still being revealed.  Moreover, the Proposed Settlement would have released

17   all claims relating to defendants' conspiracy and backdating of stock options that are now the subject

18   of civil and criminal charges – without providing any monetary recovery for Brocade.  Likewise, the

19   Proposed Settlement contemplated the release of Brocade's valuable claims against defendants

20   KPMG and WSGR for no consideration whatsoever.

21   259.    Currently, Brocade has withdrawn from the Proposed Settlement.

22   **CIVIL AND CRIMINAL CHARGES ARE BROUGHT AGAINST BROCADE AND**
     **DEFENDANTS REYES, JENSEN, CANOVA AND BYRD**

23

24   260.    On July 20, 2006, the SEC announced that it had filed civil charges against

25   defendants Reyes, Jensen and Canova [7] A criminal case was simultaneously brought by the United

26

27   [7] *See supra*, ¶22a.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

States Attorney for the Northern District of California against Reyes and Jensen.[8] An article by *The*

WALL STREET JOURNAL, entitled "Brocade Ex-CEO, 2 Others Charged In Options Probe" released

on July 21, 2006, explained the charges in both actions. It stated, in pertinent part, as follows:

> *Federal authorities issued civil and criminal securities-fraud charges against a former Silicon Valley chief executive and two other executives in a stock-options backdating scheme, signaling they will take a hard line in the widening scandal.*
>
> Prosecutors accused 43-year-old Gregory Reyes, the CEO of Brocade Communications Systems Inc. until January 2005, of backdating options he doled out as a "committee of one" to hundreds of employees, boosting the potential value of the -options and concealing millions of dollars of compensation expenses from shareholders.
>
> *Officials underscored how seriously they view options manipulation by charging not just Mr. Reyes -- who isn't directly accused of backdating his own grants, and who made no profit from them -- but also a former chief financial officer and former vice president for human resources at the firm.*
>
> They also indicated that many more executives could face charges related to manipulating options. Securities and Exchange Commission Chairman Christopher Cox said the agency is investigating more than 80 companies.
>
> *"The full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating," he said at a San Francisco news conference.* He said additional cases likely would be brought in the "coming weeks and months."
>
> The crux of the case brought yesterday is that Mr. Reyes altered the dates of option grants to new employees to increase their value and give Brocade, a San Jose, Calif., maker of switching devices for data-storage networks, an edge in the cutthroat scramble for talent during Silicon Valley's boom days. In doing so, prosecutors said, he violated accounting rules by not recording the proper expenses for the options.
>
> *Under a criminal complaint from the U.S. attorney for the Northern District of California, Mr. Reyes faces a single count of securities fraud, which carries a maximum penalty of 20 years in prison. Also facing a criminal-fraud charge is Stephanie Jensen, 48, Brocade's human-resources director from October 1999 through February 2004. She is accused of helping Mr. Reyes with the scheme.*
>
> Both also face civil charges from the SEC of securities fraud and filing false documents. *Antonio Canova, 44, who served as the company's finance chief from May 2001 until he left in December, also was charged in the civil* case but not in the criminal action.
>
> *     *     *

---

[8] *See supra*, ¶22b.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> *The SEC's Mr. Cox warned that backdating "deceives investors and the market as a whole about the financial health of companies that cheat in this way." He added, "It is poisonous to an efficient marketplace."*

                                    *  *  *

The charges against Ms. Jensen and Mr. Canova suggested that federal officials won't hesitate to pursue those further down the corporate ladder who allegedly participated in an options-timing fraud.

John Coffee, a law professor at Columbia Law School, said human-resources officials could find themselves in the hot seat as prosecutors attempt to persuade them to cooperate in investigations of senior executives. "This is going to send a shiver through the spines of much of corporate America," he said.

> *The SEC also showed it won't take a kind view of executives who knew about backdating but signed off on financial statements. The agency said that's what Mr. Canova did, despite hearing misgivings from some employees about the practice. The SEC also alleged that he "helped facilitate" the fraud by directing others to ensure that option dates matched hiring dates in employee records.*

261.    On August 17, 2007, the SEC filed a new enforcement action against defendant Byrd arising out of his alleged role in the backdating activity at Brocade, which subsequently was consolidated into the SEC action against defendants Reyes, Jensen and Canova. Among other things, the SEC's complaint against Byrd accuses him of allowing Brocade "to represent to shareholders that the Company did not incur expenses to employees, including executives." According to the complaint, Byrd violated the antifraud, books and records and other provisions of the federal securities laws. The SEC is seeking civil monetary penalties and disgorgement of Byrd's ill-gotten gains.

262.    Thus, even as the architects of Brocade's fiscal woes began to confront the criminal and civil enforcement consequences of their misconduct, the remaining Individual Defendants, who participated in, facilitated knowingly or recklessly acquiesced to the scheme, have denied any role in the backdating scandal that now embroils Brocade. Instead, on July 20, 2006, the Individual Defendants caused or allowed the Company to issue a press release, entitled "Brocade Statement Regarding Stock Option Matters," in which they proclaimed that "[n]o executive officers involved in the historical stock option granting practices remain employed with Brocade."

263.    The July 20, 2006 press release further disclosed that the Company had reserved $7 million for a proposed settlement with the SEC. This disclosure was a harbinger of the damages that would be paid by Brocade about a year later to settle the enforcement action eventually filed by the

1  SEC in May 2007 against the Company itself that arose out of the illicit backdating activity

2  described herein.  On August 27, 2007, a final judgment against Brocade was entered based on an

3  agreement between the Company and the SEC.  In addition to a variety of permanent injunctive

4  relief set forth in the judgment, Brocade was ordered to pay a civil penalty of $7 million within ten

5  days after entry of judgment.

6       264.    In the first U.S. felony criminal conviction by a jury arising out of the backdating of

7  stock options, defendant Reyes was found guilty in the U.S. District Court for the Northern District

8  of California on August 7, 2007 of one count of conspiracy, one count of securities fraud, three

9  counts of filing false documents with the SEC, one count of falsifying Brocade's books and records

10  and four counts of lying to an accountant.  Following a jury trial, defendant Jensen also was

11  convicted in the same Court on December 5, 2007 on two criminal counts – conspiracy to falsify

12  books, records and accounts in violation of 18 U.S.C. §371; and falsifying books, records and

13  accounts in violation of 15 U.S.C. §§78m(b)(2)(A), 78m(b)(5), and 78ff, 17 C.F.R. §240.13b2-1, all

14  arising out of her role in the illegal employee compensation scheme that took place at Brocade

15                              **IMPROPER FINANCIAL REPORTING**

16       265.    The Individual Defendants and defendant KPMG, by their fiduciary duties of care,

17  good faith and loyalty, owed to Brocade a duty to ensure that the Company's financial reporting

18  fairly presented, in all material respects, the operations and financial condition of the Company.  In

19  order to adequately carry out these duties, it was and remains necessary for the Individual

20  Defendants to have known and understood, and know and understand, the material, non-public

21  information to be either disclosed or omitted from the Company's public statements.  This material,

22  non-public information included the presence of material weaknesses in Brocade's internal controls.

23  Further, defendants Neiman, Dempsey, Moore, Leslie, Krause, Sonsini, Paisley and O'Brien, as

24  members of the Audit Committee at various times since at least 1999, had a special duty to know and

25  understand this material information as set out in the Audit Committee's charter which provides that

26  it is responsible for, among other things, oversight of: (i) the quality and integrity of the Company's

27  accounting and financial reporting processes and the audits of its financial statements; (ii) the

28  performance of the Company's systems of internal controls, disclosure controls and internal audit

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  functions; and (iii) the Company's procedures for legal and regulatory compliance, risk assessment
2  and business conduct standards. Defendants Byrd, Canova, Klayko, Deranleau, Jensen, Reyes and
3  House, along with non-parties Cuthbert, D. Smith and Bonderson and, as officers of Brocade, had
4  ample opportunity to discuss this material information with their fellow officers at management
5  meetings and via internal corporate documents and reports. Moreover, defendants House, Klayko,
6  Reyes, Neiman, Dempsey, Walker, Moore, Vaswani, Leslie, Krause, Jones, Rose, Sonsini, Paisley
7  and O'Brien, as directors of Brocade, had ample opportunity to discuss this material information with
8  management and fellow directors at any of the approximately thirty-four Board meetings that
9  occurred between 1999 and 2004. Defendant Paisley had a heightened duty stemming from his
10  financial expertise. Paisley is a professor of Accounting and Finance at Santa Clara University and
11  has been since January 2001. Despite these duties, the Individual Defendants and KPMG
12  negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the
13  following improper statements to be disseminated by Brocade to the investing public and the
14  Company's shareholders since at least 1999.

15  <div align="center">**The FY:99 Form 10-Q and Form 10-K**</div>

16      266.    On September 15, 1999, the Individual Defendants caused or allowed Brocade to file
17  Form 10-Q for the 3Q:99. On January 31, 2000, the Individual Defendants caused or allowed the
18  Company to file its FY:99 Form 10-K with the SEC. The FY:99 Form 10-K was subsequently
19  amended. Accordingly, on February 28, 2000, the Individual Defendants caused or allowed the
20  Company to file its FY:99 Form 10-K/A with the SEC. The FY:99 Form 10-Qs and 10-K were
21  simultaneously distributed to shareholders and the public. The FY:99 Form 10-Qs and 10-K
22  included Brocade's FY:99 financial statements which were improperly presented in violation of
23  GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's
24  compensation expense was understated and its net earnings were overstated.

25  <div align="center">**The FY:00 Form 10-Qs and Form 10-K**</div>

26      267.    On March 13, 2000, June 13, 2000 and September 12, 2000, the Individual
27  Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:00, 2Q:00 and 3Q:00,
28  respectively. On January 26, 2001, the Individual Defendants caused or allowed the Company to file

1   its FY:00 Form 10-K with the SEC.  The FY:00 Form 10-Qs and 10-K were simultaneously

2   distributed to shareholders and the public.  The FY:00 Form 10-Qs and 10-K included Brocade's

3   FY:00 financial statements which were improperly presented in violation of GAAP, due to improper

4   accounting for the backdated stock options.  As a result, Brocade's compensation expense was

5   understated and its net earnings were overstated.

6                            **The FY:01 Form 10-Qs and Form 10-K**

7           268.    On March 13, 2001, June 12, 2001 and September 11, 2001, the Individual

8   Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:01, 2Q:01 and 3Q:01,

9   respectively.  On January 24, 2002, the Individual Defendants caused or allowed the Company to file

10  its FY:01 Form 10-K with the SEC.  The FY:01 Form 10-Qs and 10-K were simultaneously

11  distributed to shareholders and the public.  The FY:01 Form 10-Qs and 10-K included Brocade's

12  FY:01 financial statements which were improperly presented in violation of GAAP, due to improper

13  accounting for the backdated stock options.  As a result, Brocade's compensation expense was

14  understated and its net earnings were overstated.

