DEWEY & LEBOEUF LLP
Barbara Caulfield
bcaulfield@dl.com
One Embarcadero Center, Suite 400
San Francisco, California 94111
Telephone:  (650) 845-7000
Facsimile:  (650) 845-7333

Ralph C. Ferrara
rferrara@dl.com
Ann Ashton
aashton@dl.com
1101 New York Avenue, N.W., Suite 1100
Washington, DC 20005
Telephone:  (202) 346-8000
Facsimile:  (202) 346-8102

Jonathan E. Richman
jrichman@dl.com
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8537
Facsimile:  (212) 259-6333

*Attorneys for Brocade
Communications Systems, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARY E. BARBOUR AS TRUSTEE FOR THE MARY E. BARBOUR FAMILY TRUST ONE, Derivatively On Behalf of BROCADE COMMUNICATIONS SYSTEMS, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**GREGORY L. REYES, DAVID L. HOUSE, MICHAEL KLAYKO, RICHARD DERANLEAU, KUMAR MALAVALLI, ANTONIO CANOVA, MICHAEL J. BYRD, STEPHANIE JENSEN, NEIL DEMPSEY, SANJAY** | **Case No.  C 08-02029 CRB**<br><br>**NOTICE OF MOTION OF MOTION TO DISMISS PLAINTIFF'S AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT OR, IN THE ALTERNATIVE, TO REALIGN THE PARTIES AND STAY THIS ACTION**<br><br>**Date:   September 19, 2008**<br>**Time:   10:00 a.m.**<br>**Court:  Hon. Charles R. Breyer** |

1    **VASWANI, L. WILLIAM KRAUSE,**
     **ROBERT R. WALKER, GLENN C.**
2    **JONES, MICHAEL J. ROSE, SETH D.**
     **NEIMAN, NICHOLAS G. MOORE,**
3    **CHRISTOPHER B. PAISLEY, WILLIAM**
4    **K. O'BRIEN, LARRY SONSINI, MARK**
     **LESLIE, TYLER WALL, RENATO A.**
5    **DIPENTIMA, JOHN W. GERDELMAN,**
     **ROBERT D. BOSSI, KPMG, LLP,**
6    **WILSON SONSINI GOODRICH &**
     **ROSATI, P.C. AND DOES 1-25, inclusive,**
7

8                **Defendants,**

9         **-and-**

10
     **BROCADE COMMUNICATIONS**
11   **SYSTEMS, INC., a Delaware corporation,**

12               **Nominal Defendant.**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   NOTICE OF MOTION TO DISMISS PLAINTIFF'S AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
     OR, IN THE ALTERNATIVE, TO REALIGN THE PARTIES AND STAY THIS ACTION
     CASE NO. C 08-02029 CRB

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. iii

STATEMENT OF ISSUES (CIV. L.R. 7-4(A)(3)) .................................................2

INTRODUCTION ...................................................................................................3

SUMMARY OF ARGUMENT ...............................................................................6

FACTUAL BACKGROUND/PROCEDURAL HISTORY.......................................7

    A. Brocade's Initial Internal Review and Restatements ....................................7

    B. Derivative Litigation.....................................................................................8

        1. The Consolidated Federal Action ("Lead Action") .................................8

        2. State Court Litigation.............................................................................9

        3. Dismissal of the Lead Action for Failure to Make a Demand ................9

    C. The Demand..................................................................................................10

    D. Turnover on the Board ..................................................................................11

    E. Formation of the SLC ...................................................................................12

    F. Barbour's Eleventh-Hour Complaint............................................................13

    G. The SLC Resolution......................................................................................14

    H. The SLC Informs the Court -- and Barbour -- of Its Plans ...........................15

    I. Barbour's Recent Flurry of Activity -- Contrary to Brocade's Interests ......16

        1. Attempts to Derail the Filing of the SLC's Amended Complaint ...........16

        2. Barbour's Latest Duplicative Pleading ..................................................17

        3. Barbour's Motion for Partial Summary Judgment..................................19

ARGUMENT ...........................................................................................................20

    I. THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO MAKE
       A DEMAND ...................................................................................................20

    A. Barbour's Allegations of Demand Futility Are Directly Contradicted By
       Actual Events.................................................................................................21

    B. Virtually All Of Plaintiff's Demand Futility Allegations Have Already
       Been Rejected By This Court .........................................................................24

    C. On These Facts, Far From Constituting An Admission Of Demand Futility,
       The Formation Of The SLC Only Underscores The Board's Independence and
       Disinterestedness............................................................................................25

D. Plaintiff's Allegations Of Demand Futility Are Conclusory,
Unparticularized And/Or Immaterial As A Matter of Law ..........................................28

   1. Plaintiff's Allegations Do Not Plead Particularized Facts Sufficient To
     Support The Conclusion That Either Of the SLC Members Is
     Interested In This Litigation.................................................................................28

   2. Plaintiff Does Not -- And Cannot --Allege Particularized Facts
     Showing That A Numerical Majority Of The Board Is Interested In
     This Litigation.....................................................................................................31

     a. A Majority Of The Current Directors Joined The Board *After* The
       Alleged Misconduct Occurred.....................................................................32

     b. Each Of Plaintiff's Purported Grounds For Establishing A
       Substantial Likelihood Of Liability Is Without Merit ....................................32

       i. Plaintiff Does Not Adequately Plead That A Board Majority
         Faces A Substantial Likelihood Of Personal Liability Based On
         An Alleged Lack Of Oversight...................................................................32

       ii. Plaintiff Does Not Allege That A Majority Of The Board Faces
         A Substantial Likelihood Of Liability By Virtue Of The
         Delegation Of Authority To Grant Stock Options.....................................35

       iii. Board Service At The Time Of The Alleged Misconduct,
         Without More, Is Insufficient To Demonstrate A Substantial
         Likelihood Of Liability ..............................................................................35

       iv. Allegations Of Insider Trading (Which Apply Only To A
         Single Board Member) Do Not Establish A Disqualifying
         Personal Interest.........................................................................................36

       v. The Board's Decision To Approve The Proposed Settlement
         And/Or Not To Renew The Company's Tolling Agreement
         With Reyes Are Irrelevant To An Analysis Of Interestedness.................37

   3. Plaintiff Fails To Adequately Plead Any Particularized Facts
     Demonstrating That A Majority Of The Board Lacks Independence....................38

II. IN THE ALTERNATIVE, THE COURT SHOULD REALIGN THE
PARTIES AND STAY THIS ACTION PENDING RESOLUTION OF
THE LEAD ACTION .................................................................................................40

  A. The Parties Should Be Realigned .........................................................................40

  1. Brocade Is Entitled To Control This Litigation ......................................................40

  2. The Company And Its Shareholders Would Be Far Better Served If
    The Parties Were Realigned To Allow The SLC To Prosecute
    Brocade's Claims In An Orderly Fashion ..............................................................46

  B. This Action Should Be Stayed Pending Resolution Of The Lead
    Action.....................................................................................................................49

CONCLUSION...................................................................................................................50

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                                                          **Page(s)**

3

*Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983) ...............25, 26, 29

4

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)............................................................2, 20, 21, 22, 33

5

*Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d. 289 (9th Cir. 1996) ...................................10

6

*In re BankAmerica Sec. Litig.*, 636 F. Supp. 419 (C.D. Cal. 1986)...............................................21

7

*In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995) ..........................................33, 34

8

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) ..........................................................................38, 39

9

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ch. 2005) ...................................39

10

*Bluth v. Bellow*, CA 6823, 1987 WL 9369 (Del. Ch. Apr. 9, 1987)..................................40, 41, 42

11

*Canadian Commercial Workers Indus. Pension Plan v. Alden,* No. Civ. A. 1184-N, 2006
12    WL 456786 (Del Ch. Feb. 22, 2006) ....................................................................................43

13

*In re Computer Scis. Corp. Derivative Litig.,* No. CV 06-05288, 2007 WL 1321715
14    (C.D. Cal. Mar. 26, 2007) ......................................................................22, 30, 36, 37

15

*Cucci v. Edwards,* No. SACV 07-532 PSG (MLGx*),* 2007 WL 3369234 (C.D. Cal. Oct.
16    31, 2007) ................................................................................................................49

17

*Damon Trust v. Wipfli, Ullrich, Bertelson, LLP*, No. 5:04-CV-172, 2005 WL 2405966
18    (W.D. Mich. Sept. 29, 2005)............................................................................43, 44

19

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) ...................................................................36

20

*In re Digimarc Corp. Deriv. Litig.*, No. 05-1324-HA (LEAD), 2006 WL 2345497 (D. Or.
21    Aug. 11, 2006) .....................................................................................................44

22

*In re F5 Networks, Inc.*, No. C06-794RSL, 2007 WL 2476278 (W.D. Wash. Aug. 06,
23    2007) ....................................................................................................................27

24

*Glenbrook Capital Ltd. P'ship v. Kuo.*, 525 F. Supp. 2d 1130 (N.D. Cal. 2007) ..........................10

25

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)......................................................29, 34, 36, 37

26

*In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814 (C.D. Cal. 2004) ........................10, 30

27

28

*Jacobs v. Yang,* No. Civ. A. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004), *aff'd,*
    867 A.2d 902 (Del. 2005) .........................................................................................40

*Johnson v. Masselli*, No. 2:07-CV-214-PPS, 2007 WL 2743493 (N.D. Ind. Sept. 17,
    2007) ....................................................................................................................44

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991).......................................... 2, 20

*Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726 (Del. 1988) ..........................21

*Kennedy v. Blumeyer*, 309 F. Supp. 939 (E.D. Mo. 1969) ............................................43

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) ...................................................................49

*Levine v. Smith,* 591 A.2d 194 (Del. 1991), *overruled on other grounds  by Brehm v.*
    *Eisner*, 746 A.2d 244 (Del. 2000)............................................................................26

*Levine v. Smith*, C.A. No. 8833, slip op. (Del. Ch. Dec. 22, 1987) ...............................41

*Lewis v. Odell*, 503 F.2d 445 (2d Cir. 1974)...................................................................44

*Liddy v. Urbanek*, 707 F.2d 1222 (11th Cir. 1983)........................................................44

*Lutz v. Boas*, 171 A.2d 381 (Del. Ch. 1961)...................................................................41

*In re MIPS Techs., Inc. Derivative Litig.*, 542 F. Supp. 2d 968 (N.D. Cal. 2008) ........36

*In re Merck & Co., Inc.*, MDL No. 1658, 2006 WL 1228595 (D.N.J. May 5, 2006) ..................27

*Mertens, et al. v. Kaiser Steel Retirement Plan et al.*, 744 F. Supp. 917 (N.D. Cal. 1990)...........44

*In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993) .......................................45

*Peller v. Southern Co.*, 911 F.2d 1532 (11th Cir. 1990)................................................27

*In re Penn Cent. Sec. Litig.*, 335 F. Supp. 1026 (E.D. Pa. 1971) .................................43

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ..................................................28, 29, 38

*Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ..........20, 37

*Richardson v. Graves*, No. 6617, 1983 WL 21109 (Del. Ch. June 17, 1983) ...............26

*Risberg ex rel. Aspen Tech., Inc. v. McArdle*, 529 F. Supp. 2d 213 (D. Mass. 2008) ..................27

*Seminaris v. Landa*, 662 A.2d 350 (Del. Ch. 1995).......................................................27

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) ................................................................25, 26, 27

*Sterling v. Stewart*, 158 F.3d 1199 (11th Cir. 1998).....................................................................43

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ...................................................................................33

*Sutherland v. Sutherland*, No. 2399-VCL, 2008 WL 2221770 (Del. Ch. May 29, 2008).............45

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ........................................................................................46

*Texlon Corp. v. Bogomolny*, 792 A.2d 964 (Del. Ch. 2001) ......................................................42

*Townsend Corp. of Am. v. Davidson*, 181 A.2d 219 (Del. Ch. 1962) ..........................................41

*Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732 (Del. Ch. 2007) ...................................................42

*In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342 (Del. Ch. 1998), *rev'd in part on other grounds*, 746 A.2d 244 (Del. 2000).................................................................................39

*Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981) .............................................6, 26, 41,42

## STATUTES

8 Del. C. §141(a)............................................................................................................................41

Fed. R. Civ. P. 12(b)    ...................................................................................................................2

Fed. R. Civ. P. 23.1    ...................................................................................................... *passim*

Del. Ch. Ct. R. 23.1.......................................................................................................................20

## OTHER AUTHORITIES

R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* §13.16.................................................................................................... 40-41

NYB 687497.1

PLEASE TAKE NOTICE that as soon as the matter may be heard in the Courtroom of the Honorable Charles R. Breyer of the United States District Court for the Northern District of California, nominal defendant Brocade Communications Systems, Inc. ("Brocade"), by its undersigned counsel and pursuant to Federal Rules of Civil Procedure 12(b) and 23.1, will move the Court for an order dismissing Plaintiff's Amended Verified Shareholder Derivative Complaint. Or, in the alternative, Brocade will move for an order to realign the parties and stay this action pending resolution of a substantially similar, earlier-filed consolidated case pending in this Court in which Brocade is now pursuing direct claims.

This Motion is based upon this Notice, the accompanying memorandum of law, the Declaration of Jonathan E. Richman, and the complete files and records in these actions and such oral argument as the Court may consider in deciding this Motion.

Dated: August 2, 2008    By:    ___/s/ Barbara A. Caulfield___

DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, California 94111
Telephone: (650) 845-7000
Facsimile: (650) 845-7333

DEWEY & LEBOEUF LLP
1101 New York Avenue, N.W., Ste. 1100
Washington, DC 20005
Telephone: (202) 346-8000
Facsimile: (202) 346-8102

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8537
Facsimile: (212) 259-6333
*Attorneys for Brocade*
*Communications Systems, Inc.*

1

Nominal defendant Brocade Communications Systems, Inc. ("Brocade" or the "Company"), by and through the Special Litigation Committee of the Brocade board of directors ("SLC") and its undersigned counsel, respectfully submits this memorandum of law in support of its motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b) and 23.1 or, in the alternative, to realign the parties, re-designate Brocade as the sole party-plaintiff in substitution for the shareholder plaintiff, and stay this action pending resolution of a substantially similar, earlier-filed consolidated case pending in this Court, in which Brocade is now prosecuting direct claims (the "Lead Action").

