DEWEY & LEBOEUF LLP
Barbara Caulfield
bcaulfield@dl.com
Peter E. Root
proot@dl.com
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Telephone:  (650) 845-7000
Facsimile:  (650) 845-7333

Ralph C. Ferrara
rferrara@dl.com
Ann Ashton
aashton@dl.com
1101 New York Avenue, N.W., Suite 1100
Washington, DC 20005
Telephone:  (202) 346-8000
Facsimile:  (202) 346-8102

Jonathan E. Richman
jrichman@dl.com
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333

*Attorneys for Brocade*
*Communications Systems, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARY E. BARBOUR AS TRUSTEE FOR THE MARY E. BARBOUR FAMILY TRUST ONE, Derivatively On Behalf of BROCADE COMMUNICATIONS SYSTEMS, INC.,** | **Case No.  C 08-02029 CRB** |
| **Plaintiff,** | **NOTICE OF ERRATA** |
| **vs.** | |
| **GREGORY L. REYES, DAVID L. HOUSE, MICHAEL KLAYKO, RICHARD DERANLEAU, KUMAR** | |

- 1 -

MALAVALLI, ANTONIO CANOVA, MICHAEL J. BYRD, STEPHANIE JENSEN, NEIL DEMPSEY, SANJAY VASWANI, L. WILLIAM KRAUSE, ROBERT R. WALKER, GLENN C. JONES, MICHAEL J. ROSE, SETH D. NEIMAN, NICHOLAS G. MOORE, CHRISTOPHER B. PAISLEY, WILLIAM K. O'BRIEN, LARRY SONSINI, MARK LESLIE, TYLER WALL, RENATO A. DIPENTIMA, JOHN W. GERDELMAN, ROBERT D. BOSSI, KPMG, LLP, WILSON SONSINI GOODRICH & ROSATI, P.C. AND DOES 1-25, inclusive,

Defendants,

-and-

BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation,

Nominal Defendant.

## NOTICE OF ERRATA

Please take notice of the following clerical/non-substantive corrections to Brocade Communications Systems, Inc.'s Notice of Motion of Motion to Dismiss Plaintiffs' Amended Verified Shareholder Derivative Complaint or, in the Alternative, to Realign the Parties and Stay this Action pleadings and papers listed below (Docket No. 69):

| Page:Line | Original Text | Amended Text |
|---|---|---|
| 12:12 | Ex. C | Ex. A |
| 13:11 | *Id.* | Am. Barbour Compl. |
| 13:15 | announced two months before | announced before |
| 14:12-13; 14:20; 14:27-15:1; 15:8 | Federal Action | Lead Action |

| 14:17 | Ex. C | Ex. A |
|---|---|---|
| 15:8 | *Barbour* action | State Case |
| 16:21 | *See infra* sec. I.A & B.1. | *See infra* sec. I.A. |
| 18:16 | Compl. | Am. Compl. |
| 19:17 | decisions about indemnity | decisions about when indemnity |
| 20:4 | would potentially forcing | would be potentially forcing |
| 20:27 | (Am. Barbour Compl. ¶42) | (Am. Barbour Compl. ¶30) |
| 21:8-9 | Sec. II | Sec. I.C. |
| 23:9 | Sec. I.B.3 | Sec. I.D.1 |
| 23:22 | sufferance | suffered |
| 24:26 | which was long since | which were long since |
| 30:25 | Copies of Brocade's filings… are attached to the Richman Decl. as collective Ex. J. | A copy of Brocade's filing … is attached to the Richman Decl. as Ex. J. |
| 30:27-28 | the SLC resolutions finds that "[n]either SLC member played any role in giving directions about handling any litigation relating to the claims asserted in the Derivative Actions."  Richman Decl. Ex. D at 26 (Sec. IV.A.4.d.iv.). | neither SLC member played any role in giving directions about handling any litigation relating to the claims asserted in the derivative actions. |
| 31:26 | disable | disabled |
| 31:28 | such allegations are without merit for ht reasons set forth *infra*, Sec. I.B | such allegations are without merit for the reasons set forth *infra*, Sec. I.D.2.b.v. |
| 32:8 | December 20, 2004 | December 10, 2004 |
| 32:26 | Sec. I.B. | Sec. I.D.2.b.v. |
| 35:15 | Sec. I.B.ii | Sec. I.D.2.b.i |
| 35:24 | (*see supra* n. 8) | (*see supra* n. 37) |
| 38:14-15 | filed concurrently herewith in the Lead Action (and the SLC Resolution annexed thereto), | filed concurrently in the Lead Action, |
| 38:28 | Sec. I.A. | Sec. I.D.1. |
| 39:5 | are Hewlett Packard Company | at Hewlett-Packard Company |
| 41:8 | that this precisely the case | that is precisely the case |
| 45:6-7 | (Pl. Br. at 5 (emphasis added)) | *Barbour* Docket No. 49 |
| 45:25 | the Wilson Sonsini | WSGR |

1

2      The attached pages 12, 13, 14, 15, 16, 18, 19, 20, 21, 23, 24, 30, 31, 32, 35, 38, 39, 41,

3  and 45 have been revised to reflect the above corrections and may be substituted accordingly.