15                           **The FY:02 Form 10-Qs and Form 10-K**

16          269.    On March 12, 2002, May 30, 2002 and August 27, 2002, the Individual Defendants

17  caused or allowed Brocade to file Form 10-Qs for the 1Q:02, 2Q:02 and 3Q:02, respectively.  On

18  January 22, 2003, the Individual Defendants caused or allowed the Company to file its FY:02 Form

19  10-K with the SEC.  The FY:02 Form 10-Qs and 10-K were simultaneously distributed to

20  shareholders and the public.  The FY:02 Form 10-Qs and 10-K included Brocade's FY:02 financial

21  statements which were improperly presented in violation of GAAP, due to improper accounting for

22  the backdated stock options.  As a result, Brocade's compensation expense was understated and its

23  net earnings were overstated.

| Defendants and Non-Parties | Reported Grant Date | Adjusted Number of Securities Underlying Options | Adjusted Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | Estimated Paper Profit | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Jensen, Stephanie | 10/4/1999 | 640,000 | $25.85 | $26.00 - | $36.13 | $96,000.00 - | $6,576,000.00 |
| Tarrant, Peter | 10/4/1999 | 400,000 | $25.85 | $26.00 - | $36.13 | $60,000.00 - | $4,110,000.00 |
| Bonderson, Paul | 11/19/1999 | 532,000 | $32.13 | $32.81 - | $40.00 | $363,090.00 - | $4,186,840.00 |
| Byrd, Michael | 11/19/1999 | 85,000 | $32.13 | $32.81 - | $40.00 | $58,012.50 - | $668,950.00 |

- 95 -

| Name | Date | Shares | | | | | | | |
|------|------|--------|---|---|---|---|---|---|---|
| Cuthbert, Jack | 11/19/1999 | 143,328 | $32.13 | $32.81 | - | $40.00 | $97,821.36 | | $1,127,991.36 |
| Malavalli, Kumar | 11/19/1999 | 212,000 | $32.13 | $32.81 | - | $40.00 | $144,690.00 | | $1,668,440.00 |
| Reyes, Gregory | 11/19/1999 | 1,040,000 | $32.13 | $32.81 | - | $40.00 | $709,800.00 | | $8,184,800.00 |
| Rinkle, Victor | 11/19/1999 | 180,000 | $32.13 | $32.81 | - | $40.00 | $122,850.00 | | $1,416,600.00 |
| Smith, Charles | 11/19/1999 | 288,328 | $32.13 | $32.81 | - | $40.00 | $196,783.86 | | $2,269,141.36 |
| Tarrant, Peter | 11/19/1999 | 120,000 | $32.13 | $32.81 | - | $40.00 | $81,900.00 | | $944,400.00 |
| Smith, David | 1/6/2000 | 800,000 | $37.27 | $39.93 | | $44.66 | $2,127,760.00 | | $5,908,960.00 |
| Cuthbert, Jack | 1/31/2000 | 400,000 | $40.50 | $42.48 | - | $70.77 | $793,760.00 | | $12,106,240.00 |
| Dempsey, Neal | 1/31/2000 | 10,000 | $40.50 | $42.48 | - | $70.77 | $19,844.00 | | $302,656.00 |
| Neiman, Seth | 1/31/2000 | 10,000 | $40.50 | $42.48 | - | $70.77 | $19,844.00 | | $302,656.00 |
| Bonderson, Paul | 11/29/2000 | 220,000 | $76.88 | $80.91 | - | $112.56 | $885,786.00 | | $7,850,150.00 |
| Byrd, Michael | 11/29/2000 | 410,000 | $76.88 | $80.91 | - | $112.56 | $1,650,783.00 | | $14,629,825.00 |
| Cuthbert, Jack | 11/29/2000 | 542,000 | $76.88 | $80.91 | - | $112.56 | $2,182,254.60 | | $19,339,915.00 |
| Jensen, Stephanie | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | | $2,854,600.00 |
| Malavalli, Kumar | 11/29/2000 | 50,000 | $76.88 | $80.91 | - | $112.56 | $201,315.00 | | $1,784,125.00 |
| Reyes, Gregory | 11/29/2000 | 4,800,000 | $76.88 | $80.91 | - | $112.56 | $19,326,240.00 | | $171,276,000.00 |
| Rinkle, Victor | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | | $2,854,600.00 |
| Smith, Charles | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | | $2,854,600.00 |
| Smith, David | 11/29/2000 | 80,000 | $76.88 | $80.91 | - | $112.56 | $322,104.00 | | $2,854,600.00 |
| Canova, Antonio | 12/21/2000 | 360,000 | $68.44 | $75.50 | - | $105.00 | $2,541,600.00 | | $13,161,600.00 |
| Bonderson, Paul | 4/17/2001 | 260,450 | $20.70 | $24.83 | - | $49.94 | $1,075,658.50 | | $7,615,558.00 |
| Byrd, Michael | 4/17/2001 | 1,139,050 | $20.70 | $24.83 | - | $49.94 | $4,704,276.50 | | $33,305,822.00 |
| Canova, Tony | 4/17/2001 | 377,750 | $20.70 | $24.83 | - | $49.94 | $1,560,107.50 | | $11,045,410.00 |
| Cuthbert, Jack | 4/17/2001 | 541,760 | $20.70 | $24.83 | - | $49.94 | $2,237,468.80 | | $15,841,062.40 |
| Dempsey, Neal | 4/17/2001 | 80,000 | $20.70 | $24.83 | - | $49.94 | $330,400.00 | | $2,339,200.00 |
| Jensen, Stephanie | 4/17/2001 | 176,460 | $20.70 | $24.83 | - | $49.94 | $728,779.80 | | $5,159,690.40 |
| Leslie, Mark | 4/17/2001 | 60,000 | $20.70 | $24.83 | - | $49.94 | $247,800.00 | | $1,754,400.00 |
| Malavalli, Kumar | 4/17/2001 | 73,910 | $20.70 | $24.83 | - | $49.94 | $305,248.30 | | $2,161,128.40 |
| Neiman, Seth | 4/17/2001 | 80,000 | $20.70 | $24.83 | - | $49.94 | $330,400.00 | | $2,339,200.00 |
| Reyes, Gregory | 4/17/2001 | 3,970,020 | $20.70 | $24.83 | - | $49.94 | $16,396,182.60 | | $116,083,384.80 |
| Rinkle, Victor | 4/17/2001 | 172,540 | $20.70 | $24.83 | - | $49.94 | $712,590.20 | | $5,045,069.60 |
| Smith, Charles | 4/17/2001 | 110,030 | $20.70 | $24.83 | - | $49.94 | $454,423.90 | | $3,217,277.20 |
| Smith, David | 4/17/2001 | 207,810 | $20.70 | $24.83 | - | $49.94 | $858,255.30 | | $6,076,364.40 |
| Sonsini, Larry | 4/17/2001 | 60,000 | $20.70 | $24.83 | - | $49.94 | $247,800.00 | | $1,754,400.00 |
| Tarrant, Peter | 4/17/2001 | 48,480 | $20.70 | $24.83 | - | $49.94 | $200,222.40 | | $1,417,555.20 |
| Bonderson, Paul | 10/1/2001 | 5,996 | $12.90 | $13.43 | - | $27.10 | $3,177.88 | | $85,143.20 |
| Byrd, Michael | 10/1/2001 | 257,218 | $12.90 | $13.43 | - | $27.10 | $136,325.54 | | $3,652,495.60 |
| Canova, Antonio | 10/1/2001 | 178,756 | $12.90 | $13.43 | - | $27.10 | $94,740.68 | | $2,538,335.20 |
| Cuthbert, Jack | 10/1/2001 | 205,451 | $12.90 | $13.43 | - | $27.10 | $108,889.03 | | $2,917,404.20 |
| Dempsey, Neal | 10/1/2001 | 75,000 | $12.90 | $13.43 | - | $27.10 | $39,750.00 | | $1,065,000.00 |
| Jensen, Stephanie | 10/1/2001 | 83,411 | $12.90 | $13.43 | - | $27.10 | $44,207.83 | | $1,184,436.20 |
| Malavalli, Kumar | 10/1/2001 | 1,292 | $12.90 | $13.43 | - | $27.10 | $684.76 | | $18,346.40 |
| Neiman, Seth | 10/1/2001 | 75,000 | $12.90 | $13.43 | - | $27.10 | $39,750.00 | | $1,065,000.00 |
| Reyes, Gregory | 10/1/2001 | 1,262,113 | $12.90 | $13.43 | - | $27.10 | $668,919.89 | | $17,922,004.60 |
| Rinkle, Victor | 10/1/2001 | 3,996 | $12.90 | $13.43 | - | $27.10 | $2,117.88 | | $56,743.20 |
| Smith, David | 10/1/2001 | 3,826 | $12.90 | $13.43 | - | $27.10 | $2,027.78 | | $54,329.20 |
| Klayko, Michael | 1/27/2003 | 463,781 | $4.55 | $4.56 | - | $4.80 | $4,637.81 | | $115,945.25 |
| Bonderson, Paul | 8/15/2003* | 200,000 | $5.53 | $5.64 | - | $5.64 | $22,000.00 | | $22,000.00 |
| Canova, Antonio | 8/15/2003* | 150,000 | $5.53 | $5.64 | - | $5.64 | $16,500.00 | | $16,500.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cuthbert, Jack | 8/15/2003* | 300,000 | $5.53 | $5.64 | - | $5.64 | $33,000.00 | - | $33,000.00 |
| Jensen, Stephanie | 8/15/2003* | 100,000 | $5.53 | $5.64 | - | $5.64 | $11,000.00 | - | $11,000.00 |
| Klayko, Michael | 8/15/2003* | 250,000 | $5.53 | $5.64 | - | $5.64 | $27,500.00 | - | $27,500.00 |
| Reyes, Gregory | 8/15/2003* | 600,000 | $5.53 | $5.64 | - | $5.64 | $66,000.00 | - | $66,000.00 |
| Total | | 22,496,756 | | | | | $64,679,393.20 | | $535,240,395.17 |

### The FY:03 Form 10-Qs and Form 10-K

270.   On March 7, 2003, June 9, 2003 and September 8, 2003, the Individual Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:03, 2Q:03 and 3Q:03, respectively. On January 20, 2004, the Individual Defendants caused or allowed the Company to file its FY:03 Form 10-K with the SEC. The FY:03 Form 10-Qs and 10-K were simultaneously distributed to shareholders and the public. The FY:03 Form 10-Qs and 10-K included Brocade's FY:03 financial statements which were improperly presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's compensation expense was understated and its net earnings were overstated.