## STATEMENT OF ISSUES (CIV. L.R. 7-4(A)(3))

1.     Whether this purported shareholder derivative action should be dismissed for failure to make a pre-suit demand on the board of directors, as required by FRCP 23.1 and controlling Delaware precedent,[1] where:

(a)     the board is composed of a majority of outside, independent, disinterested directors,

(b)     a prior, substantially similar derivative action was dismissed by this Court for failure to plead with particularity that pre-suit demand was excused,

(c)     the plaintiffs in that action subsequently made a demand on the board, following which the board formed a Special Litigation Committee, composed exclusively of outside, independent, disinterested directors, to investigate and prosecute any meritorious claims, and

(d)     the Special Litigation Committee has now filed a complaint asserting numerous direct claims against many of the defendants herein.

2.     Whether, pursuant to Delaware General Corporations Law ("DGCL") §141(a) and other applicable Delaware and federal precedent, the parties in this purported derivative action should be realigned, and nominal defendant Brocade re-designated as the sole party-plaintiff in lieu of Barbour, where a Special Litigation Committee, formed by Brocade's

---

[1] Because Brocade is a Delaware-incorporated company, derivative claims against it are governed by Delaware substantive law. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991); *see also Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). So-called "demand futility," which relieves a derivative plaintiff of the obligation to make a pre-suit demand, is considered a substantive element of such claims and is therefore also governed by Delaware law. *Kamen*, 500 U.S. at 101.

2

1
2   majority-independent board and composed exclusively of outside, independent, disinterested
3   directors, has (a) brought numerous direct claims in this Court against many of the individual
4   defendants named herein based on the same underlying alleged misconduct, and (b) determined
5   that it is in the best interests of the corporation that it take control of this litigation, not for
    purposes of dismissing it, but rather in order to preserve additional claims Brocade might choose
6   to prosecute against some or all of the defendants herein.
7           3.      Whether, upon realignment, this action should be stayed, in the interests of
8   judicial economy and in order to preserve Brocade's ability to prosecute some or all of the claims
9   asserted herein that it has not already asserted in its direct action, pending further developments
10  in various related proceedings, including Brocade's direct action and ongoing SEC enforcement
11  proceedings against certain of the defendants herein.
12
                                    **INTRODUCTION**
13
            This is a purported shareholder derivative suit predicated on the notion that a pre-
14
    suit demand on Brocade's board of directors to pursue the underlying allegations of improper
15
    options backdating and related accounting irregularities, as expressly required by Federal Rule of
16
    Civil Procedure 23.1 and applicable Delaware law, should be excused as a "futile, wasteful and
17
    useless act." Am. Barbour Compl. ¶337.[2]
18
            The first problem with that notion is that the case was filed just over three months
19
    ago:
20
21          •   *after* a derivative complaint in an earlier-filed, substantially similar federal
                derivative suit had been dismissed by this Court for failure adequately to plead
22              that pre-suit demand was excused;[3]

23          [2] Citations to the "Am. Barbour Compl." are to plaintiff's Amended Verified Shareholder
24  Derivative Complaint, filed on or about July 22, 2008. Citations to the "Barbour Compl." are to
    plaintiff's Verified Shareholder Derivative Complaint, filed on or about April 18, 2008.

25          [3] *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, No. C05-2233 CRB (Jan. 6, 2006) ("Lead
    Action"). Although the Court properly analyzed demand futility in the Lead Action with respect to the
26  members of the board at the time that complaint was filed, a numerical majority of the nine-member
    board has remained the same. Thus, for purposes of assessing demand futility in the present case, the fact
27  that there are now four new directors who were not affiliated with the company at the time of the alleged
    wrongdoing is, at worst, immaterial and, in fact, underscores the current board's independence and
28  disinterestedness.

                                            3

- *after* the plaintiffs in the Lead Action, following its dismissal, had made a formal demand on the Brocade board to pursue the backdating claims;

- *after* the board, subsequent to that demand, had formed a Special Litigation Committee composed of two independent, outside directors, both of whom joined the board years after the underlying conduct at issue occurred (and, indeed, after this Court had already dismissed the earlier-filed derivative suit); and

- *after* the SLC had engaged independent counsel and other advisors and commenced a wide-ranging investigation into the underlying allegations.[4]

But that is not all.  Just last week, Barbour filed an amended complaint acknowledging that, in fact, the SLC had previously resolved to prosecute numerous direct claims against multiple defendants.[5]  The Company's complaint, which names 10 defendants, eight of whom Barbour purports to sue derivatively on its behalf, and runs to over 1,459 paragraphs and 282 pages, is being filed simultaneously herewith.  It clearly refutes Barbour's assertion that a demand on the Brocade board to prosecute those very claims would be "futile."

The derivative device is a creation of equity that exists for the narrow purpose of allowing the shareholders of a corporation to pursue the corporation's claims derivatively on its behalf, but *only* where (a) well-pleaded, particularized facts demonstrate that a demand that the corporation do so itself would be refused, *i.e.*, that the demand would be "futile," or (b) the corporation, having received such a demand, has wrongfully refused to bring such claims.  But through this action, Barbour is attempting to pursue claims derivatively that are now being prosecuted *directly* by Brocade in the Lead Action in response to an *actual* demand, while at the same time arguing that her failure to make a demand on the corporation to pursue such claims should be excused because it would have been a futile act.  Am. Barbour Compl. ¶337.  That makes no sense.

Typically, of course, the so-called "demand futility" inquiry is, of necessity,

---

[4] After this action was filed in April 2008, the additional defendants named and causes of action asserted herein were expressly included in the scope of SLC's investigation.

[5] Any new allegations in the amended Barbour complaint for which there was specific factual support were also presented to and considered by the SLC prior to finalizing its decision as to which claims to pursue against which defendants in its Second Amended Complaint in the Lead Action. Declaration of Jonathan E. Richman, dated August 1, 2008 ("Richman Decl."), ¶8.

4

precisely the sort of hypothetical exercise the amended *Barbour* complaint suggests it should be here: could this board be expected to respond to a demand in an independent, disinterested manner, to investigate the shareholder's allegations in good faith and, if appropriate, to pursue any viable claims? But this is not the typical case. *Here, the Brocade board (acting through the SLC) has already done so*. There is thus no need to engage in hypothesis. The unique sequence of events in this case means that the Court need not resort to conjecture to determine whether a demand would have been futile. Actual events conclusively demonstrate that it would *not* have been -- and, indeed, *was not*.

In the teeth of these events, plaintiff asserts, based on unparticularized allegations of allegedly "debilitating conflicts of interest," that a demand on the SLC and/or Brocade's current board to pursue the very claims it is now pursuing would have been to no avail. As demonstrated below, however, it is clear from the face of the complaint that a majority of the board -- most of whom had no affiliation with the Company at the time the wrongful conduct occurred -- was both independent and disinterested. The board was therefore fully capable under applicable Delaware law of fielding a demand. This is particularly true of the two SLC members, who did not join the board until *2007*, when the company on whose board they previously sat -- an erstwhile competitor of Brocade -- was acquired. And because the SLC had been formed, given a plenary mandate with respect to options backdating and related claims, and announced to the parties in the existing derivative litigation at the time this action was filed, any demand by Barbour would have been made on, and responded to by, the SLC.

In any event, even if the Court were for some reason disinclined to dismiss the complaint for failure to satisfy the demand requirement, Barbour simply has no right or standing to control the case going forward. Under DGCL §141(a) and well-established Delaware (and federal) decisional law, only the SLC, acting for the board, has that right. Accordingly, the parties should be realigned, and the SLC should be permitted to take over prosecution of the case and, in the interests of judicial economy and of protecting its ability to pursue additional potentially culpable parties named herein but not in its direct complaint in the Lead Action, stay

it pending further developments in the Lead Action, the SEC civil actions against some of those individuals and other pending litigation.

Finally, while plaintiff has made clear on more than one occasion that she is anxious to launch a so-called "*Zapata*" challenge to the SLC's independence, good faith and the reasonableness of its investigation,[6] controlling Delaware precedent entitles a corporation to assume control of derivative litigation, even if properly initiated, so long as there is no hint of collusion with the defendants or other evidence that the corporation does not intend to prosecute the action in good faith. Here, in light of the fact that the SLC has already conducted an investigation and is concurrently filing a complaint to prosecute *directly* many of the very same claims Barbour seeks to assert herein derivatively, there can be no legitimate contention that either is the case. Thus, plaintiff is simply not entitled to discovery or an evidentiary hearing on "*Zapata*" issues.

Meanwhile, Barbour's activities to date have, contrary to the purpose of derivative litigation, served as roadblocks to the SLC's pursuit of the wrongdoers who caused Brocade harm and have diverted the SLC's efforts -- and Brocade's ever-scarcer resources -- from that mission, all at considerable expense to the corporation whose interests she claims to be serving and to the potential prejudice of the successful resolution of the very claims she seeks to assert.

## SUMMARY OF ARGUMENT

Filed in April 2008, this action represents the latest (by several years) in a series of derivative actions filed beginning in May 2005 arising out of Brocade's historical stock option grants and associated accounting practices from fiscal years 1999 to 2004. Prior to the filing of plaintiff's complaint (which is substantially similar to the complaints in the Lead Action and the consolidated state court derivative litigation (the "State Case")), this Court had already rejected the argument, made by plaintiffs in the Lead Action, that a pre-suit demand on the board would have been futile and dismissed that action for failure to make such a demand.

---

[6] *See Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Following that dismissal, plaintiffs in that case made a demand on the board, and the board, though not required to do so, ultimately delegated plenary decision-making authority to a Special Litigation Committee that conducted an investigation into all of the claims asserted in all of the then-pending and future derivative complaints -- including this one.    Upon completion of its investigation, the SLC, far from wrongfully *refusing* to pursue litigation, determined to do precisely that.

Even apart from the SLC process, the board was at the time of the filing of the complaint in this action composed of a majority of independent, outside directors.    Accordingly, demand on the board was not excused.   Moreover, the majority-independent board and the SLC have the absolute right under applicable Delaware and federal precedent to assume control of the litigation.    Thus, either (a) this action should be dismissed under FRCP 12(b) and 23.1 and applicable Delaware law for failure to make a pre-suit demand, or (b) alternatively, the parties should be realigned, consistent with DGCL §141, with Brocade re-designated as the sole party plaintiff in lieu of Barbour, so that the SLC can prosecute the case in the manner it deems most consistent with the best interests of Brocade, in coordination with its efforts in the Lead Action, the State Case and other venues.

## FACTUAL BACKGROUND/
## PROCEDURAL HISTORY[7]

### A.    *Brocade's Initial Internal Review and Restatements*

As the Court is aware, Brocade is a Delaware corporation headquartered in San Jose, California, that designs, sells and supports data storage networking products and services. Am. Barbour Compl. ¶30.   In January 2005, Brocade announced that, as a result of an ongoing internal review, it had determined that its historical accounting for stock option grants was incorrect and required restatement.   *Id.* ¶226.   A few weeks later, on January 24, 2005, Brocade announced that its internal review was complete and that the Company would restate its

---

[7] Given the Court's long history with the Brocade litigation in all of its many iterations, we have assumed the Court's general familiarity with the procedural history and repeat only those facts relevant or necessary to consideration of the instant motion.

financials for 2002 and 2003 and make adjustments to fiscal year 2004 to record additional stock-based compensation charges. *Id.* ¶¶20, 226. On May 16, 2005, the Company announced that it would again restate its financial statements for fiscal years 2002 to 2004 to record additional charges for stock-based compensation expense. *Id.* ¶231.

As this Court by now knows all too well, numerous civil suits, regulatory investigations and criminal prosecutions ensued. Over time, among other things, an agreement in principle to resolve a federal securities fraud class action filed in this Court was entered into by Brocade, a formal investigation of the Company by the SEC was resolved, and its former CEO, Gregory Reyes, and former VP of Human Resources, Stephanie Jensen, were tried and convicted by the DOJ on multiple criminal counts. Enforcement proceedings by the SEC against Reyes, Jensen and certain other individuals remain pending. For purposes of the present motion, our primary focus is on the associated derivative litigation, described in greater detail below.

**B.    Derivative Litigation**

    *1.    The Consolidated Federal Action ("Lead Action")*

Beginning in June of 2005, on the heels of the above-described restatements and subsequent federal securities fraud class action, four competing derivative suits were filed in this Court by shareholders purporting to sue derivatively on the Company's behalf and consolidated under the caption, *In re Brocade Communications Systems, Inc. Derivative Litigation*, Case No. C05-02233 CRB. A consolidated amended complaint was filed on October 7, 2005. In essence, the Lead Action, which named as defendants various current and former Brocade directors and officers, alleged that those individuals had breached their fiduciary duties to the Company by allowing it to improperly issue and account for backdated stock option grants made between 1999 and 2004. The Company itself, as is standard in these sorts of cases, was named solely as a nominal defendant.

No pre-suit demand on the Brocade board to investigate and bring plaintiffs' claims had been made, let alone rejected, before the Lead Action was filed. Instead, plaintiffs

alleged that such a demand was excused under Delaware law because it would have been futile in light of the alleged interestedness and/or lack of independence of a majority of the board.[8]

    *2.    State Court Litigation*

Roughly simultaneously with the filing of the constituent cases in the Lead Action, three substantially similar derivative suits were filed in Santa Clara Superior Court, consolidated under the caption, *In re Brocade Communications Systems, Inc. Derivative Litigation*, Lead Case No. 1-05-cv-041683 ("State Case") (*id.* ¶22(e)), and initially stayed in favor of the Lead Action.[9]  After a partial lifting of the stay, an amended complaint was filed on November 13, 2006.  Once again, no pre-suit demand was made on the Brocade board, and demand futility was alleged.

Not coincidentally, one of the co-lead plaintiffs in the State Case, which has once again been stayed (by agreement of all parties) pending the outcome of the SLC process in the Lead Action, is represented by plaintiff's counsel herein.

    *3.    Dismissal of the Lead Action for Failure to Make a Demand*

On October 27, 2005, Brocade and the individual defendants moved to dismiss the complaint in the Lead Action on the grounds that plaintiffs had failed to make a pre-suit demand on the board to investigate and bring their claims, as required by FRCP 23.1 and Delaware law, or to adequately allege that demand was excused as futile.

At the January 6, 2006, hearing on defendants' motion, this Court found that, while plaintiffs had asserted a "whole variety of arguments" that demand would have been futile, "none of them work[ed]," and the complaint was "not even close" to adequately pleading demand futility.  *See* Order and Transcript of Jan. 6, 2006 at 4:1-3; 4:25-5:2 (Lead Action Docket No. 79).  Indeed, the Court expressed skepticism that plaintiffs could *ever* plead demand

---

[8] At the time the Lead Action was filed, the Brocade board consisted of: David L. House, Michael Klayko, L. William Krause, Sanjay Vaswani, Robert R. Walker, Seth D. Neiman, Neil Dempsey, Christopher B. Paisley and Nicholas G. Moore.