4  Dated:  August 5, 2008

5

6                                              By:      /S/ Peter E. Root
                                                    DEWEY & LEBOEUF LLP
7                                                   Barbara A. Caulfield
                                                    Peter E. Root
8                                                   1950 University Avenue, Suite 500
                                                    East Palo Alto, California 94303
9                                                   Telephone:  (650) 845-7000
                                                    Facsimile:  (650) 845-7333
10                                                  *Attorneys for Brocade*
                                                    *Communications Systems, Inc.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF ERRATA
CASE NO. C 08-02029 CRB

### E.    Formation of the SLC

In February 2008, after it became apparent that a global resolution of the derivative claims was unlikely, the Brocade board appointed Messrs. DiPentima and Gerdelman as a two-member Special Litigation Committee to act on the Company's behalf with respect to the derivative actions.  *Id.*  ¶338.[13]  The board's February 22, 2008 resolution delegated to the SLC plenary authority to decide whether it was in the best interest of the Company and its shareholders to pursue or otherwise resolve the claims raised in the various derivative lawsuits and, if so, to pursue or resolve those claims and/or any other Company claims the SLC deemed appropriate relating to, among other things, the derivative lawsuits, Brocade's historical stock options practices, and legal fees and expenses advanced by the Company on behalf of its former and current employees, officers and directors with regard to the various associated investigations and court actions.  *See* Richman Decl., Ex. A at ¶120.[14]  Brocade filed a statement informing the Court and the parties that the SLC had been formed on March 21, 2008.  *See* Joint Case Mgmt. Conf. Statement, dated Apr. 25, 2008 (Lead Action Docket No. 185).

---

[13] Between January 1995 and March 2007, Mr. DiPentima was employed in various capacities by SRA International, Inc., a leading provider of technological and strategic consulting services, including serving as the company's president and CEO from January 2005 through March 2007.  Prior to joining SRA, Mr. DiPentima spent 33 years in various government posts, including serving as deputy commissioner for systems at the Social Security Administration.  He also chaired both the Federal Information Technology Acquisition Improvement team (as part of President Clinton's National Performance Review Initiatives) and the Industry Advisory Council's CIO Task Force.  *See* Lead Action Docket No. 186 at 2.  Mr. Gerdelman currently serves as the chairman of Intelliden Corporation, a networking software solutions company he co-founded in 2004.  Prior to that, he served in various executive and other capacities at Metromedia Fiber Networks, USA.NET, and MCI Communications Corporation.  In addition to serving on the board and SLC of Brocade, Mr. Gerdelman is a director of Sycamore Networks, Inc. and is a member of a special committee reviewing issues relating to Sycamore's equity compensation practices.  *Id.*

Neither Mr. DiPentima nor Mr. Mr. Gerdelman was on the Settlement Committee formed in connection with the proposed settlement in the Lead Action and State case or participated in any decisions relating to the conduct of the derivative litigation, including but not limited to decisions relating to Wilson Sonsini's continued representation of the Company or the individual defendants.

[14] It bears noting that the board was not required to form a special litigation committee.  Consistent with this Court's demand futility decision in the Lead Action, because the Brocade board was (and is) composed of a majority of outside, independent directors, it was competent to consider and respond to the demand without the need for an SLC.

**F.     Barbour's Eleventh-Hour Complaint**

On April 18, 2008, after the parties to the existing derivative litigation had been made aware that the SLC's investigation was underway, counsel for one of the co-lead plaintiffs in the State Case (in which a scheduled hearing on defendants' motion to renew the stay was just weeks away) filed the instant complaint, which is substantially similar to the complaints in the Lead Action and the State Case, in this Court.[15]  Like its predecessors, the complaint conceded that plaintiff had not made a pre-litigation demand on the board or the SLC, but alleged that a demand on either would have been "futile."  Barbour Compl. ¶287; *see also* Am. Barbour Compl. ¶¶323, 337.

The members of Brocade's board when this action was filed were Messrs. House, Klayko, Krause, Vaswani, Walker, Rose, Jones, DiPentima and Gerdelman.  Am. *Barbour* Compl. ¶337.  All of them, with the exception of Mr. Klayko, are outside, independent directors who do not -- and did not ever -- have any managerial role or employment relationship with Brocade.[16]  As noted above, the SLC, in the persons of Messrs. DiPentima and Gerdelman, had already been established and announced before this action was filed.  *Id.* ¶338.

On April 25, 2008, at a case management conference in the Lead Action at which counsel for Barbour appeared, this Court addressed, among other things, whether to consolidate *Barbour* into the Lead Action.  Notwithstanding the substantial overlap in the allegations, the Court determined that it was "not going to consolidate the actions formally" and that they would instead be coordinated rather than consolidated.  *See* Apr. 25, 2008 Hr'g Tr. at 15 (Lead Action Docket No. 197).  Thereafter, on May 27, 2008, the Court granted plaintiff's administrative motion to consider whether *Barbour* should be related to the Lead Action, finding that it would be related but not consolidated into the Lead Action because, among other things, Barbour

---

[15] The original *Barbour* complaint alleges claims nearly identical to those in the Lead Action and the State Case, but adds (a) new claims for violations of RICO, (b) four defendants named in the State Case but not the Lead Action, and (c) six new defendants not named in either of the other actions.

[16] Mr. Klayko became Brocade's CEO in January 2005. *Id.* ¶33.  Prior to that time, he served as a Brocade sales executive (beginning in January 2003). *Id.*

13

alleged demand futility, while the plaintiffs in the Lead Action had "conceded demand" (meaning, presumably, that they had made a demand on the board).

## G.    The SLC Resolution

Meanwhile, pursuant to its mandate, the SLC had retained Dewey & LeBoeuf LLP ("D&L") to serve as counsel to Brocade for purposes of advising and assisting the SLC, as well as Delaware and California law experts, Financial Reporting Advisors, LLC, to serve as its accounting expert, and the economic consulting firm of Compass Lexecon. Together with its advisors, between March 6, 2008 and May 29, 2008, the SLC conducted a wide-ranging inquiry into the various issues raised by each of the then-pending derivative cases, including but not limited to a review of each defendant then named and each claim then asserted in this action. *See* Richman Decl., Ex. D.

Specifically the SLC's review addressed each allegation made in the Lead Action, this case, the original *Barbour* complaint and the demand letter to the effect that that the officers, directors, employees and advisors to the Company had breached their fiduciary duties and harmed the Company, and also investigated possible corporate injuries and potential defendants that had *not* been mentioned in the existing derivative actions or the demand. *Id*; *see also* Richman Decl., Ex. A ¶127.