### The FY:04 Form 10-Qs and Form 10-K

271.   On March 8, 2004, June 14, 2004 and September 13, 2004, the Individual Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:04, 2Q:04 and 3Q:04, respectively. On January 31, 2005, the Individual Defendants caused or allowed the Company to file its FY:04 Form 10-K with the SEC. The FY:04 Form 10-Qs and 10-K were simultaneously distributed to shareholders and the public. The FY:04 Form 10-Qs and 10-K included Brocade's FY:04 financial statements which were improperly presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's compensation expense was understated and its net earnings were overstated.

### The FY:05 Form 10-Qs and Form 10-K

272.   On March 9, 2005, June 10, 2005 and September 9, 2005, the Individual Defendants caused or allowed Brocade to file Form 10-Q for the 1Q:05, and NT 10-K's for 2Q:05 and 3Q:05, respectively. On January 19, 2006, the Individual Defendants caused or allowed the Company to file its FY:05 Form 10-K with the SEC. On November 14, 2005, the Individual Defendants caused or allowed Brocade to file Form 10-Qs for the 2Q-05 and 3Q:05, Form 10-Q/A for the 1Q:05 and Form

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  10-K/A for the FY:04. The FY:05 Form 10-Qs, 10-Q/A and 10-K along with the FY:04 Form 10-

2  K/A were simultaneously distributed to shareholders and the public. The FY:05 Form 10-Qs and 10-

3  K included Brocade's FY:05 financial statements which were improperly presented in violation of

4  GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's

5  compensation expense was understated and its net earnings were overstated.

6      273.  The improper FY:98 to FY:05 Form 10-Ks and 10-Qs described above were

7  reviewed, prepared and/or endorsed by the Individual Defendants. The following chart details the

8  defendants who signed and certified the Company's filings under the SOX:

| Date | Filing | Person(s) Who Signed and Certified | Notes |
|------|--------|-----------------------------------|-------|
| 9/15/1999 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 1/31/2000 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | |
| 1/31/2000 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | **Period:** October 31, 1999 |
| 2/28/2000 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, Finance, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | **Period:** October 31, 1999 |
| 3/13/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 6/13/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 9/12/2000 | 10-Q | Michael J. Byrd (Vice President, Finance, and Chief Financial Officer) | |
| 1/26/2001 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director); Michael J. Byrd (Vice President, and Chief Financial Officer); Seth D. Neiman (Chairman of the Board); Neal Dempsey (Director); Mark Leslie (Director); Larry W. Sonsini (Director) | |
| 3/13/2001 | 10-Q | Michael J. Byrd (Vice President, and Chief Financial Officer) | |
| 6/12/2001 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) | |
| 9/11/2001 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) | |
| 1/24/2002 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Mark Leslie (Director); Seth D. Neiman (Director); Larry W. Sonsini (Director) | |
| 3/12/2002 | 10-Q | Antonio Canova (Vice President, and Chief Financial Officer) | |
| 5/30/2002 | 10-Q | Antonio Canova (Vice President, and Chief Financial Officer) | |

| | | | |
|---|---|---|---|
| 8/27/2002 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 1/22/2003 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Larry W. Sonsini (Director) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 3/7/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 6/9/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 9/8/2003 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 1/20/2004 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer); Antonio Canova (Vice President, Finance, and Chief Financial Officer); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Larry W. Sonsini (Director); Nicholas G. Moore (Director) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 3/8/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 6/14/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 9/13/2004 | 10-Q | Antonio Canova (Vice President, Finance, and Chief Financial Officer) **SOX CERTIFICATION:** Gregory L. Reyes (CEO); Antonio Canova (CFO) | |
| 1/31/2005 | 10-K | Michael Klayko (Chief Executive Officer); Antonio Canova (Vice President, Administration, and Chief Financial Officer); David L. House (Executive Chairman); L. William Krause (Lead Director); Neal Dempsey (Director); Nicholas G. Moore (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Gregory L. Reyes (Director); Sanjay Vaswani (Director); Larry W. Sonsini (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 3/9/2005 | 10-Q | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 11/14/2005 | 10-Q | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | |
| 11/14/2005 | 10-Q/A | Antonio Canova (Vice President, Administration, and Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | **Period:** January 29, 2005 |
| 11/14/2005 | 10-K/A | Michael Klayko (Chief Executive Officer); Antonio Canova (Vice President, Administration, and Chief Financial Officer); David L. House (Executive Chairman); L. William Krause (Lead Director); Neal Dempsey (Director); Nicholas G. Moore (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Sanjay Vaswani (Director); Robert Walker (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Antonio Canova (CFO) | **Period:** October 30, 2004 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 1/19/2006 | 10-K | Michael Klayko (Chief Executive Officer); Richard Deranleau (Vice President, Accounting, and Interim Chief Financial Officer); David L. House (Chairman of the Board); L. William Krause (Lead Director); Neal Dempsey (Director); Seth D. Neiman (Director); Christopher B. Paisley (Director); Sanjay Vaswani (Director); Robert Walker (Director) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| --- | --- | --- | --- |
| 3/8/2006 | 10-Q | Richard Deranleau (Vice President, Interim Chief Financial Officer, and Treasurer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| 6/7/2006 | 10-Q | Richard Deranleau (Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |
| 9/6/2006 | 10-Q | Richard Deranleau (Chief Financial Officer) **SOX CERTIFICATION:** Michael Klayko (CEO); Richard Deranleau (CFO) | |

274. The SOX certifications signed in conjunction with the filing of Brocade's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Brocade's FY:05 Form 10-K that was signed by defendants Klayko and Deranleau:

I, [Michael Klayko/Richard Deranleau], certify that:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended October 29, 2005 of Brocade Communications Systems, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1         c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

2

3

4         d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5

6

7      5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

8

9

10        a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

11

12        b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

13

14       275.   Pursuant to the Audit Committee's charter, defendants Dempsey, Neiman, Leslie,

15   Sonsini, Paisley, Moore and Krause, as members of the Audit Committee since at least 1999, were

16   each responsible to oversee the integrity of Brocade's financial information oversight, which

17   included reviewing and discussing with management and the independent auditor the Company's

18   quarterly and annual financial statements, the critical accounting policies and practices used by the

19   Company and earnings press releases, guidance and other information provided to analysts and

20   rating agencies. Specifically, the Audit Committee was required to review in advance and approve

21   all filings with the SEC containing, or incorporating by reference, Brocade's financial information

22   including the Quarterly Reports on Form 10-Q, the Annual Report on Form 10-K, and

23   "Management's Discussion and Analysis of Financial Condition and Results of Operations" in such

24   filings. Thus, by reason of such duties, Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and

25   Krause knew of or recklessly disregarded the false and misleading statements contained in the

26   Company's Forms 10-K filed for FY:00, FY:01, FY:02, FY:03 and FY:04  Further, in the Audit

27   Committee's report contained in the Company's Proxy Statements for FY:00, FY:01, FY:02, FY:03

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  and FY:04, each of which were filed with the SEC, Dempsey, Neiman, Leslie, Sonsini, Paisley,

2  Moore and Krause affirmed that they had fulfilled these duties in relation to each of the Forms 10-K:

3      The following is the report of the Audit Committee of the Board of Directors. The
       Audit Committee has reviewed and discussed our audited financial statements for the
4      fiscal year ended 2000 with our management. In addition, the Audit Committee has
       discussed with KPMG LLP, our independent auditors, the matters required to be
5      discussed by Statement on Auditing Standards No. 61 (Communications with Audit
       Committee). The Audit Committee also has received the written disclosures and the
6      letter from KPMG as required by the Independence Standards Board Standard No. 1
       (Independence Discussions with Audit Committees) and the Audit Committee has
7      discussed the independence of KPMG LLP with that firm.

8      Based on the Audit Committee's review of the matters noted above and its
       discussions with our independent auditors and our management, the Audit
9      Committee recommended to the Board of Directors that the financial statements be
       included in our Annual Report on Form 10-K.

10                              **INSIDER SELLING**

11

12      276.    As a result of the Individual Defendants' actions, Brocade's market capitalization has

13  been damaged by over $9.1 billion.  At the same time that these defendants were causing Brocade to

14  suffer such devastation, the Insider Selling Defendants fared much better, as depicted in the table

15  below, by selling approximately $1.5 billion dollars of their personally-held stock.