[9] The State Case named certain additional defendants not named in the Lead Action who are also named as defendants in the instant case.

futility in light of Brocade's majority-independent board (*id.* at 5:15-17)[10] and denied plaintiffs' request for discovery to assist them in attempting to do so, both for that reason and because permitting discovery to support demand futility allegations is "not a procedure that has been sanctioned by the [Ninth] Circuit and I'm not inclined to set new law." *See id.* at 8:4-5. Instead, the Court entered an order dismissing the complaint with leave to amend after a demand had been made, considered and responded to by the Brocade board. *Id.* at 8-9.

Brocade later (in March 2007) demurred to the consolidated complaint in the State Case on the grounds that the plaintiffs in that case had likewise failed to make a demand on the board that, as evidenced by this Court's dismissal of the Lead Action, was not properly excused. Though fully briefed, that motion has been taken off-calendar pending the outcome of the SLC process in the Lead Action.

## C.    The Demand

By letter dated January 13, 2006, plaintiffs in the Lead Action made a formal demand on the board to bring claims based on their options backdating allegations in order to recover, for the benefit of the corporation, damages Brocade had sustained by reason of, among other things, various alleged breaches of fiduciary duty by current and former Brocade directors and officers. *See* Richman Decl., Ex. B.[11]

---

[10] "I don't think you've done it. I don't know that you can do it. So I am inclined to think what you want to do is make your demand."

[11] At the time of the demand, the board consisted of Messrs. House, Klayko, Krause, Vaswani, Walker, Neiman, Dempsey and Paisley. *Id.* (The SLC respectfully requests that the Court take judicial notice of certain exhibits annexed to the Richman Declaration, such as pleadings and other court papers publicly filed in its own docket in a related case, including, in particular, the Second Amended Complaint in the Lead Action, filed by the SLC on behalf of Brocade simultaneously herewith ("SLC Am. Compl."), Richman Decl., Ex. A. *See, e.g., Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (The district court may take judicial notice of pleadings in earlier related proceedings in the litigation.); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 816 (C.D. Cal. 2004) (court proceedings are properly the subject of judicial notice). This Court can, of course, consider on a motion to dismiss not only all documents incorporated by reference in the complaint, but public filings and certain other documents of which the Court may take judicial notice. *See, e.g., Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F. Supp. 2d 1130, 1137 (N.D. Cal. 2007) ("In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss."). The exhibits to the Richman Declaration that do not fall into one of those categories are submitted either by way of background for the Court's assistance or in support of Brocade's alternative request to realign the parties and stay the litigation.)

10

1

2          In response to the demand, the Company began to explore the possibility of a

3    negotiated resolution. *See* Richman Decl., Ex. C (April 27, 2007 Tr.) at 18:2-6. In May 2006,

4    the parties reached, and the Brocade board approved, a settlement on behalf of the Company,

5    subject to Court approval.[12] In June 2006, the parties jointly sought preliminary approval of the

6    proposed settlement. The board also formed an independent Settlement Committee in November

7    2006 to consider the pending settlement in this Court, as well as any settlement issues in the

8    State Case. (Neither of the SLC members was on the Settlement Committee.) This Court

9    granted preliminary approval of the proposed settlement in February 2007. Plaintiffs in the Lead

10   Action ultimately informed the Court before the scheduled April 27, 2007 hearing that the Court

11   should not approve the settlement at that time. *Id.* at 6-7. The Court ultimately declined to grant

12   final approval, and the Company subsequently withdrew the proposed settlement from the

13   Court's consideration. *See* April 25, 2008 Tr. at 7 (Lead Action Docket No. 197).

**D.    Turnover on the Board**

14          By early 2007, four of the nine directors who were on the board in May 2005,

15   when the Lead Action was originally filed, had been replaced. *Compare* Am. Barbour Compl.

16   ¶323 *with* ¶337. Mr. Moore resigned from the board in November 2005 (*id.* ¶47), Messrs.

17   Paisley and Neiman in April 2006 (*id.* ¶¶48, 46), and Mr. Dempsey in April 2007 (*id.* ¶40). In

18   their respective places, Glenn C. Jones and Michael J. Rose joined the board in April 2006 (*id.*

19   ¶¶44, 45), while Renato A. DiPentima and John W. Gerdelman joined in January 2007 as a result

20   of Brocade's acquisition of a competitor, McDATA Corporation (*id.* ¶¶53, 54). None of the four

21   new directors was employed by Brocade at the time of the alleged wrongdoing, or was otherwise

22   affiliated with the Company prior to his tenure on the board.

23

24

25

26   ───────────────

27       [12] The composition of the board differed slightly by the time the proposed settlement was
     preliminarily approved in May 2006 from when the demand was made, as former directors Paisley and
     Neiman had been replaced by directors Jones and Rose in April 2006. Am. Barbour Compl. ¶¶44, 45, 48,

28   46.

1

2    *E.    Formation of the SLC*

3            In February 2008, after it became apparent that a global resolution of the

4    derivative claims was unlikely, the Brocade board appointed Messrs. DiPentima and Gerdelman

5    as a two-member Special Litigation Committee to act on the Company's behalf with respect to

6    the derivative actions. *Id.* ¶338.[13]  The board's February 22, 2008 resolution delegated to the

7    SLC plenary authority to decide whether it was in the best interest of the Company and its

8    shareholders to pursue or otherwise resolve the claims raised in the various derivative lawsuits

9    and, if so, to pursue or resolve those claims and/or any other Company claims the SLC deemed

10   appropriate relating to, among other things, the derivative lawsuits, Brocade's historical stock

11   options practices, and legal fees and expenses advanced by the Company on behalf of its former

12   and current employees, officers and directors with regard to the various associated investigations

13   and court actions. *See* Richman Decl., Ex. C at ¶120.[14]  Brocade filed a statement informing the

14   Court and the parties that the SLC had been formed on March 21, 2008. *See* Joint Case Mgmt.

     Conf. Statement, dated Apr. 25, 2008 (Lead Action Docket No. 185).

15

16

17        [13] Between January 1995 and March 2007, Mr. DiPentima was employed in various capacities by
     SRA International, Inc., a leading provider of technological and strategic consulting services, including
18   serving as the company's president and CEO from January 2005 through March 2007.  Prior to joining
     SRA, Mr. DiPentima spent 33 years in various government posts, including serving as deputy
19   commissioner for systems at the Social Security Administration.  He also chaired both the Federal
     Information Technology Acquisition Improvement team (as part of President Clinton's National
20   Performance Review Initiatives) and the Industry Advisory Council's CIO Task Force. *See* Lead Action
     Docket No. 186 at 2.  Mr. Gerdelman currently serves as the chairman of Intelliden Corporation, a
21   networking software solutions company he co-founded in 2004.  Prior to that, he served in various
     executive and other capacities at Metromedia Fiber Networks, USA.NET, and MCI Communications
22   Corporation.  In addition to serving on the board and SLC of Brocade, Mr. Gerdelman is a director of
     Sycamore Networks, Inc. and is a member of a special committee reviewing issues relating to Sycamore's
23   equity compensation practices. *Id.*

24        Neither Mr. DiPentima nor Mr. Mr. Gerdelman was on the Settlement Committee formed in
     connection with the proposed settlement in the Lead Action and State case or participated in any decisions
25   relating to the conduct of the derivative litigation, including but not limited to decisions relating to Wilson
     Sonsini's continued representation of the Company or the individual defendants.
26
          [14] It bears noting that the board was not required to form a special litigation committee.
27   Consistent with this Court's demand futility decision in the Lead Action, because the Brocade board was
     (and is) composed of a majority of outside, independent directors, it was competent to consider and
28   respond to the demand without the need for an SLC.

                                                    12

1

2      *F.     Barbour's Eleventh-Hour Complaint*

3              On April 18, 2008, after the parties to the existing derivative litigation had been

4      made aware that the SLC's investigation was underway, counsel for one of the co-lead plaintiffs

5      in the State Case (in which a scheduled hearing on defendants' motion to renew the stay was just

6      weeks away) filed the instant complaint, which is substantially similar to the complaints in the

7      Lead Action and the State Case, in this Court.[15]  Like its predecessors, the complaint conceded

8      that plaintiff had not made a pre-litigation demand on the board or the SLC, but alleged that a

9      demand on either would have been "futile."   Barbour Compl. ¶287; *see also* Am. Barbour

10     Compl. ¶¶323, 337.

11             The members of Brocade's board when this action was filed were Messrs. House,

12     Klayko, Krause, Vaswani, Walker, Rose, Jones, DiPentima and Gerdelman.  *Id.* ¶337.  All of

13     them, with the exception of Mr. Klayko, are outside, independent directors who do not -- and did

14     not ever -- have any managerial role or employment relationship with Brocade.[16]  As noted

15     above, the SLC, in the persons of Messrs. DiPentima and Gerdelman, had already been

16     established and announced two months before this action was filed.  *Id.* ¶338.

17             On April 25, 2008, at a case management conference in the Lead Action at which

18     counsel for Barbour appeared, this Court addressed, among other things, whether to consolidate

19     *Barbour* into the Lead Action.  Notwithstanding the substantial overlap in the allegations, the

20     Court determined that it was "not going to consolidate the actions formally" and that they would

21     instead be coordinated rather than consolidated.  *See* Apr. 25, 2008 Hr'g Tr. at 15 (Lead Action

22     Docket No. 197).   Thereafter, on May 27, 2008, the Court granted plaintiff's administrative

23     motion to consider whether *Barbour* should be related to the Lead Action, finding that it would

24     be related but not consolidated into the Lead Action because, among other things, Barbour

25

26             [15] The original *Barbour* complaint alleges claims nearly identical to those in the Lead Action and
       the State Case, but adds (a) new claims for violations of RICO, (b) four defendants named in the State
27     Case but not the Lead Action, and (c) six new defendants not named in either of the other actions.

28             [16] Mr. Klayko became Brocade's CEO in January 2005. *Id.* ¶33.  Prior to that time, he served as a
       Brocade sales executive (beginning in January 2003).  *Id.*

alleged demand futility, while the plaintiffs in the Lead Action had "conceded demand" (meaning, presumably, that they had made a demand on the board).

## G.    The SLC Resolution

Meanwhile, pursuant to its mandate, the SLC had retained Dewey & LeBoeuf LLP ("D&L") to serve as counsel to Brocade for purposes of advising and assisting the SLC, as well as Delaware and California law experts, Financial Reporting Advisors, LLC, to serve as its accounting expert, and the economic consulting firm of Compass Lexecon. Together with its advisors, between March 6, 2008 and May 29, 2008, the SLC conducted a wide-ranging inquiry into the various issues raised by each of the then-pending derivative cases, including but not limited to a review of each defendant then named and each claim then asserted in this action. *See* Richman Decl., Ex. D.

Specifically the SLC's review addressed each allegation made in the Federal Action, this case, the original *Barbour* complaint and the demand letter to the effect that that the officers, directors, employees and advisors to the Company had breached their fiduciary duties and harmed the Company, and also investigated possible corporate injuries and potential defendants that had *not* been mentioned in the existing derivative actions or the demand. *Id*; *see also* Richman Decl., Ex. C ¶127.

On June 9, 2008, the SLC adopted a 127-page resolution detailing its investigation and findings and directing D&L to take a variety of actions, including filing a Second Amended Complaint in the Federal Action asserting numerous direct claims against 11 defendants. *See* Richman Decl., Ex. E. Eight of the individual defendants herein are among the 11 named in the SLC's resolution. The resolution further provides that while the SLC had determined that, *at that time*, action should only be taken against 11 individuals, it would defer further consideration of *all other claims* asserted in the derivative actions because of, among other things: the pendency of ongoing SEC enforcement proceedings against various individuals, certain related class action litigation and Mr. Reyes' appeal of his criminal conviction; the fact that the SLC may be pursuing discovery in connection with the claims asserted in the Federal

14

1
2
Action; and the fact that numerous individuals (including certain defendants in the derivative
actions) have invoked their Fifth Amendment privilege in related proceedings. *See id.*[17]

3
4
5
6
7
8
Accordingly, the resolution indicated that the SLC had decided *not* to provide an
omnibus release to all actual or prospective defendants not among the 11 to be sued, but to deal
with releases on a defendant-by-defendant basis (if at all) and directed counsel to take steps to
preserve the claims the SLC has not yet decided to assert on behalf of the Company. *See id.*[18]  In
order to effectuate that mandate, the resolution directed counsel to seek to stay this case and the
*Barbour* action in favor of the Federal Action. *See id.*

9
10
### H.    The SLC Informs the Court -- and Barbour -- of Its Plans

11
12
13
At a June 12, 2008 case management conference in the Lead Action and the
instant case, the SLC informed the Court that, as a result of its investigation, it (i) intended to
pursue claims against the 11 prospective defendants, (ii) wished to give those defendants an

14
[17] The defendants named in the SLC's Second Amended Complaint in the Lead Action are Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, Bonderson, Bossi and Cuthbert.

15
16
17
18
19
20
21
22
23
24
25
[18] The only releases provided to date to any defendant named in any derivative action are to Larry Sonsini and Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR").  In connection with granting those releases, the SLC took into account numerous factors, including (a) the views of the SLC's expert on California law governing legal professionals, who discussed issues relating to WSGR's representation of Brocade and the relevant standards of professional responsibility governing WSGR's roles as corporate counsel and litigation counsel, (b) the SLC's evaluation of documents and testimony relating to Mr. Sonsini's role as a Brocade director and WSGR's roles as Brocade's counsel, (c) Mr. Sonsini's and WSGR's contentions that Brocade employees had misled WSGR about stock-option grants, that the Audit Committee's investigation had not found wrongdoing by WSGR, that WSGR had negotiated a favorable settlement with the SEC and the avoidance of DOJ proceedings against Brocade, and that WSGR had recommended that Brocade retain outside counsel to investigate the demand letter in the Federal Action, (d) WSGR's long-standing representation of Brocade, (e) WSGR's past and continued willingness to assist Brocade in resolving outstanding questions about the events that occurred in connection with faulted stock option grants at Brocade, and (f) WSGR's commitment to pay (and its subsequent payment of) a one-time contribution in the amount of $9.5 million in recognition of and in order to defray some of the significant costs Brocade has incurred over the past four years in connection with the various investigations and lawsuits relating to the Company's historical stock option practices.  After balancing the full array of considerations, the SLC determined that pursuing claims against WSGR and Mr. Sonsini would be inappropriate.