On June 9, 2008, the SLC adopted a 127-page resolution detailing its investigation and findings and directing D&L to take a variety of actions, including filing a Second Amended Complaint in the Lead Action asserting numerous direct claims against 11 defendants. *See* Richman Decl., Ex. E. Eight of the individual defendants herein are among the 11 named in the SLC's resolution. The resolution further provides that while the SLC had determined that, *at that time*, action should only be taken against 11 individuals, it would defer further consideration of *all other claims* asserted in the derivative actions because of, among other things: the pendency of ongoing SEC enforcement proceedings against various individuals, certain related class action litigation and Mr. Reyes' appeal of his criminal conviction; the fact that the SLC may be pursuing discovery in connection with the claims asserted in the Lead

Action; and the fact that numerous individuals (including certain defendants in the derivative actions) have invoked their Fifth Amendment privilege in related proceedings. *See id.*[17]

Accordingly, the resolution indicated that the SLC had decided *not* to provide an omnibus release to all actual or prospective defendants not among the 11 to be sued, but to deal with releases on a defendant-by-defendant basis (if at all) and directed counsel to take steps to preserve the claims the SLC has not yet decided to assert on behalf of the Company. *See id.*[18] In order to effectuate that mandate, the resolution directed counsel to seek to stay this case and the State Case in favor of the Lead Action. *See id.*

**H.     *The SLC Informs the Court -- and Barbour -- of Its Plans***

At a June 12, 2008 case management conference in the Lead Action and the instant case, the SLC informed the Court that, as a result of its investigation, it (i) intended to pursue claims against the 11 prospective defendants, (ii) wished to give those defendants an

---

[17] The defendants named in the SLC's Second Amended Complaint in the Lead Action are Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, Bonderson, Bossi and Cuthbert.

[18] The only releases provided to date to any defendant named in any derivative action are to Larry Sonsini and Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR"). In connection with granting those releases, the SLC took into account numerous factors, including (a) the views of the SLC's expert on California law governing legal professionals, who discussed issues relating to WSGR's representation of Brocade and the relevant standards of professional responsibility governing WSGR's roles as corporate counsel and litigation counsel, (b) the SLC's evaluation of documents and testimony relating to Mr. Sonsini's role as a Brocade director and WSGR's roles as Brocade's counsel, (c) Mr. Sonsini's and WSGR's contentions that Brocade employees had misled WSGR about stock-option grants, that the Audit Committee's investigation had not found wrongdoing by WSGR, that WSGR had negotiated a favorable settlement with the SEC and the avoidance of DOJ proceedings against Brocade, and that WSGR had recommended that Brocade retain outside counsel to investigate the demand letter in the Federal Action, (d) WSGR's long-standing representation of Brocade, (e) WSGR's past and continued willingness to assist Brocade in resolving outstanding questions about the events that occurred in connection with faulted stock option grants at Brocade, and (f) WSGR's commitment to pay (and its subsequent payment of) a one-time contribution in the amount of $9.5 million in recognition of and in order to defray some of the significant costs Brocade has incurred over the past four years in connection with the various investigations and lawsuits relating to the Company's historical stock option practices. After balancing the full array of considerations, the SLC determined that pursuing claims against WSGR and Mr. Sonsini would be inappropriate.

In addition, while the SLC originally concluded in its June 9 resolution that claims would be pursued against Grace Ward, as a result of subsequent meetings and discussions between the SLC's counsel and counsel to Ms. Ward, the SLC determined that it was not in Brocade's best interests to bring claims against Ward due to (a) the fact that she would likely be incapable of satisfying in significant part any judgment obtained against her, and (b) her expressed willingness to assist the SLC in connection with the factual development of its claims. Richman Decl. ¶¶5-6.

opportunity to make written submissions explaining why they believed the SLC should not take action against them, (iii) would finalize its determination with respect to those defendants after consideration of such submissions, (iv) intended to file an amended complaint in the Lead Action asserting direct claims against those defendants on behalf of Brocade, and (v) intended to move to dismiss or stay *Barbour* for failure to make a demand. Following the June 12 conference, by order entered June 18, 2008, the Court ordered that the SLC could "file any amended complaint it wishes to file" in the Lead Action, and any motion to dismiss or stay in *Barbour*, on or before August 1, 2008, and stayed discovery in *Barbour* until further notice.

## I.    *Barbour's Recent Flurry of Activity -- Contrary to Brocade's Interests*

### 1.    *Attempts to Derail the Filing of the SLC's Amended Complaint*

At the June 12 CMC, counsel for Barbour had appeared and argued that, prior to the filing of the SLC's amended complaint in the Lead Action, (i) the SLC should be required to provide Barbour with a copy of its final report and/or the identity of the 11 defendants against whom it intended to assert claims, and (ii) Barbour should be permitted to bring some sort of application challenging the SLC's good faith and independence. Both propositions were rejected by the Court. Then, on June 27, 2008, Barbour filed "objections" to the order memorializing the schedule set by the Court at the June 12 CMC (entered by this Court almost two weeks earlier), seeking to re-litigate exactly the same issues she had already raised -- and lost -- at the CMC, and raising the additional argument (which she could have raised -- but chose not to -- at the CMC) that the instant motion was doomed to failure because the formation of the SLC was a concession of demand futility. (She is wrong. *See infra* sec. I.A.)