| Defendant and Non-Parties | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BONDERSON | 8/23/1999 | 20,000 | $164.22 | $3,284,400.00 |
| | 8/24/1999 | 20,000 | $168.67 | $3,373,400.00 |
| | 8/25/1999 | 27,000 | $181.35 | $4,896,450.00 |
| | 8/26/1999 | 20,000 | $179.38 | $3,587,600.00 |
| | 9/22/1999 | 7,750 | $226.33 | $1,754,057.50 |
| | 9/23/1999 | 12,250 | $225.13 | $2,757,842.50 |
| | 9/27/1999 | 10,000 | $210.27 | $2,102,700.00 |
| | 9/28/1999 | 10,000 | $213.15 | $2,131,500.00 |
| | 9/30/1999 | 10,000 | $211.71 | $2,117,100.00 |
| | 12/8/1999 | 39,000 | $144.50 | $5,635,500.00 |
| | 12/10/1999 | 21,000 | $140.00 | $2,940,000.00 |
| | 12/10/1999 | 10,000 | $141.00 | $1,410,000.00 |
| | 12/10/1999 | 10,000 | $141.38 | $1,413,800.00 |
| | 12/17/1999 | 60,000 | $140.33 | $8,419,800.00 |
| | 2/22/2000 | 500 | $264.56 | $132,280.00 |
| | 2/22/2000 | 50,000 | $266.06 | $13,303,000.00 |
| | 2/22/2000 | 500 | $276.31 | $138,155.00 |
| | 2/23/2000 | 10,000 | $267.90 | $2,679,000.00 |
| | 2/24/2000 | 40,000 | $267.05 | $10,682,000.00 |
| | 2/24/2000 | 21,500 | $268.37 | $5,769,955.00 |
| | 2/25/2000 | 18,500 | $269.16 | $4,979,460.00 |
| | 3/7/2000 | 18,500 | $336.03 | $6,216,555.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | 3/9/2000 | 31,500 | $325.33 | $10,247,895.00 |
| | | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | | 5/30/2000 | 50,000 | $110.03 | $5,501,500.00 |
| | | 6/1/2000 | 40,000 | $120.47 | $4,818,800.00 |
| | | 6/2/2000 | 10,000 | $126.50 | $1,265,000.00 |
| | | 6/2/2000 | 50,000 | $133.18 | $6,659,000.00 |
| | | 6/15/2000 | 78,500 | $141.79 | $11,130,515.00 |
| | | 6/16/2000 | 7,500 | $145.00 | $1,087,500.00 |
| | | 6/16/2000 | 21,500 | $146.63 | $3,152,545.00 |
| | | 6/19/2000 | 42,500 | $145.00 | $6,162,500.00 |
| | | 8/18/2000 | 25,000 | $209.00 | $5,225,000.00 |
| | | 8/21/2000 | 10,000 | $212.23 | $2,122,300.00 |
| | | 8/22/2000 | 40,000 | $213.53 | $8,541,200.00 |
| | | 8/23/2000 | 15,000 | $214.00 | $3,210,000.00 |
| | | 8/24/2000 | 50,000 | $220.12 | $11,006,000.00 |
| | | 8/24/2000 | 10,000 | $223.50 | $2,235,000.00 |
| | | 8/30/2000 | 60,000 | $218.16 | $13,089,600.00 |
| | | 8/31/2000 | 20,000 | $227.41 | $4,548,200.00 |
| | | 9/1/2000 | 10,000 | $229.00 | $2,290,000.00 |
| | | 9/14/2000 | 15,000 | $219.50 | $3,292,500.00 |
| | | 9/20/2000 | 15,000 | $220.38 | $3,305,700.00 |
| | | 9/20/2000 | 15,000 | $223.38 | $3,350,700.00 |
| | | 9/20/2000 | 15,000 | $230.19 | $3,452,850.00 |
| | | 12/1/2000 | 40,000 | $86.78 | $3,471,200.00 |
| | | 12/4/2000 | 80,000 | $85.19 | $6,815,200.00 |
| | | 12/5/2000 | 80,000 | $85.96 | $6,876,800.00 |
| | | 12/5/2000 | 100,000 | $92.25 | $9,225,000.00 |
| | | 12/8/2000 | 100,000 | $108.79 | $10,879,000.00 |
| | | 1/4/2001 | 25,000 | $89.38 | $2,234,500.00 |
| | | 1/5/2001 | 75,000 | $79.65 | $5,973,750.00 |
| | | 5/17/2001 | 25,000 | $47.49 | $1,187,250.00 |
| | | 5/18/2001 | 25,000 | $46.56 | $1,164,000.00 |
| | | 5/21/2001 | 220,000 | $49.96 | $10,991,200.00 |
| | | 5/21/2001 | 18,000 | $49.96 | $899,280.00 |
| | | 5/21/2001 | 12,000 | $49.96 | $599,520.00 |
| | | 12/5/2001 | 50,000 | $36.08 | $1,804,000.00 |
| | | 12/7/2001 | 50,000 | $38.15 | $1,907,500.00 |
| | | 12/11/2001 | 50,000 | $39.00 | $1,950,000.00 |
| | | | 2,018,320 | | $271,440,260.00 |
| | | | | | |
| BYRD | | 9/22/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/22/1999 | 6,395 | $226.33 | $1,447,380.35 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 9/23/1999 | 1,855 | $225.13 | $417,616.15 |
| | | 12/23/1999 | 33,500 | $157.19 | $5,265,865.00 |
| | | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |
| | 12/23/1999 | 3,500 | $157.19 | $550,165.00 |
| | 4/6/2000 | 37,500 | $141.20 | $5,295,000.00 |
| | 4/7/2000 | 65,000 | $145.68 | $9,469,200.00 |
| | 6/16/2000 | 60,000 | $141.76 | $8,505,600.00 |
| | 7/3/2000 | 6,500 | $180.50 | $1,173,250.00 |
| | 7/5/2000 | 10,000 | $180.31 | $1,803,100.00 |
| | 7/6/2000 | 5,000 | $173.16 | $865,800.00 |
| | 7/6/2000 | 4,000 | $173.44 | $693,760.00 |
| | 7/6/2000 | 5,500 | $174.06 | $957,330.00 |
| | 8/24/2000 | 27,000 | $218.49 | $5,899,230.00 |
| | 9/5/2000 | 28,000 | $229.18 | $6,417,040.00 |
| | 10/3/2000 | 17,000 | $224.86 | $3,822,620.00 |
| | 10/4/2000 | 10,000 | $220.19 | $2,201,900.00 |
| | 12/11/2001 | 300,000 | $38.58 | $11,574,000.00 |
| | 7/5/2002 | 880 | $16.70 | $14,696.00 |
| | | **653,380** | | **$73,068,872.00** |
| | | | | |
| CANOVA | 6/2/2003 | 4,903 | $6.43 | $31,526.29 |
| | | **4,903** | | **$31,526.29** |
| | | | | |
| DEMPSEY | 12/1/1999 | 6,846 | $141.68 | $969,954.29 |
| | 12/3/1999 | 2,500 | $141.63 | $354,075.00 |
| | 1/5/2000 | 5,000 | $150.38 | $751,900.00 |
| | 1/5/2000 | 5,000 | $155.00 | $775,000.00 |
| | 1/5/2000 | 5,000 | $158.88 | $794,400.00 |
| | 1/5/2000 | 5,000 | $168.25 | $841,250.00 |
| | 3/23/2000 | 2,500 | $174.44 | $436,100.00 |
| | 3/24/2000 | 5,000 | $175.00 | $875,000.00 |
| | 3/30/2000 | 2,500 | $174.38 | $435,950.00 |
| | 3/31/2000 | 5,000 | $175.53 | $877,650.00 |
| | 5/24/2000 | 39,000 | $97.14 | $3,788,460.00 |
| | 8/22/2000 | 4,000 | $215.00 | $860,000.00 |
| | 8/23/2000 | 4,000 | $215.25 | $861,000.00 |
| | 12/11/2000 | 10,000 | $114.10 | $1,141,000.00 |
| | 1/4/2001 | 8,000 | $90.28 | $722,240.00 |
| | 12/12/2001 | 9,648 | $39.26 | $378,780.48 |
| | 12/12/2001 | 5,656 | $39.26 | $222,054.56 |
| | 9/23/2002 | 4,875 | $10.12 | $49,335.00 |
| | 9/24/2002 | 7,299 | $9.83 | $71,749.17 |
| | | **136,824** | | **$15,205,898.50** |
| | | | | |
| DERANLEAU | 3/23/2006 | 1,000 | $6.39 | $6,390.00 |
| | 3/23/2006 | 1,784 | $6.40 | $11,417.60 |
| | | **2,784** | | **$17,807.60** |
| | | | | |
| KLAYKO | 10/8/2004 | 8,000 | $6.18 | $49,440.00 |
| | 2/23/2006 | 300,000 | $5.03 | $1,509,000.00 |
| | 2/23/2006 | 100,000 | $5.03 | $503,000.00 |
| | | **408,000** | | **$2,061,440.00** |
| | | | | |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| LESLIE | 8/23/1999 | 12,186 | $161.25 | $1,964,992.50 |
| | 2/23/2000 | 17,500 | $267.22 | $4,676,350.00 |
| | 2/24/2000 | 9,164 | $268.23 | $2,458,059.72 |
| | 2/24/2000 | 23,336 | $269.09 | $6,279,484.24 |
| | 8/25/2000 | 14,268 | $216.42 | $3,087,880.56 |
| | 8/25/2000 | 2,666 | $216.42 | $576,975.72 |
| | 12/12/2000 | 28,000 | $114.20 | $3,197,600.00 |
| | 12/12/2000 | 6,000 | $114.20 | $685,200.00 |
| | 12/3/2001 | 144,168 | $31.02 | $4,472,091.36 |
| | 12/3/2001 | 35,324 | $31.02 | $1,095,750.48 |
| | 4/4/2002 | 120,000 | $27.07 | $3,248,400.00 |
| | 4/4/2002 | 20,000 | $27.07 | $541,400.00 |
| | | 432,612 | | $32,284,184.58 |
| | | | | |
| MALAVALLI | 8/23/1999 | 68,950 | $164.22 | $11,322,969.00 |
| | 9/22/1999 | 4,650 | $226.33 | $1,052,434.50 |
| | 9/23/1999 | 7,350 | $222.13 | $1,632,655.50 |
| | 9/27/1999 | 6,000 | $210.27 | $1,261,620.00 |
| | 9/28/1999 | 6,000 | $213.15 | $1,278,900.00 |
| | 9/30/1999 | 6,000 | $211.71 | $1,270,260.00 |
| | 12/8/1999 | 20,000 | $143.69 | $2,873,800.00 |
| | 12/16/1999 | 20,000 | $130.31 | $2,606,200.00 |
| | 12/21/1999 | 20,000 | $147.19 | $2,943,800.00 |
| | 1/6/2000 | 10,000 | $159.00 | $1,590,000.00 |
| | 1/7/2000 | 10,000 | $152.02 | $1,520,200.00 |
| | 2/22/2000 | 10,000 | $266.06 | $2,660,600.00 |
| | 2/22/2000 | 15,000 | $266.96 | $4,004,400.00 |
| | 2/23/2000 | 8,000 | $267.90 | $2,143,200.00 |
| | 2/24/2000 | 25,000 | $268.37 | $6,709,250.00 |
| | 2/25/2000 | 25,000 | $269.16 | $6,729,000.00 |
| | 2/25/2000 | 17,000 | $274.00 | $4,658,000.00 |
| | 3/9/2000 | 50,000 | $325.33 | $16,266,500.00 |
| | 5/25/2000 | 30,000 | $105.90 | $3,177,000.00 |
| | 5/25/2000 | 15,000 | $110.40 | $1,656,000.00 |
| | 5/30/2000 | 15,000 | $110.03 | $1,650,450.00 |
| | 5/31/2000 | 40,000 | $115.69 | $4,627,600.00 |
| | 6/1/2000 | 22,500 | $120.47 | $2,710,575.00 |
| | 6/2/2000 | 7,500 | $126.50 | $948,750.00 |
| | 6/2/2000 | 40,000 | $132.84 | $5,313,600.00 |
| | 6/7/2000 | 20,000 | $147.94 | $2,958,800.00 |
| | 6/19/2000 | 25,000 | $145.00 | $3,625,000.00 |
| | 6/19/2000 | 25,000 | $148.31 | $3,707,750.00 |
| | 7/7/2000 | 10,000 | $178.00 | $1,780,000.00 |
| | 9/1/2000 | 20,000 | $230.00 | $4,600,000.00 |
| | 9/5/2000 | 6,700 | $230.00 | $1,541,000.00 |
| | 9/14/2000 | 20,000 | $218.07 | $4,361,400.00 |
| | 9/20/2000 | 13,300 | $230.09 | $3,060,197.00 |
| | 9/21/2000 | 20,000 | $234.17 | $4,683,400.00 |
| | 9/22/2000 | 25,000 | $244.66 | $6,116,500.00 |
| | 9/28/2000 | 10,000 | $243.13 | $2,431,300.00 |
| | | 693,950 | | $131,473,111.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| NEIMAN | 9/22/1999 | 10,100 | $223.07 | $2,253,007.00 |
| | 9/22/1999 | 23,325 | $226.33 | $5,279,147.25 |
| | 9/23/1999 | 6,775 | $225.13 | $1,525,255.75 |
| | 9/23/1999 | 3,900 | $226.33 | $882,687.00 |
| | 9/24/1999 | 16,100 | $216.45 | $3,484,845.00 |
| | 10/6/1999 | 728 | $209.19 | $152,290.32 |
| | 12/3/1999 | 15,296 | $142.00 | $2,172,032.00 |
| | 12/3/1999 | 412 | $142.00 | $58,504.00 |
| | 12/3/1999 | 20,000 | $142.14 | $2,842,800.00 |
| | 12/6/1999 | 13,000 | $142.50 | $1,852,500.00 |
| | 12/6/1999 | 10,000 | $143.38 | $1,433,800.00 |
| | 12/7/1999 | 40,000 | $138.47 | $5,538,800.00 |
| | 12/8/1999 | 7,000 | $142.50 | $997,500.00 |
| | 12/8/1999 | 12,500 | $145.20 | $1,815,000.00 |
| | 12/10/1999 | 2,500 | $142.00 | $355,000.00 |
| | 12/17/1999 | 17,500 | $142.15 | $2,487,625.00 |
| | 12/20/1999 | 18,800 | $142.19 | $2,673,172.00 |
| | 12/21/1999 | 7,500 | $144.93 | $1,086,975.00 |
| | 12/22/1999 | 50,000 | $152.77 | $7,638,500.00 |
| | 12/27/1999 | 6,000 | $157.50 | $945,000.00 |
| | 12/28/1999 | 50,000 | $155.28 | $7,764,000.00 |
| | 12/29/1999 | 50,000 | $162.59 | $8,129,500.00 |
| | 1/3/2000 | 50,000 | $169.85 | $8,492,500.00 |
| | 2/22/2000 | 50,000 | $265.94 | $13,297,000.00 |
| | 2/23/2000 | 50,000 | $268.32 | $13,416,000.00 |
| | 2/28/2000 | 31,150 | $283.18 | $8,821,057.00 |
| | 3/1/2000 | 90,842 | $295.79 | $26,870,155.18 |
| | 3/2/2000 | 3,000 | $315.00 | $945,000.00 |
| | 3/3/2000 | 97,000 | $315.45 | $30,598,650.00 |
| | 3/6/2000 | 80,000 | $322.66 | $25,812,800.00 |
| | 3/7/2000 | 20,000 | $336.47 | $6,729,400.00 |
| | 3/7/2000 | 20,000 | $338.00 | $6,760,000.00 |
| | 3/7/2000 | 20,000 | $340.33 | $6,806,600.00 |
| | 3/10/2000 | 10,000 | $340.00 | $3,400,000.00 |
| | 3/10/2000 | 10,000 | $345.00 | $3,450,000.00 |
| | 3/20/2000 | 21,000 | $167.52 | $3,517,920.00 |
| | 3/22/2000 | 19,000 | $168.27 | $3,197,130.00 |
| | 6/20/2000 | 13,508 | $159.19 | $2,150,338.52 |
| | 6/20/2000 | 13,509 | $160.19 | $2,164,006.71 |
| | 8/21/2000 | 96,500 | $211.10 | $20,371,150.00 |
| | 8/22/2000 | 3,500 | $211.00 | $738,500.00 |