26
27
28
In addition, while the SLC originally concluded in its June 9 resolution that claims would be pursued against Grace Ward, as a result of subsequent meetings and discussions between the SLC's counsel and counsel to Ms. Ward, the SLC determined that it was not in Brocade's best interests to bring claims against Ward due to (a) the fact that she would likely be incapable of satisfying in significant part any judgment obtained against her, and (b) her expressed willingness to assist the SLC in connection with the factual development of its claims.  Richman Decl. ¶¶5-6.

opportunity to make written submissions explaining why they believed the SLC should not take action against them, (iii) would finalize its determination with respect to those defendants after consideration of such submissions, (iv) intended to file an amended complaint in the Lead Action asserting direct claims against those defendants on behalf of Brocade, and (v) intended to move to dismiss or stay *Barbour* for failure to make a demand.  Following the June 12 conference, by order entered June 18, 2008, the Court ordered that the SLC could "file any amended complaint it wishes to file" in the Lead Action, and any motion to dismiss or stay in *Barbour*, on or before August 1, 2008, and stayed discovery in *Barbour* until further notice.

### I.    *Barbour's Recent Flurry of Activity -- Contrary to Brocade's Interests*

#### 1.    *Attempts to Derail the Filing of the SLC's Amended Complaint*

At the June 12 CMC, counsel for Barbour had appeared and argued that, prior to the filing of the SLC's amended complaint in the Lead Action, (i) the SLC should be required to provide Barbour with a copy of its final report and/or the identity of the 11 defendants against whom it intended to assert claims, and (ii) Barbour should be permitted to bring some sort of application challenging the SLC's good faith and independence.  Both propositions were rejected by the Court.  Then, on June 27, 2008, Barbour filed "objections" to the order memorializing the schedule set by the Court at the June 12 CMC (entered by this Court almost two weeks earlier), seeking to re-litigate exactly the same issues she had already raised -- and lost -- at the CMC, and raising the additional argument (which she could have raised -- but chose not to -- at the CMC) that the instant motion was doomed to failure because the formation of the SLC was a concession of demand futility.  (She is wrong.  *See infra* sec. I.A. & B.1.)

In raising such issues yet again, Barbour was doing exactly what this Court had attempted to prevent her from doing in setting the SLC schedule -- distracting the SLC from the tasks it had undertaken to complete by August 1, 2008 and wasting the very Brocade resources about which she professes to be concerned.  The Court summarily denied Barbour's post-conference application.  *See Barbour* Docket No. 51.  But that was just the first of Barbour's

16

attempts to try to cling to derivative claims on behalf of a corporation that is already actively pursuing those claims directly.

Indeed, Barbour's only proffered reason for needing the identities of the 11 prospective defendants and/or a copy of the SLC's report was that she was somehow entitled to challenge the SLC's findings, independence and good faith even *before* it took any action. As this Court had already held, however, any such challenge should, at a minimum, await the filing of the SLC's Second Amended Complaint in the Lead Action, when everything will be "out on the table." *See* Richman Decl., Ex. F (June 12, 2008 Tr.) at 33-34; *see also id.* at 38-39 (while plaintiff may file motions, including one to challenge the SLC's good faith, before August 1, 2008, "they will not be heard until at least the second or third week of August [be]cause I don't want to force [the SLC] to write an opposition either until -- until they've put their complaint out on the table ....  I want them to spend between now and August 1st doing what they said they're going to do.").[19]

### 2. *Barbour's Latest Duplicative Pleading*

Undeterred, on July 22, 2008, just ten days prior to the deadline set by this Court for the SLC to file its Second Amended Complaint in the Lead Action and the instant motion, Barbour filed an amended complaint. To the extent that any new allegations for which there was specific factual support not previously considered by the SLC appeared in the amended complaint, they have since been presented to and considered by the SLC in reaching its conclusions with respect to which claims to pursue and against whom. Richman Decl. ¶8. (As noted above, all of the claims, defendants and material factual allegations in the original *Barbour* complaint were fully considered by the SLC prior to the adoption of the [June 9] resolution.).[20]

Moreover, the only significant amendment to Barbour's "demand futility" allegations is an acknowledgement that the Company is actually pursuing direct claims against

---

[19] As demonstrated *infra*, Sec. I.B., C., on the facts of this case, plaintiff is not entitled to bring on any such motion.

[20] While the *Barbour* complaint added a new defendant not previously named in any of the pending derivative cases (Bossi), potential claims against Mr. Bossi had already been considered by the SLC prior to its June 9 resolution and he is in fact a defendant in the SLC's Second Amended Complaint.

numerous defendants (although Barbour attempts to spin this as somehow helpful, rather than fatal, to her cause): "Recently, the SLC informed the Court that it intends to file an Amended Complaint on behalf of the Company to bring claims related to the backdating scheme alleged herein against eleven unspecified defendants." Am. Barbour Compl. ¶334(iv); *see also id.* ¶338.[21]

This inconvenient truth stands in stark contrast to Barbour's repeated protestations to this Court that she must be permitted to pursue this case derivatively because the SLC will otherwise never take action. *See, e.g.,* Apr. 25, 2008 Case Mgmt. Stmt. of Plaintiff Mary E. Barbour, at 4 ("Barbour's claims should be allowed to proceed because … Brocade is still controlled by individuals who are firmly committed to protecting the individual defendants …. Brocade has taken no action whatsoever to pursue redress against the responsible individuals."). Indeed, so critical is it to her position that, elsewhere in the amended complaint itself, Barbour continues to cling to this obvious fiction: "the Individual Defendants and *the current Board have not filed any lawsuits against* themselves or *others who were responsible for [the] wrongful conduct* to attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby." Compl. ¶351 (emphasis added).

Moreover, Barbour goes on to effectively admit, by necessary implication, that the SLC's prosecution of Brocade's direct claims establishes that, at the time *her* complaint was filed (the only time relevant for the demand futility analysis in this case (*see infra*)), demand obviously would not have been futile: "This action [*i.e.*, the SLC's decision to prosecute direct claims] only came after three years of litigation and … criminal convictions …, demonstrating that *the Board at the time of the original filings* of this action was unwilling to take action …." *Id.* (emphasis added).[22]

---

[21] Barbour could not, of course, have known at the time that the SLC's complaint would name eight of the defendants sued in her complaint, but this merely underscores the inadvisability of her having brought this last-minute, competing action in the first place.

[22] By "of this action" we can only assume that Barbour is referring to the now-dismissed Lead Action and/or the State Case in which her counsel represents one of the co-lead plaintiffs. Moreover, this allegation is, of course, at odds with this Court's order dismissing the consolidated derivative complaint in the Lead Case.

3.    *Barbour's Motion for Partial Summary Judgment*

Then, on July 25, 2008, just days before the SLC was to file its amended complaint, Barbour filed a motion for partial summary judgment against Reyes, seeking a declaration that Reyes is not entitled to indemnification or advancement of legal fees and must return to the Company monies advanced for the cost of his defense of any claims that he violated the federal securities laws in connection with the backdating allegations (Count XIV of Barbour's Amended Complaint). *See Barbour* Docket No. 59. The motion is predicated on the federal public policy against indemnification for violations of the federal securities laws and argues, in broad strokes, that principles of collateral estoppel bar Reyes from re-litigating that he violated the federal securities laws in light of his criminal conviction therefor.

This attempt to leap out ahead of the SLC in the prosecution of claims against (and recovery from) Reyes -- potentially prejudicing the Company's position should it choose, at the appropriate time, to seek similar relief -- is emblematic of the dangers of allowing Barbour to proceed on a parallel track with the SLC and serves only to underscore the need for the SLC to be given exclusive control of the Company's claims. As discussed below, Barbour's motion essentially ignores the terms of Reyes' Indemnification Agreement with Brocade, which (if applicable) contains provisions concerning the timing of decisions about indemnity and advancement of fees can be made, and which gives the Delaware Chancery Court exclusive jurisdiction to decide actions instituted under the Indemnification Agreement. Barbour's failure to consider these issues thus has potentially put the Company in a position of having to advance Reyes' expenses to defend a motion that did not need to be, and should not have been, filed – especially because the Court has not yet determined that Barbour has *any* right to continue to pursue this case.

Among other things, Barbour's motion essentially ignores the terms of Reyes's indemnification agreement with Brocade, which provides that the relief Barbour requests in her motion can only be obtained (a) following a "final judicial determination" of non-entitlement to indemnification under applicable law as to which all appeals have been exhausted (or the time

19

for taking an appeal has lapsed), and (b) in Delaware Chancery Court. Here, in addition to having raised the issue of indemnification in the wrong court, as Barbour well knows, Reyes is in the process of appealing the criminal convictions on which her motion purports to be predicated. The fact that Barbour would potentially forcing the Company to advance Reyes' expenses to defend such an ill-conceived motion is, standing alone, dispositive evidence of the need for the SLC to assume control of the derivative litigation.

## ARGUMENT

### I.

### THE COMPLAINT MUST BE DISMISSED
### FOR FAILURE TO MAKE A DEMAND

It is a "basic principle of corporate governance that the decisions of a corporation -- including the decision to initiate litigation -- should be made by the board of directors or the majority of shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991); *see also Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.") (*citing* 8 Del. C. §141(a)).[23]

A shareholder derivative action is an equitable vehicle that enables a shareholder, in limited circumstances, to sue in the corporation's name "to enforce a corporate cause of action." *Kamen*, 500 U.S. at 95. Because a derivative action "necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation," *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323, at *7 (Del. Ch. Sept. 30, 2003), a shareholder who seeks to pursue such an action must either (1) make a pre-suit demand on the corporation's directors requesting that they commence litigation, or (2) plead particularized facts showing why a pre-suit demand would have been futile. Fed. R. Civ. P. 23.1; Del. Ch. Ct. R. 23.1; *see also*

---

[23] While the demand requirement in a federal derivative suit is embodied in FRCP 23.1 (verified complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort"), because Brocade is a Delaware corporation (Am. Barbour Compl. ¶42), Delaware law governs the question of whether plaintiff is excused from making a demand, which is considered a substantive element of a derivative claim. *See Kamen*, 500 U.S. at 108-109.

*Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988); *Kamen*, 500 U.S. at 95-96 ("To prevent abuse" of the derivative action device, pre-suit demand is required "unless excused by extraordinary conditions."). The demand requirement is "not merely a technical pleading hurdle." *See In re BankAmerica Sec. Litig.*, 636 F. Supp. 419, 420 (C.D. Cal. 1986). Rather, it "is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson*, 473 A.2d at 809. [Accordingly, derivative claims that fail to satisfy the demand requirement are subject to dismissal]. That is exactly what the SLC, on behalf of Brocade, is doing here (*see* Sec. II, *infra*).

Barbour concedes that she failed to make a pre-suit demand, but contends that this failure should be excused because to do so would have been "futile." Am. Barbour Compl. ¶337. As demonstrated below, plaintiff's allegations of demand futility (a) are flatly contradicted by actual events, which had already occurred at the time the complaint was filed and are either pled in the complaint itself or of the sort that can be judicially noticed by this Court on a motion to dismiss, (b) have, to a large extent, already been rejected by this Court in the Lead Action, and/or (c) are, in any event, woefully lacking in particulars and insufficient to plead demand futility as a matter of law.

## A.    Barbour's Allegations of Demand Futility Are Directly Contradicted By Actual Events

Barbour contends that she should be excused from making a demand because it would have been a "futile, wasteful and useless" act. Am. Barbour Compl. ¶¶323, 337. To that end, in a broad attempt to cover her bases, she alleges demand futility with respect to (i) the board at the time the Lead Action and State Case were filed (*i.e.*, in 2005), (ii) the current full board (*i.e.*, the board at the time she filed her original complaint in April 2008), and (iii) the SLC. All of plaintiff's allegations of demand futility are facially untenable.

First, this Court has already addressed -- and rejected -- the pleading of demand futility allegations with respect to the board in place at the time the Lead Action was filed. *See* Order Granting Motion to Dismiss Complaint (Lead Action Docket No. 79) (*see infra*). Even

21

leaving that aside, however, such allegations are legally irrelevant since it is well-settled that demand futility is tested as of the time the complaint *in the case at hand* was filed. *See*, *e.g.*, *Aronson*, 473 A.2d; *In re Computer Scis. Corp. Derivative Litig.*, No. CV 06-05288, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007). Plaintiff filed her complaint on April 18, 2008; thus, it is the directors on the board at that time (*i.e.*, the current board) on whom in the typical case she would have been required to make a demand and whose capacity to respond to it would be at issue.[24]

But here, plaintiff's allegations of demand futility with respect to the current board fare even worse. As this Court is aware, and as the complaint acknowledges, a demand was in fact made on the board by the plaintiffs in the Lead Action, and in February 2008, the current board responded by forming the SLC to investigate the derivative claims and prosecute any that merited it. Am. Barbour Compl. ¶338. As noted above, the mandate the board gave to the SLC was broad indeed, *i.e.,* "plenary authority to decide whether it is in the best interest of the Company and its shareholders to pursue or otherwise resolve the claims raised" in any of the then-pending derivative lawsuits, *including this one*, "and to pursue or resolve such claims; to pursue or resolve these claims and any other Company claims the [SLC] deems necessary or appropriate," including claims to recoup legal fees advanced to Brocade's current and former officers, directors and employees relating to its options backdating investigations and litigation, and "to pursue or resolve all other claims of the Company relating to its historical stock options practices to the extent necessary or appropriate." Richman Decl., Ex. A ¶120. Clearly, then, demand on this board was not "futile." As noted above, formation of the SLC was publicly announced by Brocade in a court filing in March 2008. Thus, any demand in April 2008 would have to have been made on, and would have been responded to by, the SLC.