In raising such issues yet again, Barbour was doing exactly what this Court had attempted to prevent her from doing in setting the SLC schedule -- distracting the SLC from the tasks it had undertaken to complete by August 1, 2008 and wasting the very Brocade resources about which she professes to be concerned. The Court summarily denied Barbour's post-conference application. *See Barbour* Docket No. 51. But that was just the first of Barbour's

numerous defendants (although Barbour attempts to spin this as somehow helpful, rather than fatal, to her cause): "Recently, the SLC informed the Court that it intends to file an Amended Complaint on behalf of the Company to bring claims related to the backdating scheme alleged herein against eleven unspecified defendants." Am. Barbour Compl. ¶334(iv); *see also id.* ¶338.[21]

This inconvenient truth stands in stark contrast to Barbour's repeated protestations to this Court that she must be permitted to pursue this case derivatively because the SLC will otherwise never take action. *See, e.g.,* Apr. 25, 2008 Case Mgmt. Stmt. of Plaintiff Mary E. Barbour, at 4 ("Barbour's claims should be allowed to proceed because ... Brocade is still controlled by individuals who are firmly committed to protecting the individual defendants .... Brocade has taken no action whatsoever to pursue redress against the responsible individuals."). Indeed, so critical is it to her position that, elsewhere in the amended complaint itself, Barbour continues to cling to this obvious fiction: "the Individual Defendants and *the current Board have not filed any lawsuits against* themselves or *others who were responsible for [the] wrongful conduct* to attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby." Am. Compl. ¶351 (emphasis added).

Moreover, Barbour goes on to effectively admit, by necessary implication, that the SLC's prosecution of Brocade's direct claims establishes that, at the time *her* complaint was filed (the only time relevant for the demand futility analysis in this case (*see infra*)), demand obviously would not have been futile: "This action [*i.e.,* the SLC's decision to prosecute direct claims] only came after three years of litigation and ... criminal convictions ..., demonstrating that *the Board at the time of the original filings* of this action was unwilling to take action ...." *Id.* (emphasis added).[22]

---

[21] Barbour could not, of course, have known at the time that the SLC's complaint would name eight of the defendants sued in her complaint, but this merely underscores the inadvisability of her having brought this last-minute, competing action in the first place.

[22] By "of this action" we can only assume that Barbour is referring to the now-dismissed Lead Action and/or the State Case in which her counsel represents one of the co-lead plaintiffs. Moreover, this allegation is, of course, at odds with this Court's order dismissing the consolidated derivative complaint in the Lead Case.

3.    *Barbour's Motion for Partial Summary Judgment*

Then, on July 25, 2008, just days before the SLC was to file its amended complaint, Barbour filed a motion for partial summary judgment against Reyes, seeking a declaration that Reyes is not entitled to indemnification or advancement of legal fees and must return to the Company monies advanced for the cost of his defense of any claims that he violated the federal securities laws in connection with the backdating allegations (Count XIV of Barbour's Amended Complaint). *See Barbour* Docket No. 59. The motion is predicated on the federal public policy against indemnification for violations of the federal securities laws and argues, in broad strokes, that principles of collateral estoppel bar Reyes from re-litigating that he violated the federal securities laws in light of his criminal conviction therefor.

This attempt to leap out ahead of the SLC in the prosecution of claims against (and recovery from) Reyes -- potentially prejudicing the Company's position should it choose, at the appropriate time, to seek similar relief -- is emblematic of the dangers of allowing Barbour to proceed on a parallel track with the SLC and serves only to underscore the need for the SLC to be given exclusive control of the Company's claims. As discussed below, Barbour's motion essentially ignores the terms of Reyes' Indemnification Agreement with Brocade, which (if applicable) contains provisions concerning the timing of decisions about when indemnity and advancement of fees can be made, and which gives the Delaware Chancery Court exclusive jurisdiction to decide actions instituted under the Indemnification Agreement. Barbour's failure to consider these issues thus has potentially put the Company in a position of having to advance Reyes' expenses to defend a motion that did not need to be, and should not have been, filed – especially because the Court has not yet determined that Barbour has *any* right to continue to pursue this case.

Among other things, Barbour's motion essentially ignores the terms of Reyes's indemnification agreement with Brocade, which provides that the relief Barbour requests in her motion can only be obtained (a) following a "final judicial determination" of non-entitlement to indemnification under applicable law as to which all appeals have been exhausted (or the time

for taking an appeal has lapsed), and (b) in Delaware Chancery Court. Here, in addition to having raised the issue of indemnification in the wrong court, as Barbour well knows, Reyes is in the process of appealing the criminal convictions on which her motion purports to be predicated. The fact that Barbour would be potentially forcing the Company to advance Reyes' expenses to defend such an ill-conceived motion is, standing alone, dispositive evidence of the need for the SLC to assume control of the derivative litigation.

## ARGUMENT

### I.

### THE COMPLAINT MUST BE DISMISSED
### FOR FAILURE TO MAKE A DEMAND

It is a "basic principle of corporate governance that the decisions of a corporation -- including the decision to initiate litigation -- should be made by the board of directors or the majority of shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991); *see also Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.") (*citing* 8 Del. C. §141(a)).[23]

A shareholder derivative action is an equitable vehicle that enables a shareholder, in limited circumstances, to sue in the corporation's name "to enforce a corporate cause of action." *Kamen*, 500 U.S. at 95. Because a derivative action "necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation," *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323, at *7 (Del. Ch. Sept. 30, 2003), a shareholder who seeks to pursue such an action must either (1) make a pre-suit demand on the corporation's directors requesting that they commence litigation, or (2) plead particularized facts showing why a pre-suit demand would have been futile. Fed. R. Civ. P. 23.1; Del. Ch. Ct. R. 23.1; *see also*

---

[23] While the demand requirement in a federal derivative suit is embodied in FRCP 23.1 (verified complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort"), because Brocade is a Delaware corporation (Am. Barbour Compl. ¶30), Delaware law governs the question of whether plaintiff is excused from making a demand, which is considered a substantive element of a derivative claim. *See Kamen*, 500 U.S. at 108-109.

*Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988); *Kamen*, 500 U.S. at 95-96 ("To prevent abuse" of the derivative action device, pre-suit demand is required "unless excused by extraordinary conditions."). The demand requirement is "not merely a technical pleading hurdle." *See In re BankAmerica Sec. Litig.*, 636 F. Supp. 419, 420 (C.D. Cal. 1986). Rather, it "is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson*, 473 A.2d at 809. [Accordingly, derivative claims that fail to satisfy the demand requirement are subject to dismissal]. That is exactly what the SLC, on behalf of Brocade, is doing here (*see* Sec. I.C., *infra*).

Barbour concedes that she failed to make a pre-suit demand, but contends that this failure should be excused because to do so would have been "futile." Am. Barbour Compl. ¶337. As demonstrated below, plaintiff's allegations of demand futility (a) are flatly contradicted by actual events, which had already occurred at the time the complaint was filed and are either pled in the complaint itself or of the sort that can be judicially noticed by this Court on a motion to dismiss, (b) have, to a large extent, already been rejected by this Court in the Lead Action, and/or (c) are, in any event, woefully lacking in particulars and insufficient to plead demand futility as a matter of law.

## A.    Barbour's Allegations of Demand Futility Are Directly Contradicted By Actual Events

Barbour contends that she should be excused from making a demand because it would have been a "futile, wasteful and useless" act. Am. Barbour Compl. ¶¶323, 337. To that end, in a broad attempt to cover her bases, she alleges demand futility with respect to (i) the board at the time the Lead Action and State Case were filed (*i.e.,* in 2005), (ii) the current full board (*i.e.,* the board at the time she filed her original complaint in April 2008), and (iii) the SLC. All of plaintiff's allegations of demand futility are facially untenable.

First, this Court has already addressed -- and rejected -- the pleading of demand futility allegations with respect to the board in place at the time the Lead Action was filed. *See* Order Granting Motion to Dismiss Complaint (Lead Action Docket No. 79) (*see infra*). Even

allegations. Barbour alleges that the members of the SLC -- who her own complaint makes clear were not on the board (or otherwise affiliated with the Company) at the time of any wrongdoing in connection with the underlying stock options backdating[25] -- are not disinterested and independent because they (a) "supported [Wilson Sonsini] as Brocade's outside counsel" in the derivative litigation and "supported the filing of various legal memoranda in opposition to motions to disqualify Wilson Sonsini" (Am. Barbour Compl. ¶339), and (b) "supported the Proposed Settlement" of the Lead Action. *Id.* While these assertions (in addition to being untrue) are irrelevant to a determination of interestedness for purposes of demand futility (*see infra*, Sec. I.D.1),[26] the proof of the SLC members' disinterestedness and independence is once again in the proverbial pudding: the mere fact that the SLC has resolved to prosecute numerous claims against multiple defendants is, standing alone, dispositive evidence that a demand on the SLC would not have been futile. With respect to Barbour's claim that the SLC approved or supported either the proposed settlement or Wilson Sonsini's representation of the Company, she alleges no particularized facts whatsoever to support these bald assertions, which do not, in any event, form the basis for any viable cause of action. (As to the proposed settlement, as noted above, the Settlement Committee had the responsibility for that, and the SLC members were not on it.)

Indeed, prior to her amended complaint, a lynchpin of Barbour's argument as to why she should be permitted to pursue these claims derivatively was that "the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby." Barbour Compl. ¶287; *see also* Am. Barbour

---

[25] *See, e.g.,* Am. Barbour Compl. ¶¶53, 54; Richman Decl., Ex. D ("Both committee members were board members at McData at the time of the acquisition, which took place long after the options practices that gave rise to the claims in this action and the state derivative action occurred.").

[26] Barbour alleges no particularized facts to support any of these conclusory assertions. As but one example, she does not – and cannot – allege that either of the SLC members sat on the Settlement Committee to which the board delegated decision-making authority regarding the proposed settlement in the Lead Action and State Case.

Compl. ¶351 (same). Now, of course, she has been forced at least to acknowledge that "the SLC … intends to file an Amended Complaint on behalf of the Company to bring claims related to the backdating scheme alleged herein against eleven unspecified defendants," and to thereby effectively concede that her allegations of "futility," even if otherwise viable (and they are not), hearken back to periods long before her complaint was filed (periods which are legally irrelevant to the "futility" analysis in *this* case). *See* Am. Barbour Compl. ¶334(iv) ("This action only came after three years of litigation and … criminal convictions …, demonstrating that *the Board at the time of the original filings* of this action was unwilling to take action …."); *see also id.* ¶338.[27] Simply put, where a demand has been made, investigated and responded to by the filing of direct claims, it strains credulity to assert that demand would be "futile."

B.    **Virtually All Of Plaintiff's Demand Futility Allegations Have Already Been Rejected By This Court**

If this Court is experiencing a sense of déjà vu while reading this motion, that is understandable: it already addressed and rejected many of the same demand futility allegations when it dismissed the consolidated derivative complaint in the Lead Action for failure to make a pre-suit demand back in 2006. While it is well-settled that demand futility is tested at the time of the filing of the complaint – here, April 2008 – a cursory review of the now-dismissed Lead Action complaint reveals that the plaintiffs in that case made many of the same allegations with respect to demand futility that Barbour makes here. *Compare* Consol. Lead Action Deriv. Compl. ¶¶81-84 *with* Am. Barbour Compl. ¶¶323-351.[28] For the same reasons the Court rejected such arguments in that case,[29] they should be summarily rejected here. Indeed, the only

---

[27] The phrase "this action" appears to refer to the now-dismissed Lead Action derivative suit and/or the State Case.