| | 12/1/2000 | 20,000 | $83.69 | $1,673,800.00 |
| | | 1,100,445 | | $250,579,947.73 |
| | | | | |
| REYES | 9/22/1999 | 9,300 | $226.33 | $2,104,869.00 |
| | 9/23/1999 | 14,700 | $225.13 | $3,309,411.00 |
| | 9/27/1999 | 15,000 | $210.27 | $3,154,050.00 |
| | 9/28/1999 | 16,000 | $213.15 | $3,410,400.00 |
| | 9/28/1999 | 23,500 | $216.32 | $5,083,520.00 |
| | 9/30/1999 | 16,500 | $211.71 | $3,493,215.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 10/1/1999 | 13,200 | $208.02 | $2,745,864.00 |
| | 10/4/1999 | 20,000 | $206.31 | $4,126,200.00 |
| | 10/5/1999 | 10,000 | $207.53 | $2,075,300.00 |
| | 10/6/1999 | 16,800 | $209.85 | $3,525,480.00 |
| | 12/15/1999 | 50,000 | $123.56 | $6,178,000.00 |
| | 12/15/1999 | 25,000 | $124.44 | $3,111,000.00 |
| | 12/16/1999 | 60,500 | $128.88 | $7,797,240.00 |
| | 12/17/1999 | 50,000 | $139.11 | $6,955,500.00 |
| | 12/17/1999 | 11,500 | $141.00 | $1,621,500.00 |
| | 12/20/1999 | 15,000 | $145.00 | $2,175,000.00 |
| | 12/21/1999 | 100,000 | $151.80 | $15,180,000.00 |
| | 2/22/2000 | 17,500 | $267.00 | $4,672,500.00 |
| | 2/23/2000 | 12,500 | $267.90 | $3,348,750.00 |
| | 2/24/2000 | 30,000 | $268.37 | $8,051,100.00 |
| | 2/25/2000 | 40,000 | $269.16 | $10,766,400.00 |
| | 2/25/2000 | 50,000 | $270.83 | $13,541,500.00 |
| | 2/25/2000 | 25,000 | $274.00 | $6,850,000.00 |
| | 2/28/2000 | 25,000 | $275.30 | $6,882,500.00 |
| | 2/28/2000 | 100,000 | $283.71 | $28,371,000.00 |
| | 3/7/2000 | 96,000 | $337.54 | $32,403,840.00 |
| | 3/8/2000 | 5,000 | $332.44 | $1,662,200.00 |
| | 3/9/2000 | 49,000 | $325.33 | $15,941,170.00 |
| | 3/10/2000 | 5,500 | $342.91 | $1,886,005.00 |
| | 3/13/2000 | 10,000 | $335.95 | $3,359,500.00 |
| | 3/14/2000 | 6,000 | $338.59 | $2,031,540.00 |
| | 3/17/2000 | 57,000 | $153.07 | $8,724,990.00 |
| | 5/19/2000 | 100,000 | $100.02 | $10,002,000.00 |
| | 5/23/2000 | 100,000 | $110.54 | $11,054,000.00 |
| | 5/31/2000 | 25,000 | $120.20 | $3,005,000.00 |
| | 6/2/2000 | 25,000 | $133.18 | $3,329,500.00 |
| | 6/2/2000 | 75,000 | $133.30 | $9,997,500.00 |
| | 6/8/2000 | 25,000 | $151.79 | $3,794,750.00 |
| | 6/9/2000 | 5,000 | $155.00 | $775,000.00 |
| | 6/14/2000 | 50,000 | $142.19 | $7,109,500.00 |
| | 6/15/2000 | 100,000 | $140.24 | $14,024,000.00 |
| | 6/16/2000 | 50,000 | $143.25 | $7,162,500.00 |
| | 6/26/2000 | 22,145 | $157.19 | $3,480,972.55 |
| | 8/21/2000 | 32,500 | $212.50 | $6,906,250.00 |
| | 8/22/2000 | 67,500 | $212.01 | $14,310,675.00 |
| | 8/22/2000 | 50,000 | $213.61 | $10,680,500.00 |
| | 8/23/2000 | 50,000 | $214.54 | $10,727,000.00 |
| | 8/24/2000 | 40,000 | $219.53 | $8,781,200.00 |
| | 8/24/2000 | 10,000 | $223.50 | $2,235,000.00 |
| | 8/30/2000 | 5,942 | $219.63 | $1,305,041.46 |
| | 9/18/2000 | 127,000 | $214.26 | $27,211,020.00 |
| | 9/18/2000 | 973 | $214.26 | $208,474.98 |
| | 12/5/2000 | 150,000 | $87.97 | $13,195,500.00 |
| | 12/5/2000 | 100,000 | $94.63 | $9,463,000.00 |
| | 12/6/2000 | 50,000 | $97.44 | $4,872,000.00 |
| | 12/7/2000 | 100,000 | $98.41 | $9,841,000.00 |
| | 12/8/2000 | 420 | $106.62 | $44,780.40 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 1 | 12/8/2000 | 72,886 | $106.62 | $7,771,105.32 |
| | 12/11/2000 | 39,000 | $113.51 | $4,426,890.00 |
| 2 | 12/27/2000 | 100,000 | $88.09 | $8,809,000.00 |
| | 12/28/2000 | 100,000 | $93.35 | $9,335,000.00 |
| 3 | 12/28/2000 | 20,944 | $96.42 | $2,019,420.48 |
| | 12/29/2000 | 35,000 | $97.88 | $3,425,800.00 |
| 4 | 5/17/2001 | 250,000 | $46.47 | $11,617,500.00 |
| 5 | 5/17/2001 | 50,000 | $47.00 | $2,350,000.00 |
| | 6/7/2001 | 300,000 | $46.35 | $13,905,000.00 |
| 6 | 12/4/2001 | 250,000 | $33.10 | $8,275,000.00 |
| | 12/5/2001 | 250,000 | $36.18 | $9,045,000.00 |
| 7 | 12/10/2001 | 500,000 | $37.52 | $18,760,000.00 |
| | 12/11/2001 | 630,000 | $39.10 | $24,633,000.00 |
| 8 | 1/4/2002 | 85,600 | $37.44 | $3,204,864.00 |
| 9 | 1/4/2002 | 85,600 | $37.99 | $3,251,944.00 |
| | 3/31/2004 | 100,000 | $6.64 | $664,000.00 |
| 10 | 2/22/2005 | 449 | $6.30 | $2,828.70 |
| | 2/22/2005 | 124,985 | $6.32 | $789,905.20 |
| 11 | 2/22/2005 | 173,495 | $6.33 | $1,098,223.35 |
| | 2/22/2005 | 221,710 | $6.34 | $1,405,641.40 |
| 12 | 2/22/2005 | 183,152 | $6.35 | $1,163,015.20 |
| | 2/22/2005 | 69,875 | $6.36 | $444,405.00 |
| 13 | 2/22/2005 | 31,239 | $6.37 | $198,992.43 |
| 14 | 2/22/2005 | 136,712 | $6.38 | $872,222.56 |
| | 2/22/2005 | 109,300 | $6.39 | $698,427.00 |
| 15 | 2/22/2005 | 13,900 | $6.40 | $88,960.00 |
| | 2/22/2005 | 4,000 | $6.41 | $25,640.00 |
| 16 | 2/22/2005 | 40,700 | $6.42 | $261,294.00 |
| | 2/22/2005 | 1,500 | $6.43 | $9,645.00 |
| 17 | 2/22/2005 | 15,000 | $6.45 | $96,750.00 |
| | 2/22/2005 | 3,900 | $6.46 | $25,194.00 |
| 18 | 2/22/2005 | 833 | $6.47 | $5,389.51 |
| 19 | 2/22/2005 | 5,000 | $6.49 | $32,450.00 |
| | 2/22/2005 | 48,600 | $6.50 | $315,900.00 |
| 20 | 2/22/2005 | 31,150 | $6.51 | $202,786.50 |
| | 2/22/2005 | 1,500 | $6.52 | $9,780.00 |
| 21 | 2/23/2005 | 809 | $6.07 | $4,910.63 |
| | 2/23/2005 | 365,221 | $6.08 | $2,220,543.68 |
| 22 | 2/23/2005 | 179,331 | $6.10 | $1,093,919.10 |
| | 2/23/2005 | 134,970 | $6.11 | $824,666.70 |
| 23 | 2/23/2005 | 82,800 | $6.12 | $506,736.00 |
| 24 | 2/23/2005 | 7,369 | $6.13 | $45,171.97 |
| | 2/23/2005 | 5,893 | $6.15 | $36,241.95 |
| 25 | 2/23/2005 | 14,700 | $6.16 | $90,552.00 |
| | 2/23/2005 | 12,600 | $6.17 | $77,742.00 |
| 26 | 2/23/2005 | 31,907 | $6.18 | $197,185.26 |
| | 2/23/2005 | 20,000 | $6.19 | $123,800.00 |
| 27 | 2/23/2005 | 25,600 | $6.20 | $158,720.00 |
| | 2/23/2005 | 39,800 | $6.21 | $247,158.00 |
| 28 | 2/23/2005 | 55,000 | $6.22 | $342,100.00 |
| | 2/23/2005 | 14,000 | $6.23 | $87,220.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 2/23/2005 | 9,893 | $6.24 | $61,732.32 |
| | 2/23/2005 | 5,600 | $6.25 | $35,000.00 |
| | 2/23/2005 | 16,100 | $6.29 | $101,269.00 |
| | 2/23/2005 | 54,700 | $6.30 | $344,610.00 |
| | 2/23/2005 | 18,700 | $6.31 | $117,997.00 |
| | 2/23/2005 | 42,000 | $6.32 | $265,440.00 |
| | 2/23/2005 | 5,000 | $6.33 | $31,650.00 |
| | 2/23/2005 | 10,315 | $6.34 | $65,397.10 |
| | 2/23/2005 | 900 | $6.35 | $5,715.00 |
| | 2/23/2005 | 11,434 | $6.37 | $72,834.58 |
| | 2/23/2005 | 6,358 | $6.38 | $40,564.04 |
| | 2/24/2005 | 900,000 | $6.10 | $5,490,000.00 |
| | 2/24/2005 | 12,466 | $6.10 | $76,042.60 |
| | 2/24/2005 | 373,747 | $6.11 | $2,283,594.17 |
| | 2/24/2005 | 464,788 | $6.12 | $2,844,502.56 |
| | 2/24/2005 | 175,777 | $6.13 | $1,077,513.01 |
| | 2/24/2005 | 67,445 | $6.14 | $414,112.30 |
| | 2/24/2005 | 127,698 | $6.15 | $785,342.70 |
| | 2/24/2005 | 165,453 | $6.16 | $1,019,190.48 |
| | 2/24/2005 | 62,000 | $6.17 | $382,540.00 |
| | 2/24/2005 | 138,479 | $6.18 | $855,800.22 |
| | 2/24/2005 | 50,400 | $6.19 | $311,976.00 |
| | 2/25/2005 | 30,800 | $6.20 | $190,960.00 |
| | | 10,183,063 | | $580,227,132.41 |
| | | | | |
| RINKLE | 8/23/1999 | 24,000 | $164.22 | $3,941,280.00 |
| | 9/23/1999 | 4,000 | $225.13 | $900,520.00 |
| | 9/27/1999 | 4,000 | $210.27 | $841,080.00 |
| | 9/28/1999 | 2,500 | $213.15 | $532,875.00 |
| | 9/30/1999 | 1,500 | $211.71 | $317,565.00 |
| | 12/27/1999 | 10,650 | $158.00 | $1,682,700.00 |
| | 12/28/1999 | 24,000 | $158.00 | $3,792,000.00 |
| | 3/1/2000 | 12,500 | $299.75 | $3,746,875.00 |
| | 3/2/2000 | 12,500 | $303.05 | $3,788,125.00 |
| | 3/6/2000 | 2,000 | $325.00 | $650,000.00 |
| | 3/7/2000 | 8,000 | $340.33 | $2,722,640.00 |
| | 3/23/2000 | 20,000 | $174.20 | $3,484,000.00 |
| | 6/16/2000 | 50,000 | $142.00 | $7,100,000.00 |
| | 6/19/2000 | 30,000 | $150.17 | $4,505,100.00 |
| | 7/6/2000 | 3,250 | $173.05 | $562,412.50 |
| | 7/6/2000 | 3,250 | $173.05 | $562,412.50 |
| | 7/6/2000 | 3,500 | $173.05 | $605,675.00 |
| | 7/7/2000 | 1,725 | $178.00 | $307,050.00 |
| | 7/7/2000 | 1,625 | $178.00 | $289,250.00 |
| | 7/7/2000 | 1,625 | $178.00 | $289,250.00 |
| | 7/7/2000 | 1,725 | $180.00 | $310,500.00 |
| | 7/7/2000 | 1,625 | $180.00 | $292,500.00 |
| | 7/7/2000 | 1,625 | $180.00 | $292,500.00 |
| | 9/22/2000 | 20,000 | $245.94 | $4,918,800.00 |
| | 9/25/2000 | 16,300 | $257.47 | $4,196,761.00 |
| | 9/25/2000 | 5,000 | $258.50 | $1,292,500.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | 9/25/2000 | 5,000 | $258.50 | $1,292,500.00 |
| | | 9/26/2000 | 6,000 | $240.06 | $1,440,360.00 |
| | | 9/26/2000 | 6,000 | $240.06 | $1,440,360.00 |
| | | 9/26/2000 | 700 | $240.06 | $168,042.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 600 | $240.40 | $144,240.00 |
| | | 9/27/2000 | 4,200 | $240.40 | $1,009,680.00 |
| | | 12/11/2000 | 58,000 | $115.02 | $6,671,160.00 |
| | | 1/4/2001 | 10,000 | $91.00 | $910,000.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 23,200 | $79.65 | $1,847,880.00 |
| | | 1/5/2001 | 9,800 | $79.65 | $780,570.00 |
| | | 1/5/2001 | 4,600 | $79.65 | $366,390.00 |
| | | 5/23/2001 | 10,000 | $50.00 | $500,000.00 |
| | | 5/24/2001 | 10,000 | $49.50 | $495,000.00 |
| | | | **462,600** | | **$72,974,793.00** |
| | | | | | |
| SMITH, C. | | 8/23/1999 | 10,000 | $164.22 | $1,642,200.00 |
| | | 8/25/1999 | 7,100 | $181.35 | $1,287,585.00 |
| | | 8/25/1999 | 900 | $181.35 | $163,215.00 |
| | | 8/30/1999 | 100 | $180.00 | $18,000.00 |
| | | 8/31/1999 | 800 | $185.00 | $148,000.00 |
| | | 9/22/1999 | 1,550 | $226.33 | $350,811.50 |
| | | 9/23/1999 | 450 | $225.13 | $101,308.50 |
| | | 10/6/1999 | 7,000 | $225.94 | $1,581,580.00 |
| | | 10/7/1999 | 1,000 | $225.81 | $225,810.00 |
| | | 12/21/1999 | 10,000 | $149.75 | $1,497,500.00 |
| | | 12/21/1999 | 10,000 | $155.00 | $1,550,000.00 |
| | | 1/3/2000 | 5,000 | $177.76 | $888,800.00 |
| | | 3/1/2000 | 5,000 | $299.00 | $1,495,000.00 |
| | | 3/10/2000 | 10,000 | $349.75 | $3,497,500.00 |
| | | 3/20/2000 | 15,000 | $171.44 | $2,571,600.00 |
| | | 3/22/2000 | 25,000 | $170.13 | $4,253,250.00 |
| | | 3/30/2000 | 12,500 | $174.50 | $2,181,250.00 |
| | | 3/31/2000 | 7,500 | $174.50 | $1,308,750.00 |
| | | 3/31/2000 | 20,000 | $174.88 | $3,497,600.00 |
| | | 6/2/2000 | 20,000 | $126.50 | $2,530,000.00 |
| | | 6/2/2000 | 10,000 | $130.94 | $1,309,400.00 |
| | | 6/6/2000 | 10,000 | $140.25 | $1,402,500.00 |
| | | 6/8/2000 | 10,000 | $155.44 | $1,554,400.00 |
| | | 6/19/2000 | 5,000 | $155.00 | $775,000.00 |
| | | 6/20/2000 | 5,000 | $160.00 | $800,000.00 |
| | | 6/21/2000 | 5,000 | $165.00 | $825,000.00 |
| | | 6/28/2000 | 10,000 | $169.00 | $1,690,000.00 |
| | | 8/22/2000 | 10,000 | $212.00 | $2,120,000.00 |
| | | 8/22/2000 | 10,000 | $215.00 | $2,150,000.00 |
| | | 8/24/2000 | 10,000 | $220.10 | $2,201,000.00 |
| | | 8/31/2000 | 10,000 | $225.00 | $2,250,000.00 |
| | | 9/1/2000 | 5,000 | $230.00 | $1,150,000.00 |