Plaintiff is thus reduced to arguing, in a single conclusory paragraph, that a demand on the SLC itself (which had already been formed and publicly announced at the time she filed her complaint) would have been futile. Here, too, events have far outstripped plaintiff's

---

[24] As set forth above in the background section, the composition of the board changed between 2005 and 2007 with respect to four of the nine directors, including the two SLC members.

allegations. Barbour alleges that the members of the SLC -- who her own complaint makes clear were not on the board (or otherwise affiliated with the Company) at the time of any wrongdoing in connection with the underlying stock options backdating[25] -- are not disinterested and independent because they (a) "supported [Wilson Sonsini] as Brocade's outside counsel" in the derivative litigation and "supported the filing of various legal memoranda in opposition to motions to disqualify Wilson Sonsini" (Am. Barbour Compl. ¶339), and (b) "supported the Proposed Settlement" of the Lead Action. *Id.* While these assertions (in addition to being untrue) are irrelevant to a determination of interestedness for purposes of demand futility (*see infra*, Sec. I.B.3.),[26] the proof of the SLC members' disinterestedness and independence is once again in the proverbial pudding: the mere fact that the SLC has resolved to prosecute numerous claims against multiple defendants is, standing alone, dispositive evidence that a demand on the SLC would not have been futile. With respect to Barbour's claim that the SLC approved or supported either the proposed settlement or Wilson Sonsini's representation of the Company, she alleges no particularized facts whatsoever to support these bald assertions, which do not, in any event, form the basis for any viable cause of action. (As to the proposed settlement, as noted above, the Settlement Committee had the responsibility for that, and the SLC members were not on it.)

Indeed, prior to her amended complaint, a lynchpin of Barbour's argument as to why she should be permitted to pursue these claims derivatively was that "the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brocade any part of the damages Brocade sufferance and will suffer thereby." Barbour Compl. ¶287; *see also* Am. Barbour

---

[25] *See, e.g.,* Am. Barbour Compl. ¶¶53, 54; Richman Decl., Ex. D ("Both committee members were board members at McData at the time of the acquisition, which took place long after the options practices that gave rise to the claims in this action and the state derivative action occurred.").

[26] Barbour alleges no particularized facts to support any of these conclusory assertions. As but one example, she does not – and cannot – allege that either of the SLC members sat on the Settlement Committee to which the board delegated decision-making authority regarding the proposed settlement in the Lead Action and State Case.

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Compl. ¶351 (same). Now, of course, she has been forced at least to acknowledge that "the SLC … intends to file an Amended Complaint on behalf of the Company to bring claims related to the backdating scheme alleged herein against eleven unspecified defendants," and to thereby effectively concede that her allegations of "futility," even if otherwise viable (and they are not), hearken back to periods long before her complaint was filed (periods which are legally irrelevant to the "futility" analysis in *this* case). *See* Am. Barbour Compl. ¶334(iv) ("This action only came after three years of litigation and … criminal convictions …, demonstrating that *the Board at the time of the original filings* of this action was unwilling to take action …."); *see also id.* ¶338.[27] Simply put, where a demand has been made, investigated and responded to by the filing of direct claims, it strains credulity to assert that demand would be "futile."

**B.    Virtually All Of Plaintiff's Demand Futility Allegations Have Already Been Rejected By This Court**

        If this Court is experiencing a sense of déjà vu while reading this motion, that is understandable: it already addressed and rejected many of the same demand futility allegations when it dismissed the consolidated derivative complaint in the Lead Action for failure to make a pre-suit demand back in 2006. While it is well-settled that demand futility is tested at the time of the filing of the complaint – here, April 2008 – a cursory review of the now-dismissed Lead Action complaint reveals that the plaintiffs in that case made many of the same allegations with respect to demand futility that Barbour makes here. *Compare* Consol. Lead Action Deriv. Compl. ¶¶81-84 *with* Am. Barbour Compl. ¶¶323-351.[28] For the same reasons the Court rejected such arguments in that case,[29] they should be summarily rejected here. Indeed, the only

---

[27] The phrase "this action" appears to refer to the now-dismissed Lead Action derivative suit and/or the State Case.

[28] As noted above, the demand futility allegations in the Lead Action pertained to a differently constituted board. The turnover on the board, however, only renders plaintiff's allegations of demand futility against the full board *weaker*, since all of the new board members (Messrs. Rose, Jones, DiPentima and Gerdelman) are outside, independent directors with no current or former employment relationship with Brocade, let alone any involvement in the underlying options backdating or accounting improprieties (which was long since over and done with when they arrived on the board).

[29] The SLC respectfully refers the Court to the demand futility allegations at ¶¶81-84 of the consolidated Lead Action derivative complaint filed on or about October 7, 2005, the briefing on Brocade's motion to dismiss for failure to make a demand in the Lead Action and the January 6, 2006

24

difference between the demand futility allegations in this case and those in the Lead Action is that Barbour has alleged certain purported breaches of fiduciary duty relating to support/approval of the proposed settlement in the Lead Action, WSGR and the expiration of a tolling agreement with Reyes, in an obvious attempt to plead around this Court's 'demand futility determination' in the Lead Action.   But those additional allegations, as demonstrated in Sections I.D.1 and I.D.2.b.v., *infra*, get Barbour nowhere.

**C.    On These Facts, Far From Constituting An Admission Of Demand Futility, The Formation Of The SLC Only <u>Underscores The Board's Independence and Disinterestedness</u>**

Perhaps recognizing that most of her arguments on the merits of demand futility have already been rejected by this Court, Barbour's primary grounds for alleging that the current board lacks independence and disinterestedness, apparently based on *Abbey v. Computer & Commc'ns. Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983), a 25-year old case from the Delaware Court of Chancery, is that the formation of the SLC constituted an admission or concession that a demand on the full board would have been futile. Am. Barbour Compl. ¶338.[30] That is simply incorrect as a matter of law.

Subsequent Delaware Supreme Court and other authority has expressly rejected the assertion that *Abbey* stands for the blanket proposition that "a board of directors, *ipso facto*, waives its right to challenge a shareholder plaintiff's allegation that demand is excused by the act of appointing a special litigation committee and delegating to [it] the authority to act on the demand." *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990). To the contrary, the "decision of a board of directors to appoint a special litigation committee, with a delegation of complete authority to act on a demand, is not, *in all instances*, an acknowledgement that demand was excused and *ergo* that a shareholder's lawsuit was properly initiated as a derivative action." *Id.*

---

transcript of the oral argument on that motion and order granting it, all of which are annexed to the Richman Decl. as Exs. G-I, respectively, for the Court's convenience.

[30] Barbour raised this "admission" argument in her recent motion to amend the Court's June 12 scheduling order in the Lead Action and this case (which the Court denied *sua sponte*), as well as her April 25, 2008 Case Management Conference Statement, placing heavy reliance on *Abbey*. *See* Barbour Docket No. 49.

1

2          For, as the Delaware Supreme Court pointed out, "even when [as here] a majority

3   of a board of directors is independent, one advantage of establishing a special litigation

4   committee is to isolate the interested directors from material information during either the

5   investigative or decisional process." *Id.* at 776 n.18.  Indeed, *Abbey* itself recognized the right of

6   a board to appoint committees to address derivative litigation without automatically subjecting

7   the committee's decision to the two-tier level of judicial scrutiny established in *Zapata Corp. v.*

8   *Maldonado*, 430 A.2d 779 (Del. 1981).  *See id.* at 777 (*citing Abbey*, 457 A.2d at 373 ("[B]ut for

9   the disqualifying self-interest factor, the board could make its decision for itself, whether it chose

10  to do so through a committee or not, and cause an appropriate motion to be made on behalf of the

11  corporation just as in any normal suit in which the corporation was named as a party

12  defendant.")).  Here, of course, the SLC was not appointed due to any "disqualifying self-

13  interest."  Quite the contrary: it was formed only after this Court had, in effect, determined that

14  the full board *could* properly consider a demand and had dismissed the Lead Action as a result.

15          Moreover, in *Spiegel*, the Delaware Supreme Court affirmed the Chancery

16  Court's holding distinguishing that case from *Abbey* on the grounds that, among other things,

17  (i) unlike the plaintiff in *Abbey*, who had made a demand and *then* filed suit, the plaintiff in

18  *Spiegel* filed suit and then made a demand (like the Lead Action plaintiffs here), and (ii) unlike

19  in *Spiegel*, the board in *Abbey* did not file a motion to dismiss pursuant to Rule 23.1 until *after* it

20  had already surrendered control of the action to an SLC.  These procedural distinctions "d[id] not

21  support a finding of concession" on the part of the board in *Spiegel* so as to divest it of the power

22  to move to dismiss the complaint for failure to make a demand.  *See id.* (*citing Richardson v.*

23  *Graves*, No. 6617, 1983 WL 21109, at *4 (Del. Ch. June 17, 1983) (noting importance of

24  whether the board filed its motion to dismiss before or after appointing a special litigation

25  committee in determining whether demand is excused)); *see also, e.g.*, *Levine v. Smith*, 591 A.2d

26  194 (Del. 1991) (creation of SLC does not, *ab initio*, concede demand futility without additional

27  evidence of board's intention to do so, as well as its interestedness), *overruled on other grounds*

28

26

*by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[31]   Moreover, a derivative plaintiff must allege particularized facts to support a factual determination that the board intended to concede demand futility. *See, e.g., Seminaris v. Landa*, 662 A.2d 350, 1353 (Del. Ch. 1995).

Here, there are no particularized facts (much less evidence) that the board was interested and/or intended to concede demand futility – nor could there be.  On the contrary, in granting Brocade's motion to dismiss the complaint in the Lead Action for failure to make a demand, this Court has already essentially rejected the notion that a majority of the board was disabled from considering a demand.  Moreover, not only did (a) both Barbour and the plaintiffs in the Lead Action file suit without first making a demand, and (b) the board file a motion to dismiss the Lead Action for failure to make a demand prior forming the SLC (as in *Spiegel*), but it was only after that motion was actually litigated and *won* by the defendants that the plaintiffs in the Lead Action made their demand, and only after receipt of that post-dismissal demand that the board formed the SLC.

Accordingly, far from conceding demand futility, in forming the SLC, the Brocade board was simply exercising its sound business judgment for purely practical reasons. Indeed, as the Delaware Supreme Court noted in *Spiegel*, this is often the most prudent, conservative course.  *Id.* at 776 ("even where [as here] a majority of directors is independent, one

---

[31] Federal courts in other jurisdictions applying or looking to Delaware law have followed suit. *See, e.g., In re Merck & Co., Inc.*, MDL No. 1658, 2006 WL 1228595, at \*6 (D.N.J. May 5, 2006) (rejecting notion that formation of special committee concedes demand futility without additional evidence that board was not disinterested and/or considered itself incapable of considering demand); *Peller v. Southern Co.*, 911 F.2d 1532, 1537 (11th Cir. 1990) (finding that demand was excused, but noting that "if a board responds to a derivative suit by filing a motion to dismiss for failure to make a demand before appointing a special litigation committee to evaluate the suit, a court may not find that such a board has conceded that demand is excused"); *Risberg ex rel. Aspen Tech., Inc. v. McArdle*, 529 F. Supp. 2d 213 (D. Mass. 2008) (relying on *Seminaris* and rejecting notion that creation of SLC effectively conceded that the board was incapable of properly considering a demand); *In re F5 Networks, Inc.*, No. C06-794RSL, 2007 WL 2476278, at \*15 (W.D. Wash. Aug. 06, 2007) ("[A] disinterested board of directors does not waive its right to control derivative litigation merely by delegating that control to a special committee.  For this Court to find that a board of directors conceded the futility of demand, a derivative plaintiff must allege particularized facts that support a factual finding that the board made the concession . . . .  There has been no showing by plaintiffs that in forming this committee, the Director Defendants intended to concede the futility of demand.").  So, too, here.

advantage of establishing a special committee is to isolate [any even arguably] interested directors from material information during either the investigation or decision process.").

### D. Plaintiff's Allegations Of Demand Futility Are Conclusory, Unparticularized And/Or Immaterial As A Matter of Law

Leaving aside the stubborn fact that an actual, real-world demand has proven anything but futile in this case, and that this Court has already considered and rejected most of Barbour's "demand futility" allegations in the Lead Action, generally, in order to demonstrate that a demand would have been futile, a derivative plaintiff bears the burden, at the pleading stage, of adequately alleging with particularized facts that a *majority* of the "directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). Thus, with a nine-member board of directors such as Brocade's, Barbour must demonstrate that at least five of the directors are disqualified from considering a demand. Where, as here, the conduct underlying the derivative complaint is not a specific board-approved transaction, the relevant inquiry in determining whether demand is futile is "whether or not the *particularized factual allegations* of a derivative stockholder complaint create a reasonable doubt that ... the board of directors could have properly exercised its independent and disinterested business judgment." *Id.* at 934 (emphasis added). No such reasonable doubt exists here. Moreover, here, because an SLC had been formed, the relevant inquiry is whether the SLC, not the full board, could have done so.

### 1. Plaintiff's Allegations Do Not Plead Particularized Facts Sufficient To Support The Conclusion That Either Of The SLC Members Is Interested In This Litigation

Plaintiff readily acknowledges that, by the time she filed her complaint, (a) the board had formed the SLC and delegated to it full authority to investigate and, if appropriate, pursue claims on behalf of the Company arising out of its historical options backdating practices and related accounting irregularities (Am. Barbour Compl. ¶338), and (b) the SLC was already in the process of doing exactly that. Accepting, *arguendo*, that there was anything left for Barbour to demand at that point, it is quite apparent that any pre-suit demand should have been made on, and would have been considered by, the SLC. That being the case, all of Barbour's allegations

regarding the alleged interestedness and/or lack of independence of any board members *other than* the two SLC members are completely irrelevant.

Recognizing this, Barbour is forced to shoulder the impossible task of attempting to plead with particularity that Messrs. DiPentima and Gerdelman are somehow "unfit to serve as members of the SLC, because each of them is interested in the subject matter of this litigation as a result of their breaches of fiduciary duty to Brocade." *Id.* ¶339.[32] Delaware law presumes that directors are disinterested. *See, e.g.*, *Rales*, 634 A.2d at 936. To rebut this presumption, a plaintiff must plead particularized facts establishing that the director defendant (a) will receive a personal financial benefit from a transaction that is not equally shared by the stockholders and/or a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders (*see Rales*, 634 A.2d at 936), or (b) faces a "substantial likelihood" of personal liability (*see Aronson*, 473 A.2d at 815; *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003)). The "mere threat of personal liability" is not sufficient. *See Aronson*, 473 A.2d at 815. Barbour has alleged no particularized fact to support either conclusion with respect to the SLC members.

Messrs. DiPentima and Gerdelman joined Brocade's board in January 2007 as part of the Company's acquisition of McDATA Corporation (Am. Barbour Compl. ¶¶53, 54), well after the alleged options-backdating-related misconduct underlying this complaint, well after Brocade restated its financials and, indeed, more than a year after the Lead Action and State Case were filed. Neither of them is alleged to have committed any wrongdoing whatsoever in connection with the stock option grants or associated accounting practices that spawned this litigation and the Company's woes.[33] Rather, Barbour alleges that the SLC members somehow breached their fiduciary duties insofar as they "supported [Wilson Sonsini] as Brocade's outside counsel with respect to the litigation despite [the firm's] blatant, disabling and non-waivable

---

[32] Plaintiff does not allege a lack of independence with respect to the SLC members.