[28] As noted above, the demand futility allegations in the Lead Action pertained to a differently constituted board. The turnover on the board, however, only renders plaintiff's allegations of demand futility against the full board *weaker*, since all of the new board members (Messrs. Rose, Jones, DiPentima and Gerdelman) are outside, independent directors with no current or former employment relationship with Brocade, let alone any involvement in the underlying options backdating or accounting improprieties (which were long since over and done with when they arrived on the board).

[29] The SLC respectfully refers the Court to the demand futility allegations at ¶¶81-84 of the consolidated Lead Action derivative complaint filed on or about October 7, 2005, the briefing on Brocade's motion to dismiss for failure to make a demand in the Lead Action and the January 6, 2006

conflicts of interest" and "supported the Proposed Settlement, which threatens to wipe out Brocade's derivative claims that are worth potentially hundreds of millions of dollars." *Id.* ¶339.

But alleged breaches of fiduciary duty that post-date and are separate and distinct from the underlying conduct challenged (which is all that is alleged against the SLC members here) are irrelevant to a finding of interestedness in this litigation for purposes of demand futility. *See, e.g., In re Computer Scis.*, 2007 WL 1321715, at *6 (decision to retain CEO after government investigations commenced "does not reasonably imply that the entire board was complicit in the option backdating transactions. The decision by the board to maintain [CEO] in his current positions is separate and distinct from the backdating transactions that occurred at the [Compensation] subcommittee level."). Moreover, and in any event, plaintiff's allegations regarding the SLC members' "support of Wilson Sonsini as Brocade's outside counsel" are not only unsupported by any particularized facts, but are demonstrably false.

The allegation that the SLC members "supported the filing of various legal memoranda [in the State Action] in opposition to motions to disqualify [Wilson Sonsini] and force Brocade to retain independent counsel" (Am. Barbour Compl. ¶339) is flatly contradicted by public filings of which this Court may take judicial notice and can consider on this motion. *See, e.g., In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814,  816 (C.D. Cal. 2004) (court proceedings are properly the subject of judicial notice). Specifically, WSGR had already withdrawn as counsel to Brocade before the board even opposed the motion to disqualify. The Company's opposition to the motion[34] related solely to Wilson Sonsini's continued representation of the individual defendants.[35] Nor, in any event, are any specific facts alleged with respect to what meetings or telephone calls the SLC participated in, what documents they

---

[34] A copy of Brocade's filing in opposition to the State Case plaintiffs' motion to disqualify Wilson Sonsini is attached to the Richman Decl. as Ex. J.

[35] Indeed, while it is outside the four corners of the complaint, we note that neither SLC member played any role in giving directions about handling any litigation relating to the claims asserted in the derivative actions.

prepared or reviewed, or anything else they did to "support" those filings. The reason is obvious: there are none.

Plaintiff's allegations with respect to the proposed settlement are equally without merit for all of the reasons set forth *infra* Sec. I.D.2.b(v). In addition, the proposed settlement was reached in May 2006, and preliminary approval thereof was sought in June 2006, *before* the SLC members joined the board, on January 2007. *See, e.g.,* Am. Barbour Compl. ¶¶53, 54; *see also* Richman Decl., Ex. D ("Both committee members were board members at McData at the time of the acquisition, which took place long after the options practices that gave rise to the claims in this action and the state derivative action occurred."). Tellingly, Count VI in plaintiff's amended complaint relating to the alleged breach of fiduciary duty arising out of the approval of the proposed settlement is asserted against all of the current board members *except* the SLC members (and Mr. Jones, who joined the board in April 2006 and, like the SLC members, apparently took no part in the settlement's approval). Am. Barbour Compl. ¶¶393-398.

In any event, as Barbour acknowledges elsewhere in her amended complaint (*see* Am. Barbour Compl. ¶23), shortly after the arrival of the SLC members on the board, the Company abandoned the proposed settlement for good (*see* Tr. of April 25, 2008 conference (Lead Action Docket No. 197)), mooting any claim that its terms have been prejudicial to the Company.[36]

### 2. Plaintiff Does Not -- And Cannot --Allege Particularized Facts Showing That A Numerical Majority Of The Board Is Interested In This Litigation

Even if the Court were to look past the dispositive fact of the SLC's disinterestedness and independence, Barbour's efforts to show that a majority of Brocade's board

---

[36] Finally, even for the brief period of time that the proposed settlement was still on the table after the SLC members joined the board, responsibility for settlement-related matters had been delegated to a Settlement Committee on which neither of them sat. Richman Decl., Ex. C, at (April 27, 2007 Tr.) at 18:2-6. Moreover, we note that elsewhere in the amended complaint, plaintiff seems to suggest that the SLC members are somehow tainted by virtue of having allowed a tolling agreement between Brocade and Mr. Reyes to lapse. To the extent plaintiff is alleging that the SLC members were disabled from properly considering a demand by virtue of their purported involvement in that decision, such allegations are without merit for the reasons set forth *infra*, Sec. I.D.2.b.v.

-- that is, at least *five* directors -- faces a substantial likelihood of liability fall flat.

      a.      **A Majority Of The Current Directors Joined**
                   **The Board *After* The Alleged Misconduct Occurred**

      As a dispositive threshold matter, plaintiff could never demonstrate that a majority of the board faces a substantial likelihood of personal liability because most of the current directors joined the board in April 2005 or later[37] -- *after* the alleged option backdating misconduct occurred. By plaintiff's own account, the last of the allegedly backdated options was granted on December 10, 2004 (Am. Barbour Compl. ¶191), and the "truth" about the alleged backdating "beg[an] to emerge" as early as January 2005 with the Company's restatement of earnings. *Id.* ¶226. Indeed, the only significant thing that has happened since April 2005 is that the board undertook to *restate* Brocade's financial statements and *rectify* any prior improper accounting. Thus, plaintiff would not be able to demonstrate that a majority of the board faces a substantial likelihood of liability (much less for intentional or reckless misconduct) with respect to underlying derivative conduct that pre-dated their tenure on the board. *See, e.g., In re Computer Scis.*, 2007 WL 1321715, at *9 (finding directors were not interested where, as here, they joined the compensation committee subsequent to the alleged backdating).[38]

      b.      **Each Of Plaintiff's Purported Grounds For Establishing**
                   **A Substantial Likelihood Of Liability Is Without Merit**

      i.      **Plaintiff Does Not Adequately Plead That A Board**
                **Majority Faces A Substantial Likelihood Of Personal**
                **Liability Based On An Alleged Lack Of Oversight**