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 9/5/2000 | 2,500 | $230.00 | $575,000.00 |
| | 9/20/2000 | 10,000 | $229.25 | $2,292,500.00 |
| | 9/20/2000 | 2,500 | $230.09 | $575,225.00 |
| | 9/22/2000 | 10,000 | $250.04 | $2,500,400.00 |
| | 1/4/2001 | 10,000 | $90.50 | $905,000.00 |
| | 1/5/2001 | 40,000 | $79.65 | $3,186,000.00 |
| | | 343,900 | | $59,051,185.00 |
| | | | | |
| SONSINI | 12/9/1999 | 12,500 | $139.09 | $1,738,562.50 |
| | | 12,500 | | $1,738,562.50 |
| | | | | |
| TARRANT | 8/23/1999 | 10,000 | $164.22 | $1,642,200.00 |
| | 8/25/1999 | 4,500 | $181.35 | $816,075.00 |
| | 8/26/1999 | 5,500 | $179.38 | $986,590.00 |
| | 12/7/1999 | 20,000 | $140.06 | $2,801,200.00 |
| | 2/24/2000 | 20,000 | $265.19 | $5,303,800.00 |
| | 2/24/2000 | 15,000 | $265.94 | $3,989,100.00 |
| | 2/24/2000 | 5,000 | $268.37 | $1,341,850.00 |
| | 2/25/2000 | 10,000 | $269.16 | $2,691,600.00 |
| | 5/24/2000 | 40,000 | $92.08 | $3,683,200.00 |
| | 5/24/2000 | 40,000 | $100.01 | $4,000,400.00 |
| | 6/19/2000 | 40,000 | $142.18 | $5,687,200.00 |
| | 8/21/2000 | 25,000 | $210.80 | $5,270,000.00 |
| | 8/31/2000 | 25,000 | $225.00 | $5,625,000.00 |
| | 9/26/2000 | 5,000 | $237.69 | $1,188,450.00 |
| | | 265,000 | | $45,026,665.00 |
| | | | | |
| TOTAL | | 16,718,281 | | $1,535,181,385.61 |