[33] Accordingly, numerous of the claims asserted against DiPentima and Gerdelman in Barbour's amended complaint arising out of the underlying alleged backdating conduct (*e.g.*, Counts II (RICO) and VIII (Violation of California Corporations Code Section 25403)) are patently frivolous.

29

conflicts of interest" and "supported the Proposed Settlement, which threatens to wipe out Brocade's derivative claims that are worth potentially hundreds of millions of dollars." *Id.* ¶339.

But alleged breaches of fiduciary duty that post-date and are separate and distinct from the underlying conduct challenged (which is all that is alleged against the SLC members here) are irrelevant to a finding of interestedness in this litigation for purposes of demand futility. *See, e.g., In re Computer Scis.*, 2007 WL 1321715, at *6 (decision to retain CEO after government investigations commenced "does not reasonably imply that the entire board was complicit in the option backdating transactions. The decision by the board to maintain [CEO] in his current positions is separate and distinct from the backdating transactions that occurred at the [Compensation] subcommittee level."). Moreover, and in any event, plaintiff's allegations regarding the SLC members' "support of Wilson Sonsini as Brocade's outside counsel" are not only unsupported by any particularized facts, but are demonstrably false.

The allegation that the SLC members "supported the filing of various legal memoranda [in the State Action] in opposition to motions to disqualify [Wilson Sonsini] and force Brocade to retain independent counsel" (Am. Barbour Compl. ¶339) is flatly contradicted by public filings of which this Court may take judicial notice and can consider on this motion. *See, e.g., In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814,  816 (C.D. Cal. 2004) (court proceedings are properly the subject of judicial notice). Specifically, WSGR had already withdrawn as counsel to Brocade before the board even opposed the motion to disqualify. The Company's opposition to the motion[34] related solely to Wilson Sonsini's continued representation of the individual defendants.[35] Nor, in any event, are any specific facts alleged with respect to what meetings or telephone calls the SLC participated in, what documents they

---

[34] Copies of Brocade's filings in opposition to the State Case plaintiffs' motion to disqualify Wilson Sonsini are attached to the Richman Decl. as collective Ex. J.

[35] Indeed, while outside the four corners of the complaint, we note that the SLC resolutions finds that "[n]either SLC member played any role in giving directions about handling any litigation relating to the claims asserted in the Derivative Actions." Richman Decl., Ex. D at 26 (Sec. IV.A.4.d.iv.).

1  prepared or reviewed, or anything else they did to "support" those filings. The reason is obvious:

2  there are none.

3          Plaintiff's allegations with respect to the proposed settlement are equally without

4  merit for all of the reasons set forth *infra* Sec. I.D.2.b(v). In addition, the proposed settlement

5  was reached in May 2006, and preliminary approval thereof was sought in June 2006, *before* the

6  SLC members joined the board, on January 2007. *See, e.g.,* Am. Barbour Compl. ¶¶53, 54; *see*

7  *also* Richman Decl., Ex. D ("Both committee members were board members at McData at the

8  time of the acquisition, which took place long after the options practices that gave rise to the

9  claims in this action and the state derivative action occurred."). Tellingly, Count VI in plaintiff's

10 amended complaint relating to the alleged breach of fiduciary duty arising out of the approval of

11 the proposed settlement is asserted against all of the current board members *except* the SLC

12 members (and Mr. Jones, who joined the board in April 2006 and, like the SLC members,

13 apparently took no part in the settlement's approval). Am. Barbour Compl. ¶¶393-398.

14         In any event, as Barbour acknowledges elsewhere in her amended complaint (*see*

15 Am. Barbour Compl. ¶23), shortly after the arrival of the SLC members on the board, the

16 Company abandoned the proposed settlement for good (*see* Tr. of April 25, 2008 conference

17 (Lead Action Docket No. 197)), mooting any claim that its terms have been prejudicial to the

18 Company.[36]

19

20    **2.    Plaintiff Does Not -- And Cannot --Allege Particularized Facts Showing
             That A Numerical Majority Of The Board Is Interested In This Litigation**

21         Even if the Court were to look past the dispositive fact of the SLC's

22 disinterestedness and independence, Barbour's efforts to show that a majority of Brocade's board

23

24         [36] Finally, even for the brief period of time that the proposed settlement was still on the table after
       the SLC members joined the board, responsibility for settlement-related matters had been delegated to a
25     Settlement Committee on which neither of them sat. Richman Decl., Ex. C, at (April 27, 2007 Tr.) at
       18:2-6. Moreover, we note that elsewhere in the amended complaint, plaintiff seems to suggest that the
26     SLC members are somehow tainted by virtue of having allowed a tolling agreement between Brocade and
       Mr. Reyes to lapse. To the extent plaintiff is alleging that the SLC members were disable from properly
27     considering a demand by virtue of their purported involvement in that decision, such allegations are
       without merit for ht reasons set forth *infra*, Sec. I.B.
28

                                             31

1  -- that is, at least *five* directors -- faces a substantial likelihood of liability fall flat.

2      **a.**    **A Majority Of The Current Directors Joined**
3             **The Board *After* The Alleged Misconduct Occurred**

4            As a dispositive threshold matter, plaintiff could never demonstrate that a

5  majority of the board faces a substantial likelihood of personal liability because most of the

6  current directors joined the board in April 2005 or later[37] -- *after* the alleged option backdating

7  misconduct occurred. By plaintiff's own account, the last of the allegedly backdated options was

8  granted on December 20, 2004 (Am. Barbour Compl. ¶191), and the "truth" about the alleged

9  backdating "beg[an] to emerge" as early as January 2005 with the Company's restatement of

10  earnings. *Id.* ¶226. Indeed, the only significant thing that has happened since April 2005 is that

11  the board undertook to *restate* Brocade's financial statements and *rectify* any prior improper

12  accounting. Thus, plaintiff would not be able to demonstrate that a majority of the board faces a

13  substantial likelihood of liability (much less for intentional or reckless misconduct) with respect

14  to underlying derivative conduct that pre-dated their tenure on the board. *See*, *e.g.*, *In re*

15  *Computer Scis.*, 2007 WL 1321715, at *9 (finding directors were not interested where, as here,

16  they joined the compensation committee subsequent to the alleged backdating).[38]

17      **b.**    **Each Of Plaintiff's Purported Grounds For Establishing**
18             **A Substantial Likelihood Of Liability Is Without Merit**

19          **i.**    **Plaintiff Does Not Adequately Plead That A Board**
                **Majority Faces A Substantial Likelihood Of Personal**
20                  **Liability Based On An Alleged Lack Of Oversight**

21            With the exception of Mr. Klayko, no member of the board is alleged to have

22  made, approved or received any of the allegedly backdated stock option grants. Rather, at the

23

24        [37] *See* Am. Barbour Compl. ¶43 (Walker has been a director since April 2005); ¶44 (Jones has
25  been a director since April 2006); ¶45 (Rose has been a director since April 2006); ¶53 (DiPentima has
been a director since January 2007); ¶54 (Gerdelman has been a director since January 2007).

26        [38] As demonstrated *infra*, Sec. I.B., Barbour's allegations regarding conduct that post-dated the
27  underlying backdating and associated accounting irregularities (*i.e.*, "support" of the now-defunct
proposed settlement in the Lead Action and of Wilson Sonsini as the company's counsel), are a red
28  herring.

heart of plaintiff's demand futility allegations is the argument that the board failed to exercise adequate oversight over Brocade's affairs.

Specifically, plaintiff alleges that five members of the board (House, Klayko, Krause, Vaswani and Walker) face a substantial likelihood of liability because they "failed to exercise proper due care in carrying out their duties and responsibilities" and "failed to establish a system of internal controls and oversight mechanisms that could and would have prevented or timely detected the illicit backdating activity." Am. Barbour Compl. ¶340. In addition, plaintiff alleges that the members of the Compensation Committee (Krause, House, Vaswani) failed to adequately oversee the stock option grants (*id.* ¶343), and the Audit Committee (Krause) failed to ensure that financial reporting and accounting controls were adequate (*id.* ¶344). All of plaintiff's oversight allegations miss the mark.

When director liability is predicated upon a failure to prevent or correct the alleged liability-creating activity, only an "utter[] fail[ure] to implement any reporting or information system or controls" or a "conscious[] fail[ure] to monitor or oversee" those systems or controls can create liability for failure of oversight. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (oversight liability requires proof of director's "conscious disregard for their responsibilities"). Accordingly, courts routinely reject conclusory allegations that directors condoned or otherwise failed to prevent misconduct, holding that such boilerplate assertions are insufficient to excuse demand. *See, e.g., In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268, 1270-71 (Del. Ch. 1995). As the Delaware Supreme Court has held, "[s]uch allegations are conclusory at best . . . [M]ere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand." *Aronson*, 473 A.2d at 817.

Nowhere in plaintiff's complaint does she allege a single particularized fact evidencing that a majority of *this* board is facing *any* likelihood of liability, let alone a substantial one, on a theory of "sustained or systematic failure" of oversight. Indeed, the grand

total of current directors who joined the board in 2004, and thus were on the board for even a portion of the period when the underlying conduct relating to options backdating was allegedly occurring, is three (Messrs. House, Krause and Vaswani) (the others joined later). Taken together with Mr. Klayko (who had been an insider at Brocade since January 2003) that represents a minority of four of the current nine board members to whom these allegations could even arguably apply.

Even as to Messrs. House, Klayko, Krause, and Vaswani, moreover, there are no particularized factual allegations to suggest that the board (including members of the Compensation and/or Audit Committees) "had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation." *Guttman*, 823 A.2d at 507; *see also Baxter*, 654 A.2d at 1270-71 (court could not "conclude that there was a substantial likelihood of liability" without particularized facts showing directors "ignored 'obvious danger signs of employee wrongdoing'") (citation omitted). Nor are there any facts explaining what role, if any, the six/eight directors who did not serve on the Compensation/Audit Committee had in pricing options or accounting for them.

As plaintiff herself alleges, Brocade's board (and specifically the Audit Committee) conducted an internal investigation into various aspects of the Company's stock options and accounting practices. Am. Barbour Compl. ¶18. That investigation -- which was initiated by the same board majority plaintiff contends is disabled -- led the Company to restate its financial results not once, but twice. *Id*. ¶21. In other words, plaintiff's own allegations demonstrate the very opposite of a failure to exercise oversight: when the board majority was alerted to issues regarding the Company's stock options granting practices, it acted promptly to investigate and take remedial action.

Moreover, even if plaintiff could otherwise plead a claim for director of oversight (which she cannot), she still cannot establish that a majority of the board faces a substantial likelihood of liability. As noted above, only three of the nine directors served on the Compensation Committee during any portion of the relevant time period (even construing that

34

period as broadly as possible) (Am. Barbour Compl. ¶343),[39] while only one of the nine directors served on the Audit Committee (*id.* ¶344).

### ii.     Plaintiff Does Not Allege That A Majority Of The Board Faces A Substantial Likelihood Of Liability By Virtue Of The Delegation Of Authority To Grant Stock Options

Plaintiff contends that the three members of the Compensation Committee (Krause, House and Vaswani) breached their fiduciary duties to oversee stock option grants by delegating authority to grant stock options to Gregory Reyes, Brocade's CEO, in contravention of the committee's charter.     Am. Barbour Compl. ¶343.     Plaintiff does not allege with particularity that the delegation occurred on Messrs. House, Krause and Vaswani's watch – *i.e.*, during or after 2004 – rather than before they had joined the board.

Moreover, even if plaintiff were correct that this delegation was somehow inappropriate, this would only relate to whether the three directors that are alleged to have made this delegation face a substantial likelihood of liability for their failure to exercise oversight. Thus, the allegations regarding this delegation relate only to a minority of the board.  As to the remaining directors, as explained above (*supra*, Sec. I.B.ii.), plaintiff cannot show that any member of Brocade's board faces a substantial likelihood of liability for failure to exercise oversight.

### iii.     Board Service At The Time Of The Alleged Misconduct, Without More, Is Insufficient To Demonstrate A Substantial Likelihood Of Liability

Plaintiff's attempt to establish a substantial likelihood of liability by asserting that (a) certain directors (House, Klayko, Krause, Vaswani and Walker) "participated in the wrongs complained of" (Am. Barbour Compl. ¶349) by virtue of their board service during the relevant time period (an assertion which is demonstrably untrue with respect to Walker, who joined the board in April 2005 (*see supra* n.8)) and (b) all of the directors "authorized and/or permitted the

---

[39] Gerdelman has been a member of the Compensation Committee only since February 2007, well after the events in question.  Am. Barbour Compl. ¶54.  Indeed, even plaintiff does not allege that Gerdelman breached his fiduciary duties in his capacity as a member of the Compensation Committee. *Id.* ¶343.

false statements disseminated to the public" (*id.* ¶348) by virtue of their board service, is

untenable. It is well-settled that mere service on a board at the time of the challenged conduct is

insufficient, standing alone, to demonstrate a substantial likelihood of liability. *See, e.g., In re*

*MIPS Techs., Inc. Derivative Litig.*, 542 F. Supp. 2d 968, 977 (N.D. Cal. 2008) (citing *Desimone*

*v. Barrows*, 924 A.2d 908, 938 (Del. Ch. 2007)) ("Knowingly granting or approving stock

options can render a director interested, while 'mere membership' of a committee is

insufficient."). Nor, again, was any member of the current board – including Messrs. House,

Klayko, Krause, Vaswani and Walker -- even on the board at the time that most of the alleged

misconduct occurred.

Moreover, with respect to the specific allegation that the directors "authorized

and/or permitted" the publishing of false information, plaintiff fails to allege any facts regarding

any specific documents, conversations, meetings or reports from which any directors would have

learned that the stock option accounting was incorrect. There are no particularized allegations

that any director had direct or indirect knowledge of any accounting error, let alone how, when

or where any director learned such information. Nor is it alleged that there were any "red flags"

that the directors failed to heed. *See, e.g., Guttman*, 823 A.2d at 504 (demand not excused where

plaintiff failed to "plead a single fact suggesting specific red – or even yellow – flags were

waved at the outside directors"). Such conclusory allegations are insufficient to establish a

substantial likelihood of liability. *See, e.g., In re Computer Scis.*, 2007 WL 1321715, at *9 ("[a]

Complaint cannot establish a 'substantial likelihood' of director liability that excuses demand by

merely making conclusory allegations that a director disseminated financial statements he knew

to be false.")