      With the exception of Mr. Klayko, no member of the board is alleged to have made, approved or received any of the allegedly backdated stock option grants. Rather, at the

---

[37] *See* Am. Barbour Compl. ¶43 (Walker has been a director since April 2005); ¶44 (Jones has been a director since April 2006); ¶45 (Rose has been a director since April 2006); ¶53 (DiPentima has been a director since January 2007); ¶54 (Gerdelman has been a director since January 2007).

[38] As demonstrated *infra*, Sec. I.D.2.b.v., Barbour's allegations regarding conduct that post-dated the underlying backdating and associated accounting irregularities (*i.e.,* "support" of the now-defunct proposed settlement in the Lead Action and of Wilson Sonsini as the company's counsel), are a red herring.

period as broadly as possible) (Am. Barbour Compl. ¶343),[39] while only one of the nine directors served on the Audit Committee (*id.* ¶344).

### ii. Plaintiff Does Not Allege That A Majority Of The Board Faces A Substantial Likelihood Of Liability By Virtue Of The Delegation Of Authority To Grant Stock Options

Plaintiff contends that the three members of the Compensation Committee (Krause, House and Vaswani) breached their fiduciary duties to oversee stock option grants by delegating authority to grant stock options to Gregory Reyes, Brocade's CEO, in contravention of the committee's charter. Am. Barbour Compl. ¶343. Plaintiff does not allege with particularity that the delegation occurred on Messrs. House, Krause and Vaswani's watch – *i.e.*, during or after 2004 – rather than before they had joined the board.

Moreover, even if plaintiff were correct that this delegation was somehow inappropriate, this would only relate to whether the three directors that are alleged to have made this delegation face a substantial likelihood of liability for their failure to exercise oversight. Thus, the allegations regarding this delegation relate only to a minority of the board. As to the remaining directors, as explained above (*supra*, Sec. I.D.2.b.i), plaintiff cannot show that any member of Brocade's board faces a substantial likelihood of liability for failure to exercise oversight.

### iii. Board Service At The Time Of The Alleged Misconduct, Without More, Is Insufficient To Demonstrate A Substantial Likelihood Of Liability

Plaintiff's attempt to establish a substantial likelihood of liability by asserting that (a) certain directors (House, Klayko, Krause, Vaswani and Walker) "participated in the wrongs complained of" (Am. Barbour Compl. ¶349) by virtue of their board service during the relevant time period (an assertion which is demonstrably untrue with respect to Walker, who joined the board in April 2005 (*see supra* n.37)) and (b) all of the directors "authorized and/or permitted the

---

[39] Gerdelman has been a member of the Compensation Committee only since February 2007, well after the events in question. Am. Barbour Compl. ¶54. Indeed, even plaintiff does not allege that Gerdelman breached his fiduciary duties in his capacity as a member of the Compensation Committee. *Id.* ¶343.

maintain [the CEO] in his current positions is separate and distinct from the backdating transactions that occurred at the [Compensation] subcommittee level . . ."), and (b) are business decisions that are protected by the business judgment rule (*see, e.g., Rales*, 634 A.2d at 933). With respect to the purported expiration of the tolling agreement with Reyes, from the face of the complaint, it appears that the agreement that was allowed to "lapse" tolled claims between Reyes and the individual directors, whereas "the statute of limitations remains tolled on any claim which … Brocade may have against Reyes." Am. Compl. ¶342. Moreover, plaintiff appears to have overlooked the fact that claims against Reyes arising out of these transactions or occurrences are tolled by virtue of the pendency of the Lead Action and State Case. Thus, as between Brocade and Reyes, the tolling agreement was, to some extent superfluous. Only Reyes was potentially harmed by the agreement's expiration. Moreover, notwithstanding plaintiff's cryptic allegation that the lapsing of the tolling agreement "materially undermined Brocade's ability to file *new* claims in a *new* action against Reyes" (Am. Barbour Compl. ¶342) (emphasis added), as set forth in the Second Amended Complaint filed concurrently in the Lead Action, the SLC has evaluated all potential claims against Reyes and identified those that it intends to pursue on behalf of the Company. It was not impaired in its ability to pursue any such claims due to the expiration of the applicable limitations periods.[41]

### 3. Plaintiff Fails To Adequately Plead Any Particularized Facts Demonstrating That A Majority Of The Board Lacks Independence

To demonstrate that a director lacks independence, a plaintiff must set forth particularized fact showing that that director is so "beholden" to an interested director that his or her discretion is effectively "sterilized." *See Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004). Absent such facts, the business judgment rule presumes that directors are independent. *Id.*

Plaintiff makes only the vaguest of allusions to a lack of director independence. While she alleges, in conclusory fashion, that demand should be excused because "a number of

---

[41] Finally, any allegation that any members of the board were interested by virtue of having "supported" the continued representation of the Company by Wilson Sonsini are without merit for the reasons set forth *supra*, Sec. I.D.1.

current members of the board" have "debilitating conflicts of interest that prevent the board members of the company from taking the necessary and proper action" due to "inter-related business, professional and personal relationships," the only "prejudicial entanglement" identified in the complaint is that "Klayko and Walker are long-time business associates" because both of them held various positions at Hewlett-Packard Company prior to joining the board. Am. Barbour Compl. ¶347. But it is well-settled under Delaware law that allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. *See Beam*, 845 A.2d at 1050-51 (allegations that directors "moved in the same social circles, developed business relationships before joining the board, and described each other as 'friends'" were insufficient to rebut presumption of independence). Rather, in order for a relationship to render a director unable to consider a demand, it must be of a "bias-producing" nature. *Id.* at 1050. Plaintiff has pled no such particularized allegations.