277.    Defendant Reyes' sales on February 22, 2005 were particularly suspicious. The Form 8-K filed by Brocade with the SEC on that day announced, among other things, that Reyes would not stand for re-election on the Board, and indicates that the form was "accepted" by the SEC at "2005-02-22 06:05:17." On February 22, Reyes sold 1,217,000 shares for $7,474,49.85 in proceeds. These sales also came before Brocade's first restatement, which was filed on May 16, 2005.

278.



1    279. 

7                    **THE IMPROPER STOCK REPURCHASE**

8         280.    During August 2004, the Board authorized a stock repurchase program providing for

9    the repurchase of up to $100 million worth of the Company's stock.  Under this program, the Board

10   authorized the repurchase of over 1.1 million shares at prices that were artificially inflated.  These

11   repurchases occurred between January 2005 and May 2005.  During this time, Brocade's stock was

12   artificially inflated because the Company did not disclose that the stock option compensation

13   expenses being restated as announced on January 24, 2005 were the result of options backdating

14   until May 16, 2005.  During that time, Brocade's stock value declined from $7.46 per share to $4.01

15   per share.

16        281.    Brocade repurchased the 1.1 million shares at an average price of approximately

17   $6.12 per share, which is substantially higher than Brocade's stock value of $4.01 per share after the

18   full disclosure of stock options backdating at the Company.  The repurchase price is comparable to

19   the $6.19 per share that defendant Reyes averaged in selling his own Brocade stock holdings during

20   the same time period.  On information and belief, in authorizing the stock repurchases, the Board

21   members failed to properly discuss and consider that the Company's stock was artificially inflated

22   due to concealed stock option backdating.

23                          **DAMAGES TO BROCADE**

24        282.    Brocade fared much worse than the Insider Selling Defendants and the Options

25   Defendants.  The Company has spent and will need to further expend significant sums of money,

26   including, without limitation, the following:

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1           (a)     costs incurred and to be incurred to carry out internal investigations, including

2    legal fees paid to outside counsel, accounting firms and consultants.  Currently, these costs amount

3    to more than $73 million and continue to rapidly increase;

4           (b)     costs incurred and to be incurred from potential and actual fines in connection

5    with governmental investigations and enforcement actions, which total at least $7 million to date;

6           (c)     costs incurred and to be incurred from the indemnification of defendants or

7    third parties pursuant to indemnity agreements or as otherwise may be required by law;

8           (d)     costs incurred for legal fees and associated expenses incurred and to be

9    incurred by Brocade in connection with the defense of the Company against the enforcement action

10    filed by the SEC and class actions filed by shareholders that arise out of the stock option backdating

11    misconduct alleged herein;

12           (e)     costs incurred and to be incurred arising out of damages that have been or may

13    be paid by the Company in connection with the resolution of class actions filed by shareholders that

14    arise out of the stock option backdating misconduct alleged herein, whether by settlement,

15    arbitration, judgment or otherwise;

16           (f)     costs incurred and to be incurred from increased D&O insurance premiums as

17    a result of the illegally manipulated stock option grants;

18           (g)     enormous tax liabilities from improper deductions taken on backdated option

19    grants, and the costs associated with the Tender Offer alleged herein;

20           (h)     costs incurred and to be incurred from directing manpower to restate

21    Brocade's prior financial results to correct for the improperly dated stock option grants;

22           (i)     costs incurred from the millions that Brocade has advanced to the defendants

23    to pay for their legal defense, including at least $46,709,323 in legal fees and expenses to Reyes and

24    $7,140,253 in legal fees and expenses to Jensen;

25           (j)     costs incurred and to be incurred from directing manpower to correct

26    Brocade's defective internal controls; and

27           (k)     Costs incurred from canceling improperly backdated options in exchange for a

28    cash payment of approximately $3.5 - $4.5 million.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    283.    Brocade also suffers from the untoward effects of the illegal backdating practices on

2    its own corporate reputation, which are difficult to quantify.  For example, in reaction to the

3    backdating disclosures, the Corporate Library – the leading independent source for United States

4    corporate governance information and analysis – had downgraded Brocade's overall corporate

5    governance rating to a "D." A rating of "D" placed Brocade in a high risk category due to the

6    epidemic of illicit stock option granting practices at the Company.

7                    **PLAINTIFF'S DERIVATIVE ALLEGATIONS**

8    284.    Plaintiff brings this action derivatively in the right and for the benefit of Brocade to

9    redress injuries suffered, and to be suffered, by the Company as a direct result of the violations by

10    the Individual Defendants of federal securities laws, multiple breaches of fiduciary duties owed to

11    Brocade, the conspiracy to breach those duties and violations of California state law prohibitions on

12    insider selling codified in California Corporations Code sections 25402 and 25403.  Brocade is

13    named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer

14    jurisdiction on this Court that it would not otherwise have.

15    285.    Plaintiff will adequately and fairly represent the interests of Brocade in enforcing and

16    prosecuting its rights.

17    286.    Plaintiff is the trustee of "The Mary E. Barbour Family Trust One," which was and is

18    an owner of the stock of Brocade during the time of the transaction complained of, and it remains a

19    shareholder of the Company.

20                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

21    287.    By reason of their positions as officers, directors and/or fiduciaries of Brocade and

22    because of their ability to control the business and corporate affairs of Brocade, the Individual

23    Defendants owed Brocade and its shareholders fiduciary obligations of trust, loyalty, good faith and

24    due care, and were and are required to use their utmost ability to control and manage Brocade in a

25    fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in

26    furtherance of the best interests of Brocade and its shareholders so as to benefit all shareholders

27    equally and not in furtherance of their personal interest or benefit.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     288.    Each director and officer of the Company owes to Brocade and its shareholders the

2  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

3  Company and in the use and preservation of its property and assets, and the highest obligations of

4  fair dealing.  In addition, as officers and/or directors of a publicly-held company, the Individual

5  Defendants had a duty to timely disseminate accurate and truthful information with regard to the

6  compensation paid to its executives and employees.  These disclosures necessarily include the value

7  of stock options granted to the Company's executives.

8     289.    The Individual Defendants, because of their positions of control and authority as

9  directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise control

10  over the wrongful acts complained of herein, as the Company's disclosures of its financial results

11  including expenses related to stock option grants.  Because of their advisory, executive, managerial

12  and directorial positions with Brocade, each of the Individual Defendants had access to adverse, non-

13  public material information about the financial condition and improper representations of Brocade.

14     290.    At all times relevant hereto, each of the Individual Defendants was the agent of each

15  of the other Individual Defendants and of Brocade, and was at all times acting within the course and

16  scope of such agency.

17     291.    To discharge their duties, the officers and directors of Brocade were required to

18  exercise reasonable and prudent supervision over the management, policies, practices and controls of

19  the financial affairs of the Company.  By virtue of such duties, the officers and directors of Brocade

20  were required to, among other things:

21             (a)    ensure that the Company complied with its legal obligations and requirements,

22  including acting only within the scope of its legal authority and disseminating truthful and accurate

23  statements to the SEC and the investing public;

24             (b)    conduct the affairs of the Company in an efficient, business-like manner so as

25  to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting

26  the Company's assets;

27             (c)    properly and accurately guide investors and analysts as to the true financial

28  condition of the Company at any given time, including making accurate statements about the

- 115 -

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Company's financial results, and ensuring that the Company maintained an adequate system of

2   internal controls such that the Company's financial reporting would be true and accurate at all times;

3           (d)    remain informed as to Brocade's internal controls, and, upon receipt of notice

4   or information of imprudent or unsound conditions or practices, to make reasonable inquiry in

5   connection therewith, and to take steps to correct such conditions or practices and make such

6   disclosures as necessary to comply with federal and state securities laws;

7           (e)    ensure that Brocade was properly handling its tax liabilities;

8           (f)    ensure that Brocade's internal controls were sufficient to prevent backdating or

9   other manipulations of stock options granted to Brocade executives; and

10          (g)    ensure that the Company was operated in a diligent, honest and prudent

11  manner in compliance with all applicable federal, state and local laws, rules and regulations.

12      292.    Each Individual Defendant, by virtue of his or her position as a director and/or

13  officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

14  the exercise of due care and diligence in the management and administration of the affairs of the

15  Company, as well as in the use and preservation of its property and assets.  The conduct of the

16  Individual Defendants complained of herein involves a knowing and culpable violation of their

17  obligations as directors and officers of Brocade, the absence of good faith on their part, and a

18  reckless disregard for their duties to the Company and its shareholders that the Individual

19  Defendants were aware or should have been aware posed a risk of serious injury to the Company.

20  The conduct of the Individual Defendants, who were also officers and/or directors of the Company,

21  has been ratified by the remaining Individual Defendants who collectively comprise all of the Board.