        **iv.     Allegations Of Insider Trading (Which Apply Only To A Single**
                 **Board Member) Do Not Establish A Disqualifying Personal Interest**

Plaintiff alleges that Klayko sold Brocade stock while in possession of "material,

adverse, non-public information regarding" the alleged option backdating. Am. Barbour Compl.

¶345. Not only does this allegation fail to reach more than a single person on the nine-member

board, but plaintiff fails to allege a disabling interest even as to Klayko.[40]

Here, plaintiff provides absolutely no detail regarding Klayko's purported insider trading. She merely states the number of shares allegedly sold and the proceeds generated therefrom and asserts, in conclusory fashion, that Klayko "faces a substantial threat of liability for his [alleged] illegal insider trading." Am. Barbour Compl. ¶345. But she does not plead any particularized facts showing his knowledge of any misconduct relating to Brocade stock option practices.

>    **v.    The Board's Decision To Approve The Proposed Settlement**
>    **And/Or Not To Renew The Company's Tolling Agreement**
>    **With Reyes Are Irrelevant To An Analysis Of Interestedness**

Plaintiff argues that seven members of the board (House, Jones, Klayko, Krause, Rose, Vaswani, Walker, DePentima and Gerdelman) breached their fiduciary duties by approving the proposed settlement which, she alleges, was "patently unfair to the Company and its shareholders." Am. Barbour Compl. ¶341. She further argues that the entire board was "grossly negligent" in allowing a tolling agreement between Brocade and Gregory Reyes to expire by its terms on January 1, 2008. *Id.* ¶342. Plaintiff is mistaken as to both assertions.

The board's decisions to support and/or approve the proposed settlement and not to renew the tolling agreement with Reyes (a) do not relate to the underlying options backdating conduct challenged in this action and are thus irrelevant to any analysis of interestedness for purposes of demand futility (*see, e.g., In re Computer Scis.*, 2007 WL 1321715, at *6 (decision to retain CEO after government investigations commenced "does not reasonably imply that the entire board was complicit in the option backdating transactions. The decision by the board to

---

[40] Delaware courts have found it "unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Guttman*, 823 A.2d at 502; *see also Rattner*, 2003 WL 22284323, at *11 (same). Thus, such directors will not be found to be interested unless "the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman*, 823 A.2d at 502; *see also Rattner*, 2003 WL 22284323, at *11 ("Thus, critically, 'it must be shown that each sale by each individual defendant was entered into and competed on the basis of, and because of, adverse material non-public information.'").

maintain [the CEO] in his current positions is separate and distinct from the backdating transactions that occurred at the [Compensation] subcommittee level . . ."), and (b) are business decisions that are protected by the business judgment rule (*see, e.g.*, *Rales*, 634 A.2d at 933). With respect to the purported expiration of the tolling agreement with Reyes, from the face of the complaint, it appears that the agreement that was allowed to "lapse" tolled claims between Reyes and the individual directors, whereas "the statute of limitations remains tolled on any claim which … Brocade may have against Reyes." Am. Compl. ¶342. Moreover, plaintiff appears to have overlooked the fact that claims against Reyes arising out of these transactions or occurrences are tolled by virtue of the pendency of the Lead Action and State Case. Thus, as between Brocade and Reyes, the tolling agreement was, to some extent superfluous. Only Reyes was potentially harmed by the agreement's expiration. Moreover, notwithstanding plaintiff's cryptic allegation that the lapsing of the tolling agreement "materially undermined Brocade's ability to file *new* claims in a *new* action against Reyes" (Am. Barbour Compl. ¶342) (emphasis added), as set forth in the Second Amended Complaint filed concurrently in the Lead Action (and the SLC Resolution annexed thereto), the SLC has evaluated all potential claims against Reyes and identified those that it intends to pursue on behalf of the Company. It was not impaired in its ability to pursue any such claims due to the expiration of the applicable limitations periods.[41]

### 3. Plaintiff Fails To Adequately Plead Any Particularized Facts Demonstrating That A Majority Of The Board Lacks Independence

To demonstrate that a director lacks independence, a plaintiff must set forth particularized fact showing that that director is so "beholden" to an interested director that his or her discretion is effectively "sterilized." *See Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004). Absent such facts, the business judgment rule presumes that directors are independent. *Id.*

Plaintiff makes only the vaguest of allusions to a lack of director independence. While she alleges, in conclusory fashion, that demand should be excused because "a number of

---

[41] Finally, any allegation that any members of the board were interested by virtue of having "supported" the continued representation of the Company by Wilson Sonsini are without merit for the reasons set forth *supra*, Sec. I.A..

current members of the board" have "debilitating conflicts of interest that prevent the board members of the company from taking the necessary and proper action" due to "inter-related business, professional and personal relationships," the only "prejudicial entanglement" identified in the complaint is that "Klayko and Walker are long-time business associates" because both of them held various positions are Hewlett-Packard Company prior to joining the board. Am. Barbour Compl. ¶347. But it is well-settled under Delaware law that allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. *See Beam*, 845 A.2d at 1050-51 (allegations that directors "moved in the same social circles, developed business relationships before joining the board, and described each other as 'friends'" were insufficient to rebut presumption of independence). Rather, in order for a relationship to render a director unable to consider a demand, it must be of a "bias-producing" nature. *Id.* at 1050. Plaintiff has pled no such particularized allegations.

The notion that Mr. Klayko lacks independence because other board members determine his salary (Am. Barbour Compl. ¶346) is likewise insufficient. As set forth above, because the board members are not themselves interested, there is no possibility of a disabling dependence on the part of Mr. Klayko. *See, e.g., In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354 (Del. Ch. 1998), *rev'd in part on other grounds*, 746 A.2d 244 (Del. 2000) ("In order to prove domination and control by [CEO-Chairman] Eisner, plaintiffs must first demonstrate first that Eisner was personally interested . . ."). Essentially, Plaintiff is asserting that an inside director (*i.e.*, those employed by the corporation) can never be considered independent for demand futility purposes because the other board members determine his or her salary. But Delaware courts often find inside directors to be independent for purposes of assessing demand. *See*, *e.g.*, *id.* at 356-67 ("[T]he general Delaware rule [is] that 'the fact that [the inside directors] hold positions with the company [controlled by Eisner] . . . is no more disqualifying than is the fact that he designated them as directors.'") (citation omitted); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 176-77 (Del. Ch. 2005) (finding President/CEO

39

and Executive VP independent even though an interested director controlled their compensation as chairman of the compensation committee); *Jacobs v. Yang*, No. Civ. A. 206-N, 2004 WL 1728521, at *4-5 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del. 2005) (CEO independent despite the fact that board controlled his employment and another director was interested).

Finally, the allegation that "in order to bring this suit, all of the directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements" (Am. Barbour Compl ¶347) is not enough to establish that the board is not independent. If it were, it would render every director named in a derivative lawsuit not independent.

In sum, the action must be dismissed for failure to make a demand.

## II.

### IN THE ALTERNATIVE, THE COURT SHOULD REALIGN THE PARTIES AND STAY THIS ACTION PENDING RESOLUTION OF THE LEAD ACTION

In the event the Court declines to dismiss the complaint for failure to make a demand, (a) Brocade should be realigned as the sole party-plaintiff in lieu of Barbour, and (b) this action should be stayed in favor of the Lead Action in which the SLC has filed direct claims against eight of the defendants named herein.

### A.    The Parties Should Be Realigned

#### 1.    Brocade Is Entitled To Control This Litigation

A bedrock principle of Delaware corporate law is that the decision to initiate and/or pursue litigation belongs to the corporation. *See* 8 Del. C. §141(a). Accordingly, where a corporation is inclined to assume control of derivative litigation (even if properly initiated) in order to *prosecute* (rather than to dismiss) it, courts will realign the parties and permit the corporation to pursue and/or settle the claims directly on its own behalf provided that there is "no hint of collusion between the corporation and the defendants to the suit or evidence that the corporation may not prosecute the action in good faith." *See, e.g.*, *Bluth v. Bellow*, CA 6823, 1987 WL 9369, at *3 (Del. Ch. Apr. 9, 1987); *see also* R. Franklin Balotti & Jesse A.

40

Finkelstein, *Delaware Law of Corporations & Business Organizations* §13.16 (Aspen Publishers, Inc. 1997) ("It appears that if a special litigation committee determines that the best interests of the corporation would be served by further litigation of derivative claims, the corporation may ... take control of the litigation itself .... If the committee decides to prosecute the claims itself, a motion to realign the corporation as plaintiff should be made.  That motion should be granted if there is no evidence of collusion between the committee and the defendants or evidence that the committee may not prosecute the claims in good faith.").  As demonstrated below, that this precisely the case here, where the SLC has brought multiple direct claims against 10 defendants, including eight of the defendants named herein.

In *Bluth*, after a proxy contest resulted in a change in the composition of the board of directors of a corporation that was subject to a pending derivative suit, the new board determined that it wished to assume prosecution of the case.  The audit committee of the board investigated the corporation's claims against former officers and directors with the assistance of special outside counsel and determined that, if the claims could not be settled, the corporation should seek realignment as the plaintiff in the action.  No settlement being forthcoming, the company sought realignment from nominal defendant to plaintiff and leave to file an amended complaint, arguing that such an application should be granted "almost as a matter of course, in the absence of any suggestion of collusion between the nominal corporate defendant and the director defendants."  *Id.* at *2.  Relying in part on federal authority, the court agreed and concluded that realignment was proper.  *Id.* at *5; *see also Levine v. Smith,* C.A. No. 8833 (Del. Ch. Dec. 22, 1987), slip op. at 6 n. 2, *aff'd,* 591 A.2d 194 (Del. 1991) ("The options normally considered by a special litigation committee include whether to have the corporation take control of the litigation, whether to allow the stockholder plaintiff to pursue the claim on the corporation's behalf, or whether to seek the dismissal of the derivative action"); *Townsend Corp. of Am. v. Davidson*, 181 A.2d 219, 223 (Del. Ch. 1962) (referring to realignment of corporation as plaintiff in derivative suit); *Lutz v. Boas*, 171 A.2d 381, 383 (Del. Ch. 1961) (same).[42]

---

[42] While it arose in a different context, raised different concerns and applied a different standard, support for realignment can be found throughout *Zapata*, 430 A.2d at 779, in which the Delaware

41

Notably, the *Bluth* court rejected the individual defendants' argument that a "decision to pursue litigation by 'interested' directors should be set aside under … *Zapata* [*Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981)]" and "that, at least, evidence [of the good faith and independence of the special committee and the reasonableness of the investigation undertaken, as in *Zapata*] must be developed and presented before the motion [for realignment] is decided." *Bluth*, 1987 WL 9369, at *1. Rather, the court found "no basis to apply the *Zapata* standards to a motion to realign":

> Inasmuch as it is the directors who are empowered to manage the company, not the stockholders, there are restrictions on a stockholder's ability to undertake that managerial power by bringing suit on behalf of the corporation. *Zapata* recognizes that even where a derivative suit is properly commenced, the corporation retains the power to control the litigation by seeking its dismissal. The mechanisms established in *Zapata* are designed to protect against the risk that a meritorious lawsuit will be terminated, with the result that the corporation will be injured, because of the board's self-interest. *Where the corporation decides to pursue litigation, those concerns are not present.*

*Id.* at *4 (internal citations omitted) (emphasis added).

More recently, the Delaware Court of Chancery has, on several occasions, granted motions for realignment in derivative cases in which a corporate defendant sought to realign itself as the party plaintiff and assume control of the litigation. *See, e.g., Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 735 (Del. Ch. 2007) (noting that "[t]he litigation was initiated as a stockholder derivative action but, following a change in control of the board, a special litigation committee of the board of directors chose to realign the corporation as a plaintiff. As a result, with the approval of the court, the company took control of the litigation."); *Texlon Corp. v. Bogomolny*, 792 A.2d 964, 968 (Del. Ch. 2001) (in action originally commenced as derivative

_____

Supreme Court held that while a shareholder may, in certain limited circumstances, initiate a derivative lawsuit on behalf of the company, he or she does not maintain "an absolute right to continue to control it." *Id.* at 782. On the contrary, absent a wrongful refusal to take action in response to a demand, a shareholder "simply lacks legal managerial power" to control the derivative litigation. *Id.* As the court stated, there is "no inherent reason why the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit should automatically result in the placement in the hands of the litigating stockholder sole control of the corporate right throughout the litigation." *Id.* at 784-85.

action challenging stock option agreement between Texlon and its then chairman, the company "realigned itself as plaintiff and filed an Amended Complaint converting the derivative action to a direct action"); *Canadian Commercial Workers Indus. Pension Plan v. Alden*, No. Civ. A. 1184-N, 2006 WL 456786 (Del Ch. Feb. 22, 2006); *Gold v. Razmilovic*, CA122-VCL (Del. Ch. 2004).

In *Gold*, nominal defendant Symbol Technologies, Inc., filed a motion to realign itself as the plaintiff on the grounds that, while it did not dispute certain of the allegations underlying the derivative complaint, the decision to pursue, settle or otherwise resolve claims belongs to the corporation. The Chancery Court granted the motion for realignment. Once realigned, Symbol immediately dismissed the claims against one defendant with whom it had reached a settlement, and filed an amended complaint against others two months later. Similarly, in *Canadian Commercial*, nominal defendant Case Financial, Inc., sought and obtained realignment over the objection of an individual defendant in order to pursue the company's claims against that defendant.[43]

Federal courts are in accord with Delaware precedent and likewise routinely grant motions to realign the parties in derivative cases absent evidence of collusion or bad faith on the part of the corporation. *See*, *e.g.*, *Sterling v. Stewart,* 158 F.3d 1199 (11th Cir. 1998) (affirming realignment of parties where independent managing receiver of corporations (acting as an SLC) (i) conducted investigation, (ii) determined that certain, but not all, claims were meritorious, (iii) submitted proposal to settle meritorious claims and realign the parties, and (iv) there was no "hint of collusion or that the Corporations [would] not adequately pursue the corporate claims in good faith"); *In re Penn Cent. Sec. Litig.*, 335 F. Supp. 1026, 1040 (E.D. Pa. 1971) (granting corporation and its reorganization trustees exclusive control of litigation upon being satisfied that there was "no hint of collusion" or "evidence that the corporation may not prosecute the action in good faith"); *Kennedy v. Blumeyer*, 309 F. Supp. 939 (E.D. Mo. 1969) (realigning the parties where corporation's answer admitted the allegations of the derivative

---

[43] A copy of the Chancery Court's orders granting realignment in *Gold* and *Canadian Commercial* are annexed to the Richman Decl. as collective Ex. K.

complaint); *see also Damon Trust v. Wipfli, Ullrich, Bertelson, LLP*, No. 5:04-CV-172, 2005 WL 2405966 at *1 (W.D. Mich. Sept. 29, 2005) (realigning parties where corporation intended to prosecute claims directly and granting corporation "exclusive authority" to control pending litigation and reach any settlements it deemed appropriate).[44]

The same result is warranted here. There is not a single hint or indicia of collusion between Brocade and the defendants to this lawsuit, let alone evidence that the SLC will not prosecute this action in good faith or is antagonistic to Barbour's interests as a shareholder of the company . On the contrary, the SLC's actions to date demonstrate that it is committed to prosecuting any and all meritorious claims asserted in any of the currently pending derivative actions. Indeed, while it has filed a panoply of claims against 10 individual defendants (including eight of the defendants in this case) at this time (set forth in the Second Amended Complaint filed concurrently herewith in the Lead Action), the SLC has prudently decided *not* to provide an omnibus release to all of the remaining defendants named in this complaint (or the State Action) that are not named in the SLC's Second Amended Complaint, but

---

[44] Even outside the *Bluth* fact pattern (where, as here, the corporation is seeking to realign for purposes of prosecuting claims), federal courts frequently realign the parties in shareholder derivative cases as a matter of course. Indeed, it is the "general rule that the corporation is properly realigned as plaintiff since it is the real party in interest in derivative shareholder litigation." *In re Digimarc Corp. Deriv. Litig.*, No. 05-1324-HA (LEAD), 2006 WL 2345497, at * 3 (D. Or. Aug. 11, 2006). The only "narrow exception" to this general proposition exists where a corporation is "actively antagonistic" to the derivative plaintiff. *Id.* Otherwise, the parties will be realigned upon request. *See, e.g., Liddy v. Urbanek*, 707 F.2d 1222 (11th Cir. 1983) (affirming realignment for purposes of diversity jurisdiction where there was no evidence of antagonism between corporation and derivative shareholder plaintiff); *Lewis v. Odell*, 503 F.2d 445 (2d Cir. 1974) (same); *Johnson v. Masselli*, No. 2:07-CV-214-PPS, 2007 WL 2743493 at *2 (N.D. Ind. Sept. 17, 2007) (realigning parties upon a finding no antagonism where corporation was "proceeding in a manner consistent with the Plaintiff's interest" by filing motions against alleged wrongdoers); *In re Digimarc*, 2006 WL 2345497 at *4 (plaintiff could not demonstrate antagonism where corporation had (i) not refused a demand nor was there any evidence that it would have done so, (ii) appointed an SLC and empowered it to take any necessary action to investigate the derivative claims, (iii) taken no action directly opposed to plaintiffs' claims and, on the contrary, had cooperated with them); *Mertens, et. al. v. Kaiser Steel Retirement Plan et al.*, 744 F. Supp. 917, 923 (N.D. Cal. 1990) (stating that, in derivative actions, "unless the corporate directors have shown an antagonism towards the plaintiff's action, the corporation should be aligned as a plaintiff"); *Damon Trust,* 2005 WL 2405966 at *3 (where, as here, the corporation "chooses to enforce its rights after a derivative action has been initiated, the corporation is the preferable plaintiff").

instead to preserve any claims not yet asserted pending additional developments in other related proceedings. *See* Richman Decl., Ex. E.[45]

In her motion to amend this Court's June 12 scheduling order, Barbour cited two cases for the ostensible proposition that "prior to the time that Brocade could be allowed to file a new or amended complaint, it will bear the burden of proving that there is no material issue of fact regarding the SLC's independence, good faith and deliberative process." (Pl. Br. at 5 (emphasis added)).[46]

We assume she will make a similar argument in her opposition to this motion. But contrary to the impression plaintiff seeks to create, both cases involved almost precisely the opposite situation from the one here: in both, the special litigation committee had made a so-called "*Zapata* motion" seeking *dismissal* of a properly initiated derivative suit on the grounds that its investigation has revealed no basis for further action. Here, (a) as demonstrated at length above (*supra*, Sec. I), the *Barbour* action was *not* properly initiated, since plaintiff failed to make a demand, and (b) the SLC is attempting to *prosecute* -- not dismiss -- claims as the result of its investigation. Thus, plaintiff's cases have no application here.

Indeed, the primary basis on which plaintiff has sought to litigate these claims on behalf of the Company -- to wit, that the "Individual Defendants and current board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to recover for Brocade any part of the damages Brocade suffered and will suffer" (Compl. ¶287; Am. Barbour Compl. ¶351[47] -- is simply no longer the case. The SLC filed its complaint in the Lead Action seeking to do just that. As such, plaintiff, even by her own lights, no longer has any legitimate basis to pursue these claims.

---

[45] Again, for the reasons set forth above, the only exceptions are Mr. Sonsini and the Wilson Sonsini.
[46] *See In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993); *Sutherland v. Sutherland*, No. 2399-VCL, 2008 WL 2221770 (Del. Ch. May 29, 2008).
[47] *See also* Apr. 25, 2008 Case Mgmt. Stmt. of Plaintiff Mary E. Barbour, at 4 ("Barbour's claims should be allowed to proceed because … Brocade is still controlled by individuals who are firmly committed to protecting the individual defendants …. Brocade has taken no action whatsoever to pursue redress against the responsible individuals.") (Lead Action Docket No. 188).

### 2.    The Company And Its Shareholders Would Be Far Better Served If The Parties Were Realigned To Allow The SLC To Prosecute Brocade's Claims In An Orderly Fashion

Barbour's litigation tactics to date highlight the need for realignment. Indeed, this action was filed at a time when (a) her counsel, who had for nearly three years been representing one of the co-lead plaintiffs in the State Case, was facing, at best, a stay of proceedings and, at worst, dismissal for failure to make a demand in that action,[48] and (b) as her counsel knew full well, the SLC was in the midst of investigating the substantially identical derivative claims alleged therein and in the Lead Action. Rather than wait to see what the SLC's investigation would yield before causing the Company to expend *more* fees to defend yet *another* derivative suit, Barbour chose to bring yet another derivative suit.[49]

More recently, having learned that, as a result of its investigation, the SLC was preparing to bring direct claims on behalf of the Company against numerous defendants, Barbour, rather than stay her hand, has continued undaunted to try to activate her case and prosecute those same claims derivatively, on a parallel track, thereby needlessly diverting the SLC's attention from its primary task, duplicating effort, doubling up on costs and potentially prejudicing the Company's substantive ability to successfully prosecute certain claims through rushed, poorly out-out litigation plays that appear designed more to give Barbour a "leg up" than to maximize the chances of recovery for Brocade.

In the three-plus months since she filed her complaint, Barbour has engaged in a flurry of activity intended to stave off the day of reckoning when the SLC filed its complaint and divested her of standing to pursue her derivative claims. First, she objected to this Court's order

---

[48] As noted above, at the time plaintiff filed her complaint on April 18, 2008, two dispositive motions were pending in the State Case, both of which were fully briefed and *sub judice*: a demurrer to the amended complaint for failure to make a demand and a motion to dismiss the complaint for lack of standing. In addition, just over a month before plaintiff filed her complaint, Brocade had asked the state court to stay proceedings pending the SLC's investigation.

[49] If plaintiff's counsel wanted to add additional defendants or assert additional claims in the State Case, he could presumably have done so. (Barbour's RICO claim (the only federal claim asserted in the original *Barbour* complaint) could have been asserted in the State Case pursuant to long-standing Supreme Court precedent holding that state and federal courts have concurrent jurisdiction over RICO claims. *Tafflin v. Levitt*, 493 U.S. 455, 458-59 (1990).

permitting the SCL to file its amended complaint, on the theory that the SLC should not be allowed to do so until after she had an opportunity to challenge the SLC's good faith, independence and the reasonableness of its investigation under *Zapata* (which she is not entitled to do, *supra*, Sec. II.A.1.) and tried to head off the Company's demand futility motion by claiming (incorrectly) that the formation of the SLC was a concession of demand futility (*supra,* Sec. I.C.). The Court summarily denied those objections.

Next, just ten days before the SLC was scheduled to file its complaint in the Lead Action and the instant motion to dismiss and/or stay herein, Barbour filed an amended complaint (Barbour Docket No. 54) naming 27 defendants. Barbour thus apparently seeks to require all 27 defendants to respond to the amended complaint before the Court determines whether this action would proceed past the pleadings stage, and 25 of those defendants would likely look to Brocade to pay (or at least advance) their legal fees and expenses. If Barbour were truly mindful of Brocade's best interests, she would not have authorized the filing of an amended pleading that serves no purpose other than to impose additional, substantial, and potentially unnecessary expenses on Brocade.

Finally, just last week, plaintiff filed a motion for partial summary judgment against Reyes, seeking a declaration that he is not entitled to indemnification and/or advancement of fees relating to his defense of federal securities fraud claims, based on the collateral estoppel effect of his criminal conviction. *See Barbour* Docket No. 59. That hastily filed motion, however, is fundamentally flawed for at least two reasons that should have been apparent from a cursory review of Reyes' Indemnification Agreement – and will almost certainly result in Reyes' incurring additional attorneys' fees and expenses for which he probably will turn to Brocade for advancement and/or indemnification. Such litigation tactics demonstrate that plaintiff's continued involvement in this action will only serve to prejudice the Company by multiplying, rather than mitigating, its litigation costs.

Reyes' Indemnification Agreement with Brocade provides for advancement of "'Expenses' (¶3(a)) – a defined term that includes attorneys' fees and all other costs, expenses

and obligations incurred in connection with investigating, defending, being a witness in or participating in (*including on appeal*) . . . any action, suit, proceeding . . .)" (¶1(d) (emphasis added). Reyes thus is likely to argue that he is contractually entitled to seek advancement of fees for his pending criminal appeal.

In addition, the Indemnification Agreement states that "any Action instituted under this Agreement shall be commenced, prosecuted and continued only in the Court of Chancery of the State of Delaware in and for New Castle County, which shall be the exclusive and only proper forum for adjudicating such a claim." (¶15) Reyes thus might argue that a motion for partial summary judgment on a particular count of a complaint that expressly seeks to claw back advanced fees and to cut off future indemnity and fee-advancement needs to be litigated in Delaware, rather than in this Court.

No one wants more than does Brocade to recover the fees advanced to Reyes and to stop future advances. Indeed, as the Court knows, Brocade sought (unsuccessfully) to recover those fees and expenses during Reyes' criminal sentencing. But even though Brocade is eager to recoup the money, it does not want to have its important claims asserted carelessly or improperly – because motions such as the one that Barbour filed serve only to cost the company *more* money when Reyes seeks additional fee advancements to defend against them. The Barbour plaintiff thus has again demonstrated her inability properly to represent the corporate interests she professes to want to protect.

The events of the past several weeks thus serve to underscore the need for realignment of the parties, so that the SLC can set about systematically, methodically and coherently to achieve the best results for Brocade pursuant to a unified, carefully thought-out strategy. The alternative will surely prove – indeed, is already proving – a classic example of "too many cooks spoiling the pot." All parties -- including Barbour herself -- would be better served if the SLC were permitted to take over the reins of all pending derivative litigation, as it is legally entitled to do, and proceed in a consistent and orderly manner to litigate Brocade's direct claims. The SLC should be left free to craft the company's big-picture strategy and should not

48

have to contend with (or clean up after) competing groups of plaintiffs' lawyers. And Brocade should not have to pay for the expenses that their duplicative and unnecessary litigation tactics are importing on the Company.

**B.      This Action Should Be Stayed
Pending Resolution Of The Lead Action**

Because, as set forth *supra*, Sec. II.A.1., the claims asserted herein belong to Brocade (which should be realigned as the party-plaintiff), the SLC has the sole and exclusive right to determine whether, when and how (if at all) it wishes to pursue them. And because the claims asserted in this action are largely duplicative of the direct claims that the SLC is currently prosecuting on Brocade's behalf in the Lead Action, it is not in the best interests of Brocade or its shareholders (or the defendants for that matter) to simultaneously litigate in both actions. That said, the SLC, if realigned as plaintiff and given control of this action, does not wish to dismiss it at this time. Rather, as set forth in the SLC's [June 9] resolution, the SLC wishes to proceed in the Lead Action, while preserving the ability to litigate the additional claims asserted against additional defendants herein if and to the extent it becomes appropriate to do so as the Lead Action and other related proceedings (including SEC civil actions against Reyes, Jensen and others) progress.

This Court has the inherent power to stay proceedings to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936); *see also Cucci v. Edwards*, No. SACV 07-532 PSG (MLGx), 2007 WL 3369234 (C.D. Cal. Oct. 31, 2007). A stay "is appropriate when it serves the interests of judicial economy and efficiency." *See Cucci*, 2007 WL 3396234, at *2 (staying a shareholder derivative action in favor of a securities class action pending in the same court where "both actions rest[ed] on the same or closely related transactions, happenings or events, and thus [would] call for the determination of the same or substantially related questions of fact"). Here, given the direct and substantial overlap of claims and parties between this action and the Lead Action, there can be little doubt that judicial

economy would be served and inconsistent adjudications avoided by a stay of this action while the SLC is prosecuting the Lead Action.

**CONCLUSION**

For the foregoing reasons, Brocade respectfully requests that the Court dismiss this action for failure to make a pre-suit demand or, alternatively, realign the parties, re-designate Brocade as the sole party-plaintiff in lieu of Barbour, who should be dismissed, and stay this case in favor of the Lead Action.

Respectfully Submitted,

Dated:  August 2, 2008                  By:    /s/ Barbara A. Caulfield
                                          DEWEY & LEBOEUF LLP
                                          One Embarcadero Center, Suite 400
                                          San Francisco, California 94111
                                          Telephone:  (650) 845-7000
                                          Facsimile:  (650) 845-7333

                                          DEWEY & LEBOEUF LLP
                                          1101 New York Avenue, N.W., Suite 1100
                                          Washington, DC 20005
                                          Telephone:  (202) 346-8000
                                          Facsimile:  (202) 346-8102

                                          DEWEY & LEBOEUF LLP
                                          1301 Avenue of the Americas
                                          New York, New York 10019
                                          Telephone:  (212) 259-8537
                                          Facsimile:  (212) 259-6333

                                          *Attorneys for Brocade*
                                          *Communications Systems, Inc.*