The notion that Mr. Klayko lacks independence because other board members determine his salary (Am. Barbour Compl. ¶346) is likewise insufficient. As set forth above, because the board members are not themselves interested, there is no possibility of a disabling dependence on the part of Mr. Klayko. *See, e.g., In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354 (Del. Ch. 1998), *rev'd in part on other grounds*, 746 A.2d 244 (Del. 2000) ("In order to prove domination and control by [CEO-Chairman] Eisner, plaintiffs must first demonstrate first that Eisner was personally interested . . ."). Essentially, Plaintiff is asserting that an inside director (*i.e.*, those employed by the corporation) can never be considered independent for demand futility purposes because the other board members determine his or her salary. But Delaware courts often find inside directors to be independent for purposes of assessing demand. *See, e.g., id.* at 356-67 ("[T]he general Delaware rule [is] that 'the fact that [the inside directors] hold positions with the company [controlled by Eisner] . . . is no more disqualifying than is the fact that he designated them as directors.'") (citation omitted); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 176-77 (Del. Ch. 2005) (finding President/CEO

Finkelstein, *Delaware Law of Corporations & Business Organizations* §13.16 (Aspen Publishers, Inc. 1997) ("It appears that if a special litigation committee determines that the best interests of the corporation would be served by further litigation of derivative claims, the corporation may ... take control of the litigation itself .... If the committee decides to prosecute the claims itself, a motion to realign the corporation as plaintiff should be made. That motion should be granted if there is no evidence of collusion between the committee and the defendants or evidence that the committee may not prosecute the claims in good faith."). As demonstrated below, that is precisely the case here, where the SLC has brought multiple direct claims against 10 defendants, including eight of the defendants named herein.

In *Bluth*, after a proxy contest resulted in a change in the composition of the board of directors of a corporation that was subject to a pending derivative suit, the new board determined that it wished to assume prosecution of the case. The audit committee of the board investigated the corporation's claims against former officers and directors with the assistance of special outside counsel and determined that, if the claims could not be settled, the corporation should seek realignment as the plaintiff in the action. No settlement being forthcoming, the company sought realignment from nominal defendant to plaintiff and leave to file an amended complaint, arguing that such an application should be granted "almost as a matter of course, in the absence of any suggestion of collusion between the nominal corporate defendant and the director defendants." *Id.* at *2. Relying in part on federal authority, the court agreed and concluded that realignment was proper. *Id.* at *5; *see also Levine v. Smith,* C.A. No. 8833 (Del. Ch. Dec. 22, 1987), slip op. at 6 n. 2, *aff'd,* 591 A.2d 194 (Del. 1991) ("The options normally considered by a special litigation committee include whether to have the corporation take control of the litigation, whether to allow the stockholder plaintiff to pursue the claim on the corporation's behalf, or whether to seek the dismissal of the derivative action"); *Townsend Corp. of Am. v. Davidson*, 181 A.2d 219, 223 (Del. Ch. 1962) (referring to realignment of corporation as plaintiff in derivative suit); *Lutz v. Boas*, 171 A.2d 381, 383 (Del. Ch. 1961) (same).[42]

---

[42] While it arose in a different context, raised different concerns and applied a different standard, support for realignment can be found throughout *Zapata*, 430 A.2d at 779, in which the Delaware

41

instead to preserve any claims not yet asserted pending additional developments in other related proceedings. *See* Richman Decl., Ex. E.[45]

In her motion to amend this Court's June 12 scheduling order, Barbour cited two cases for the ostensible proposition that "prior to the time that Brocade could be allowed to file a new or amended complaint, it will bear the burden of proving that there is no material issue of fact regarding the SLC's independence, good faith and deliberative process." *Barbour* Docket No. 49.[46]

We assume she will make a similar argument in her opposition to this motion. But contrary to the impression plaintiff seeks to create, both cases involved almost precisely the opposite situation from the one here: in both, the special litigation committee had made a so-called "*Zapata* motion" seeking *dismissal* of a properly initiated derivative suit on the grounds that its investigation has revealed no basis for further action. Here, (a) as demonstrated at length above (*supra*, Sec. I), the *Barbour* action was *not* properly initiated, since plaintiff failed to make a demand, and (b) the SLC is attempting to *prosecute* -- not dismiss -- claims as the result of its investigation. Thus, plaintiff's cases have no application here.

Indeed, the primary basis on which plaintiff has sought to litigate these claims on behalf of the Company -- to wit, that the "Individual Defendants and current board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to recover for Brocade any part of the damages Brocade suffered and will suffer" (Compl. ¶287; Am. Barbour Compl. ¶351[47] -- is simply no longer the case. The SLC filed its complaint in the Lead Action seeking to do just that. As such, plaintiff, even by her own lights, no longer has any legitimate basis to pursue these claims.

---

[45] Again, for the reasons set forth above, the only exceptions are Mr. Sonsini and WSGR.

[46] *See In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993); *Sutherland v. Sutherland*, No. 2399-VCL, 2008 WL 2221770 (Del. Ch. May 29, 2008).

[47] *See also* Apr. 25, 2008 Case Mgmt. Stmt. of Plaintiff Mary E. Barbour, at 4 ("Barbour's claims should be allowed to proceed because … Brocade is still controlled by individuals who are firmly committed to protecting the individual defendants …. Brocade has taken no action whatsoever to pursue redress against the responsible individuals.") (Lead Action Docket No. 188).