22      293.    Because of their positions of control and authority as directors and/or officers of

23  Brocade, each of the defendants was able to and did, directly and indirectly, control the wrongful

24  acts complained of herein.  As to the Director Defendants, these acts included: (i) agreement to

25  and/or acquiescence in defendants' option backdating scheme; and (ii) refusal to demand the

26  resignations or seek to recover from the defendants for their misconduct. Because of their positions

27  with Brocade, each defendant was aware of these wrongful acts, had access to adverse, non-public

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  information and was required to disclose these facts promptly and accurately to Brocade's

2  shareholders and the financial markets but failed to do so.

3      294.   In each of Brocade's publicly-filed Proxy Statements for 1999-2005, the Individual

4  Defendants repeated that the stock option grants made during that period carried an exercise price

5  that was *not less than* the fair market value of Brocade's stock *on the date granted*, as calculated by

6  the public trading price of the stock at the market's close on that date.  However, such defendants

7  concealed until January 2005 that the stock option grants were repeatedly and consciously backdated

8  to ensure that the strike price associated with the option grants was at or near the lowest trading price

9  for that fiscal period.  Plaintiff thus seeks to have: (i) an accounting of all undisclosed backdated

10  stock option grants made to defendants; (ii) all the unexercised options granted to defendants

11  between at least 1999 and 2005 cancelled; and (iii) the financial gains obtained via the exercise of

12  any backdated stock options returned to the Company.

13      295.   Additionally, the Individual Defendants never disclosed the fact that the Board's

14  Compensation Committee actually delegated defendant Reyes the authority to approve the granting

15  and recording of substantially *all* compensation-related activity based upon the Company's liberal

16  use of stock options to attract and retain employees.  Further, the Individual Defendants never

17  disclosed the Compensation Committee's approval of 1.1 million grants to Reyes and the fact that

18  they had delegated to Reyes the unfettered authority to approve and record the grant date and

19  exercise price.

20      296.   The actions have also irreparably harmed Brocade's corporate image and goodwill.

21  For at least the foreseeable future, Brocade will suffer from what is know as the "liar's discount," a

22  term applied to the stocks of companies who have been implicated in illegal behavior and have

23  misled the investing public, such that Brocade's ability to raise equity capital or dept on favorable

24  terms in the future is now impaired.

25  <div align="center">**DUTIES OF DEFENDANT KPMG**</div>

26      297.   Defendant KPMG owed a duty to Brocade to perform its auditing procedures in

27  accordance with professional auditing standards.  Although a diligent application of standard

28  Generally Accepted Auditing Standards ("GAAS") procedures by KPMG auditors assigned to

<div align="center">- 117 -</div>

1  Brocade should have caused KPMG to identify and act to stop the fraudulent accounting activity
2  alleged herein, KPMG also knew or should have known that Brocade exhibited specific
3  characteristics recognized by GAAS of an audit client at higher than normal risk of committing
4  fraud. These auditing standards were adopted to force heightened awareness by auditors of the
5  possibilities for fraud and, when risk was found to be high, to require more extensive audit planning
6  and procedures in those areas suggesting high risk. These standards applied to the audits of each of
7  Brocade's fraudulent financial statements filed with the SEC for FY:02 through FY:04.[9]

8      298.    GAAS requires, among other things, that an auditor plan and perform the audit with a
9  healthy attitude of professional skepticism. This requires an auditor to conduct an objective analysis
10  of persuasive evidence to make a reasonable judgment whether a public company's financial
11  statements are accurate. When a client can be characterized as a high risk for fraud – as Brocade
12  should have been – then even greater care is required in planning and conducting the audit, and
13  heightened scrutiny is to be applied to management's selection and application of significant
14  accounting practices. This is especially true in areas related to executive compensation to ensure
15  they are not being used to misstate financial results.

16      299.    GAAS also requires an auditor to assess whether an accounting system is effective.
17  Among other things, an effective accounting system records transactions on a timely basis in
18  sufficient detail to permit proper classification and quantification for financial reporting purposes.
19  As part of this process, the auditor must assess the effectiveness of the client's internal control
20  system for preventing or detecting a material misstatement in the financial reports. Cardinal
21  characteristics of adequate internal controls include, among other things, properly designed

22

23

24  [9] In 1996, the Auditing Standards Board issued SAS No. 82, Consideration of Fraud in a Financial
   Statement Audit, which should have been applied to the fraudulent financial statements filed with the
   SEC for FY:00 audited by Arthur Andersen. In response to questions and criticisms of the auditing
25  and accounting profession's lack of adequate addressing of the subject of fraud, the AICPA replaced
   SAS No. 82 with SAS 99 to give expanded guidance to auditors for detecting fraud. Per the AICPA,
26  the standard was part of an effort to "restore investor confidence in U.S. capital markets and re-
   establish audited financial statements as a clear picture window into Corporate America." SAS 99
27  became effective for audits of financial statements for periods beginning on or after December 15,
   2002. Thus, KPMG's audits should have complied with SAS 99, which established the standards
28  and provided guidance to auditors in fulfilling their responsibility to detect fraud.

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  procedures to record stock compensation transactions accurately and segregation of duties so that it

2  is difficult to perpetuate and conceal accounting errors and fraud.

3      300.  Thus, defendant KPMG was obligated to perform professional audits and act with

4  reasonable care and competence in the performance of its auditing and consulting services, which

5  required KPMG to ensure that Brocade was properly addressing material matters relating to the

6  granting, documenting, accounting and reporting for stock option grants. Furthermore, KPMG was

7  required to exercise professional skepticism, a standard that required its personnel to probe and

8  question Brocade management, and to recognize the need to diligently and carefully corroborate

9  management representations and explanations concerning potentially material matters. KPMG either

10  knowingly or recklessly failed to address risks associated with the fact that Brocade improperly

11  granted, documented, accounted for and reported stock option grants, and as a result, materially

12  misstated its financial statements. KPMG also knowingly or recklessly failed to consider the fact

13  that Brocade had multiple material weaknesses in internal controls related to the granting,

14  documenting, accounting for and reporting of stock options. KPMG was obligated under

15  professional auditing standards to acquire sufficient information to assess the nature and magnitude

16  of these risks. KPMG had a duty to consider the following indicators of risk related to Brocade's

17  option granting practices:

18      (a)  As recognized in public filings, the Company's success depended upon its

19  ability to attract and retain qualified personnel along with "excessive interests in management in

20  maintaining or increasing the entity's stock price or earnings trends through the use of unusually

21  aggressive accounting practices." American Institute of Certified Public Accountants, Professional

22  Standards ("AU") §316.67.

23      (b)  Brocade's executives and key employees compensation scheme was heavily

24  dependent upon stock option grants. Like other technology companies in Silicon Valley, Brocade

25  faced significant competition to hire and retain qualified personnel. Brocade's management believed

26  that the Company's success depended in part on its ability to hire and retain qualified personnel.

27  Brocade thus made liberal use of employee stock options as a form of compensation.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     (c)    Brocade's historical stock option grants had "highly variable grant dates,"

2 which coincided with a pattern of jumps in share value following stock option grants.

3     (d)    Brocade's historical stock price experience high levels of stock price volatility

4 and Brocade's levels of option grants are high in relation to shares outstanding.

5     (e)    The extent of or lack of involvement of Brocade's Compensation Committee

6 in matters involving the accounting, timing and granting of stock options and the fact that between

7 fiscal years 2000 through 2004, the Compensation Committee only met a total of nine times.

8     (f)    As Brocade's former CEO and Chairman, defendant Reyes was highly

9 influential and able to recommend that the Board act to compensate officers, including himself,

10 through option grants.

11     (g)    Authority to grant stock options was delegated to Brocade's management. In

12 fact, defendant Reyes as CEO, acted as a one-man compensation committee and he personally

13 benefited from the option backdating scheme. Reyes was therefore in a unique position to override

14 any existing controls related to the accounting, timing, and granting of stock options.

15     (h)    By June 2003, the fraudulent backdating practices alleged herein had become

16 so routine and endemic at Brocade that an employee from the human resources department prepared

17 a memorandum describing the practices. The memorandum explicitly directs human resources

18 employees to recommend a pricing date by printing out historical closing prices for Brocade's stock

19 and identifying the closing price that is the lowest since the last pricing date.

20     (i)    In June 2003, a committee of the Board approved a recommendation that

21 defendant Reyes be granted 1.1 million options, but failed to stipulate the terms of the award (*i.e.*

22 specified date of grants or strike prices) and allowed Reyes himself to determine the terms of the

23 award. This committee did not approve the grants until after Reyes made the grants and they were

24 recorded in Brocade's books and records.

25   301.   Defendant KPMG is being sued in its capacity as an auditor for failure to consider

26 obvious risk factors indicating the existence of fraud, failure to exercise professional care and

27 skepticism, failure to obtain sufficient competent evidential matter, and over-reliance on

28 management representations.

1    302.    GAAS requires that auditors exercise due professional care in performing an audit or

2  review and in preparing the audit report.  AU §230.01. Due professional care requires that the

3  auditor exercise professional skepticism in performing audit and review procedures and gathering

4  and analyzing audit evidence. AU §230.07-.08. "In exercising professional skepticism, the auditor

5  should not be satisfied with less than persuasive evidence because of a belief that management is

6  honest." AU §230.09. Exercise of professional skepticism requires auditors to demonstrate a

7  questioning mind and to critically assess audit evidence. AU §316.27.

8    303.    GAAS also requires that auditors obtain sufficient competent evidential matter

9  through inspection, observation, inquiries and confirmations to afford a reasonable basis for an audit

10  opinion. AU §326.01. Evidence obtained from independent sources outside the company provides

11  greater assurance of reliability than that secured solely within the company. AU §326.21a. Auditors

12  *may not* substitute management's representations for the application of auditing procedures

13  necessary to afford a reasonable basis for an audit opinion.  AU §333.02.

14    304.    In auditing and reviewing Brocade's financial statements, defendant KPMG auditors

15  acted unreasonably in failing to exercise due professional care and skepticism, failing to obtain

16  sufficient competent evidential matter, and substituting management's representations with

17  competent evidential matter.

18    305.    Among other things, defendant KPMG's liability arises from the fact its personnel

19  failed to appropriately consider and modify the nature, timing and extent of procedures performed

20  based upon fraud risk factors and internal control deficiencies, including management's ability to

21  override internal controls.  KPMG reasonably should have known that Brocade's accounting and

22  reporting of compensation expense was not in conformity with GAAP.  KPMG also reasonably

23  should have know that certain disclosures in Brocade's publicly-filed financial information was

24  inconsistent with actual practices employed by Brocade and that these did not comply with GAAP

25  disclosure requirements.

26    306.    Defendant KPMG, however, concurred with Brocade's accounting, did not object to

27  Brocade's disclosures, and issued audit reports stating that KPMG had conducted its audits in

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT